

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DANUTA WOZNIAK, Individually and as )
Special Administrator of the ESTATE of )
JAN WOZNIAK, deceased, )
    )
        Plaintiff, ) Civil Action No: 08 CV 1361
    ) Judge Lefkow
    -vs- ) Magistrate Judge Denlow
    )
WYNDHAM HOTELS AND RESORTS, LLC )
a foreign corporation, )
    ) AUG 2 8 2008  T C
    )
        Defendant. ) Aug 28, 2008
    MICHAEL W. DOBBINS
    CLERK, U.S. DISTRICT COURT

### PLAINTIFF, DANUTA WOZNIAK, Individually and as Special Administrator of the ESTATE of JAN WOZNIAK, deceased, RESPONSE TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FORUM NON CONVENINS

## ARGUMENT

### I.    QUINTANA ROO, MEXICO IS NOT AN ADEQUATE FORUM AND DEFENDANT'S MOTION MUST BE DENIED

In deciding a forum non conveniens motion, the Seventh Circuit has set forth a

two-part inquiry to be followed. First, the court must determine whether an adequate

alternative forum is available. *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 643 (7th

Cir.2003). A forum is "adequate" when the parties will not be deprived of all remedies or

treated unfairly. *Kamel v. Hill-Rom Cp., Inc.*, 108 F.3d 799, 802 (7th Cir. 1997).

Defendant has the burden of persuasion in proving all elements necessary for the court to

dismiss a claim based upon forum non conveniens. *Piper Aircraft Co. v. Reyno*, 454 U.S.

235, 258 (1981); *Reid-Walen v. Hansen*, 933 F.2d 1390 (8th Cir.1991).

In the instant case, Mexico is not an adequate forum. Forcing this case to be

litigated in Mexico will deprive plaintiffs and the beneficiaries of the estate of all

remedies available here in the United States District Court for the Northern District of Illinois, Eastern Division.

Danuta Wozniak, individually and as special administrator of the Estate of Jan Wozniak, deceased, has filed a three count complaint, one under the Illinois Wrongful Death Act, one under the Illinois Survival Act for the conscious pain and suffering that Jan Wozniak suffered from the time of his accident until the time of his death some six hours later and one individually for her loss of consortium. All three counts were filed against Wyndham Hotels and Resorts, Inc.("Wyndham") based upon an apparent agency theory. Wyndham is not the owner of the resort in Cozumel, Mexico where this accident occurred. Wyndham is the franchisor and brand that Islander Properties, the Mexican company that owns the resort, purchased to market its resort to potential vacationers, including Danuta and Jan Wozniak.

Illinois law first recognized apparent agency in the case of *Gilbert v. Sycamore Mun. Hosp.*, 155 Ill.2d 511, 523 (1993). The vacation that Jan and Danuta Wozniak were on was marketed and sold to them as a Wyndham vacation. They purchased their vacation from a travel agency, American Travel Abroad, Inc., 5316 N. Milwaukee Ave., Suite 1, Chicago, IL. (Exhibit 8) The trip was organized and run by a tour company, Apple Vacations, an Illinois corporation. (Exhibit 8) All the paperwork that that Jan and Danuta Wozniak received about the vacation indicated they were booking a Wyndham resort vacation. (Exhibit 8) The Wozniaks' relied upon the Wyndham name and reputation in choosing this vacation. The first time that Danuta Wozniak learned that she was not at a Wyndham owned resort is after her husband, Jan Wozniak, died as a result of the fall at the resort and Wyndham was contacted about a claim for his death.

2

Defendant, in support of their motion to dismiss for forum non conveniens, attached an affidavit of Mexican attorney, Emilio Gonzalez de Casatilla del Valle. It was this attorney's opinion that Quintana Roo, Mexico, where Cozumel is located, was the appropriate state in Mexico to litigate this case. (Exhibit 2, Emilio dep. pg. 22, lines 16-19) He opined that Quintana Roo, Mexico provided an adequate forum for this lawsuit as its laws recognized a wrongful death cause of action. Plaintiffs' concede that Quintana Roo, Mexico does have a civil code recognizing wrongful death claims, although patently unfair and capped such that plaintiff's claim could not be litigated in Mexico if this motion is granted for economic reasons. The plaintiff was on disability at the time of his death. The Quintana Roo Civil Code bases its recovery on a person's income at the time of their death. (Exhibit 2, Emilio dep. pg. 28-29). Since plaintiff did not have any income, he would be entitled to 800 days of the average wage in the economic zone in Quintana Roo, Mexico for his death. (Exhibit 2, Emilio dep. pg. 28-29). Since the average was is about $5 dollars per day, plaintiff's claim would be worth about $4,000. This paltry amount would not allow plaintiff to hire a Mexican lawyer and litigate what will undoubtedly be an expensive, highly contested case. This was one private/public factor in *Reid-Walen v. Hansen*, 933 F.2d 1390 (8th Cir. 1990) in favor denial of the motion to dismiss for forum non conviens. Furthermore, it makes Quintana Roo, Mexico an inadequate forum.

Quintana Roo, Mexico does not recognize is apparent agency for wrongful death or personal injury cases. Defendant's own expert, Mexican attorney Emilio Gonzalez de Castilla del Valle acknowledged that Mexcian law does not recognize apparent agency in

3

wrongful death and personal injury cases during his deposition (Exhibit 2, Emilio dep.

pg. 37-38):

> Q. Where is it codified in the Civil Code of Quintana Roo?
> A. Well, I haven't reviewed the Quintana Roo legislation. I'm not even certain
> that the code comprehends apparent agency....
> Q. What do you define as apparent agency?
> A. Under Mexico, well, that's when an agent represents to third parties that the
> agent does represent a principle without proper authority or with limited authority,
> and then based upon that apparent authorizations, the apparent agent goes on and
> concludes a transaction.
> Q. Is that applicable in Mexico, in any place in Mexico that you are aware of,
> whether federal or whatnot, to claims for injury or death?
> A. No, I don't think so.

Since Mexican law, and specifically, the Civil Code of Quintana Roo does not

recognize "apparent agency" for wrongful death or personal injury cases, the dismissal of

this case based upon forum non conveniens will be dispositive of all three counts in the

complaint at law. As such, an adequate forum does not exist in Mexico to litigate this

case and the motion to dismiss for forum non conveniens must be denied.

Attorney Emilio Gonzalez de Castilla del Valle acknowledged that Mexican Law,

including the Civil Code of Quintana Roo, does not recognize pain and suffering.

(Exhibit 2, Emilio dep. pg. 33, lines 19-24). As such, the Survival Count filed for

conscious pain and suffering by Jan Wozniak from the time of his accident until the time

of his death would not be viable. (Exhibit 2, Emilio dep. pg. 33, line 19-24). Quintana

Roo would not be an adequate forum for the Survival count as the Civil Code does not

recognize this cause of action and this motion must be denied.

The third count of plaintiff's complaint is based upon loss of consortium of the

surviving spouse. Since Quintana Roo, Mexico does not recognize loss of consortium

claims, this count will be dismissed. (Exhibit 2, Emilio dep. pg. 25).

According to Illinois law, the wrongful death cause of action would be for decedent, Jan Wozniak's beneficiaries at the time of his death. Those beneficiaries would be his wife, Danuta and his two sons, Gregory and Vick. Article 129 of the Civil Code of Quintana Roo governs damages recoverable for wrongful death. Article 129 would only allow recovery to a surviving spouse or child who was economically dependent upon the decedent. (Exhibit 2 ,Emilio dep. pg. 29-32). Since both of Mr. Wozniak's sons were not economically dependent upon their father, they would have no grounds to recover under the wrongful death count. (Exhibit 2, Emilio dep. pg. 29-32). These two beneficiaries would not have an adequate forum in Mexico and is a further basis why this motion must be denied.

For the reasons stated above, defendant has failed in its burden to establish that Quintana Roo, Mexico is an adequate forum. If this matter is dismissed, Quintana Roo, Mexico will not provide an adequate forum as it does not recognize apparent agency, thus eliminating plaintiff's entire cause of action, does not recognize the survival count because it does not recognize pain and suffering, does not allow the children/beneficiaries of Jan Wozniak to recover under the wrongful death statute and does not recognize loss of consortium. As such, this court must deny the motion to dismiss for forum non conveniens.

## II.    PRIVATE INTEREST FACTORS FAVOR ILLINOIS

### A.    PLAINTIFF'S CHOICE OF HOME FORUM MUST BE GIVEN GREAT WEIGHT

Assuming arguendo, that this court finds that Quintana Roo, Mexico is an adequate forum, then this court must weigh the balancing factors as set forth in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501(1947) and *Piper Aircraft Co. v. Reyno*, 454 U.S. 235

5

(1981). The decedent, Jan Wozniak and his wife and special administrator, Danuta

Wozniak, are residents of Morton Grove, Cook County, Illinois. (See exhibit 1). There is

a strong presumption that plaintiff's choice of forum should rarely be disturbed. *Gilbert*,

330 U.S. at 508; *In re Bridgestone/Firestone*, 420 F.3d 702, 704 (7th Cir. 2005); *Zelinski*,

335 F.3d at 643; *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 718 (7th Cir. 2002). Such is

true especially where the plaintiff chooses his home forum. *AAR Intern, Inc. v. Nimelias*

*S.A.*, 250 F.3d 510, 524 (7th Cir. 2001); *Kamel*, 108 F.3d at 803; *Wilson v. Humphrys*

*(Cayman) Ltd.*, 916 F.2d 1239, 1245-47 (7th Cir. 1990).

In *Koster v. American Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 524 (1947),

the Supreme Court explained:

> [Plaintiff] should not be deprived of the presumed advantages of his home
> jurisdiction except upon a clear showing of facts which either (1) establish such
> oppressiveness and vexation to a defendant as to be out of proportion to a
> plaintiff's convenience, which may be shown to be slight or nonexistent, or (2)
> make trial in the chosen forum inappropriate because of considerations affecting
> the court's own administrative and legal problems. In any balancing of
> conveniences, a real showing of convenience by a plaintiff who has sued in his
> home forum will normally outweigh the inconvenience the defendant may have
> shown.

Decedent, Jan Wozniak, and his wife and special administrator, Danuta Wozniak,

live in Morton Grove, Cook County, Illinois. (See Exhibit 1, affidavit of Danuta

Wozniak). Both are United States citizens. (Exhibit 1, Wozniak affidavit). Plaintiffs

have chosen to file this lawsuit in their home forum, making defendant's attempt to

dismiss the case based upon forum non conveniens a difficult one. It is generally

acknowledged that citizens should rarely be denied access to courts of the United States.

*Kostner*, 330 U.S. at 524. Such a choice should be declined only in "exceptional"

circumstances. *Gilbert*, 330 U.S. at 504. Further strengthening plaintiff's position is that

6

defendant Wyndham is a United States corporation registered to do business in the State of Illinois and doing business in Cook County. In fact, for jurisdiction to be conferred in Mexico, Wyndham must agree to submit to the jurisdiction of the Mexican courts, rather than Mexico having jurisdiction over them due to this incident.

At the time of the accident, Jan and Danuta Wozniak were on a personal vacation with a group of people from Illinois at the Wyndham Cozumel Resort. (Exhibit 1, Wozniak affidavit). An individual's residence often will correlate with his or her convenience. See *Rudetsky v. O'Dowd*, 660 F. Supp. 341, 346 (E.D.N.Y. 1987).

Plaintiff relies strongly on three cases: *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339 (8th Cir. 1983), *Wilson v. Humphreys (Cayman) Limited*, 916 F.2d 1239 (7th Cir. 1990) and *Reid-Walen v. Hansen*, 933 F.2d 1390 (8th Cir.1991). Each of these cases are similar factually to the facts in our case. In each case, the appellate court either affirmed the denial of a motion to transfer for forum non conveniens or reversed a trial courts granting of a motion to dismiss for forum non conveniens.

In *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339 (8th Cir. 1983), the court found the fact that both plaintiff and defendant being United States citizens was an important factor to weigh. In the instant case, both plaintiffs, Jan Wozniak and Danuta Wozniak and defendant Wyndham are United States residents. The court concluded that Iowa and the United States have an interest in the lawsuit because the plaintiff was an Iowa resident and the travel plans were made and booked in Iowa.

In *Wilson v. Humphreys (Cayman) Limited*, 916 F.2d 1239 (7th Cir. 1990), the court found that Indiana had an interest in the case because this was an injury stemming from a tour booked in Indiana for a group that left from Indiana.

In *Reid-Walen v. Hansen*, 933 F.2d 1390 (8th Cir.1991), the appellate court reversed a trial courts granting of a motion to dismiss for forum non conveniens.

### B.   **LOCATION OF KEY WITNESSES**

Defendant makes the incorrect assertion that all of the witnesses reside in Mexico. That is entirely untrue. Danuta Wozniak and her husband were traveling with a group of Illinois residents who were either occurrence or post-occurrence witnesses. All either saw the accident or came to the area where Mr. Wozniak fell and are able to discuss the condition of the staircase and the area where plaintiff. All are Illinois residents who are not subject to a Mexican subpoena. Plaintiffs are unaware of any other witnesses to the accident at this time. However, if there were any guests of the hotel who witnessed the occurrence, it is very likely that they are citizens of the United States or some country other than Mexico and are not subject to compulsory service of process in Mexico.

Plaintiff's case against Wyndham is predicated upon the legal theory of apparent agency. This vacation was booked through American Travel Abroad, Inc, 5316 N. Milwaukee Ave., Ste. 1, Chicago, IL 60630. (Exhibit 8, Invoice from American Travel and Exhibit 1, Affidavit of Danuata Wozniak). All of the personnel who worked with Jan and Danuta Wozniak in representing that they were going to a Wyndham resort are Illinois resident. Furthermore, the tour company, Apple Vacations, is an Illinois corporation with an office located in Elk Grove Village, IL. All witnesses from Apple Vacation will likely be Illinois residents.

Although Mr. Wozniak was injured on October 16, 2007 and died that day, plaintiff intends to call doctors who treated Mr. Wozniak here in the Chicago area before his accident to establish testimony about his life expectancy. Since Mr. Wozniak was a

8

type II diabetic, it is expected that the defense will seek to depose plaintiff's medical
treaters here in the Chicago area about his medical condition that predated the accident.

From the time of his fall on October 16, 2007 until his death later that day,
plaintiff Jan Wozniak had limited medical care and a small number of medical treaters.
Defendant can certainly take depositions of the limited number of medical treaters for
purposes of trial testimony. As a number of courts have discussed, the time and expense
of obtaining the presence of testimony of foreign witnesses is greatly reduced by
commonplace modes of communication and travel. *Lehman*, 713 F.2d at 343. Any
foreign witness testimony may be taken, if possible, by deposition or other means.
*Lehman*, 713 F.2d at 343; See Fed.R.Civ.P. 28(b) and 29.

Defendant, in its motion, fails to identify any specific witness who resides in
Mexico, instead making conclusory statements in their motion. Such lack of information
in support of a motion to dismiss based upon forum non conveniens was rejected by the
court in *Reid-Walen v. Hansen*, 933 F.2d 1390, 1396-1398 (8th Cir.1991). The record
provided by defendants does not reveal if Cozumel, Quintana Roo or Mexican authorities
ever investigated this incident, whether a report was made and whether their testimony
would be needed. *Reid-Walen*, 933 F2d at 1397. During the deposition of Valerie
Capers-Workman, vice president for Wyndham, she testified that Wyndham was unaware
of any witnesses to the accident. (Exhibit 7, Valerie Capers-Workman dep. pg. 99-101).

As far as documents in the possession of or testimony by the owners (Islander
Properties) of the property where this accident occurred, the defense fails to reveal to this
court that Islander Properties maintains offices in Houston, TX, Dallas, TX, New York
and San Diego, CA. (Exhibit 3, printout -Islander Properties website at

www.islandercollection.com. The Islander Properties website makes it clear that they are doing business in the United States and thus are amenable to service in the United States for purposes of obtaining documents and to subpoena witnesses.

Wyndham also fails to disclose that their franchise agreement with Islander Properties gives them the right to require personnel employed by Islander Properties to attend meetings. (Exhibit 4, Franchise Agreement, pg. 9, Section B 1-3). As such, any concern Wyndham has about taking a deposition of an Islander Properties employee is unfounded. This power over the employees of Islander is similar to the power over the resort owner's employees in *Wilson v. Humphreys (Cayman) Limited*, 916 F.2d 1239 (7th Cir. 1990).

Defendant has the burden of persuasion in proving all elements necessary for the court to dismiss a claim based upon forum non conveniens. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258 (1981); *Reid-Walen v. Hansen*, 933 F.2d 1390 (8th Cir.1991).

### C.    ACCESS TO EVIDENCE AND VIEW OF THE PREMISES

The franchise agreement between Wyndham and Islander Properties gives Wydham the right to enter and inspect the Wyndham Cozumel Resort where this accident occurred "at all reasonable times, with or without prior notice, for the purposes of conducting inspections." (Exhibit 4, Franchise Agreement, pg. 12, subsection F; Exhibit 7, Valerie Capers Workman dep., pg. 78-81). Thus, Wyndham has the ability to view the premises, take measurements, pictures and have any expert they to do a personal inspection of the area where Jan Wozniak fell. This is a simple case involving a staircase with walls on either side that were too low and without rails, thus allowing Mr. Wozniak to fall over the side. It is unlikely that a court would allow a site visit for such an event

10

when photographs, video and measurements would typically be used to present to a jury. In thirteen years of legal practice with over fifty jury trial, no court had ever allowed my firm a site visit during trial.

Defendant contends that certain key documents will need to be translated from Spanish into English, thus increasing the cost. Such an argument is ridiculous. The Report of Death of An American Citizen Abroad, attached hereto as Exhibit 5, is in English. The medical records, attached hereto as exhibit 6, are of limited duration in time and are already in English. Finally, defendant is unaware whether or not any governmental agencies did an investigation of this accident.

### D,    THE DEFENDANT'S ABILITY TO IMPLEAD

Defendant makes the conclusory statement that they do not have the ability to implead Islander Properties, the owner of the resort, yet has failed to meet their burden of proof on this issue. As described above, it is the defendant's burden to prove all issues in the motion to dismiss for forum non conveniens. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258 (1981); *Reid-Walen v. Hansen*, 933 F.2d 1390 (8th Cir.1991). They have provided this court with absolutely no evidence of the sort, except that Islander Properties is a Mexican corporation.

Plaintiff, through the website of Islander Properties at www.islandercollection.com, has clearly shown that this company does business and maintains offices in the United States. Furthermore, since its hotel is systematically marketed to Illinois residents, plaintiff believes that Illinois courts will have jurisdiction over Islander. Defendant had not attempted to implead Islander Properties in this jurisdiction not sought to implead them in any jurisdiction in the United States where

they maintain offices and do business such as Houston, TX, Dallas, TX, San Diego, CA and New York.

Assuming arguendo that defendant were unable to implead Islander Properties, that factor is not dispositive in the balancing test. *Lehman v. Humphrey Cayman, Ltd*, 713 F.2d 339 8th Cir. 1983); *Santora v. Strarwood Hotel and Resorts Worldwife, Inc.*,05-C-6391, 2006 WL 1371432, at 2 (N.D.Ill. May 15, 2006).

## II.    PUBLIC INTEREST FACTORS FAVOR ILLINOIS

Defendant's choice of law analysis based upon *Townsend v. Sears, Roebuck and Company*, 227 Ill.2d 147 (2007) is flawed. In *Townsend*, the court held that Michigan law should apply rather that Illinois law. What defendant fails to discuss is the reasons why: Not only was the site of the accident in Michigan but the plaintiff was a Michigan resident and the machine in question had been purchased in Michigan.

Our case is much more akin to the facts as presented in *Esser v. McIntyre*, 169 Ill.2d 292 (1996), in which the Illinois Supreme Court held that Illinois law applied to a negligence action brought by an Illinois resident who was injured while on a vacation in Mexico. Under the most significant relationship test, the court looked at where the parties were domiciled (Illinois) and where plaintiff's relationship with the defendant was centered (Illinois). The court found that even though the accident occurred in Mexico, Illinois law applied, since everything about the vacations planning and booking took place in Illinois. The determination was that the State of Illinois has an interest in

providing a remedy for an Illinois resident who has been allegedly injured by another Illinois resident, which outweighed Mexico's interest in limiting tort recoveries.

The facts in our case are quite similar to the facts in *Esser*. The Wozniaks booked a trip with a group of other Illinois residents to vacation at the Wyndham Cozumel Resort in Mexico. The vacation was booked through an Illinois travel agent, run by an Illinois tour group, Apple Vacations, with their flight leaving for Mexico and arriving back from Mexico at O'Hare International Airport in Chicago. The defendant, Wyndham, does business in Cook County, Illinois and marketed its brand through its franchise agreement with Islander Properties to these Illinois residents. As such, pursuant to the precedent set in *Esser*, Illinois law will likely apply to our case.

Wyndham, in its brief, submits an affidavit from Valerie Capers Workman, to allow a Mexican court to have jurisdiction over it should this court grant the motion to dismiss for forum non conveniens. This affidavit is an admission by defendant Wyndham that absent its affidavit, Mexican courts would NOT have jurisdiction over them for the actions in this case. Using the reasoning in *Esser*, how could Mexico have the more significant relationship with this case when all the contractual matters, the booking of the hotel, representations under apparent agency that Wyndham was the "owner" of the resort, the decision to book a Wyndham vacation, the Illinois residence of the plaintiffs and their group, the use of an Illinois travel agent, the use of an Illinois tour company and the fact that Wyndham is registered to do business in Illinois and sells its brand to be marketed to Illinois residents. That coupled with the fact that Mexico has no jurisdiction over Wyndham clearly points to Illinois as being the place with the most significant relationship to the parties in this case.

13

If Mexican law is applied to this case, then plaintiffs will not have a case. Mexican law does not recognize apparent agency in wrongful death or injury cases. A dismissal for forum non conveniens will serve as a dismissal of the case for good. The very relationship between the parties arose in the State of Illinois. Like is *Esser*, Illinois has a significant relationship, especially considering Illinois' interest in providing tort remedies to its injured citizens. *Esser*, 169 Ill.2d 300-301.

**CONCLUSION**

For the reasons discussed above, Quintana Roo, Mexico is not an adequate forum for this case and this motion must be denied. Assuming arguendo that this court finds Quintana Roo, Mexico to be an adequate forum, then the private/public interest factors favor denial of the motion, especially in light of the fact that plaintiffs have filed this lawsuit in their home forum.

Respectfully submitted,
NEMEROFF LAW OFFICES, LTD.

David Nemeroff

NEMEROFF LAW OFFICES, LTD.
Attorney for Plaintiffs
55 W. Monroe St., Suite 600
Chicago, IL 60603
(312) 629-8800

IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANUTA WOZNIAK, Individually and as )
Special Administrator of the ESTATE of )
JAN WOZNIAK, deceased, )
)
Plaintiff, )        No. 08 cv 1361
)
-vs- )
WYNDHAM HOTELS AND RESORTS, LLC )
a Foreign Corporation, )
)
Defendant. )

### AFFIDAVIT OF DANUTA WOZNIAK

I, Danuta Wozniak, first being duly sworn on oath, depose and state as follows:

1.    I was married to Jan Wozniak at the time of his death on October 16,

2007.

2.    He died while we were on vacation at the Wyndham Cozumel Resort.

3.    We lived in Morton Grove, Cook County, Illinois before my husband's

death.

4.    I still reside in Morton Grove, Cook County, Illinois.

5.    Jan Wozniak was an American citizen at the time of his death.

6.    Danuta Wozniak was an American citizen at the time of Jan Wozniak's

death.

7.    Our trip to the Wyndham Cozumel Resort was booked here in Cook

County, Illinois through our travel agent, American Travel Abroad, Inc., 5316 N.

Milwaukee Ave., Suite 1, Chicago, IL 60630.

8.    The trip was an Apple Vacations trip.

9.    Apple Vacations is an Illinois corporation.



10. We were on the vacation with a group of people, all of whom were either occurrence or post-occurrence witnesses. All of the people in our group were Illinois residents.

AFFIANT FURTHER SAYETH NOT.

Danuta Wozniak

Subscribed and sworn this 21 day of August, 2008.

Notary Public

OFFICIAL SEAL
SLAVA A. TENENBAUM
Notary Public - State of Illinois
My Commission Expires Apr 09, 2011

NEMEROFF LAW OFFICES, LTD.
55 W. Monroe St., Suite 600
Chicago, IL 60603
(312) 629-8900

Page 1

```
 1       IN THE UNITED STATES DISTRICT COURT
 2     FOR THE NORTHERN DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4   DANUTA WOZNIAK, Individually   )
 5   and as Special Administrator   )
 6   of the ESTATE of JAN WOZNIAK,  )
 7   deceased,              )
 8          Plaintiff,  )
 9        -vs-        ) NO. 08 CV 1361
10   WYNDHAM HOTELS AND RESORTS, LLC )
11   a Foreign Corporation,       )
12          Defendant.   )
13
14      The telephonic deposition of EMILIO
15   GONZALEZ de CASTILLA del VALLE, called for
16   examination, taken pursuant to the Federal Rules of
17   Civil Procedure of the United States District Courts
18   pertaining to the taking of depositions, taken
19   before MIGDALIA MONTERO, CSR No. 84-4383, a Notary
20   Public within and for the County of Cook, State of
21   Illinois, and a Certified Shorthand Reporter of said
22   state, at Suite 600, 55 West Monroe Street, Chicago,
23   Illinois, on the 15th day of July, A.D. 2008, at
24   12:07 p.m.
```

Page 2

```
 1   PRESENT:
 2
 3   NEMEROFF LAW OFFICES, LTD.,
 4   (55 West Monroe Street, Suite 600,
 5   Chicago, Illinois 60603,
 6   312-629-8800), by:
 7   DAVID B. NEMEROFF,
 8      appeared on behalf of the Plaintiff,
 9
10   WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP.,
11   (120 North LaSalle Street,
12   Chicago, Illinois 60602-2412,
13   312-704-0550), by:
14   MR. CHRISTOPHER M. DELY,
15      appeared on behalf of the Defendant.
16
17
18
19
20   REPORTED BY: MIGDALIA MONTERO, C.S.R.
21       Certificate No. 84-4383.
22
23
24
```

Page 3

```
 1        (WHEREUPON, the witness was duly
 2   sworn.)
 3      EMILIO GONZALEZ de CASTILLA del VALLE,
 4   called as a witness herein, having been first duly
 5   sworn, was examined and testified as follows:
 6           EXAMINATION
 7   BY MR. NEMEROFF:
 8      Q.  Can you please state your complete name
 9   for me.
10      A.  Emilio Gonzalez de Castilla del Valle.
11      MR. NEMEROFF: Let the record reflect this is
12   the deposition of Emilio Gonzalez de Castilla del
13   Valle.
14   BY MR. NEMEROFF:
15      Q.  Should I call you Mr. Castilla? Is that
16   okay?
17      A.  Yes, please.
18      Q.  On the letterhead of the law firm, it
19   lists Mr. Castilla, Sr., Mr. Castilla, Jr. Are you
20   the Sr. or the Jr.?
21      A.  Jr.
22      Q.  Sir, my name is David Nemeroff. I
23   represent various entities in a lawsuit Wozniak v.
24   Wyndham Hotels and Resorts, LLC, that is currently
```

Page 4

```
 1   pending here in the United States District Court,
 2   Northern District of Illinois.
 3        Have you ever given a deposition before?
 4      A.  I have, yes.
 5      Q.  Let me just explain some brief ground
 6   rules that you probably have heard before. I will
 7   try, because of the fact that you are doing this by
 8   phone, I will try to speak as slowly as I possibly
 9   can. What I would ask you to do is in order for
10   this to work, when I ask you a question, let me
11   finish my question completely first, and then I will
12   be quiet and let you answer. I want to avoid us
13   speaking at the same time. Is that okay?
14      A.  Yes, sir.
15      Q.  And if for some reason, while you are
16   giving an answer, I do cut you off, say so. I'm not
17   necessarily intending to do that. It just may be
18   that I can't see you, and I can't necessarily judge
19   when you are done with your answer. So there may be
20   a circumstance where I do cut you off, and if that
21   occurs, just say, "I need to finish my answer," and
22   I will be quiet and let you finish. Okay?
23      A.  Yes, sir.
24      Q.  There is a court reporter here, and she
```

1 (Pages 1 to 4)

Page 5

1 is going to be taking down everything that I say and
2 everything that you say and everything that the
3 lawyer that represents Wyndham says. When I ask you
4 a question -- first of all, you understand the
5 English language, correct?
6    A.   I do sir, yes.
7    Q.   When I ask you a question, if you don't
8 understand my question, please say so, and I will
9 attempt to rephrase it in a way you do understand.
10 If you do answer my question, I will assume you
11 understood it. Is that okay?
12    A.   Yes, sir.
13    Q.   Do you have the Civil Code of Quintana
14 Roo with you?
15    A.   I have the specific provisions, which I
16 cited in my opinion, but I can get the full Code if
17 you need it.
18    Q.   Yes, if you could, that would help us
19 move along because I have the full Code in front of
20 me because I may ask you questions about other
21 provisions of the Code that you haven't specifically
22 referenced in your letter.
23    A.   Okay. If you can give me just a couple
24 of minutes, I will get it.

Page 6

1    Q.   That's fine. We will hang on.
2    A.   Do you need the Civil Code and the
3 Procedural Codes or just the Civil Code?
4    Q.   I have the Civil Code in front of me.
5 You might as well have both because I'm going to ask
6 you about any references to either code that
7 pertains to injury cases or wrongful death.
8    A.   Okay. I have the Civil Code with me
9 right now.
10    Q.   Okay. Let me ask some questions about
11 your background. You were born in Mexico City?
12    A.   Yes, sir.
13    Q.   And I don't necessarily understand the
14 educational system there. It says that you went to
15 law school in 1973 through 1978; is that correct?
16    A.   That is correct, in Mexico City.
17    Q.   How old were you when you started law
18 school?
19    A.   How old I was when I started law school?
20 Around 20, 19, 20.
21    Q.   It's my understanding that law school is
22 incorporated into the undergraduate curriculum in
23 Mexico for university?
24    A.   Once you finish what we call prep school,

Page 7

1 then you go into whatever university you choose to
2 study a specific discipline, so I finished prep
3 school, and then I went into the university to study
4 law.
5    Q.   And I know that you have actually studied
6 in the United States. Prep school would be the
7 equivalent of what grade here in United States, high
8 school?
9    A.   No, I think before you enter into prep
10 school, you go to high school in Mexico. So you
11 have three years approximately of high school, then
12 you have another three years for prep school, and
13 then after that, you go into a university.
14    Q.   And you received your law certificate in
15 August of 1979; is that correct?
16    A.   That is correct.
17    Q.   And that's in Mexico; is that correct?
18    A.   In Mexico City, yes.
19    Q.   Are you licensed to practice law anywhere
20 in the United States of America?
21    A.   I'm not licensed to practice in the
22 United States. I am licensed to practice in the
23 Mexican Republic.
24    Q.   Does your Mexican law license allow you

Page 8

1 to practice in any one of the 31 Mexican states?
2    A.   Yes, our system works that way. Once you
3 receive your certificate, unless you have a specific
4 local provision that would impose and use certain
5 requirements, you are able to practice law
6 nationwide.
7    Q.   So, for example, if somebody contacts you
8 to represent them for an injury or wrongful death
9 case, you can represent them in any of the 31 states
10 in Mexico?
11    A.   Yes, sir.
12    Q.   Do you represent people who are either
13 injured or wrongfully killed as a result of the
14 claim of someone else's negligence?
15    A.   I'm in litigation, and I have several
16 cases of various types, and some of them are related
17 with civil responsibility.
18    Q.   Involving injury and/or wrongful death?
19    A.   Yes, from time to time we do have cases
20 of that sort.
21    Q.   In those cases, do you represent the
22 injured person, or do you represent the person
23 that's being sued?
24    A.   In some cases, we represent the insurance

Page 9

1 company basically. That is the general approach of
2 our firm.
3    Q.   You always represent the insurance
4 company in cases involving injury or death in
5 Mexico, correct?
6    A.   Most of the cases, yes.
7    Q.   When you say "most," all the cases? When
8 you say "most," that would leave some room for some
9 cases where you represent the injured person. Can
10 you be more clear on that?
11    A.   I do not recall of representing a victim
12 of an injury case.
13    Q.   You went through a master's program at
14 Harvard University for one year; is that correct?
15    A.   Yes, that is correct.
16    Q.   And was that in the area of law?
17    A.   I studied and reviewed several topics
18 related with commercial issues, like bankruptcy,
19 banking, and the like.
20    Q.   You did not receive an LLM from Harvard
21 University, did you?
22    A.   I did.
23    Q.   You did? Okay. Then it says you worked
24 for the law firm of Reid & Priest for about one year

Page 10

1 in New York?
2    A.   Yes.
3    Q.   What did you do for them?
4    A.   Basically, I worked on arbitration
5 matters, international arbitration matters, and from
6 time to time, I had to do some research regarding
7 Latin American legislation basically.
8    Q.   You did not have a New York law license,
9 correct?
10    A.   No, I did not.
11    Q.   So you were not practicing law in the
12 state of New York at that time, correct?
13    A.   No, I was not. I was considered to be a
14 point of law consultant.
15    Q.   And then in 1982, you returned to a law
16 firm called Gonzalez de Castilla, Abogados, S.C.,
17 correct?
18    A.   Yes.
19    Q.   Is that a firm that your father started?
20    A.   Yes, sir.
21    Q.   Your father is still with the firm?
22    A.   Excuse me?
23    Q.   Is your father still with the firm?
24    A.   Yes, sir.

Page 11

1    Q.   Have you ever been retained by Wyndham in
2 any other legal matter other than this case?
3    A.   No, not that I recall.
4    Q.   Have you ever been retained by any law
5 firm or insurance company to write a report or an
6 affidavit concerning forum non conveniens issues?
7    A.   Yes, I have rendered several opinions on
8 the forum non conveniens issues and whether the
9 Mexican courts are competent to address issues of
10 responsibility.
11    Q.   Have you ever done any work for the law
12 firm of Pretzel & Stouffer before other than this
13 case?
14    A.   Not that I recall.
15    Q.   How many times have you been asked to
16 render opinions about the competency of Mexican
17 courts as it relates to claims filed in the United
18 States for injuries occurring in Mexico?
19    A.   Forum non conveniens?
20    Q.   Yes.
21    A.   Excuse me. Are you referring to forum
22 non conveniens and jurisdiction issues?
23    Q.   Yes.
24    A.   I have rendered probably eight or ten

Page 12

1 opinions.
2    Q.   And can you name the law firms that have
3 hired you to render those opinions?
4    A.   The same firms that are now addressing
5 the case.
6    Q.   Wilson Elser?
7    A.   Pretzel & Stouffer? I'm asking you if
8 your question is if Pretzel & Stouffer has contacted
9 me for other opinions.
10    Q.   What I'm asking you is you said you have
11 given opinions in around eight to ten other matters.
12 I'm asking you for the names of the law firms that
13 have retained you in those matters?
14    A.   Vincent & Elkins and some other firms. I
15 will have to pull my files on all those opinions.
16 One that I recall now is Vincent & Elkins.
17    Q.   Vincent & Elkins?
18    A.   From Houston.
19    Q.   Do you know a lawyer named Jorge Vargas?
20    A.   Jorge Vargas, it sounds familiar, but I
21 can't recall right now from where.
22    Q.   Sir, it looks like you were provided with
23 the Complaint At Law that was filed in this case and
24 also the defendant's Notice of Removal. Are those

3 (Pages 9 to 12)

## Page 13

1  the only two documents you were provided with?
2      A.  Yes.
3      Q.  And you have the copy of the Complaint At
4  Law in front of you?
5      A.  No, I don't right now.
6      Q.  Do you have a file on this matter that
7  you keep in your office?
8      A.  I do have a file in front of me, but I
9  just have my opinion with the exhibits, and probably
10 the documents that were sent to me could be in my
11 system. I don't recall where I put them honestly.
12 Probably I have them in my computer.
13     Q.  Okay. I'll just have to go through what
14 is in the complaint.
15     MR. NEMEROFF:  Can you mark this Exhibit Nos. 1
16 and 2.
17         (WHEREUPON, certain documents were
18         marked Deposition Exhibit Nos. 1 and
19         2, for identification, as of July 15,
20         2008.)
21 BY MR. NEMEROFF:
22     Q.  Mr. Castilla, I have marked as Exhibit
23 No. 2 a declaration of Licenciado,
24 L-i-c-e-n-c-i-a-d-o, of Emilio Gonzalez de Castilla

## Page 14

1  del Valle.
2         Sir, your declaration is -- hang on one
3  second. Your declaration is six pages long,
4  correct?
5      A.  Yes, that is correct.
6      Q.  And at the end, there is a line with your
7  signature and your name in capital letters, correct?
8      A.  The final page, Number 6?
9      Q.  Yes.
10     A.  Yes, it has two lines, and then a date,
11 which is March 27th, and then my name and my
12 signature.
13     Q.  Let's go through the various things.
14 First of all, would you agree with me that claims
15 for bodily injury and wrongful death are called
16 extra contractual liability claims in Mexico?
17     A.  Yes.
18     Q.  And extra contractual liability claims
19 basically form Mexican tort law, correct?
20     A.  That is my understanding, yes.
21     Q.  And Mexican extra contractual liability
22 -- Mexico doesn't have the common law, correct?
23     A.  It doesn't have common law, and let me
24 just state that if you do have a services contract

## Page 15

1  with a hotel, the potential responsibility could
2  also fall within the contractual scenario, depending
3  on the kind of arrangement that you have. So you
4  can draw the responsibility from two perspectives;
5  contractual on certain cases and noncontractual
6  under other circumstances.
7      Q.  For example, in this instance, my client
8  is alleging that ultimately her husband died at a
9  Wyndham Cozumel resort. That would be considered an
10 extra contractual liability case, correct?
11     A.  Yes, to the extent that there is no
12 contractual responsibility with the hotel directly
13 operating the premises.
14     Q.  Mexican law is totally codified, correct?
15     A.  Yes.
16     Q.  And there is a Federal Civil Code,
17 correct?
18     A.  Yes.
19     Q.  And there is also each of the individuals
20 -- there is 31 states in Mexico, correct?
21     A.  31 states plus Mexico City, which for
22 practical purposes is considered to be another
23 state, so it's 31 plus Mexico City, and then you
24 have several legislations.

## Page 16

1      Q.  Do each of the states has their own Civil
2  Code?
3      A.  Yes, sir.
4      Q.  And this accident occurred in Cozumel,
5  Mexico. That is considered to be in the state of
6  Quintana Roo, correct?
7      A.  Yes, sir.
8      Q.  You would agree with me that Mexican law
9  does not adhere -- are you familiar with the legal
10 principle in the United States of stare decisis?
11     A.  No. If you could explain it to me, I
12 probably will follow you.
13     Q.  You don't know what that term is,
14 correct?
15     A.  No.
16     Q.  So you don't know whether Mexican law
17 adheres to stare decisis or not, correct?
18     MR. DELY:  I'm going to object that he doesn't
19 know what stare decisis is.
20 BY MR. NEMEROFF:
21     Q.  Sir, because you don't know what stare
22 decisis is, you do not know whether Mexican law
23 adheres to stare decisis or not, correct?
24     MR. DELY:  He can't answer the question if he

4 (Pages 13 to 16)

Page 17

1 doesn't know what it is.
2 BY MR. NEMEROFF:
3 Q. You can answer my question.
4 A. Pardon me?
5 Q. Sir, I assume because you don't know what
6 the term "stare decisis" is, you don't know whether
7 Mexican law adheres to the legal principle of stare
8 decisis or not, correct?
9 MR. DELY: And I will renew my objection that
10 he doesn't know what stare decisis is, so he can't
11 know if it applies.
12 MR. NEMEROFF: I didn't ask if it applies. I
13 asked him he doesn't know whether it applies.
14 BY MR. NEMEROFF:
15 Q. You can answer my question.
16 MR. DELY: 1 will renew the objection.
17 BY THE WITNESS:
18 A. I don't know what stare decisis is.
19 BY MR. NEMEROFF:
20 Q. You would agree with me that in the
21 Federal Civil Code, there are a number of books that
22 comprise the Federal Civil Code, correct?
23 A. I didn't hear you well. Could you repeat
24 the question?

Page 18

1 Q. Sure. You would agree with me that in
2 the Federal Civil Code, the Federal Civil Code is
3 comprised of a number of books, correct?
4 A. Yes, like all the local Civil Codes.
5 Q. And in the Federal Civil Code, Book 4 is
6 devoted to what is termed "obligations," correct?
7 A. Yes.
8 Q. And then Chapter 5 is entitled
9 liabilities from illicit acts, correct?
10 A. Yes.
11 Q. And then within Chapter 5, there are 26
12 articles, which is basically the law for resolving
13 all kinds of personal bodily injury and wrongful
14 death cases from a federal perspective, correct?
15 A. Yes.
16 Q. And in the Federal Code, Articles 1910
17 through 1934, comprise the articles that are related
18 to personal bodily injury and wrongful death,
19 correct?
20 A. Yes, illicit conduct is regulated by
21 Article 1910 and the following on noncontractual
22 responsibility.
23 Q. Right. There is no body of case law in
24 Mexico that sets forth technical legal standard

Page 19

1 rules or principles for personal bodily injury or
2 wrongful death cases, correct?
3 A. Well, there is precedence, which are
4 published by the federal court system regarding all
5 topics of law, so we do have precedents published by
6 the Federal Judiciary, and some of them are binding
7 and some of them are not.
8 Q. Jurisprudencia are federal decisions that
9 are legally binding, correct?
10 A. There are cases where the precedent is
11 considered to be binding on the rest of the
12 judiciary, yes.
13 Q. And that is called Jurisprudencia,
14 correct?
15 A. That is correct.
16 Q. And then there is Ejecturias Ortetis,
17 which are not legally binding but of persuasive
18 value only, correct?
19 A. That is correct.
20 Q. You are familiar with the law in the
21 United States, correct?
22 A. Are you asking me if I am familiar with
23 the U.S. law?
24 Q. Yes.

Page 20

1 A. Well, I know certain principles, but I'm
2 not entitled to practice, and I wouldn't consider
3 myself being an expert on U.S. law.
4 Q. Let's talk about Illinois law. Do you
5 consider yourself to be an expert in the area of
6 Illinois law as it pertains to personal injury and
7 wrongful death cases?
8 A. No, 1 am not an expert on Illinois law.
9 Q. Would you agree with me that most of the
10 Federal Civil Code has been adopted by the states to
11 form their code as it relates to personal bodily
12 injury and wrongful death?
13 A. No, I wouldn't say that. The 31 states
14 and the Mexico City code follow the basic framework,
15 but each states has different rules and different
16 provisions, so you do have changes from state to
17 state. The general framework is basically the same,
18 but each state has its own rules, which refer from
19 the other and from the federal system as well.
20 Q. Which articles of the Civil Code of
21 Quintana Roo are applicable to personal injury or
22 wrongful death matters?
23 A. The ones that I cited in my opinion,
24 which are basically Article 2, and then Article 126,

5 (Pages 17 to 20)

Page 21

1    127, 130, 131, 132.
2        Q.   Are those the only articles that you
3    believe are related to personal bodily injury or
4    wrongful death claims?
5        A.   Well, those provisions in turn make
6    cross-reference to the labor law for purposes of
7    calculating the amount of indemnification, so if you
8    also have the Federal Labor Law, that you should
9    consider in order to quantify the indemnity, but
10   basically from a civil standpoint, I would say that
11   Article 2, Article 87, Article 126, 127, 128, 129,
12   130, 131, and 132 are basically the provisions from
13   the Civil Code of Quintana Roo that would apply to
14   noncontractual responsibility and responsibility for
15   wrongful death.
16       Q.   Would you agree with me that in the --
17   can I just call it the Civil Code of Quintana Roo?
18   Would you understand what we are talking about?
19       A.   Yes.
20       Q.   In the Civil Code of Quintana Roo, there
21   is no provision for awarding damages for pain and
22   suffering, correct?
23       A.   If you understand pain and suffering, the
24   situation of the victim before he died, I don't

Page 22

1    think Quintana Roo provides any compensation for
2    pain and suffering. As I mentioned, under the
3    Quintana Roo system, it is only the wife or sons or
4    close relative the ones who are entitled to receive
5    an indemnity.
6        Q.   If you could just answer my question.
7    You would agree with me that the Civil Code of
8    Quintana Roo does not provide for damages for pain
9    and suffering for bodily injury, correct?
10       A.   If the pain and suffering is a situation
11   the victim went through before he died, my opinion
12   is that the Quintana Roo Code doesn't comprehend
13   that.
14       Q.   Does not, correct?
15       A.   Does not.
16       Q.   It's your opinion that the Civil Code of
17   Quintana Roo would be the law in Mexico that would
18   be applicable to this case, correct?
19       A.   Yes, sir.
20       Q.   Article 2, can you read what Article 2
21   states? Can you translate it into English, please?
22       A.   Well, basically Article 2 says that all
23   the loss of the state of Quintana Roo apply to all
24   habitants of the state without any distinction

Page 23

1    between sex, nationality, and regardless of whether
2    they have a domicile there or are in transit.
3        Q.   So you interpret that to mean that
4    anybody that is injured there, whether they live
5    there or they are just visiting, is covered; is that
6    correct?
7        A.   Yes, it's any and all situations created
8    within the state, the local laws apply.
9        Q.   You would agree with me that Mexican law
10   does not provide for damages for loss of consortium,
11   correct?
12       MR. DELY: I'll just object.
13   BY THE WITNESS:
14       A.   Could you explain to me what is loss of
15   consortium?
16   BY MR. NEMEROFF:
17       Q.   Let me ask you this question. Can you
18   point to me anywhere in the Civil Code of Quintana
19   Roo that it codifies that loss of consortium damages
20   are applicable for either bodily injury -- let me
21   finish.
22       A.   Sorry to interrupt you. The
23   communication is very bad.
24       Q.   I'm sorry. Then let me see if I can

Page 24

1    speak a little slower. Sir, can you hear me now?
2        A.   I hear you better now, yes.
3        Q.   Can you point to me anywhere in the Civil
4    Code of Quintana Roo that codifies the awarding of
5    loss of consortium damages in a claim for bodily
6    injury or wrongful death?
7        MR. DELY: I just want to object. He said he
8    didn't understand what loss of consortium meant.
9    BY MR. NEMEROFF:
10       Q.   You can answer my question, sir.
11       A.   Well, first of all, if loss of consortium
12   means the inability of a wife or husband to relate
13   to the wife or husband as a result of a wrongful
14   death, obviously, that affects the sentiment and the
15   private life of the surviving spouse, then I would
16   say that those sentiments would fall into the
17   category of moral damages.
18       Q.   Forget about wrongful death. Let's talk
19   about somebody being injured. Is there recovery to
20   the spouse of an injured person for loss of
21   consortium that is codified in Mexican law?
22       MR. DELY: I just want to object to the fact
23   that the term of loss of consortium, he stated that
24   he doesn't understand it. As it relates to moral

6 (Pages 21 to 24)

Page 25

1  damages, he testified --
2      MR. NEMEROFF: We are not talking about moral
3  damages right now. We are talking about for
4  somebody that is injured.
5  BY MR. NEMEROFF:
6      Q. Sir, if somebody is injured in Mexico,
7  not died, but is injured, and I'm talking about a
8  man now, can their wife make a claim for the loss of
9  sexual relationship, loss of companionship, or loss
10 of society, not in a wrongful death, just when
11 somebody is injured?
12     A. No, I don't think you have a provision
13 which allows a wife to claim damages for loss of
14 consortium in injury cases. All she can do is claim
15 what we call moral damages, and the items are very
16 specific in moral damages, and they relate to
17 sentiments, feelings, and these type of subjective
18 conditions of a person. So if the wife feels that
19 her sentiments or affections or feelings have been
20 harmed somehow, then she would be able to claim
21 moral damages.
22     If the lack of sexual relationship
23 impacts the sentiments, affections, feelings of the
24 wife, then she could argue that she has a claim for

Page 26

1  moral damages. She will have to link the lack of
2  consortium and the lack of sexual relationship to
3  the psychological and sentimental aspect of her
4  personality, and then she would be able to claim
5  moral damages.
6      Q. Sir, would you agree with me that the
7  definition of moral damages is injuries inflicted
8  upon a person's feelings, affection, belief,
9  decorum, honor, reputation, privacy, image, and
10 physical appearance, or how that person is perceived
11 in the opinion of others?
12     A. That is basically what -- more than a
13 definition, those are the issues that are
14 contemplated under the federal law, which is Article
15 1916.
16     Q. And where is that codified in the
17 Quintana Roo Civil Code?
18     A. That would be Article 131 of the Quintana
19 Roo Code.
20     Q. And what I just read would be exactly
21 what Article 131 of the Quintana Roo Code said,
22 correct?
23     A. Well, they follow basically the same view
24 of what could be harm under moral damages.

Page 27

1      MR. DELY: I just want to clarify something.
2  Did you say 31? He had testified 131.
3      MR. NEMEROFF: It is 131. If I said 31, I
4  meant 131.
5  BY MR. NEMEROFF:
6      Q. Can you tell me, and I don't want your
7  interpretation. I would like you to tell me what
8  Article 126 says, if you can please translate it?
9      A. Article 126? I'm sorry. I'm
10 interrupting.
11     Q. Could you please tell me not your
12 interpretation of 126, but can you please translate
13 into English, word for word, what Article 126 of the
14 Quintana Roo Civil Code says?
15     A. Well, to make a translation, it would be
16 if the harmful consequence is death, then the
17 indemnification for material damages shall consist
18 in the payment of expenses payable to the person who
19 made those payments, and then the second paragraph
20 addresses the issue if the harmful consequence
21 creates a total and permanent incapacity or
22 partially permanent incapacity, the indemnification,
23 material indemnification, should be the payment of
24 professional services of doctors, medicine,

Page 28

1  osteopath, and any other that may have been paid as
2  a result of the damages. So that would be a very
3  rough translation. Paragraph 1 refers to death.
4  Paragraph 2 refers to incapacity.
5      Q. Can you interpret Article 127 for me,
6  please?
7      A. The economic indemnification shall be the
8  payment of 800 days of wage perceived by the victim,
9  but if that wage exceeds four times the highest
10 minimum wage in the state, that would be a comp for
11 the indemnification.
12     Q. Is that indemnification for death or for
13 injury or both?
14     A. Both.
15     Q. Article 128, can you please translate
16 that into English for me?
17     A. If the victim had variable income or had
18 no income, the indemnification shall be calculated
19 based upon the provision of Article 127, taken 800
20 days of minimum wage in the economic zone of
21 Quintana Roo.
22     Q. Can you read for me Article 129?
23     A. The people entitled to receive the
24 expenses incurred shall be those who justify having

7 (Pages 25 to 28)

Page 29

1 paid them, and the payment of the indemnity shall go
2 to the person economically depending on the victim
3 or those family members who will live with him or
4 the person that is economically dependent on the
5 victim. If none of them, then the right of
6 indemnification shall go to legal heirs.
7    Q.  So if there are people that fall within
8 the categories above, then that's how the money
9 would be paid out, correct?
10    A.  Excuse me?
11    Q.  With regard to Article 129, for damages,
12 say for wrongful death, if there is a surviving
13 spouse and surviving children, only the surviving
14 spouse and children who are economically dependent
15 upon the deceased person are entitled to recover,
16 correct?
17    A.  Yes.
18    Q.  So if you are a surviving child who is
19 not economically supported by the deceased person,
20 you are not entitled to recover, correct?
21    A.  Correct.
22    Q.  Article 130, can you please read that for
23 me?
24    A.  If the debtor were not economically

Page 30

1 capable of making the payment in one single
2 exhibition or payment, the judge could allow the
3 payment in installments, and then the judge puts the
4 amount of installments and the terms how to do it.
5    Q.  Is that it?
6    A.  Yes.
7    Q.  How about Article 131?
8    A.  131 refers to moral damages.
9    Q.  Can you read what 131 says?
10    A.  Yes, moral damages, it is the damages
11 contemplated in Article 2299 of the Code, and when
12 one act or omission produces moral damages, the
13 responsible party shall have the obligation to
14 repair it, paying a certain amount of money
15 regardless of whether there are economic or material
16 damages or not.
17       The action for the indemnification of
18 moral damages is not transferrable to third-parties,
19 and it only passes to the heirs of the victim when
20 the victim has, in fact, started the action while
21 alive.
22    Q.  Is that it, or is there more?
23    A.  No, that's it.
24    Q.  So, for example, if the estate of

Page 31

1    Mr. Wozniak is claiming damages for pain and
2 suffering -- first of all, you realize this lawsuit
3 was filed after Mr. Wozniak's death, correct?
4    A.  Yes.
5    Q.  And the claim for moral damages arising
6 out of any injury Mr. Wozniak received before his
7 death is not transferrable to a third-party,
8 correct?
9    A.  No, that would be pain and suffering.
10 What the widow and the children can claim is moral
11 damages on their own right.
12    Q.  I understand that. If we can stay on my
13 question, and if you can focus on what I'm asking
14 now. I'm not asking about the children and the
15 wife. I'm asking specifically about any claim that
16 Mr. Wozniak would have for moral damages as a result
17 of any injury he suffered before his death. Number
18 one, that claim is not transferrable to
19 third-parties; isn't that correct?
20    A.  Correct.
21    Q.  And also, it's not available to any heirs
22 unless Mr. Wozniak had filed this action before his
23 death, correct?
24    A.  Correct.

Page 32

1    Q.  So Mr. Wozniak could not get moral
2 damages in this case? I'm talking about Mr. Wozniak
3 himself.
4    A.  Well, he passed away. He didn't file an
5 action.
6    Q.  It's very simple. Mr. Wozniak himself or
7 his estate on behalf of Mr. Wozniak only, not his
8 family, not his children, could not recover moral
9 damages in this case; isn't that correct?
10    A.  My opinion is that the estate could not.
11 There is one isolated precedent, nonbinding
12 precedent, which addresses the issue, and I think
13 that that nonbinding precedent infers that under
14 certain circumstances, the estate could claim moral
15 damages.
16    Q.  I'm sorry. Go ahead.
17    A.  I would have to search it in my system,
18 but except for that isolated precedent, and I cannot
19 recall from which circuit it comes from, I have seen
20 no other precedents or opinions or statutes that
21 would allow the estate of a deceased person to claim
22 moral damages that would be pain and suffering.
23    Q.  Number one, when you say it's not
24 precedent, because it would be nonbinding on the

8 (Pages 29 to 32)

Page 33

1  Quintana Roo court, correct?
2     A.  Because it's not binding, exactly.
3     Q.  And you don't know what state that that
4  decision you think you saw comes from, correct?
5     A.  I don't recall. I would have to do some
6  research and find it again, but I recall having seen
7  that precedent, and I cannot recall from which
8  circuit.
9     Q.  You don't know the name of that case, do
10  you?
11    A.  Again, I will have to look for it. I
12  don't recall the name or the specifics.
13    Q.  Nonetheless, Mr. Wozniak or his estate
14  could not recover damages for Mr. Wozniak's pain and
15  suffering prior to his death; isn't that correct?
16    A.  In my opinion, the estate could not file
17  an action to claim moral damages on behalf of
18  Mr. Wozniak.
19    Q.  And also, they couldn't file a claim
20  alleging pain and suffering for Mr. Wozniak's pain
21  and suffering prior to his death, neither
22  Mr. Wozniak nor his estate, correct?
23    A.  I don't think so. It's my opinion that
24  the estate could not do that.

Page 34

1     Q.  What you just read in Article 131, it
2  references Article 2299.
3     A.  Yes.
4     Q.  What is that?
5     A.  Well, let me go to 2299, if you give me a
6  moment. 2299 is an article that says that there
7  could be material damages or moral damages.
8     Q.  Could you read it for me, please?
9     A.  Well, it's quite long. It basically says
10  damages could be material or economic or moral.
11  Economic damage derives from Article 123, and moral
12  damages is the consequences -- not the consequences
13  -- any attack against the honor, reputation,
14  prestige, consideration, sentiments, affection,
15  esteem, towards its status or family, corporate
16  integrity, regardless of whether the harmful
17  consequence diminishes the positive work.
18         And then the second paragraph, people
19  subject to indemnification, people obligated to
20  indemnify for moral damages are, and then you have
21  four sections, and then the four sections refer to
22  imputing certain illicit conduct to another person
23  that is considered to be criminal, and then when you
24  file criminal charges without any basis and if you

Page 35

1  attack the honor, private life, or image of the
2  victim, these four sections refer to situations
3  wherein you are imputing a certain conduct to
4  another person without any basis to do so.
5     Q.  It's almost like the United States
6  defamation?
7     A.  Yes, yes, exactly, defamation. By the
8  way, that was an amendment that took place in April
9  last year. So if you incur a defamation situation,
10  then your liable for moral damages.
11    Q.  Is that pretty much complete for 2299?
12    A.  Yes. Well, you have two final
13  paragraphs.
14    Q.  Go ahead.
15    A.  Pardon me?
16    Q.  Why don't you go ahead and tell us about
17  those two?
18    A.  The final two paragraphs refer to the
19  obligation to publicly rectify your defamation, and
20  you will not be liable if you are able to cite the
21  source from where you took the information from to
22  defame another person.
23    Q.  Does that complete Article 2299?
24    A.  2299. 2299.

Page 36

1     Q.  I'm sorry.
2     A.  Yes.
3     Q.  Why don't we go back. You had cited one
4  more article, Article 132, I believe you discussed.
5  What is that?
6     A.  132 says that moral damage would be
7  invariably considered if there is wrongful death.
8  In total permanent incapacity, permanent partially
9  incapacity, and total temporary incapacity, in those
10  cases, the quantification of moral damages shall be
11  determined based upon the specific provisions of the
12  Federal Labor Law. In addition to what has been
13  said in the previous paragraph, the court could
14  award to the victim an increase of up to 80 percent
15  of the amount that has been determined in accordance
16  with the Federal Labor Law. That's what basically
17  132 says.
18         MR. DELY:  Is there a point where we can take a
19  break?
20         MR. NEMEROFF:  We are going to take about a
21  five-minute break here.
22         (WHEREUPON, a recess was had.)
23  BY MR. NEMEROFF:
24    Q.  Mr. Castilla, are you familiar with the

9 (Pages 33 to 36)

Page 37

1 term apparent agency as Illinois law defines it?
2    MR. DELY: I will just object to form.
3 BY THE WITNESS:
4    A.    Apparent agency?
5 BY MR. NEMEROFF:
6    Q.    Yes.
7    A.    Well, I know of a concept under Mexican
8 law of apparent agency.
9    Q.    What does Mexican law say about apparent
10 agency? First of all, where is it codified?
11    A.    It is codified in the Civil Codes
12 basically.
13    Q.    Where is it codified in the Civil Code of
14 Quintana Roo?
15    A.    Well, I haven't reviewed the Quintana Roo
16 legislation. I'm not even certain that code
17 comprehends apparent agency, but I can tell you that
18 in Mexico City Civil Code and the Federal Code and
19 some local legislation, they do comprehend apparent
20 agency.
21    Q.    What do you define --
22    A.    I'm not certain that Quintana Roo does
23 have a specific provision, so I can give you the
24 concept, but I would have to do some research to see

Page 38

1 if the Quintana Roo does, in fact, contain the
2 apparent agency principle.
3    Q.    Let me ask you a question: What do you
4 define as apparent agency?
5    MR. DELY: Under Mexico?
6    MR. NEMEROFF: Yes.
7 BY THE WITNESS:
8    A.    Under Mexico, well, that's when an agent
9 represents to third-parties that that agent does
10 represent a principle without any proper authority
11 or with limited authority, and then based upon that
12 apparent authorization, the apparent agent goes on
13 and concludes a transaction.
14 BY MR. NEMEROFF:
15    Q.    Is that applicable in Mexico, in any
16 place in Mexico that you are aware of, whether
17 federal or whatnot, to claims for injury or death?
18    A.    No, I don't think so.
19    Q.    Sir, can you turn to Article 87 for me of
20 the Civil Code of Quintana Roo?
21    A.    Which?
22    Q.    Article 87.
23    A.    87?
24    Q.    87, yes, sir.

Page 39

1    A.    Yes.
2    Q.    Would you agree with me that the Civil
3 Code of Quintana Roo does not bar a recovery for
4 injury or death when there is any -- let me strike
5 that.
6        The Federal Code provides that if there
7 is any contributory negligence on behalf of someone
8 claiming injury or death, there is a total bar in
9 recovery, correct?
10    A.    Contributory negligence is when the
11 victim has rightfully acted; and therefore, you
12 cannot claim damages. Is that what you are
13 referring to contributory negligence?
14    Q.    No, that's not what I consider it -- let
15 me strike that.
16        Can you read what Article 87 says,
17 please?
18    A.    Excuse me. I couldn't hear you.
19    Q.    Can you read what Article 87 says,
20 please, in the Quintana Roo Code?
21    A.    Any act of men that is not considered to
22 be a crime executed with negligence, simple or gross
23 negligence, that causes a harmful consequence to
24 another person and its assets, obligates the author

Page 40

1 of that illicit conduct to repair the harmful
2 consequences and to indemnify lost profits in
3 accordance with the provisions of this article.
4    Q.    What about Article 188 -- I want to go
5 through 188 through 190 -- excuse me. I'm
6 misspeaking. I want to go through Article 88,
7 please. What does that say?
8    A.    The minor that causes a harmful
9 consequence shall repair it unless the
10 responsibility falls on the person referred to in
11 Article 92.
12    Q.    What about Article 89?
13    A.    Without any guilt or negligence, two or
14 more persons causes harmful consequences, each one
15 of them shall bear the damages based on receive
16 without any right to receive an indemnification.
17    Q.    What does Number 90 say?
18    A.    People commonly causing a harmful
19 consequence shall be jointly liable to repair it.
20    Q.    And 91?
21    A.    When someone in the exercise of certain
22 rights create a harmful consequence, then that
23 person must indemnify if it is demonstrated that the
24 exercise of the right has been made with the purpose

10 (Pages 37 to 40)

Page 41

1  of harming without any advantages for the person or
2  of the right.
3      Q.   The next section that says Seccion
4  Segundo, what is that title, Seccion Segundo de la
5  Responsabilidad?
6      A.   The responsibility from the acts of
7  third-parties.
8      Q.   Bear with me a second. So these articles
9  do play into extra contractual remedies relating to
10  injury and death, correct?
11      A.   Yes.
12      Q.   And does Articles 92 through 103 play
13  into that role?
14      A.   Well, section first refers to acts or
15  omissions of the same person, which is responsible.
16  And Section 2 refers to the responsibility that you
17  have for acts or omissions of third-parties. Like
18  for example, a while ago we referred to the
19  responsibility of the minor unless the
20  responsibility falls in the people in charge of the
21  minor under Article 92.
22         Article 92 refers to the parent who are
23  overlooking the minor, so the parents are
24  responsible for the acts or omissions of the minor,

Page 42

1  so that is the responsibility they have for acts or
2  omissions of third-parties.
3      Q.   What about starting in Article 104, just
4  what does the heading say?
5      A.   104?
6      Q.   Yes, sir.
7      A.   104, responsibility, section third the
8  headline is responsibility for damages derived from
9  certain goods that you own. And 104 refers to the
10  responsibility that you may have as owner of a
11  building if the building has not been repaired or is
12  in ruins, so you do have the responsibility as a
13  result of your ownership of the specific building.
14      Q.   I know there is a lot stuff here. What
15  is 105? Just paraphrase what 105, 106, 107, 108,
16  and 109 says?
17      A.   105 refers to the responsibility of the
18  owner of a building, the rights of the construction
19  defects and lack of repairs. 106 refers to
20  responsibility to the neighbors for certain
21  excavations and work done in your area, on your
22  land. 107 refers to the obligation that falls into
23  the purchaser of the land or building. 108 refers
24  to the fact that the responsibilities, not limited,

Page 43

1  if you transfer the asset to another person. 109
2  refers to a joint liability in the chain of
3  transfers of one single asset. 110 refers to --
4  this is some sort of a procedural issue that a
5  competent court would be the one where the specific
6  building is located.
7      Q.   Okay. That's good for me. That's fine.
8  I just want to go to the next one. I want to go to
9  Article 115. Actually, I just want you to read the
10  heading right before Article 115.
11      A.   115 is what we call objective
12  responsibility, which is responsibility that you do
13  have without any illicit conduct or negligence.
14      Q.   That would be in the United States the
15  strict liability, correct?
16      A.   Strict liability, right.
17      Q.   Thank you. I'm almost done. I just have
18  a few more things I want to touch upon.
19         Just so I'm clear, in this case, we are
20  making a claim for what we call loss of society on
21  behalf of Mr. Wozniak's, the person who died, sons,
22  both of his sons, for loss of society. And they
23  were not supported by their father. So Mexican law
24  would not entitle them to have any cause of action

Page 44

1  for that, correct?
2      A.   If they were not economically dependent
3  on the father, I would say they would not have a
4  right to receive an indemnification on material
5  damages. That section would go to the widow, or in
6  any event, to the estate. On moral damages grounds,
7  they could claim that as a result of the father's
8  death, they were affected in their sentiments and
9  their private life, so they would have a case to
10  file a claim for moral damages, and they would have
11  the burden to prove the relationship, and so on.
12      Q.   Hang on one second. Does Quintana Roo
13  follow the Federal Labor Act?
14      A.   Pardon me?
15      Q.   Does Quintana Roo, the code in Quintana
16  Roo, follow the Federal Labor Act?
17      A.   The Civil Code of Quintana Roo make
18  cross-reference to the Federal Labor Law for
19  purposes of quantifying the indemnification. Was
20  that your question?
21      Q.   Well, yes. So Quintana Roo follows the
22  Federal Labor Act, correct, for damages, for
23  purposes of damages?
24      A.   Excuse me. Go ahead.

11 (Pages 41 to 44)

Page 45

1    Q.  For purposes of damages, Quintana Roo
2 follows the Federal Labor Act, correct?
3    A.  Yes, the local code refers to the Federal
4 Labor Rule in order to make the quantification of
5 indemnity.
6    Q.  Now, I'm looking at Article 1916 of the
7 Federal Civil Code.
8    A.  1916 of the Federal Civil Code, that
9 refers to moral damages.
10    Q.  I understand that. What 1916 says is
11 that the cause of action for moral damages cannot be
12 transferred to third-parties and can be only passed
13 to the victim's heirs if the victim has filed it
14 when he or she was alive, correct?
15    A.  Which is basically what 131 of Quintana
16 Roo Code says as well.
17    Q.  Can you show me where in the Civil Code
18 of Quintana Roo -- I know you said it's in Article
19 131 -- where it says that the surviving child of
20 someone who died as a result of an accident is
21 entitled to receive moral damages as a result of
22 that relationship?
23    A.  Well, it was not 131. It was 129, the
24 one that defines who is entitled to an indemnity.

Page 46

1    Q.  And that's correct, and 129 said only
2 those children who were economically dependent upon
3 the deceased person, correct?
4    A.  Well, it doesn't say children. It says
5 the persons that were economically dependent.
6    Q.  So the bottom line is if you are a child
7 who was not economically dependent upon the deceased
8 person, you do not have a right to claim moral
9 damages in Mexico; isn't that correct?
10    A.  If you are a child or a person not
11 economically dependent, you are not entitled to
12 receive the indemnification.
13    Q.  So in this case, in this specific case,
14 if the two sons of Mr. Wozniak were not economically
15 dependent upon Mr. Wozniak, the deceased person,
16 they have no claim for moral damages; isn't that
17 correct?
18    A.  No. Article 129 says that the
19 indemnification goes to the person whom he lived
20 with, and ultimately, if they are related to the
21 illegitimate heirs.
22    Q.  But in this case, there is a surviving
23 wife, so with a surviving wife, the surviving
24 children of Mr. Wozniak, if they were not

Page 47

1 economically dependent upon him, would have no claim
2 for moral damages, correct?
3    A.  That is my opinion. The indemnification
4 will go to the surviving spouse, if she was living
5 with the deceased person.
6    Q.  Right, and not to his children, assuming
7 they weren't economically dependent upon him,
8 correct?
9    A.  Correct.
10    Q.  With regard to jurisdiction, you believe
11 that the Mexican court has jurisdiction over this
12 case, correct?
13    A.  What I have stated is that if you have a
14 choice or agreement as an expressed submission
15 agreement, you then have a basis for the Mexican
16 court jurisdiction, and I have also stated that the
17 submission can also be a passive submission under
18 the rules I have cited in my opinion.
19    Q.  Let me ask you this question. The
20 difference between jurisdiction and competence is
21 what?
22    A.  Well, under our law, jurisdiction is the
23 ability of a court to resolve a dispute with binding
24 affects, and then the jurisdiction pass certain

Page 48

1 limitations. One limitation could be territorial
2 limitation, the other limitation could be the
3 amount, the other limitation could be the specific
4 area of the law. And what Mexican law says is that
5 the only competence that can be extended is the one
6 related with the territorial limitations.
7    Q.  Just so I'm clear, then, if an accident
8 happened in Quintana Roo, would that confer
9 jurisdiction upon Quintana Roo for extra contractual
10 instances?
11    A.  Noncontractual responsibility that
12 happened in Quintana Roo, that would be a point of
13 contact to allow the local courts to have
14 competence.
15    Q.  In order to have competence -- well,
16 first of all, where the defendant is from is a
17 factor as to whether a court has competence or not,
18 correct?
19    A.  Well, you have a default rule that states
20 that absent an agreement or any other elements, the
21 default rule is that the competent court is the
22 court of the legal domicile of the defendant. That
23 is the basic rule and principle that applies
24 basically in all 31 states.

12 (Pages 45 to 48)

Page 49

1 So you do have a default rule by which
2 the competent court would be the court of the legal
3 domicile of the defendant. You have certain
4 jurisdictions and states, like for example,
5 Tamaulipas and Quillila, which have an additional
6 rule, a procedural rule, that allows the local court
7 to have competence because it is the legal domicile
8 of plaintiff if the defendant has a legal domicile
9 outside of those states.
10 I have not found a similar provision
11 under the Quintana Roo Procedural Code. So the
12 default rule under the Quintana Roo Procedural Code
13 is that of the legal domicile of the defendant. But
14 of course, that default rule --
15 Q. I'll ask you about that in a second
16 because I understand there may be some exceptions.
17 But I'm going to ask you to stop there. So absent
18 any waivers or extensions of competence, the legal
19 domicile of Wyndham Hotels and Resorts, LLC, would
20 control whether the Quintana Roo court had
21 competence, correct?
22 A. No, because that would be a foreign
23 entity, and I don't know what the foreign law says,
24 and I don't think you can apply the default Mexican

Page 50

1 rule to the U.S. procedure, but I'm not an expert on
2 U.S. procedure. So you do not have a rule of the
3 international sphere that would allow the
4 application of the rule for one country to another,
5 at least that is what the Mexican Supreme Court has
6 stated, so I don't know if Mexican rule would really
7 apply to a foreign entity located abroad under our
8 foreign procedure.
9 Q. Well, in this case, would the Quintana
10 Roo court have either jurisdiction and competence
11 over Wyndham Hotels and Resorts, LLC?
12 A. If you have a submission clause, yes.
13 Q. I'm sorry. Go ahead.
14 A. Pardon me?
15 Q. Assume there is no contract between the
16 Wozniaks and Wyndham Hotels.
17 A. You do not necessarily need a contract.
18 You can have a submission, a choice of court
19 agreement on noncontractual responsibility entered
20 into afterwards, by which parties are able to submit
21 the case to the jurisdiction of the Quintana Roo
22 courts. So you don't need a contract prior to. You
23 can have a submission agreement executed by the
24 parties on noncontractual responsibility. And in

Page 51

1 addition, in my opinion as a foreign national, you
2 are able to tacitly submit to the local courts in
3 Quintana Roo to address the responsibility issues.
4 If you do submit a case before those courts and you
5 have the Quintana Roo provisions by which it states
6 that if you file a claim in Quintana Roo, you are
7 tacitly submitting to the territorial competence of
8 that court.
9 Q. I think you cite Article 121, Article
10 121, Section 3 of the Mexican Constitution?
11 A. Well, that is the constitutional support
12 from which you derive the competence rules provided
13 in the 31 states, the local procedural codes, and
14 federal codes, and then based upon 121 of the
15 Federal Constitution, which refers to the full faith
16 and credit of principle, it goes on to say that
17 certain resolution from one state will be
18 acknowledged in another state if there is a
19 submission, expressed submission. From that
20 principle, then you derive all their procedural
21 rules, like in this case, the procedural rules of
22 the state of Quintana Roo, basically Article 150,
23 153, and 154.
24 Q. What does Article 150 say?

Page 52

1 A. Article 150 of the Quintana Roo
2 Procedural Code says that the jurisdiction by reason
3 of territory, which means the competent territorial
4 jurisdiction of a court is the only one that can be
5 extended. That's what Article 150 says.
6 Q. I think you cite Article 153. What does
7 that say?
8 A. 152 says that --
9 Q. I'm sorry. I don't mean to cut you off.
10 I think you cited 153 in your submission.
11 A. 153 says that there is an expressed
12 submission when the interested parties clearly state
13 the court, that they clearly and precisely state the
14 court that they agree to be subject to.
15 Q. So 153 requires both sides to agree,
16 correct?
17 A. Yes, yes, absolutely.
18 Q. And Article 154 says what?
19 A. That is the tacit submission. That is
20 when you do not need prior to the agreement of the
21 parties, and then 154 says that it is understood,
22 you tacitly submitted, then you have several
23 sections. Section 1 says claimant for the fact of
24 filing a claim before that court, and defendant,

13 (Pages 49 to 52)

Page 53

1  that's Section 2, by answering that complaint or
2  filing a counterclaim. And you have others that are
3  all related.
4     Q.   So Section 154 stands for the proposition
5  that the plaintiff willingly submits itself to the
6  Quintana Roo court and the defendant answers in the
7  Quintana Roo court, then it will confer
8  jurisdiction?
9     A.   Yes. So if plaintiff files a claim for
10 one local court, he is tacitly submitting to the
11 territorial jurisdiction of that court.
12    Q.   Does the Quintana Roo court guarantee
13 jurisprudence for foreign nationals?
14    A.   I did not understand the question.
15 Whether the Quintana Roo courts have precedence?
16    Q.   No, does the Quintana Roo court guarantee
17 jurisprudence, in other words, a place to litigate
18 their case for foreign nationals?
19    A.   You would then say jurisdiction, not
20 jurisprudence.
21    Q.   I'm not talking about -- whatever you
22 want to call it. If I'm a foreign national and I
23 decide that I want Quintana Roo to be the place
24 where I'm going to litigate my case, and the person

Page 54

1  I sue says, "That's okay; I want to litigate it
2  there," under all circumstances, will the Quintana
3  Roo court hear the case?
4     A.   That is my opinion. You would then have
5  an agreement to submit to the Quintana Roo courts
6  because the way you have put the question is that
7  both parties are in agreement, so if there is a
8  point of contact, and in this case, the point of
9  contact would be the place where the accident
10 occurred, in my opinion that would give territorial
11 jurisdiction to the Quintana Roo courts.
12    Q.   But it would require either the plaintiff
13 filing it there of their own freewill or an
14 agreement between the parties, correct?
15    A.   Yes, sir.
16    MR. NEMEROFF: I don't think I have any further
17 questions.
18    MR. DELY: I just have a couple.
19          EXAMINATION
20 BY MR. DELY:
21    Q.   Sir, I would like you to turn to Exhibit
22 No. 2, which is your declaration in this matter.
23 Can you hear me okay, sir?
24    A.   Exhibit No. 2 is Article 2 of the

Page 55

1  Quintana Roo court.
2     MR. NEMEROFF: Hang on one second. We are
3  going to switch seats, so he is closer to you, and
4  it will be easier for you to hear.
5  BY MR. DELY:
6     Q.   Sir, I want you to turn to the exhibit
7  that is your declaration in this matter, your
8  opinions.
9     A.   Yes.
10    Q.   And I would like for you to turn to Page
11 5.
12    A.   Yes.
13    Q.   And I would like you to look over it,
14 take a minute to look over the opinions you have
15 rendered.
16    A.   Yes.
17    Q.   And I just wanted to ask you if those
18 accurately reflect your opinions in this matter?
19    A.   Yes, they do.
20    Q.   And to the extent that you have offered
21 these opinions, you offer them as a practitioner of
22 Mexican law, correct?
23    A.   Yes, sir.
24    Q.   And for the purposes of today, you have

Page 56

1  not held yourself out to be an expert in American
2  law, correct?
3     A.   That is correct. I am not an expert on
4  U.S. law.
5     MR. DELY: Sir, thank you. That's all the
6  questions that I have for you.
7     MR. NEMEROFF: Nothing else. Is there
8  signature in federal court? Sir, we are not 100
9  percent sure if you have a right to do this, but if
10 you want, we have no problem with it. If one of the
11 lawyers asks that the court reporter transcribe what
12 occurred here today -- I guess can he change
13 anything?
14    MR. DELY: I don't think he can make
15 substantive changes.
16    MR. NEMEROFF: Right. You can't make any
17 substantive changes. I believe you can correct any
18 errors that the court reporter may have made, or you
19 can choose to waive your signature, which just means
20 you trust that the court reporter took everything
21 down accurately. That's up to you.
22    THE WITNESS: Well, I would like to see the
23 transcript just for purposes of correcting any
24 inaccuracies from wording in Spanish and so on.

14 (Pages 53 to 56)

Page 57

1    MR. NEMEROFF: We'll reserve. Thank you very
2  much, sir.
3    MR. DELY: Thank you, Mr. Castilla.
4
5    FURTHER DEPONENT SAITH NOT.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 58

1
2    IN THE UNITED STATES DISTRICT COURT
3    FOR THE NORTHERN DISTRICT OF ILLINOIS
4        EASTERN DIVISION
5  DANUTA WOZNIAK, et. al.,    )
6        Plaintiff,  )
7    vs.    ) NO. 08 CV 1361
8  WYNDHAM HOTELS AND RESORTS, LLC )
9  a Foreign Corporation,    )
10        Defendant.  )
11    I hereby certify that I have read the
12  foregoing transcript of my deposition given at the
13  time and place aforesaid, consisting of Pages 1 to
14  57, inclusive, and I do again subscribe and make
15  oath that the same is a true, correct and complete
16  transcript of my deposition so given as aforesaid,
17  and includes changes, if any, so made by me.
18
19        EMILIO GONZALEZ de CASTILLA del VALLE,
20
21  SUBSCRIBED AND SWORN TO
22  before me this    day
23  of      , A.D. 2008.
24    Notary Public

Page 59

1  STATE OF ILLINOIS )
2        )
3  COUNTY OF C O O K )
4
5    I, MIGDALIA MONTERO, a Notary Public within
6  and for the County of Cook, State of Illinois, and a
7  Certified Shorthand Reporter of said state, do
8  hereby certify:
9    That previous to the commencement of the
10  examination of the witness, the witness was duly
11  sworn to testify the whole truth concerning the
12  matters herein;
13    That the foregoing deposition transcript
14  was reported stenographically by me, was thereafter
15  reduced to typewriting under my personal direction
16  and constitutes a true record of the testimony given
17  and the proceedings had;
18    That the said deposition was taken before
19  me at the time and place specified;
20    That I am not a relative or employee or
21  attorney or counsel, nor a relative or employee of
22  such attorney or counsel for any of the parties
23  hereto, nor interested directly or indirectly in the
24  outcome of this action.

Page 60

1    IN WITNESS WHEREOF, I do hereunto set my
2  hand and affix my seal of office at Chicago,
3  Illinois, this 18th day of July, 2008.
4
5
6
7    MIGDALIA MONTERO, CSR
8    Notary Public, Cook County, Illinois.
9    My commission expires 5/24/11.
10
11
12
13  C.S.R. Certificate No. 84-4383.
14
15
16
17
18
19
20
21
22
23
24

15 (Pages 57 to 60)

Page 61

```
 1          I N D E X
 2
 3   WITNESS                EXAMINATION
 4   EMILIO GONZALEZ de CASTILLA del VALLE
 5     By Mr. Nemeroff          3
 6     By Mr. Dely           54
 7
 8          E X H I B I T S
 9
10   NUMBER              MARKED FOR ID
11   Deposition Exhibit Nos. 1 and 2    13
12
13
14
15
16
17
18
19
20
21
22
23
24
```

16 (Page 61)

**A**

ability 47:23
able 8:5 25:20 26:4
35:20 50:20 51:2
Abogados 10:16
abroad 50:7
absent 48:20 49:17
absolutely 52:17
accident 16:4 45:20
48:7 54:9
accurately 55:18
56:21
acknowledged
51:18
act 30:12 39:21
44:13,16,22 45:2
acted 39:11
action 30:17,20
31:22 32:5 33:17
43:24 45:11 59:24
acts 18:9 41:6,14,17
41:24 42:1
addition 36:12 51:1
additional 49:5
address 11:9 51:3
addresses 27:20
32:12
addressing 12:4
adhere 16:9
adheres 16:17,23
17:7
Administrator 1:5
adopted 20:10
advantages 41:1
affection 26:8 34:14
affections 25:19,23
affidavit 11:6
affix 60:2
aforesaid 58:13,16
agency 37:1,4,8,10
37:17,20 38:2,4
agent 38:8,9,12
ago 41:18
agree 14:14 16:8
17:20 18:1 20:9
21:16 22:7 23:9
26:6 39:2 52:14
52:15
agreement 47:14,15
48:20 50:19,23
52:20 54:5,7,14
ahead 32:16 35:14
35:16 44:24 50:13
al 58:5
alive 30:21 45:14

alleging 15:8 33:20
allow 7:24 30:2
32:21 48:13 50:3
allows 25:13 49:6
amendment 35:8
America 7:20
American 10:7 56:1
amount 21:7 30:4
30:14 36:15 48:3
and/or 8:18
answer 4:12,16,19
4:21 5:10 16:24
17:3,15 22:6
24:10
answering 53:1
answers 53:6
anybody 23:4
apparent 37:1,4,8,9
37:17,19 38:2,4
38:12,12
appearance 26:10
appeared 2:8,15
applicable 20:21
22:18 23:20 38:15
application 50:4
applies 17:11,12,13
48:23
apply 21:13 22:23
23:8 49:24 50:7
approach 9:1
approximately 7:11
April 35:8
arbitration 10:4,5
area 9:16 20:5
42:21 48:4
argue 25:24
arising 31:5
arrangement 15:3
article 18:21 20:24
20:24 21:11,11,11
22:20,20,22 26:14
26:18,21 27:8,9
27:13 28:5,15,19
28:22 29:11,22
30:7,11 34:1,2,6
34:11 35:23 36:4
36:4 38:19,22
39:16,19 40:3,4,6
40:11,12 41:21,22
42:3 43:9,10 45:6
45:18 46:18 51:9
51:9,22,24 52:1,5
52:6,18 54:24
articles 18:12,16,17
20:20 21:2 41:8

41:12
asked 11:15 17:13
asking 12:7,10,12
19:22 31:13,14,15
asks 56:11
aspect 26:3
asset 43:1,3
assets 39:24
assume 5:10 17:5
50:15
assuming 47:6
attack 34:13 35:1
attempt 5:9
attorney 59:21,22
August 7:15
author 39:24
authority 38:10,11
authorization 38:12
available 31:21
avoid 4:12
award 36:14
awarding 21:21
24:4
aware 38:16
A.D 1:23 58:23

**B**

B 2:7 61:8
back 36:3
background 6:11
bad 23:23
banking 9:19
bankruptcy 9:18
bar 39:3,8
based 28:19 36:11
38:11 40:15 51:14
basic 20:14 48:23
basically 9:1 10:4,7
14:19 18:12 20:17
20:24 21:10,12
22:22 26:12,23
34:9 36:16 37:12
45:15 48:24 51:22
basis 34:24 35:4
47:15
bear 40:15 41:8
behalf 2:8,15 32:7
33:17 39:7 43:21
belief 26:8
believe 21:3 36:4
47:10 56:17
better 24:2
binding 19:6,9,11
19:17 33:2 47:23
bodily 14:15 18:13

18:18 19:1 20:11
21:3 22:9 23:20
24:5
body 18:23
Book 18:5
books 17:21 18:3
born 6:11
bottom 46:6
break 36:19,21
brief 4:5
building 42:11,11
42:13,18,23 43:6
burden 44:11

**C**

C 59:3
calculated 28:18
calculating 21:7
call 3:15 6:24 21:17
25:15 43:11,20
53:22
called 1:15 3:4
10:16 14:15 19:13
capable 30:1
capital 14:7
case 8:9 9:12 11:2
11:13 12:5,23
15:10 18:23 22:18
32:2,9 33:9 43:19
44:9 46:13,13,22
47:12 50:9,21
51:4,21 53:18,24
54:3,8
cases 6:7 8:16,19,21
8:24 9:4,6,7,9
15:5 18:14 19:2
19:10 20:7 25:14
36:10
Castilla 1:15 3:3,10
3:12,15,19,19
10:16 13:22,24
36:24 57:3 58:19
61:4
categories 29:8
category 24:17
cause 43:24 45:11
causes 39:23 40:8
40:14
causing 40:18
certain 8:4 13:17
15:5 20:1 30:14
32:14 34:22 35:3
37:16,22 40:21
42:9,20 47:24
49:3 51:17

certificate 2:21
7:14 8:3 60:13
Certified 1:21 59:7
certify 58:11 59:8
chain 43:2
change 56:12
changes 20:16
56:15,17 58:17
Chapter 18:8,11
charge 41:20
charges 34:24
Chicago 1:22 2:5
2:12 60:2
child 29:18 45:19
46:6,10
children 29:13,14
31:10,14 32:8
46:2,4,24 47:6
choice 47:14 50:18
choose 7:1 56:19
CHRISTOPHER
2:14
circuit 32:19 33:8
circumstance 4:20
circumstances 15:6
32:14 54:2
cite 35:20 51:9 52:6
cited 5:16 20:23
36:3 47:18 52:10
City 6:11,16 7:18
15:21,23 20:14
37:18
civil 1:17 5:13 6:2,3
6:4,8 8:17 15:16
16:1 17:21,22
18:2,2,4,5 20:10
20:20 21:10,13,17
21:20 22:7,16
23:18 24:3 26:17
27:14 37:11,13,18
38:20 39:2 44:17
45:7,8,17
claim 8:14 24:5
25:8,13,14,20,24
26:4 31:5,10,15
31:18 32:14,21
33:17,19 39:12
43:20 44:7,10
46:8,16 47:1 51:6
52:24 53:7
claimant 52:23
claiming 31:1 39:8
claims 11:17 14:14
14:16,18 21:4
38:17

EMIL__ __NZALEZ de CASTILLA del VALLE, JU__ __, 2008

clarify 27:1
clause 50:12
clear 9:10 43:19
  48:7
clearly 52:12,13
client 15:7
close 22:4
closer 55:3
code 5:13,16,19,21
  6:2,3,4,6,8 15:16
  16:2 17:21,22
  18:2,2,5,16 20:10
  20:11,14,20 21:13
  21:17,20 22:7,12
  22:16 23:18 24:4
  26:17,19,21 27:14
  30:11 37:13,16,18
  37:18 38:20 39:3
  39:6,20 44:15,17
  45:3,7,8,16,17
  49:11,12 52:2
codes 6:3 18:4
  37:11 51:13,14
codified 15:14
  24:21 26:16 37:10
  37:11,13
codifies 23:19 24:4
comes 32:19 33:4
commencement
  59:9
commercial 9:18
commission 60:9
common 14:22,23
commonly 40:18
communication
  23:23
comp 28:10
companionship
  25:9
company 9:1,4 11:5
compensation 22:1
competence 47:20
  48:5,14,15,17
  49:7,18,21 50:10
  51:7,12
competency 11:16
competent 11:9
  43:5 48:21 49:2
  52:3
complaint 12:23
  13:3,14 53:1
complete 3:8 35:11
  35:23 58:15
completely 4:11
comprehend 22:12

37:19
comprehends 37:17
comprise 17:22
  18:17
comprised 18:3
computer 13:12
concept 37:7,24
concerning 11:6
  59:11
concludes 38:13
conditions 25:18
conduct 18:20
  34:22 35:3 40:1
  43:13
confer 48:8 53:7
consequence 27:16
  27:20 34:17 39:23
  40:9,19,22
consequences 34:12
  34:12 40:2,14
consider 20:2,5
  21:9 39:14
consideration 34:14
considered 10:13
  15:9,22 16:5
  19:11 34:23 36:7
  39:21
consist 27:17
consisting 58:13
consortium 23:10
  23:15,19 24:5,8
  24:11,21,23 25:14
  26:2
constitutes 59:16
Constitution 51:10
  51:15
constitutional
  51:11
construction 42:18
consultant 10:14
contact 48:13 54:8
  54:9
contacted 12:8
contacts 8:7
contain 38:1
contemplated 26:14
  30:11
contract 14:24
  50:15,17,22
contractual 14:16
  14:18,21 15:2,5
  15:10,12 41:9
  48:9
contributory 39:7
  39:10,13

control 49:20
conveniens 11:6,8
  11:19,22
Cook 1:20 59:6
  60:8
copy 13:3
corporate 34:15
Corporation 1:11
  58:9
correct 5:5 6:15,16
  7:15,16,17 9:5,14
  9:15 10:9,12,17
  14:4,5,7,19,22
  15:10,14,17,20
  16:6,14,17,23
  17:8,22 18:3,6,9
  18:14,19 19:2,9
  19:14,15,18,19,21
  21:22 22:9,14,18
  23:6,11 26:22
  29:9,16,20,21
  31:3,8,19,20,23
  31:24 32:9 33:1,4
  33:15,22 39:9
  41:10 43:15 44:1
  44:22 45:2,14
  46:1,3,9,17 47:2,8
  47:9,12 48:18
  49:21 52:16 54:14
  55:22 56:2,3,17
  58:15
correcting 56:23
counsel 59:21,22
counterclaim 53:2
country 50:4
County 1:20 59:3,6
  60:8
couple 5:23 54:18
course 49:14
court 1:1 4:1,24
  19:4 33:1 36:13
  43:5 47:11,16,23
  48:17,21,22 49:2
  49:2,6,20 50:5,10
  50:18 51:8 52:4
  52:13,14,24 53:6
  53:7,10,11,12,16
  54:3 55:1 56:8,11
  56:18,20 58:2
courts 1:17 11:9,17
  48:13 50:22 51:2
  51:4 53:15 54:5
  54:11
covered 23:5
Cozumel 15:9 16:4

create 40:22
created 23:7
creates 27:21
credit 51:16
crime 39:22
criminal 34:23,24
cross-reference
  21:6 44:18
CSR 1:19 60:7
currently 3:24
curriculum 6:22
cut 4:16,20 52:9
CV 1:9 58:7
C.S.R 2:20 60:13

**D**

D 61:1
damage 34:11 36:6
damages 21:21 22:8
  23:10,19 24:5,17
  25:1,3,13,15,16
  25:21 26:1,5,7,24
  27:17 28:2 29:11
  30:8,10,11,12,16
  30:18 31:1,5,11
  31:16 32:2,9,15
  32:22 33:14,17
  34:7,7,10,12,20
  35:10 36:10 39:12
  40:15 42:8 44:5,6
  44:10,22,23 45:1
  45:9,11,21 46:9
  46:16 47:2
DANUTA 1:4 58:5
date 14:10
David 2:7 3:22
day 1:23 58:22 60:3
days 28:8,20
de 1:15 3:3,10,12
  10:16 13:24 41:4
  58:19 61:4
death 6:7 8:8,18 9:4
  14:15 18:14,18
  19:2 20:7,12,22
  21:4,15 24:6,14
  24:18 25:10 27:16
  28:3,12 29:12
  31:3,7,17,23
  33:15,21 36:7
  38:17 39:4,8
  41:10 44:8
debtor 29:24
deceased 1:7 29:15
  29:19 32:21 46:3
  46:7,15 47:5

decide 53:23
decision 33:4
decisions 19:8
decisis 16:10,17,19
  16:22,23 17:6,8
  17:10,18
declaration 13:23
  14:2,3 54:22 55:7
decorum 26:9
defamation 35:6,7
  35:9,19
defame 35:22
default 48:19,21
  49:1,12,14,24
defects 42:19
defendant 1:12
  2:15 48:16,22
  49:3,8,13 52:24
  53:6 58:10
defendant's 12:24
define 37:21 38:4
defines 37:1 45:24
definition 26:7,13
del 1:15 3:3,10,12
  14:1 58:19 61:4
Dely 2:14 16:18,24
  17:9,16 23:12
  24:7,22 27:1
  36:18 37:2 38:5
  54:18,20 55:5
  56:5,14 57:3 61:6
demonstrated
  40:23
dependent 29:4,14
  44:2 46:2,5,7,11
  46:15 47:1,7
depending 15:2
  29:2
DEPONENT 57:5
deposition 1:14
  3:12 4:3 13:18
  58:12,16 59:13,18
  61:11
depositions 1:18
derive 51:12,20
derived 42:8
derives 34:11
determined 36:11
  36:15
devoted 18:6
DICKER 2:10
died 15:8 21:14
  22:11 25:7 43:21
  45:20
difference 47:20

different 20:15,15
diminishes 34:17
direction 59:15
directly 15:12
  59:23
discipline 7:2
discussed 36:4
dispute 47:23
distinction 22:24
District 1:1,2,17 4:1
  4:2 58:2,3
DIVISION 1:3 58:4
doctors 27:24
documents 13:1,10
  13:17
doing 4:7
domicile 23:2 48:22
  49:3,7,8,13,19
draw 15:4
duly 3:1,4 59:10

**E**
E 61:1,8
easier 55:4
EASTERN 1:3 58:4
economic 28:7,20
  30:15 34:10,11
economically 29:2,4
  29:14,19,24 44:2
  46:2,5,7,11,14
  47:1,7
EDELMAN 2:10
educational 6:14
eight 11:24 12:11
either 6:6 8:12
  23:20 50:10 54:12
Ejecturias 19:16
elements 48:20
Elkins 12:14,16,17
Elser 2:10 12:6
else's 8:14
Emilio 1:14 3:3,10
  3:12 13:24 58:19
  61:4
employee 59:20,21
English 5:5 22:21
  27:13 28:16
enter 7:9
entered 50:19
entities 3:23
entitle 43:24
entitled 18:8 20:2
  22:4 28:23 29:15
  29:20 45:21,24
  46:11

entity 49:23 50:7
equivalent 7:7
errors 56:18
estate 1:6 30:24
  32:7,10,14,21
  33:13,16,22,24
  44:6
esteem 34:15
et 58:5
event 44:6
exactly 26:20 33:2
  35:7
examination 1:16
  3:6 54:19 59:10
  61:3
examined 3:5
example 8:7 15:7
  30:24 41:18 49:4
excavations 42:21
exceeds 28:9
exceptions 49:16
excuse 10:22 11:21
  29:10 39:18 40:5
  44:24
executed 39:22
  50:23
exercise 40:21,24
exhibit 13:15,18,22
  54:21,24 55:6
  61:11
exhibition 30:2
exhibits 13:9
expenses 27:18
  28:24
expert 20:3,5,8 50:1
  56:1,3
expires 60:9
explain 4:5 16:11
  23:14
expressed 47:14
  51:19 52:11
extended 48:5 52:5
extensions 49:18
extent 15:11 55:20
extra 14:16,18,21
  15:10 41:9 48:9

**F**
fact 4:7 24:22 30:20
  38:1 42:24 52:23
factor 48:17
faith 51:15
fall 15:2 24:16 29:7
falls 40:10 41:20
  42:22

familiar 12:20 16:9
  19:20,22 36:24
family 29:3 32:8
  34:15
father 10:19,21,23
  43:23 44:3
father's 44:7
federal 1:16 15:16
  17:21,22 18:2,2,5
  18:14,16 19:4,6,8
  20:10,19 21:8
  26:14 36:12,16
  37:18 38:17 39:6
  44:13,16,18,22
  45:2,3,7,8 51:14
  51:15 56:8
feelings 25:17,19,23
  26:8
feels 25:18
file 13:6,8 32:4
  33:16,19 34:24
  44:10 51:6
filed 11:17 12:23
  31:3,22 45:13
files 12:15 53:9
filing 52:24 53:2
  54:13
final 14:8 35:12,18
find 33:6
fine 6:1 43:7
finish 4:11,21,22
  6:24 23:21
finished 7:2
firm 3:18 9:2,24
  10:16,19,21,23
  11:5,12
firms 12:2,4,12,14
first 3:4 4:11 5:4
  14:14 24:11 31:2
  37:10 41:14 48:16
five-minute 36:21
focus 31:13
follow 16:12 20:14
  26:23 44:13,16
following 18:21
follows 3:5 44:21
  45:2
foregoing 58:12
  59:13
foreign 1:11 49:22
  49:23 50:7,8 51:1
  53:13,18,22 58:9
Forget 24:18
form 14:19 20:11
  37:2

forth 18:24
forum 11:6,8,19,21
found 49:10
four 28:9 34:21,21
  35:2
framework 20:14
  20:17
freewill 54:13
front 5:19 6:4 13:4
  13:8
full 5:16,19 51:15
further 54:16 57:5

**G**
general 9:1 20:17
give 5:23 34:5
  37:23 54:10
given 4:3 12:11
  58:12,16 59:16
giving 4:16
go 7:1,10,13 13:13
  14:13 29:1,6
  32:16 34:5 35:14
  35:16 36:3 40:4,6
  43:8,8 44:5,24
  47:4 50:13
goes 38:12 46:19
  51:16
going 5:1 6:5 16:18
  36:20 49:17 53:24
  55:3
Gonzalez 1:15 3:3
  3:10,12 10:16
  13:24 58:19 61:4
good 43:7
goods 42:9
grade 7:7
gross 39:22
ground 4:5
grounds 44:6
guarantee 53:12,16
guess 56:12
guilt 40:13

**H**
H 61:8
habitants 22:24
hand 60:2
hang 6:1 14:2 44:12
  55:2
happened 48:8,12
harm 26:24
harmed 25:20
harmful 27:16,20
  34:16 39:23 40:1

  40:8,14,18,22
harming 41:1
Harvard 9:14,20
heading 42:4 43:10
headline 42:8
hear 17:23 24:1,2
  39:18 54:3,23
  55:4
heard 4:6
heirs 29:6 30:19
  31:21 45:13 46:21
held 56:1
help 5:18
hereto 59:23
hereunto 60:1
high 7:7,10,11
highest 28:9
hired 12:3
honestly 13:11
honor 26:9 34:13
  35:1
hotel 15:1,12
Hotels 1:10 3:24
  49:19 50:11,16
  58:8
Houston 12:18
husband 15:8 24:12
  24:13

**I**
ID 61:10
identification 13:19
illegitimate 46:21
illicit 18:9,20 34:22
  40:1 43:13
Illinois 1:2,21,23
  2:5,12 4:2 20:4,6
  20:8 37:1 58:3
  59:1,6 60:3,8
image 26:9 35:1
impacts 25:23
impose 8:4
imputing 34:22
  35:3
inability 24:12
inaccuracies 56:24
incapacity 27:21,22
  28:4 36:8,9,9
includes 58:17
inclusive 58:14
income 28:17,18
incorporated 6:22
increase 36:14
incur 35:9
incurred 28:24

**indemnification**
21:7 27:17,22,23
28:7,11,12,18
29:6 30:17 34:19
40:16 44:4,19
46:12,19 47:3
**indemnify** 34:20
40:2,23
**indemnity** 21:9
22:5 29:1 45:5,24
**indirectly** 59:23
**Individually** 1:4
**individuals** 15:19
**infers** 32:13
**inflicted** 26:7
**information** 35:21
**injured** 8:13,22 9:9
23:4 24:19,20
25:4,6,7,11
**injuries** 11:18 26:7
**injury** 6:7 8:8,18
9:4,12 14:15
18:13,18 19:1
20:6,12,21 21:3
22:9 23:20 24:6
25:14 28:13 31:6
31:17 38:17 39:4
39:8 41:10
**installments** 30:3,4
**instance** 15:7
**instances** 48:10
**insurance** 8:24 9:3
11:5
**integrity** 34:16
**intending** 4:17
**interested** 52:12
59:23
**international** 10:5
50:3
**interpret** 23:3 28:5
**interpretation** 27:7
27:12
**interrupt** 23:22
**interrupting** 27:10
**invariably** 36:7
**involving** 8:18 9:4
**isolated** 32:11,18
**issue** 27:20 32:12
43:4
**issues** 9:18 11:6,8,9
11:22 26:13 51:3
**items** 25:15

**J**

**JAN** 1:6

**joint** 43:2
**jointly** 40:19
**Jorge** 12:19,20
**Jr** 3:19,20,21
**judge** 4:18 30:2,3
**judiciary** 19:6,12
**July** 1:23 13:19
60:3
**jurisdiction** 11:22
47:10,11,16,20,22
47:24 48:9 50:10
50:21 52:2,4 53:8
53:11,19 54:11
**jurisdictions** 49:4
**jurisprudence**
53:13,17,20
**Jurisprudencia**
19:8,13
**justify** 28:24

**K**

**K** 59:3
**keep** 13:7
**killed** 8:13
**kind** 15:3
**kinds** 18:13
**know** 7:5 12:19
16:13,16,19,21,22
17:1,5,6,10,11,13
17:18 20:1 33:3,9
37:7 42:14 45:18
49:23 50:6

**L**

**la** 41:4
**labor** 21:6,8 36:12
36:16 44:13,16,18
44:22 45:2,4
**lack** 25:22 26:1,2
42:19
**land** 42:22,23
**language** 5:5
**LaSalle** 2:11
**Latin** 10:7
**law** 2:3 3:18 6:15
6:17,19,21 7:4,14
7:19,24 8:5 9:16
9:24 10:8,11,14
10:15 11:4,11
12:2,12,23 13:4
14:19,22,23 15:14
16:8,16,22 17:7
18:12,23 19:5,20
19:23 20:3,4,6,8
21:6,8 22:17 23:9

24:21 26:14 36:12
36:16 37:1,8,9
43:23 44:18 47:22
48:4,4 49:23
55:22 56:2,4
**laws** 23:8
**lawsuit** 3:23 31:2
**lawyer** 5:3 12:19
**lawyers** 56:11
**leave** 9:8
**legal** 11:2 16:9 17:7
18:24 29:6 48:22
49:2,7,8,13,18
**legally** 19:9,17
**legislation** 10:7
37:16,19
**legislations** 15:24
**letter** 5:22
**letterhead** 3:18
**letters** 14:7
**Let's** 14:13 20:4
24:18
**liabilities** 18:6
**liability** 14:16,18
14:21 15:10 43:2
43:15,16
**liable** 35:10,20
40:19
**Licenciado** 13:23
**license** 7:24 10:8
**licensed** 7:19,21,22
**life** 24:15 35:1 44:9
**limitation** 48:1,2,2
48:3
**limitations** 48:1,6
**limited** 38:11 42:24
**line** 14:6 46:6
**lines** 14:10
**link** 26:1
**lists** 3:19
**litigate** 53:17,24
54:1
**litigation** 8:15
**little** 24:1
**live** 23:4 29:3
**lived** 46:19
**living** 47:4
**LLC** 1:10 3:24
49:19 50:11 58:8
**LLM** 9:20
**LLP** 2:10
**local** 8:4 18:4 23:8
37:19 45:3 48:13
49:6 51:2,13
53:10

**located** 43:6 50:7
**long** 14:3 34:9
**look** 33:11 55:13,14
**looking** 45:6
**looks** 12:22
**loss** 22:23 23:10,14
23:19 24:5,8,11
24:20,23 25:8,9,9
25:13 43:20,22
**lost** 40:2
**lot** 42:14
**L-i-c-e-n-c-i-a-d-o**
13:24

**M**

**M** 2:14
**making** 30:1 43:20
**man** 25:8
**March** 14:11
**mark** 13:15
**marked** 13:18,22
61:10
**master's** 9:13
**material** 27:17,23
30:15 34:7,10
44:4
**matter** 11:2 13:6
54:22 55:7,18
**matters** 10:5,5
12:11,13 20:22
59:12
**mean** 23:3 52:9
**means** 24:12 52:3
56:19
**meant** 24:8 27:4
**medicine** 27:24
**members** 29:3
**men** 39:21
**mentioned** 22:2
**Mexican** 7:23,24
8:1 11:9,16 14:19
14:21 15:14 16:8
16:16,22 17:7
23:9 24:21 37:7,9
43:23 47:11,15
48:4 49:24 50:5,6
51:10 55:22
**Mexico** 6:11,16,23
7:10,17,18 8:10
9:5 11:18 14:16
14:22 15:20,21,23
16:5 18:24 20:14
22:17 25:6 37:18
38:5,8,15,16 46:9
**MIGDALIA** 1:19

2:20 59:5 60:7
**minimum** 28:10,20
**minor** 40:8 41:19
41:21,23,24
**minute** 55:14
**minutes** 5:24
**misspeaking** 40:6
**moment** 34:6
**money** 29:8 30:19
**Monroe** 1:22 2:4
**MONTERO** 1:19
2:20 59:5 60:7
**moral** 24:17,24
25:2,15,16,21
26:1,5,7,24 30:8
30:10,12,18 31:5
31:10,16 32:1,8
32:14,22 33:17
34:7,10,11,20
35:10 36:6,10
44:6,10 45:9,11
45:21 46:8,16
47:2
**MOSKOWITZ**
2:10
**move** 5:19

**N**

**N** 61:1
**name** 3:8,22 12:2
14:7,11 33:9,12
**named** 12:19
**names** 12:12
**national** 51:1 53:22
**nationality** 23:1
**nationals** 53:13,18
**nationwide** 8:6
**necessarily** 4:17,18
6:13 50:17
**need** 4:21 5:17 6:2
50:17,22 52:20
**negligence** 8:14
39:7,10,13,22,23
40:13 43:13
**neighbors** 42:20
**neither** 33:21
**Nemeroff** 2:3,7 3:7
3:11,14,22 13:15
13:21 16:20 17:2
17:12,14,19 23:16
24:9 25:2,5 27:3,5
36:20,23 37:5
38:6,14 54:16
55:2 56:7,16 57:1
61:5


New 10:1,8,12
non 11:6,8,19,22
nonbinding 32:11
  32:13,24
noncontractual
  15:5 18:21 21:14
  48:11 50:19,24
North 2:11
Northern 1:2 4:2
  58:3
Nos 13:15,18 61:11
Notary 1:19 58:24
  59:5 60:8
Notice 12:24
number 14:8 17:21
  18:3 31:17 32:23
  40:17 61:10

___ O ___

O 59:3,3
oath 58:15
object 16:18 23:12
  24:7,22 37:2
objection 17:9,16
objective 43:11
obligated 34:19
obligates 39:24
obligation 30:13
  35:19 42:22
obligations 18:6
obviously 24:14
occurred 16:4
  54:10 56:12
occurring 11:18
occurs 4:21
offer 55:21
offered 55:20
office 13:7 60:2
OFFICES 2:3
okay 3:16 4:13,22
  5:11,23 6:8,10
  9:23 13:13 43:7
  54:1,23
old 6:17,19
omission 30:12
omissions 41:15,17
  41:24 42:2
Once 6:24 8:2
ones 20:23 22:4
operating 15:13
opinion 5:16 13:9
  20:23 22:11,16
  26:11 32:10 33:16
  33:23 47:3,18
  51:1 54:4,10

opinions 11:7,16
  12:1,3,9,11,15
  32:20 55:8,14,18
  55:21
order 4:9 21:9 45:4
  48:15
Ortetis 19:16
osteopath 28:1
outcome 59:24
outside 49:9
overlooking 41:23
owner 42:10,18
ownership 42:13

___ P ___

page 14:8 55:10
pages 14:3 58:13
paid 28:1 29:1,9
pain 21:21,23 22:2
  22:8,10 31:1,9
  32:22 33:14,20,20
paragraph 27:19
  28:3,4 34:18
  36:13
paragraphs 35:13
  35:18
paraphrase 42:15
Pardon 17:4 35:15
  44:14 50:14
parent 41:22
parents 41:23
partially 27:22 36:8
parties 50:20,24
  52:12,21 54:7,14
  59:22
party 30:13
pass 47:24
passed 32:4 45:12
passes 30:19
passive 47:17
payable 27:18
paying 30:14
payment 27:18,23
  28:8 29:1 30:1,2,3
payments 27:19
pending 4:1
people 8:12 28:23
  29:7 34:18,19
  40:18 41:20
perceived 26:10
  28:8
percent 36:14 56:9
permanent 27:21
  27:22 36:8,8
person 8:22,22 9:9

24:20 25:18 26:10
  27:18 29:2,4,15
  29:19 32:21 34:22
  35:4,22 39:24
  40:10,23 41:1,15
  43:1,21 46:3,8,10
  46:15,19 47:5
  53:24
personal 18:13,18
  19:1 20:6,11,21
  21:3 59:15
personality 26:4
persons 40:14 46:15
person's 26:8
perspective 18:14
perspectives 15:4
persuasive 19:17
pertaining 1:18
pertains 6:7 20:6
phone 4:8
physical 26:1
place 35:8 38:16
  53:17,23 54:9
  58:13 59:19
plaintiff 1:8 2:8
  49:8 53:5,9 54:12
  58:6
play 41:9,12
please 3:8,17 5:8
  22:21 27:8,11,12
  28:6,15 29:22
  34:8 39:17,20
  40:7
plus 15:21,23
point 10:14 23:20
  24:3 36:18 48:12
  54:8,8
positive 34:17
possibly 4:8
potential 15:1
practical 15:22
practice 7:19,21,22
  8:1,5 20:2
practicing 10:11
practitioner 55:21
precedence 19:3
  53:15
precedent 19:10
  32:11,12,13,18,24
  33:7
precedents 19:5
  32:20
precisely 52:13
premises 15:13
prep 6:24 7:2,6,9

7:12
PRESENT 2:1
prestige 34:14
pretty 35:11
Pretzel 11:12 12:7
  12:8
previous 36:13 59:9
Priest 9:24
principle 16:10
  17:7 38:2,10
  48:23 51:16,20
principles 19:1 20:1
prior 33:15,21
  50:22 52:20
privacy 26:9
private 24:15 35:1
  44:9
probably 4:6 11:24
  13:9,12 16:12
problem 56:10
procedural 6:3 43:4
  49:6,11,12 51:13
  51:20,21 52:2
procedure 1:17
  50:1,2,8
proceedings 59:17
produces 30:12
professional 27:24
profits 40:2
program 9:13
proper 38:10
proposition 53:4
prove 44:11
provide 22:8 23:10
provided 12:22
  13:1 51:12
provides 22:1 39:6
provision 8:4 21:21
  25:12 28:19 37:23
  49:10
provisions 5:15,21
  20:16 21:5,12
  36:11 40:3 51:5
psychological 26:3
Public 1:20 58:24
  59:5 60:8
publicly 35:19
published 19:4,5
pull 12:15
purchaser 42:23
purpose 40:24
purposes 15:22
  21:6 44:19,23
  45:1 55:24 56:23
pursuant 1:16

put 13:11 54:6
puts 30:3
p.m 1:24

___ Q ___

quantification
  36:10 45:4
quantify 21:9
quantifying 44:19
question 4:10,11
  5:4,7,8,10 12:8
  16:24 17:3,15,24
  22:6 23:17 24:10
  31:13 38:3 44:20
  47:19 53:14 54:6
questions 5:20 6:10
  54:17 56:6
quiet 4:12,22
Quillila 49:5
Quintana 5:13 16:6
  20:21 21:13,17,20
  22:1,3,8,12,17,23
  23:18 24:4 26:17
  26:18,21 27:14
  28:21 33:1 37:14
  37:15,22 38:1,20
  39:3,20 44:12,15
  44:15,17,21 45:1
  45:15,18 48:8,9
  48:12 49:11,12,20
  50:9,21 51:3,5,6
  51:22 52:1 53:6,7
  53:12,15,16,23
  54:2,5,11 55:1
quite 34:9

___ R ___

read 22:20 26:20
  28:22 29:22 30:9
  34:1,8 39:16,19
  43:9 58:11
realize 31:2
really 50:6
reason 4:15 52:2
recall 9:11 11:3,14
  12:16,21 13:11
  32:19 33:5,6,7,12
receive 8:3 9:20
  22:4 28:23 40:15
  40:16 44:4 45:21
  46:12
received 7:14 31:6
recess 36:22
record 3:11 59:16
recover 29:15,20

32:8 33:14
recovery 24:19 39:3
  39:9
rectify 35:19
reduced 59:15
refer 20:18 34:21
  35:2,18
referenced 5:22
references 6:6 34:2
referred 40:10
  41:18
referring 11:21
  39:13
refers 28:3,4 30:8
  41:14,16,22 42:9
  42:17,19,22,23
  43:2,3 45:3,9
  51:15
reflect 3:11 55:18
regard 29:11 47:10
regarding 10:6 19:4
regardless 23:1
  30:15 34:16
regulated 18:20
Reid 9:24
relate 24:12 25:16
related 8:16 9:18
  18:17 21:3 46:20
  48:6 53:3
relates 11:17 20:11
  24:24
relating 41:9
relationship 25:9
  25:22 26:2 44:11
  45:22
relative 22:4 59:20
  59:21
remedies 41:9
Removal 12:24
render 11:16 12:3
rendered 11:7,24
  55:15
renew 17:9,16
repair 30:14 40:1,9
  40:19
repaired 42:11
repairs 42:19
repeat 17:23
rephrase 5:9
report 11:5
reported 2:20 59:14
reporter 1:21 4:24
  56:11,18,20 59:7
represent 3:23 8:8
  8:9,12,21,22,24

9:3,9 38:10
representing 9:11
represents 5:3 38:9
Republic 7:23
reputation 26:9
  34:13
require 54:12
requirements 8:5
requires 52:15
research 10:6 33:6
  37:24
reserve 57:1
resolution 51:17
resolve 47:23
resolving 18:12
resort 15:9
Resorts 1:10 3:24
  49:19 50:11 58:8
Responsabilidad
  41:5
responsibilities
  42:24
responsibility 8:17
  11:10 15:1,4,12
  18:22 21:14,14
  40:10 41:6,16,19
  41:20 42:1,7,8,10
  42:12,17,20 43:12
  43:12 48:11 50:19
  50:24 51:3
responsible 30:13
  41:15,24
rest 19:11
result 8:13 24:13
  28:2 31:16 42:13
  44:7 45:20,21
retained 11:1,4
  12:13
returned 10:15
reviewed 9:17
  37:15
right 6:9 12:21 13:5
  18:23 25:3 29:5
  31:11 40:16,24
  41:2 43:10,16
  44:4 46:8 47:6
  56:9,16
rightfully 39:11
rights 40:22 42:18
role 41:13
Roo 5:14 16:6
  20:21 21:13,17,20
  22:1,3,8,12,17,23
  23:19 24:4 26:17
  26:19,21 27:14

28:21 33:1 37:14
  37:15,22 38:1,20
  39:3,20 44:12,15
  44:16,17,21 45:1
  45:16,18 48:8,9
  48:12 49:11,12,20
  50:10,21 51:3,5,6
  51:22 52:1 53:6,7
  53:12,15,16,23
  54:3,5,11 55:1
room 9:8
rough 28:3
ruins 42:12
rule 45:4 48:19,21
  48:23 49:1,6,6,12
  49:14 50:1,2,4,6
rules 1:16 4:6 19:1
  20:15,18 47:18
  51:12,21,21

_____
          S
_____
S 61:8
SAITH 57:5
saw 33:4
says 5:3 6:14 9:23
  22:22 27:8,14
  30:9 34:6,9 36:6
  36:17 39:16,19
  41:3 42:16 45:10
  45:16,19 46:4,18
  48:4 49:23 52:2,5
  52:8,11,18,21,23
  54:1
scenario 15:2
school 6:15,18,19
  6:21,24 7:3,6,8,10
  7:10,11,12
seal 60:2
search 32:17
seats 55:3
Seccion 41:3,4
second 14:3 27:19
  34:18 41:8 44:12
  49:15 55:2
section 41:3,14,16
  42:7 44:5 51:10
  52:23 53:1,4
sections 34:21,21
  35:2 52:23
see 4:18 23:24
  37:24 56:22
seen 32:19 33:6
Segundo 41:4,4
sent 13:10
sentiment 24:14

sentimental 26:3
sentiments 24:16
  25:17,19,23 34:14
  44:8
services 14:24
  27:24
set 60:1
sets 18:24
sex 23:1
sexual 25:9,22 26:2
Shorthand 1:21
  59:7
show 45:17
sides 52:15
signature 14:7,12
  56:8,19
similar 49:10
simple 32:6 39:22
single 30:1 43:3
sir 3:22 4:14,23 5:6
  5:12 6:12 8:11
  10:20,24 12:22
  14:2 16:3,7,21
  17:5 22:19 24:1
  24:10 25:6 26:6
  38:19,24 42:6
  54:15,21,23 55:6
  55:23 56:5,8 57:2
situation 21:24
  22:10 35:9
situations 23:7 35:2
six 14:3
slower 24:1
slowly 4:8
society 25:10 43:20
  43:22
somebody 8:7 24:19
  25:4,6,11
sons 22:3 43:21,22
  46:14
sorry 23:22,24 27:9
  32:16 36:1 50:13
  52:9
sort 8:20 43:4
sounds 12:20
source 35:21
Spanish 56:24
speak 4:8 24:1
speaking 4:13
Special 1:5
specific 5:15 7:2 8:3
  25:16 36:11 37:23
  42:13 43:5 46:13
  48:3
specifically 5:21

31:15
specifics 33:12
specified 59:19
sphere 50:3
spouse 24:15,20
  29:13,14 47:4
Sr 3:19,20
standard 18:24
standpoint 21:10
stands 53:4
stare 16:10,17,19
  16:21,23 17:6,7
  17:10,18
started 6:17,19
  10:19 30:20
starting 42:3
state 1:20,22 3:8
  10:12 14:24 15:23
  16:5 20:16,17,18
  22:23,24 23:8
  28:10 33:3 51:17
  51:18,22 52:12,13
  59:1,6,7
stated 24:23 47:13
  47:16 50:6
states 1:1,17 4:1 7:6
  7:7,20,22 8:1,9
  11:18 15:20,21
  16:1,10 19:21
  20:10,13,15 22:21
  35:5 43:14 48:19
  48:24 49:4,9 51:5
  51:13 58:2
status 34:15
statutes 32:20
stay 31:12
stenographically
  59:14
stop 49:17
Stouffer 11:12 12:7
  12:8
Street 1:22 2:4,11
strict 43:15,16
strike 39:4,15
studied 7:5 9:17
study 7:2,3
stuff 42:14
subject 34:19 52:14
subjective 25:17
submission 47:14
  47:17,17 50:12,18
  50:23 51:19,19
  52:10,12,19
submit 50:20 51:2,4
  54:5

**submits** 53:5
**submitted** 52:22
**submitting** 51:7 53:10
**subscribe** 58:14
**SUBSCRIBED** 58:21
**substantive** 56:15 56:17
**sue** 54:1
**sued** 8:23
**suffered** 31:17
**suffering** 21:22,23 22:2,9,10 31:2,9 32:22 33:15,20,21
**Suite** 1:22 2:4
**support** 51:11
**supported** 29:19 43:23
**Supreme** 50:5
**sure** 18:1 56:9
**surviving** 24:15 29:12,13,13,18 45:19 46:22,23,23 47:4
**switch** 55:3
**sworn** 3:2,5 58:21 59:11
**system** 6:14 8:2 13:11 19:4 20:19 22:3 32:17
**S.C** 10:16

**T**
**T** 61:8
**tacit** 52:19
**tacitly** 51:2,7 52:22 53:10
**take** 36:18,20 55:14
**taken** 1:16,18 28:19 59:18
**talk** 20:4 24:18
**talking** 21:18 25:2,3 25:7 32:2 53:21
**Tamaulipas** 49:5
**technical** 18:24
**telephonic** 1:14
**tell** 27:6,7,11 35:16 37:17
**temporary** 36:9
**ten** 11:24 12:11
**term** 16:13 17:6 24:23 37:1
**termed** 18:6
**terms** 30:4

**territorial** 48:1,6 51:7 52:3 53:11 54:10
**territory** 52:3
**testified** 3:5 25:1 27:2
**testify** 59:11
**testimony** 59:16
**thank** 43:17 56:5 57:1,3
**things** 14:13 43:18
**think** 7:9 22:1 25:12 32:12 33:4 33:23 38:18 49:24 51:9 52:6,10 54:16 56:14
**third** 42:7
**third-parties** 30:18 31:19 38:9 41:7 41:17 42:2 45:12
**third-party** 31:7
**three** 7:11,12
**time** 4:13 8:19,19 10:6,6,12 58:13 59:19
**times** 11:15 28:9
**title** 41:4
**today** 55:24 56:12
**topics** 9:17 19:5
**tort** 14:19
**total** 27:21 36:8,9 39:8
**totally** 15:14
**touch** 43:18
**transaction** 38:13
**transcribe** 56:11
**transcript** 56:23 58:12,16 59:13
**transfer** 43:1
**transferrable** 30:18 31:7,18
**transferred** 45:12
**transfers** 43:3
**transit** 23:2
**translate** 22:21 27:8,12 28:15
**translation** 27:15 28:3
**true** 58:15 59:16
**trust** 56:20
**truth** 59:11
**try** 4:7,8
**turn** 21:5 38:19 54:21 55:6,10
**two** 13:1 14:10 15:4

35:12,17,18 40:13 46:14
**type** 25:17
**types** 8:16
**typewriting** 59:15

**U**
**ultimately** 15:8 46:20
**undergraduate** 6:22
**understand** 5:4,8,9 6:13 21:18,23 24:8,24 31:12 45:10 49:16 51:8
**understanding** 6:21 14:20
**understood** 5:11 52:21
**United** 1:1,17 4:1 7:6,7,20,22 11:17 16:10 19:21 35:5 43:14 58:2
**university** 6:23 7:1 7:3,13 9:14,21
**use** 8:4
**U.S** 19:23 20:3 50:1 50:2 56:4

**V**
**v** 3:23
**Valle** 1:15 3:3,10,13 14:1 58:19 61:4
**value** 19:18
**Vargas** 12:19,20
**variable** 28:17
**various** 3:23 8:16 14:13
**victim** 9:11 21:24 22:11 28:8,17 29:2,5 30:19,20 35:2 36:14 39:11 45:13
**victim's** 45:13
**view** 26:23
**Vincent** 12:14,16 12:17
**visiting** 23:5
**vs** 1:9 58:7

**W**
**wage** 28:8,9,10,20
**waive** 56:19
**waivers** 49:18
**want** 4:12 24:7,22

27:1,6 40:4,6 43:8 43:8,9,18 53:22 53:23 54:1 55:6 56:10
**wanted** 55:17
**way** 5:9 8:2 35:8 54:6
**went** 6:14 7:3 9:13 22:11
**weren't** 47:7
**West** 1:22 2:4
**We'll** 57:1
**whatnot** 38:17
**WHEREOF** 60:1
**widow** 31:10 44:5
**wife** 22:3 24:12,13 25:8,13,18,24 31:15 46:23,23
**willingly** 53:5
**Wilson** 2:10 12:6
**witness** 3:1,4 17:17 23:13 37:3 38:7 56:22 59:10,10 60:1 61:3
**word** 27:13,13
**wording** 56:24
**words** 53:17
**work** 4:10 11:11 34:17 42:21
**worked** 9:23 10:4
**works** 8:2
**wouldn't** 20:2,13
**Wozniak** 1:4,6 3:23 31:1,6,16,22 32:1 32:2,6,7 33:13,18 33:22 46:14,15,24 58:5
**Wozniaks** 50:16
**Wozniak's** 31:3 33:14,20 43:21
**write** 11:5
**wrongful** 6:7 8:8,18 14:15 18:13,18 19:2 20:7,12,22 21:4,15 24:6,13 24:18 25:10 29:12 36:7
**wrongfully** 8:13
**Wyndham** 1:10 3:24 5:3 11:1 15:9 49:19 50:11 50:16 58:8

**X**
**X** 61:1,8

**Y**
**year** 9:14,24 35:9
**years** 7:11,12
**York** 10:1,8,12

**Z**
**zone** 28:20

**0**
**08** 1:9 58:7

**1**
**1** 13:15,18 28:3 52:23 58:13 61:11
**100** 56:8
**103** 41:12
**104** 42:3,5,7,9
**105** 42:15,15,17
**106** 42:15,19
**107** 42:15,22
**108** 42:15,23
**109** 42:16 43:1
**110** 43:3
**115** 43:9,10,11
**12:07** 1:24
**120** 2:11
**121** 51:9,10,14
**123** 34:11
**126** 20:24 21:11 27:8,9,12,13
**127** 21:1,11 28:5,19
**128** 21:11 28:15
**129** 21:11 28:22 29:11 45:23 46:1 46:18
**13** 61:11
**130** 21:1,12 29:22
**131** 21:1,12 26:18 26:21 27:2,3,4 30:7,8,9 34:1 45:15,19,23
**132** 21:1,12 36:4,6 36:17
**1361** 1:9 58:7
**15** 13:19
**15th** 1:23
**150** 51:22,24 52:1,5
**152** 52:8
**153** 51:23 52:6,10 52:11,15
**154** 51:23 52:18,21 53:4
**18th** 60:3
**188** 40:4,5
**19** 6:20

EMI GONZALEZ de CASTILLA del VALLE, JUNE 5, 2008

| | |
|---|---|
| 190 40:5 | 89 40:12 |
| 1910 18:16,21 | |
| 1916 26:15 45:6,8 | **9** |
|   45:10 | 90 40:17 |
| 1934 18:17 | 91 40:20 |
| 1973 6:15 | 92 40:11 41:12,21 |
| 1978 6:15 |   41:22 |
| 1979 7:15 | |
| 1982 10:15 | |

**2**

2 13:16,19,23 20:24
  21:11 22:20,20,22
  28:4 41:16 53:1
  54:22,24,24 61:11
20 6:20,20
2008 1:23 13:20
  58:23 60:3
2299 30:11 34:2,5,6
  35:11,23,24,24
26 18:11
27th 14:11

**3**

3 51:10 61:5
31 8:1,9 15:20,21
  15:23 20:13 27:2
  27:3 48:24 51:13
312-629-8800 2:6
312-704-0550 2:13

**4**

4 18:5

**5**

5 18:8,11 55:11
5/24/11 60:9
54 61:6
55 1:22 2:4
57 58:14

**6**

6 14:8
600 1:22 2:4
60602-2412 2:12
60603 2:5

**8**

80 36:14
800 28:8,19
84-4383 1:19 2:21
  60:13
87 21:11 38:19,22
  38:23,24 39:16,19
88 40:6

# Welcome to Islander Collection .

Back in October 01, 2006 "Islander Properties" started operations in Mexico with a very busy schedule; taking over the operation of Wyndham Cozumel Resort & Spa, "Sabor" its exclusive adults only section, Aura Cozumel Wyndham Grand Bay, Villas Arqueologicas – 5 Petit Hotels on the Archaeological Sites of Teotihuacan, Cholula, Chichen Itza, Uxmal & Coba.

Being young but full of experience due to the background of the members of the board which are represented by Mr. Carlos Del Pino as the Managing Director, "Islander Properties" is on its second year of full operation of the biggest and most complete resort of Cozumel and starts planning other developments in other destinations.

Besides its exclusive "Islander Collection" of hotels created to satisfy all the needs for a wide variety of fine clientele... in addition you will find some unique services such as: Islander Spa with over 8,000 sq ft of surface as the most complete SPA on the Island, with 11 cabins for singles and couples, beauty parlor and an extensive variety of health products for different treatments and Reef Plaza with convenient store, jewelry, boutique, ATM, and Tequila Factory, among others.
Islander Properties, extends its marketing efforts overseas with a:

- Reservations Centre in Houston, TX
- Sales Representation Offices in Dallas, TX and San Diego, CA
- Sales Representation and Reservations Office in New York
- Public Relations Company in Miami, FL

Local Time: 12:39:17 PM
Now: Partly Cloudy : 95 F















**WYNDHAM HOTEL
FRANCHISE AGREEMENT**

BETWEEN

**WYNDHAM HOTEL GROUP INTERNATIONAL, INC.**
(Franchisor)

and

**ISLANDER PROPERTIES S.A. de C.V.**
(Franchisee/Manager)

dated

**As of June 29, 2007**




# WYNDHAM HOTEL
## FRANCHISE AGREEMENT
### TABLE OF CONTENTS

Page No.

1. GRANT OF FRANCHISE ............................................................. 1
2. TERM ............................................................................................ 3
3. FEES ............................................................................................. 3
4. THE WYNDHAM ASSOCIATION ............................................. 6
5. MANAGEMENT, STAFFING AND TRAINING ........................ 7
6. HOTEL OPERATIONS ............................................................... 10
7. FURNISHING AND MAINTAINING THE HOTEL ................... 12
8. RESERVATION AND PROPERTY MANAGEMENT SYSTEMS ........ 14
9. ADVERTISING AND MARKETING .......................................... 16
10. PROPRIETARY MARKS ........................................................... 18
11. MANUAL ................................................................................... 22
12. CONFIDENTIAL INFORMATION .......................................... 23
13. ACCOUNTING AND RECORDS .............................................. 24
14. INSURANCE .............................................................................. 25
15. TRANSFERABILITY OF INTEREST ..................................... 26
16. SECURITIES OFFERINGS ...................................................... 29
17. DEFAULT AND TERMINATION ............................................. 30
18. OBLIGATIONS UPON TERMINATION .................................. 32
19. CONDEMNATION AND CASUALTY ...................................... 34
20. TAXES, PERMITS AND INDEBTEDNESS ............................. 35
21. INDEPENDENT CONTRACTOR AND INDEMNIFICATION ......... 36
22. APPROVALS AND WAIVERS .................................................. 37
23. REPRESENTATIONS OF FRANCHISEE .............................. 38
24. NOTICES .................................................................................... 40
25. ENTIRE AGREEMENT .............................................................. 40
26. CONSTRUCTION AND SEVERABILITY ............................... 41
27. DISPUTE RESOLUTION AND GOVERNING LAW ................ 42
28. REMEDIES; CURRENCY ......................................................... 43



29. WAIVER OF JURY TRIAL AND DAMAGES.....................................43

30. FRANCHISEE ACKNOWLEDGMENTS .......................................44

31. SPECIAL STIPULATIONS ...............................................................44

**ATTACHMENTS**

Attachment A –   Selected Terms

Attachment B –   Guaranty

Attachment C –   Management Company Rider

Attachment D –   Definitions

Attachment E –   Form Work for Hire Agreement

Attachment F –   Form Irrevocable Power of Attorney

Attachment G –   Project Improvement Plan (PIP)

Attachment H –   Disclosure Document

**ADDENDA**

Conversion Addendum



# WYNDHAM HOTEL
# FRANCHISE AGREEMENT

THIS AGREEMENT is made and entered into as of June 29, 2007 by and between **WYNDHAM HOTEL GROUP INTERNATIONAL, INC.** ("Franchisor"), and **ISLANDER PROPERTIES S.A. de C.V.** ("Franchisee"). Certain terms used in this Agreement are defined in Attachment D.

## Recitals

1. Franchisor has the right to use and sublicense in all countries throughout the world (other than the United States and Canada) certain trademarks and service marks, including the Marks and distinctive Wyndham System for providing transient guest lodging services to the public under the "WYNDHAM" marks, as well as certain services, including the Reservation System, advertising, marketing and training services.

2. Franchisor or its Affiliates have developed and Franchisor has the right to use and license the use of a System for the establishment and operation of full-service hotels under the trade name and service mark "Wyndham" and other designated Proprietary Marks.

3. Franchisee holds a leasehold interest in the hotel identified in Attachment A to this Agreement ("Hotel") and desires to obtain a license to use the Proprietary Marks set forth in Attachment A and the System to operate the Hotel as an All-Inclusive Wyndham Hotel as set forth in Attachment A.

4. Franchisee understands and acknowledges the importance of operating the Hotel in conformity with Franchisor's standards and specifications in order to enhance public acceptance of, and demand for, all Wyndham Hotels.

5. Franchisor is relying upon information submitted by Franchisee about the business skill, financial capacity and character of Franchisee and Franchisee's Principals, and upon the guaranty of Franchisee's obligations under this Agreement by its corporate shareholders, each of whom has executed a Guaranty in the form of Attachment B to this Agreement, to enter into this Agreement.

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## I.    GRANT OF FRANCHISE

A.    <u>Grant</u>. As of the Opening Date, Franchisor grants to Franchisee, upon the terms and conditions contained in this Agreement, the nonexclusive right and franchise, and Franchisee undertakes the obligation, to operate the Hotel as an All-Inclusive Wyndham Hotel in a manner compliant with, under and subject to

Franchisor's standards, specifications, policies and procedures at, and only at, the location specified in Attachment A ("Approved Location") and to use, solely for the operation of the Hotel at the Approved Location, the Proprietary Marks and System as it may be changed, improved and further developed from time to time. This franchise and Franchisee's rights under this Agreement are granted only for the number of guest rooms specified in Attachment A, and shall only be applicable to the ninety (90) additional rooms currently comprising the RRVC timeshare facility (the "Permitted Timeshare Facility") as the same may be marketed to guests in the event of guest demand and available inventory in the event the Hotel portion of the resort is at maximum capacity, unless and until such time as Franchisee enters into an agreement with an Affiliate of Franchisor with respect thereto. Franchisee shall not expand or change the number of guest rooms or make other structural changes to the Hotel without the prior written consent of Franchisor.

B.    <u>Reserved Rights</u>.    Franchisee acknowledges and agrees that (i) this franchise relates solely to the Approved Location; and (ii), unless otherwise set forth herein, this Agreement does not entitle Franchisee to any protected territory, territorial rights or exclusivity except as set forth in Section 31.    Franchisee further acknowledges and agrees that the Wyndham Companies have and retain the right to own, develop and operate, and to license others to develop and operate, hotels and lodging facilities (including, without limitation, business deluxe, resort and garden hotels and extended stay facilities), timeshare or vacation ownership resort properties, restaurants or other business operations of any type whatsoever, under the Wyndham name and mark or under other trade names, trademarks and service marks, at any location except the Approved Location, including locations adjacent, adjoining or proximate to the Approved Location, and that these business operations may compete directly with and adversely affect the operation of the Hotel. Franchisee agrees that the Wyndham Companies may exercise these rights from time to time without notice to Franchisee, and Franchisee covenants that it shall take no action, including any action in a court of law or equity, which may interfere with the exercise of such rights by any of the Wyndham Companies.

C.    <u>Obligations Commencing on Opening Date</u>.    The rights and obligations of the parties derived from the grant of the franchise and the right to become part of the System (including, but not limited to, those set forth at Sections 1A, 3B-F, 4, 5 (excluding Section 5A, relating to management company and management agreement approval procedures, and 5B, with respect to initial training), 6, 7, 8, 9, 10 and 11 of this Agreement) shall begin as of the Opening Date. All other rights and obligations of the parties (including, without limitation, those in the New Construction or Conversion Addendum attached hereto and Sections 1B-C, 5A, 5B, 7A(1), 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 and 30 of this Agreement), shall become effective as of the date set forth in the Preamble. Franchisee understands and agrees that it shall not open the Hotel for business as a Wyndham Hotel until the Opening Date, and except as expressly provided in Section 4 of the Conversion Addendum, Franchisee has no rights to the franchise or to the use of the System or the Proprietary Marks until the Opening Date. Franchisee further understands and agrees that if Franchisee fails to comply with the construction, furnishing and pre-opening requirements set forth in the Conversion or New Construction Addendum (as applicable), in compliance with the standards and specifications of Franchisor, then

220674.v5A (Final)

Franchisor is not obligated to authorize the opening and operation of the Hotel as a Wyndham Hotel, and this Agreement may be terminated under and subject to Section 17C. Upon any such termination, this Agreement shall thereafter be deemed null and void, except for the post-termination obligations of Franchisee set forth in the New Construction or Conversion Addendum (as applicable) and Section 18 hereof.

## 2.  TERM

Except as otherwise provided in this Agreement or in the law, the term of this Agreement shall begin on the date set forth in the Preamble and shall expire on the date set forth in Attachment A. Any renewal of this Agreement shall be upon the mutual agreement of Franchisee and Franchisor, and on Franchisor's then current form of Franchise Agreement the terms of which may differ from the terms of this Agreement.

## 3.  FEES

A.    Initial Franchise Fee; Expansion Fee.

1.    Upon the execution of this Agreement, Franchisee shall pay to Franchisor the initial franchise fee set forth in Attachment A, less the amount of the application fee paid by Franchisee (as set forth in Attachment A), which shall be credited against the initial franchise fee. The initial franchise fee is non refundable and is paid by Franchisee to Franchisor in consideration for the administrative and other expenses incurred by Franchisor in approving Franchisee's site for the Hotel and in entering into this Agreement.

2.    Franchisee shall have no right to expand the number of guest rooms at the Hotel without Franchisor's prior written consent and payment of an expansion fee in an amount equal to the then-current initial franchise fee per guest room for each additional guest room proposed to be added. Franchisee shall pay the expansion fee to Franchisor with its application for approval of the proposed expansion, which approval will be at the sole discretion of Franchisor. If Franchisee's application for expansion is approved by Franchisor, the expansion fee shall be non-refundable. If Franchisee's application for expansion is not approved by Franchisor, Franchisor will refund the expansion fee, less Franchisor's application processing charge. The terms of this Section 3.A.2 shall not be applicable to the 90 timeshare units of the Permitted Timeshare Facility.

B.    Royalty.  In consideration for Franchisee's continuing use of the Proprietary Marks and the System, Franchisee shall pay to Franchisor a continuing monthly royalty fee accruing from and after the Opening Date and continuing during the term of this Agreement in an amount equal to three percent (3%) of the Gross Package Revenues of the Hotel.

C.    Marketing Fee.  Franchisee shall pay to Franchisor on a monthly basis an amount equal to one and one-half percent (1.5%) of the Gross Package Revenues of

220674.v5A (Final)

the Hotel (the "Marketing Fee") accruing from and after the Opening Date as a contribution to the Central Marketing Fund (defined in Section 9.B.), which shall be maintained and administered by Franchisor for the System as provided in Section 9.B hereof. Each Wyndham Hotel owned or managed by Franchisor or its Affiliates shall make contributions to the Central Marketing Fund at generally the same rate required of franchisees. Franchisor may increase the Marketing Fee periodically to an amount consistent with the Central Marketing Fund allocation for all Wyndham Hotels, including hotels owned or managed by Franchisor or its Affiliates. Subject to modification by Section 31.1.

D.    Reservation System Fees.    Franchisee shall pay to Franchisor or its designee, accruing from and after the Opening Date, reservation system fees in an amount equal to the allocated reservation center cost per reservation charged to all Wyndham Hotels, Wyndham Garden hotels and any other hotel tier identified with the Proprietary Marks participating in the reservation system that is owned, franchised, licensed or operated by Franchisor.    Reservation center costs shall be paid or reimbursed on the basis of an initial link-up charge and on the cost for handling reservations made at the Hotel. Franchisor reserves the right to modify or change the reservation system fees and the basis for computing reservation system fees, provided the fees are computed on substantially the same basis for all Wyndham Hotels in the same division as the Hotel.

E.    National Sales Fee.    Franchisee shall pay to Franchisor or its designee from and after the Opening Date a continuing monthly national sales fee in the following amounts: (i) if the Hotel is a Wyndham Historic Hotel with one hundred eighty (180) or more guest rooms or a Wyndham, Wyndham Grand Collection or a Wyndham Garden Hotel, one percent (1%) of the Gross Package Revenues of the Hotel, (ii) if the Hotel is a Wyndham Historic Hotel with one hundred seventy-nine (179) or fewer guest rooms, one-half percent (½%) of the Gross Package Revenues of the Hotel, (iii) if the Hotel is a Wyndham Resort, one and one-half percent (1½%) of the Gross Package Revenues of the Hotel. The national sales fee is for national group sales services, regional convention sales services and transient business sales services provided by Wyndham's National Sales Office.

F.    Regional Marketing Fee.    Franchisee shall pay to Franchisor or its designee a continuing monthly regional marketing fee, during the term of this Agreement, in an amount equal to one-half percent (0.5%) of the Gross Package Revenues of the Hotel accruing from and after the Opening Date in the event that Franchisee decides to participate in any such regional marketing programs.

G.    Due Dates.    All payments required in Sections 3B, 3C, 3E, and 3F shall be paid to Franchisor by the fifteenth (15th) day of each month with respect to the Gross Package Revenues accrued for the preceding month, and shall be submitted to Franchisor together with any reports required under Section 13 of this Agreement. All payments required in Section 3D, and all other invoices forwarded by Franchisor or its Affiliates to Franchisee, shall be paid as provided in the invoice or, if the invoice does not specify a date for payment, within thirty (30) days after Franchisee's receipt of the invoice. Any payment or report not actually received by Franchisor on or before the date due shall be deemed overdue. If any payment is overdue, Franchisee shall pay to

220674.v5A (Final)

Franchisor, in addition to the overdue amount and as a late charge, interest on such amount from the date it was due until paid, at one and one-half percent (1½%) per month or the maximum rate permitted by law, whichever is less. Entitlement to the late charge shall be in addition to any other remedies Franchisor may have. If Franchisor is ever deemed to have contracted for, charged, or received interest in an amount that exceeds the amount permitted under applicable law, then the excess amount shall be deemed to be, and shall be treated as, a payment of outstanding fees or other amounts due under this Agreement and, if no such amounts remain outstanding, any remaining excess shall be paid to Franchisee, as applicable.

    H.    Non-Resident Withholding Taxes.

    1.    Franchisee acknowledges that this Agreement contemplates that Franchisor will not be responsible for any taxes (other than U.S. federal and state income taxes applicable to Franchisor) with respect to any transactions or payments contemplated by or pursuant to this Agreement. Accordingly, payments required to be made by Franchisee to Franchisor or to any of Franchisor's Affiliates pursuant to this Agreement (including payment of the Initial Fee, Recurring Fees and any liquidated damages and interest) shall be the gross amount determined according to the applicable paragraph of this Agreement without deduction for any taxes, including any non-resident withholding taxes which may be imposed on payments by Franchisee to Franchisor or any of its Affiliates.

    2.    If Franchisee is required to deduct any withholding tax from any payment to Franchisor or any of its Affiliates, then the amount payable shall be increased by such amount as is necessary to make the actual amount received (after such withholding tax and after any additional taxes on account of such additional payment) equal to the amount that would have been received had no withholding been required. In that case, Franchisee shall pay the amount required to be withheld to the applicable taxing authority and shall promptly deliver to Franchisor receipts of applicable governmental authorities showing that all taxes were properly withheld in compliance with applicable law.

    3.    In the event any jurisdiction imposes or seeks to impose any taxes on Franchisor or any of its Affiliates (other than U.S. federal or state income taxes) as a result of or in connection with the transactions contemplated by this Agreement or receipt of payment therefor, Franchisee agrees to indemnify and hold Franchisor and its Affiliates harmless on an after-tax basis, for the full amount of (1) any such additional taxes, (2) any penalties, interest or additional taxes with respect thereto, (3) any expenses incurred in connection with contesting the imposition of such additional taxes, and (4) any other costs or expenses incurred in connection therewith.

    I.    Payments in U.S. Dollars.

    1.    Unless Franchisor instructs Franchisee otherwise in writing, all payments shall be made in Dollars. Franchisee agrees, at Franchisor's request, to sign an Electronic Payment Authorization which authorizes Franchisor to automatically debit Franchisee's bank account, in Dollars, located outside the territory of the United Mexican States, on the dates payments are due, for any Recurring Fees

and other amounts due and owing under this Agreement and any other agreements between Franchisee and Franchisor. The above authorization does not release Franchisee from its obligation to timely make all payments due to Franchisor under this Agreement. Franchisee shall maintain a bank account with sufficient funds, on deposit, in Dollars, outside the territory of the United Mexican States, to cover all required and permitted withdrawals. In addition, Franchisor reserves the right to require that all payments be made by wire transfer to the account that Franchisor indicates, in immediately available funds, and Franchisee shall promptly execute and cause to be executed all documents requested by Franchisor to authorize and facilitate the required wire transfers.

2.    To the extent any payments require conversion to Dollars, whether by electronic funds transfer, wire transfer, or otherwise, as indicated in Section 3.1.1 above, such amounts due to Franchisor shall be initially calculated in local currency, and then converted to Dollars every other day (or if the authorized foreign exchange bank designated by Franchisor is not open on any such other day, then the immediately preceding day on which such authorized foreign exchange bank is open), as long as such payments are timely made. Conversion shall be based on the transfer rate at which local currency can be converted to Dollars for transfer to the U.S. at the purchasing US Dollars in document rate at an authorized foreign exchange bank designated by Franchisor from time to time. All fees and taxes assessed in connection with conversion of currencies or transmittal of payment shall be borne by Franchisee. If any conversion into US Dollars is made after the date it should have been done and the applicable exchange rate in effect on the due date varies from the rate in effect on the date of actual payment, the exchange rate most favorable (of those on the due date and on the date of actual payment) to Franchisor shall be used in calculating the amount of the payment to be made by Franchisee.

J.    <u>Payment Restrictions</u>. Franchisee shall notify Franchisor immediately in writing if at any time legal restrictions shall be imposed on the purchase of Dollars or the transfer to or credit of a non-resident corporation with payments in Dollars. Franchisee shall use its best efforts to obtain any consents or authorizations which may be necessary in order to permit timely payments in Dollars of all amounts payable hereunder. While such restrictions are in effect, Franchisor may require Franchisee to deposit all amounts due but unpaid as a result of such a restriction in any type of account, in any bank or institution designated by Franchisor and in any currency designated by Franchisor that is available to Franchisee. Franchisor shall be entitled to all interest earned on such deposits. Franchisor shall bear all risk of loss with respect to the deposited funds and interest payable thereon once Franchisee deposits such funds properly in the designated account. In the event such restrictions are in place for ninety (90) days or longer, Franchisor shall have the right, but not the obligation, to terminate this Agreement upon notice to Franchisee.

## 4.    THE WYNDHAM ASSOCIATION

During the term of this Agreement, Franchisor may, but is not obligated to, establish, or authorize the establishment of, an association ("Association") sanctioned by Franchisor to serve as an advisory council to Franchisor with respect to



advertising, marketing, reservations or other appropriate matters relating to Wyndham Hotels. If an Association is established, then all franchisees of the System, including Franchisee, and Franchisor shall be members of the Association.

## 5. MANAGEMENT, STAFFING AND TRAINING

A.  Hotel Management.  Franchisee will at all times retain and exercise management control over the Hotel. Any lease, management agreement or other arrangement for operating the Hotel or any part thereof (including, without limitation, food and beverage service facilities) shall be subject to Franchisor's prior written consent. Notwithstanding the foregoing, Franchisor acknowledges that certain guest entertainment services of the Hotel, such as a motorized activities, excursions and diving operations at the Hotel ("Third-Party Operated Areas") may be operated by third parties (the "Third-Party Operators") under a lease, operating agreement or similar agreement. The operation of any Third-Party Operator Areas by a Third-Party Operator, and the selection of a Third-Party Operator for such Third-Party Operated Areas, shall be subject to approval of Franchisee; provided, however, that (i) any such Third-Party Operator shall at no times use any of the Proprietary Marks in connection with its services or advertisements to any guests, (ii) the terms of such lease, operating or other agreement must be consistent with the terms of this Agreement, and (iii) the Third-Party Operators must operate the Third-Party Operated Areas in accordance with the Franchisor's standards.

1.  Franchisor acknowledges and agrees that Franchisee shall manage the operation of the Hotel as of the Opening Date. If Franchisee wishes to engage a management company to manage the Hotel, Franchisee shall apply to Franchisor for its consent. In order to be approved by Franchisor, a proposed management company must be deemed by Franchisor, in its reasonable judgment, qualified to manage the Hotel. Franchisor may refuse to approve any proposed management company which, in Franchisor's reasonable judgment, is not financially capable or responsible, is inexperienced or unqualified in managerial skills or operational capacity or capability, or is otherwise unable to adhere fully to the obligations and requirements of this Agreement. Franchisor may also withhold its approval if the proposed management company does not provide Franchisor with all information that Franchisor may reasonably request in order to reach such decision. Franchisee acknowledges that Confidential Information and materials are, in the normal course of business, imparted to System franchisees and managers, and Franchisor will be under no obligation to approve any proposed management company that is a franchisor or owner, or is affiliated with the franchisor or owner, of a hotel trade name which is competitive with Franchisor or its Affiliates, regardless of the number of hotels operating under such trade name. Franchisor reserves the right, at its option and upon reasonable notice, to revoke its approval of any management company that fails to continue to meet Franchisor's standards.

2.  In the event that Franchisee engages a management company for the management and operation of the Hotel during the term of this Agreement, any management agreement between Franchisee and such management company with respect thereto shall be subject to the terms, conditions, and obligations of this

Agreement.    Prior to the execution of any such management agreement, the management agreement shall be submitted to Franchisor for Franchisor's written approval, which shall not be unreasonably withheld, but which may be conditioned upon the inclusion of the following terms:

    a.    The management company shall have the exclusive authority and responsibility for the day-to-day management of the Hotel.

    b.    The Hotel will be operated during the term of the management agreement in compliance with this Agreement.

    c.    At Franchisor's request, Franchisor shall be named as a third party beneficiary of any such management agreement with the independent right to enforce the provision described in Section 5A(2)(b) above, or such management company shall execute a separate rider to this Agreement (in substantially the form of Attachment C hereto), agreeing to be bound by those terms hereof that relate to the management and operation of the Hotel and further agreeing to be bound by the covenants of confidentiality set forth herein.   Further, at Franchisor's request, the management company shall cause those of its key employees that Franchisor may require to execute similar covenants of confidentiality, in a form reasonably acceptable to Franchisor.

    d.    If Franchisee terminates any such management agreement pursuant to its terms, then Franchisee shall give Franchisor at least ninety (90) days' prior written notice unless termination is due to extraordinary circumstances requiring that Franchisee promptly remove the management company as the manager of the Hotel.

    3.    If Franchisee or any transferee permitted under Section 15 below (in either case, "Owner") decides to cease managing the operations of the Hotel or terminates any such approved management agreement for the operation of the Hotel pursuant to its terms, then Owner shall, within six (6) months following the date of such termination, enter into a replacement management agreement with a replacement manager approved by Franchisor, as further described below.   During such six-month period, Owner shall, with Franchisor's consent, employ an interim manager to manage the Hotel under the System and the Proprietary Marks pending the execution of a new management agreement with a replacement manager.

    a.    Any interim manager (as contemplated by this Section 5(A)(3) other than Franchisee must be approved in writing by Franchisor. Franchisor shall not unreasonably withhold its consent to a proposed interim manager but shall have the right to require that such interim manager (a) be experienced in the operation of upscale hotels, as determined by Franchisor in its sole discretion; and (b) manage the Hotel under and subject to the terms and conditions of this Agreement under a short term management agreement not to exceed six (6) months.

    b.    Owner shall diligently seek to obtain a replacement manager for the Hotel throughout the period of time the Hotel is operated by any such interim manager. Any replacement manager and replacement management agreement

220674.v5A (Final)

shall be submitted to Franchisor for its written approval, which approval shall not be unreasonably withheld, but which may be conditioned on the requirements set forth in Section 5A(2)(a-d).

B. Staffing; Training. Franchisee (or any approved manager during the term of this Agreement) shall employ qualified personnel sufficient to staff all positions at the Hotel, as prescribed in the Manual.

1. All personnel employed at the Hotel in those positions designated by Franchisor to receive training shall attend and successfully complete such initial and other training programs as Franchisor may from time to time require. Franchisor may also periodically make available other optional training courses to Franchisee's personnel, as well as other programs, conferences, seminars and materials. All training shall be provided at such times and locations and for such duration as Franchisor may designate. Before any employee attends any required or optional training program, Franchisee shall pay to Franchisor the applicable tuition fees specified in the Manual or otherwise in writing. Franchisee shall also be responsible for its employees' travel expenses and room, board and wages during any training program. As a condition of providing training, Franchisor reserves the right to require that personnel receiving training execute confidentiality agreements prepared by Franchisor. All persons subsequently employed in positions designated by Franchisor to receive training also must successfully complete Franchisor's training programs. Franchisor shall determine, in its sole discretion, whether any person has successfully completed training.

2. Franchisor may provide Franchisee with on-site training at the Hotel for personnel involved in front desk, restaurant, reservations, housekeeping, engineering, and other operations, as determined by Franchisor. The number of Franchisor's personnel and the time period for which such on-site training may be provided (if any) shall be determined by Franchisor based upon its assessment of Franchisee's requirements. Franchisee shall pay or reimburse Franchisor for the wages and all direct costs (including transportation, meals and lodging) of those persons providing such on-site training.

3. Franchisor may from time to time require certain personnel employed at the Hotel to attend periodic meetings held to address matters of general interest to the System (including, without limitation, annual sales and rooms meetings) and may require Franchisee to pay the attendance fee specified in the Manual or otherwise in writing. Such meetings shall be held at locations designated by Franchisor. Franchisee shall be responsible for the travel expenses, room, board and wages for its personnel attending any such meeting.

4. Without limiting the foregoing, any person employed as a general manager for the Hotel shall attend and successfully complete (as determined by Franchisor in its sole discretion) Franchisor's initial training program and the general manager and director of sales for the Hotel shall attend all required sales meetings and shall devote full time to the management and operation of the Hotel.



5.    Franchisee shall cause all employees, while working at the Hotel, to wear uniforms as specified in the Manual, to present a neat and clean appearance, and to render competent and courteous service to guests of the Hotel.

6.   **HOTEL OPERATIONS**

A.    <u>Adherence to System Standards</u>.    Franchisee understands and acknowledges that each and every standard, specification, policy and procedure of the System is essential in order to maintain the quality and guest service of Wyndham Hotels and to enhance public acceptance of, and demand for, Wyndham Hotels. Franchisee shall conduct its operations in strict conformity with the standards, specifications, policies and procedures set forth in the Manual or otherwise in writing, which standards, specifications, policies and procedures shall be applied consistently to all Wyndham Hotels in the same division as the Hotel. Notwithstanding the foregoing, however, if in the reasonable judgment of Franchisor local conditions or special circumstances (including the market area or the physical peculiarities of a hotel) warrant a deviation from such standards, specifications, policies, or procedures, then Franchisor may allow such deviation.

B.    <u>Restricted Use of Hotel Premises</u>.    Except for the Permitted Timeshare Facility set forth in Section 1A above, Franchisee shall use the Hotel premises solely for the operation of a Wyndham Hotel and shall refrain from using, or allowing others to use, the premises for any other purpose or activity at any time, without obtaining the prior written consent of Franchisor, which may be withheld in Franchisor's sole discretion. Franchisee shall not provide, or allow others to provide, any guest service or offer any product at the Hotel except as prescribed in the Manual or otherwise in writing. Franchisee shall not permit any part of the Hotel premises to be used for gaming purposes without the prior written consent of Franchisor. Franchisee shall not permit any activity at the Hotel which would negatively impact the good will of Franchisor or the System.

C.    <u>Promotion of Other Businesses</u>.    Except those businesses set forth on Schedule 6.C attached hereto, without the prior written consent of Franchisor, which may be withheld in Franchisor's sole discretion, Franchisee and Franchisee's manager shall ensure that no part of the Hotel or the System is used to further or promote a different or competing business, including without limitation, advertising or promotion for hotels other than those franchised by Franchisor or its Affiliates and marketing advertising or promoting any timeshare or vacation ownership resort other than the Permitted Timeshare Facility not affiliated with Franchisor and its Affiliates. For the sake of clarity, the prohibited activity described in the foregoing sentence shall not include any hotels independently owned and/or operated by Franchisee within its network of hotels, but is intended to prohibit such activity with respect to any international hotel brands that are competitors of Franchisor throughout the world. In addition, except as expressly permitted in the Manual or otherwise consented to by Franchisor in writing, no part of the Hotel or the System shall be used to further or promote any other business or concession at the Hotel. Franchisee shall use every reasonable means to encourage the use of Wyndham Hotels everywhere by the traveling public; provided, however, that nothing herein shall prohibit, and Franchisee

agrees to participate in, any program specified by Franchisor for referring prospective customers to other hotels when the customers cannot be accommodated by Franchisee's Hotel or any other Wyndham Hotel. Without limiting the foregoing and except for the Permitted Timeshare Facility, Franchisee shall not develop or operate a timeshare or vacation ownership resort which is integrated or shares amenities with the Hotel without Franchisor's prior written consent. Except as expressly provided herein (including Section 31.5 below), nothing herein shall prohibit Franchisee or an Affiliate of Franchisee from developing, operating or promoting other hotels or lodging facilities so long as Franchisee satisfies the provisions of Sections 6A, B and C and Section 7 of this Agreement.

D.    <u>Food and Beverage Standards</u>.    Franchisee shall provide food and beverage service in the Hotel in conformity with the standards and specifications prescribed in the Manual to insure the highest level of quality and service. Franchisee agrees:

1.    To use and operate the restaurant premises and lounges solely for the benefit of the franchised business, to keep any restaurant and lounge open and in normal operation for such minimum hours and days as Franchisor may from time to time prescribe; and to refrain from using or allowing others to use the premises for any other purpose or activity at any time without first obtaining the written consent of Franchisor;

2.    To maintain in sufficient supply, and use at all times, only such food and beverage products and ingredients, supplies, paper goods, dinnerware and furnishings as conform to Franchisor's standards and specifications, and to refrain from deviating therefrom without Franchisor's prior written consent;

3.    To sell or offer for sale only those menu items and beverages that comply with Franchisor's standards and specifications and all applicable legal requirements (including, without limitation, all licensing and other requirements for the sale of alcoholic beverages); to sell or offer for sale all required menu and beverage items as prescribed in the Manual or otherwise in writing by Franchisor; to prepare all menu items and beverages offered under and subject to Franchisor's standards and specifications and all applicable legal requirements; and to discontinue selling and offering for sale any items which Franchisor may, in its discretion, disapprove in writing at any time; and

4.    To use only menus, signs, promotional displays and other materials that comply with the style, pattern and design prescribed in the Manual or otherwise approved in writing by Franchisor.

E.    <u>Guest Services</u>.    Franchisee shall honor at the Hotel all credit cards specified in the Manual. Franchisee also agrees to participate in and shall provide all information requested by Franchisor for the purpose of all customer surveys and guest satisfaction audits conducted by Franchisor. Franchisee shall offer all guest services including complimentary services that Franchisor may prescribe for Wyndham Hotels including, without limitation, programs and services for senior citizens, children and frequent guests. Additionally, Franchisee shall offer all products and services and

- 11 -

shall participate in all programs that Franchisor may determine to be in the best interest of or may reasonably establish for the System, including, without limitation, guest-accessible high speed Internet service, guest recognition programs such as Wyndham ByRequest, in room, pay per view movies (subject to Franchisor's right to direct the type of adult movies which are offered and the time and manner in which such movies are offered) travel agent programs, marketing incentive programs, complaint resolution programs and programs for the provision of complimentary rooms or refunds to guests to the extent such programs are capable of being implemented at the Approved Location.

F. <u>Quality Assurance Program; Inspections</u>. Franchisor shall administer a quality assurance program for the System which may include conducting periodic inspections of the Hotel and guest satisfaction audits and surveys to ensure compliance with System standards. Franchisee hereby grants to Franchisor and its representatives the right to enter upon the premises of the Hotel at all reasonable times, with or without prior notice, for the purpose of conducting inspections. Franchisee shall pay a fee for each inspection, if any, assessed; provide lodging, if available, without charge to Franchisor's representatives during such time as may reasonably be necessary to complete the inspections; cooperate fully with Franchisor's representatives during the inspections; and take all steps reasonably necessary to correct any deficiencies detected within the time specified by Franchisor. Fees for Franchisor quality inspections shall range from $2,400 - $5,200 per inspection, with an estimated two (2) inspections per year, unless Franchisor is required to conduct additional inspections due to failed compliance reports.

## 7.    FURNISHING AND MAINTAINING THE HOTEL

A.    Hotel Facilities, Equipment and Furnishings.

1.    Prior to the Opening Date, Franchisee shall develop, construct, convert, equip and furnish the Hotel under and subject to the provisions of this Agreement (including the Conversion Addendum attached to this Agreement) and the Manuals. Franchisee shall comply in all respects with all policies, procedures and requirements of Franchisor for the development or conversion of the Hotel as a Wyndham Hotel, as the same is set forth in Attachment G attached hereto setting for the Project Improvement Plan ("PIP") mutually agreed to by the parties.

2.    Franchisee shall, at Franchisee's expense, purchase or lease and install at the Hotel all facilities, appurtenances, furnishings, fixtures, equipment, furniture, computer terminals, hardware, software, and related equipment (including, without limitation, that required for the property management and reservation systems specified by Franchisor), telephone and other communications systems, entertainment systems, facsimile machines and copiers, signs and other items (collectively, "FF&E") specified by Franchisor for the System in the PIP, the Manual or otherwise in writing. Franchisee also shall install and maintain, or arrange to have installed and maintained, at the Hotel, all coin-operated vending machines specified by Franchisor for the System.

220674.v5A (Final)



3.    Franchisee shall refrain from installing or permitting to be installed at the Hotel, without Franchisor's prior written consent, any FF&E, electronic or video games, vending machines or any other items not previously approved by Franchisor.

4.    The size, form, color scheme, content and location of all signs, advertisements and graphic materials displayed in any public area or guest rooms at the Hotel shall be as prescribed in the Manual or otherwise approved in writing by Franchisor.

5.    At Franchisor's request, Franchisee shall install and maintain all modems, devices and equipment as Franchisor may specify in the Manual or otherwise in writing to permit Franchisor to access electronically information pertaining to the operation of the Hotel, including, without limitation, Gross Package Revenues, the source and amounts of all other revenues generated at the Hotel, room occupancy and rates, and reservations data. Franchisor shall have electronic access to such information at such times and in such manner as Franchisor shall from time to time specify.

B.    Sourcing.  All food products, supplies, and FF&E (excluding computer terminals, hardware, software, and related equipment for the property management and reservation systems) used at or in the Hotel that do NOT contain Proprietary Marks may be purchased from any source, provided such products meet the specifications provided for in the Manual and are previously approved by Franchisor. Any items that contain Proprietary Marks and any Computer terminals, hardware, software and related equipment for the property management and reservations systems of the Hotel shall be purchased only from sources designated or approved by Franchisor.  Notwithstanding the above, Franchisee acknowledges that Franchisor may specify a particular model or brand of FF&E or other items for Wyndham Hotels that may be available from only one manufacturer or supplier.  Additionally, Franchisor may at any time, in its discretion, specify that certain food products, FF&E, and supplies be purchased only from designated or approved sources which have demonstrated, to the reasonable satisfaction of Franchisor, the ability to meet Franchisor's standards and specifications for those items.   If Franchisor has designated or approved suppliers for any items and the pricing of such items are not competitive with market prices for similar products within Mexico, then prior to purchasing or leasing any such item from a source which has not been previously approved by Franchisor, Franchisee shall submit to Franchisor a written request for such approval, or shall request the source itself to do so, such approval not to be unreasonably withheld if the product from such proposed supplier is substantially similar to that designated or previously approved by Franchisor.  Franchisor may require, as a condition of its approval, (i) that the source present satisfactory evidence of insurance protecting Franchisor and its franchisees against any and all claims arising from the use of such item by System franchisees, and (ii) that samples of the item be delivered by the source, at Franchisor's option and at no cost to Franchisor, to Franchisor or its designee for inspection and retention.  A charge not to exceed the cost of such inspection shall be paid to Franchisor by Franchisee or by the source seeking approval, and. Franchisor shall not be liable for damage to any sample.

- 13 -



Franchisor reserves the right, at its option, to revoke its approval as to future purchases if a source fails to continue to meet Franchisor's standards.

C.    <u>Hotel Maintenance</u>.    Franchisee shall maintain the Hotel, including, without limitation, all interior and exterior signs, parking areas, entrance ways, landscaping, and all other facilities and appurtenances in first-class condition.    In connection therewith, Franchisee shall make, at Franchisee's sole cost and expense, all additions, alterations, repairs and replacements of signs and other FF&E as Franchisor may reasonably direct.    Franchisee shall not make any material alterations to the Hotel without obtaining the prior written consent of Franchisor.

D.    <u>Upgrades</u>.    Franchisor shall have the right, from time to time, to require by written notice that Franchisee upgrade the Hotel at Franchisee's sole cost and expense to conform to the building decor and trade dress and FF&E required under Franchisor's then-current System standards (which standards shall be applied consistently throughout the System for hotels of similar age and within the same division or tier as the Hotel), including, without limitation, such FF&E replacements, remodeling, redecoration and modifications to existing improvements as may be necessary to do so.    Upgrades to the Hotel required by Franchisor pursuant to this Section 7D shall be reasonable, considering the then-current System standards and requirements and the current structural design of the Hotel.    Franchisee shall complete upgrading and remodeling of the Hotel as required by Franchisor pursuant to this Section 7D within the time reasonably specified by Franchisor, and Franchisee acknowledges that its failure to do so shall, except for delays which may be caused by the occurrence of events constituting Force Majeure, constitute a material default for which this Agreement may be terminated as provided in Section 17C.

E.    <u>Purchasing Services</u>.    Franchisor or one or more of Franchisor's Affiliates may, at Franchisor's option, provide purchasing services to Franchisee for Franchisee's acquisition from third parties of some or all of the FF&E, food products, supplies and other items required in the operation of the Hotel and may offer such purchasing services to Franchisee for a reasonable fee.

8.    **RESERVATION AND PROPERTY MANAGEMENT SYSTEMS**

A.    <u>Participation in Reservation System</u>.    As long as Franchisee is in compliance with all material terms of this Agreement, Franchisor shall make available to Franchisee's Hotel the reservation system provided by Franchisor for all Wyndham Hotels, which system may be modified or changed from time to time by Franchisor. Franchisee acknowledges that offering the public a single, efficient reservation service is essential to the goodwill, reputation and success of the System.    During the term of this Agreement, Franchisee shall participate in the reservation system on an exclusive basis and shall not participate in any other electronic central reservation system except through Franchisor's central reservation system, shall enter into all agreements required by Franchisor in connection therewith, and shall observe all terms and conditions of participation as determined from time to time by Franchisor.    Franchisee shall honor and give first priority on available rooms to all confirmed reservations referred to the Hotel through the reservation system.    Franchisee agrees that the only

reservation system or service to be used in regard to outgoing reservations referred by and from the Hotel to other hotels shall be the reservation system prescribed by Franchisor. Franchisee shall be solely responsible for notifying the reservation center of any changes in Franchisee's room rates. Franchisee shall not charge any guest a rate higher than the rate specified to the guest by the reservation center at the time the guest's reservation was made. Such rate shall be the rate most recently provided to the reservation center by Franchisee prior to the time the reservation was made, according to the records of such center.

B.    <u>Network Installation and Maintenance</u>. Franchisee, at its expense, shall install and maintain at the Hotel all computer hardware, software and related equipment necessary for participation in the reservation and property management systems required by Franchisor, including any future enhancements, additions, substitutions or other modifications specified by Franchisor. Franchisee shall cause such systems to be configured to Franchisor's specifications and shall pay all applicable installation, configuration, support and maintenance fees as and when due. Franchisee shall also be responsible for telephone line charges for connecting Franchisee's network to the wide area network designated by Franchisor, for the cost of supplies used in the operation of the equipment and for all other related expenses.

C.    <u>Software Licenses</u>. Franchisee understands and acknowledges that all software and documentation for the property management and the reservation system (if any), and all related documentation provided to Franchisee under this Agreement (the "Software"), is provided under license from Franchisor or its designee and Franchisee agrees to enter into all software license agreements required by Franchisor in connection therewith. The Software shall at all times remain the sole property of Franchisor or such designee. Franchisee shall at all times treat the Software and all upgrades, enhancements and modifications thereto as confidential. Franchisee shall not at any time, without Franchisor's prior written consent, copy, duplicate, modify, reverse engineer, or otherwise duplicate the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person. Any and all software license provided for under this Agreement to Franchisee, shall automatically terminate upon expiration or termination of this Agreement.

D.    <u>Suspension from Reservation System</u>. In the event Franchisee fails to pay royalties; Central Marketing Fund contributions, national sales fees, or reservation system fees when due, or is otherwise in material default under this Agreement, Franchisor may, if such default is not cured within the applicable cure period (if any) pursuant to Section 17 of this Agreement and after written notice to Franchisee, suspend the Hotel from the reservation system for so long as Franchisee remains in default. Franchisee waives all claims against Franchisor arising from the Hotel's suspension from the reservation system pursuant to this Section 8D. Franchisor's right to suspend the Hotel from the reservation system under this Section 8D shall be in addition to any other rights Franchisor may have.

## 9.   ADVERTISING AND MARKETING

A.   <u>Advertising Approvals</u>.   All advertising by Franchisee in any medium shall be conducted in a dignified manner and shall conform to such standards and requirements as Franchisor may specify in the Wyndham Graphics Manual, as may be modified by Franchisor from time to time. Franchisee shall submit to Franchisor (by mail, return receipt requested), for its prior approval, samples of all advertising, promotional plans and materials and public relations programs that Franchisee wishes to use which deviate from the standards and requirements set forth in the Graphics Manual and which have not been either provided or previously approved by Franchisor.   Any advertising, marketing, or sales concepts programs or materials proposed or developed by Franchisee for the Hotel and approved by Franchisor are already remunerated or paid under this Agreement by Franchisee and may therefore be used by other Wyndham Hotels. Franchisee shall cause any employee and/or third parties creating such programs, plans and materials to execute the work for hire agreement in the form of Attachment E hereto and forward an original executed copy of each such agreement to Franchisor, within five (5) calendar days following their execution.   Franchisor reserves the right to disapprove upon written notice to Franchisee any advertising materials.

B.   <u>Central Marketing Fund</u>.   Recognizing the value of marketing and advertising to all Wyndham Hotels, Franchisee agrees that Franchisor or its designee shall administer a central marketing fund ("Central Marketing Fund") as follows:

1.   To the extent provided generally by the Franchisor for the benefit of the Hotel and other hotels operating under the name "Wyndham," Franchisor will provide for the Hotel during the term of this Agreement marketing services consisting of chain-wide and/or division level marketing programs, marketing collateral, research services, advertising, and public relations efforts.

2.   On or before the fifteenth (15th) day of each calendar month during the term of this Agreement, Franchisee shall pay or reimburse Franchisor for the provision of the marketing services by contributing to the Central Marketing Fund an amount equal to the Marketing Fee, as defined in Section 3C. The Marketing Fee will be collected and applied to pay only the actual costs incurred and allocated by Franchisor in the provision of the marketing services as further described below. The Marketing Fee shall not be used to pay, and Franchisee shall pay separately, the costs of any reservation and National Sales Office services (as provided in Sections 3D and 3E of this Agreement), as well as the costs (which may include, without limitation, mileage or other direct operating costs to marketing partners) of any third party marketing partner programs (such as frequent flyer and similar programs) in which the Hotel participates that are direct-billed to participating hotels. Franchisee agrees that the Central Marketing Fund may be used to satisfy any and all costs of maintaining, administering, directing, preparing, and producing advertising and other marketing services (including, without limitation, the cost of preparing and producing television, radio, magazine and newspaper advertising campaigns; website development and maintenance; direct mail and outdoor billboard advertising; public relations activities; employing advertising agencies; and departmental and other costs



of Franchisor's personnel for advertising that is internally administered or prepared by Franchisor).

3.    Franchisor will expend the Marketing Fee at such time and in such manner as it reasonably deems appropriate for the provision of the marketing services. Franchisee acknowledges that the Central Marketing Fund is intended to maximize general public recognition, acceptance and use of the Wyndham Hotel and Wyndham Garden Hotel Systems and that Franchisor and its designees undertake no obligation in administering the Central Marketing Fund to make expenditures which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or pro rata from expenditures by the Central Marketing Fund. Prior to the expenditure thereof, the collected Marketing Fees may be held or maintained in one or more accounts, any of which also may include funds other than Marketing Fees, but Franchisor in any event shall provide reasonable reports to Franchisee regarding the Marketing Fee.

C.    National Sales Office Services.  To the extent provided generally by Franchisor for the benefit of the Hotel and other Wyndham Hotels in the same division as the Hotel, Franchisor will provide for the Hotel during the term of this Agreement, National Sales Office services, such as national and regional convention, business and sales promotion services, trade show promotional services, and group booking services. The fee for such National Sales Office services shall be paid by Franchisee as provided in Section 3E of this Agreement. Franchisee agrees to participate in any and all national account programs designated as mandatory by the National Sales Office, provided that Franchisee shall set its own reference price against which discounted rate programs are measured, shall determine whether or not to participate in programs set at specific rates or specifically authorize Franchisor to set rates for particular national accounts.

D.    Initial Opening Campaign.  For the initial opening of the Hotel for business as a Wyndham Hotel, Franchisee shall comply with the advertising and marketing campaign requirements as prescribed by Franchisor in the Manual or as otherwise agreed upon by Franchisee and Franchisor.

E.    Wyndham Hotel Directory.  Franchisee agrees to list the Hotel in the Wyndham Hotel Directory and to furnish to Franchisor such information as Franchisor may request for that purpose. Franchisee agrees to honor the information that Franchisee causes to be published in the Directory and to comply with such other requirements with respect to the Directory as may be specified from time to time in the Manual. Franchisee understands and acknowledges that Franchisor assumes no liability for, nor shall it be deemed liable by reason of, any failure by Franchisee or other Wyndham franchisees to honor any Directory listings for the period during which each Directory is in effect.

F.    Additional Marketing Programs.  Franchisor may establish and coordinate advertising, marketing and sales programs, customer satisfaction programs and other activities among System hotels and other lodging products of Franchisor and its Affiliates on a System-wide or local or regional basis and provide for

participation therein by Franchisee. Franchisee shall participate in such programs and activities on the same basis as other participating System hotels (including hotels owned or managed by Franchisor or its Affiliates) in the same division or region as the Hotel, and such programs and activities will be paid for outside the Central Marketing Fund.

G. Internet Website. Franchisee shall not establish or use any Website or other listing on the Internet except as provided herein.

1. Franchisor has established and maintains, or may establish and maintain an Internet Website that provides information about the Wyndham Hotel System and the accommodations and services that Wyndham Hotels provide. Franchisor will have sole discretion and control over the Website (including timing, design, contents and continuation). Franchisor may use part of the Marketing Fees it collects under Section 3C to pay or reimburse the costs associated with the development, maintenance and update of the Website.

2. At Franchisee's request, Franchisor may (but is not required to) include at the Website an interior page containing information about Franchisee's Hotel. If Franchisor includes such information on the Website, Franchisor may require Franchisee to prepare all or a portion of the page, at Franchisee's expense, using a template that Franchisor provides. All such information will be subject to Franchisor's approval prior to posting.

## 10. PROPRIETARY MARKS

A. License to Use. Franchisor grants Franchisee a non-exclusive license to use the Proprietary Marks during the term of this Agreement under and subject to the System and related standards and specifications.

B. Franchisee's Acknowledgments. Franchisee understands and acknowledges the following:

1. Due to the substantial and continuous use of the "Wyndham" name for hotel services in many areas of the United States beginning in 1982, Franchisor or its Affiliates have acquired substantial common law rights in and to the "Wyndham" service mark for use for hotel services. In addition, Franchisor or its Affiliates own several US state registrations, as well as registrations in other countries including Mexico, and have filed an application for federal registration of the "Wyndham" mark.

2. As between Franchisor and Franchisee, Franchisor or its Affiliates are the owners of all right, title and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them.

3. Franchisee's use of the Proprietary Marks pursuant to this Agreement shall not give the Franchisee any right, title, or interest in or to any of the Proprietary Marks or any of Franchisor's or its Affiliates' service marks, trademarks,


trade names, trade dress, logos, patents, copyrights or proprietary materials, except the non-exclusive license to use the Proprietary Marks under and subject to the terms and conditions of this Agreement for the operation of the Hotel at the Approved Location. Franchisee shall not have any right to, and Franchisee shall not, under any circumstances, use or display the Proprietary Marks except as approved by the Franchisor.

4. Franchisee understands and agrees that any and all goodwill arising from Franchisee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of Franchisor or its Affiliates and upon expiration or termination of this Agreement and the license herein granted, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the Proprietary Marks.

5. Franchisee shall not contest the validity of Franchisor's or its Affiliates' interest in the Proprietary Marks or assist others to contest the validity of such interest. Franchisee shall take no action that would prejudice or interfere with the validity of Franchisor's or its Affiliates' rights with respect to the Proprietary Marks.

6. Franchisee acknowledges that any unauthorized use of the Proprietary Marks by Franchisee, and any other person or persons under its control, shall constitute an infringement of Franchisor's or its Affiliates' rights in the Proprietary Marks and a material event of default hereunder. Franchisee agrees that it shall provide to Franchisor (at no cost to Franchisee unless such action is necessitated by the wrongful acts of Franchisee or any person or persons under its control) all assignments, affidavits, documents, information and assistance Franchisor reasonably requests to fully vest in Franchisor or its Affiliates all right, title and interest in and to the Proprietary Marks, including all such items as are reasonably requested by Franchisor to register, maintain and enforce such rights in the Proprietary Marks.

7. Franchisor reserves the right to substitute different proprietary marks for use in identifying the System if the current Proprietary Marks no longer can be used, or if Franchisor, in its sole discretion, determines that substitution of different Proprietary Marks will be beneficial to the System. Further, in the event of a sale or any other transfer or assignment of Franchisor's rights under this Agreement, Franchisor also reserves the right to require any purchaser, assignee or transferee to cease using the Proprietary Marks and substitute different names, marks, logos, insignia, slogans, emblems, designs or other identifying commercial symbols for the continued operation of the business. In any such event, Franchisor may require Franchisee, at Franchisee's expense, to discontinue or modify Franchisee's use of any of the Proprietary Marks or to use one or more additional or substitute names, marks, logos, insignia, slogans, emblems, designs or other identifying commercial symbols. In that event, Franchisee shall, at its expense, discontinue or modify Franchisee's use of any of the Proprietary Marks and use such additional or substitute names, marks, logos, insignia, slogans, emblems, designs or other identifying commercial symbols as Franchisor or the purchaser, transferee or assignee may require. Notwithstanding the foregoing provisions of this Section 10.B.7, however, in the event that the proposed

220674.v5A (Final)



schedule for the discontinuation, substitution or modification of the Proprietary Marks referred to herein creates undue economic hardship for Franchisee, Franchisor and Franchisee (and, if applicable, any purchaser, transferee or assignee referred to herein) may by mutual agreement extend for a reasonable period the time for compliance with the requirements hereof.

       8.    Franchisee acknowledges that Franchisor is the lawful, rightful and sole owner of the Internet domain name *"www.wyndham.com,"* and *"www.womenbusinesstravelers.com"* and any other Internet domain names registered by Franchisor, and unconditionally disclaims any ownership interest in those or any colorably similar Internet domain name. Franchisee agrees not to register any Internet domain name in any class or category that contains words used in or similar to any brand name owned by Franchisor or its Affiliates or any abbreviation, acronym, phonetic variation or visual variation of those words.

    C.   <u>Use of Proprietary Marks</u>. With respect to Franchisee's licensed use of the Proprietary Marks pursuant to this Agreement, Franchisee further agrees that:

       1.    Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Hotel only under the name set forth in Attachment A without prefix or suffix. Franchisee shall not use the Proprietary Marks as part of its corporate or other legal name or for any other business activity or venture. No other name or design shall be used at all concurrently with the Proprietary Marks.

       2.    During the term of this Agreement, Franchisee shall identify itself as the owner of the franchised business in conjunction with any use of the Proprietary Marks, including, but not limited to, uses on invoices, order forms, receipts, and contracts, as well as the display of a notice in such content and form and at such conspicuous locations on the premises of the Hotel or any motor vehicle associated with the Hotel as Franchisor may designate in the Manual or otherwise in writing. Franchisee shall provide Franchisor any and all such documents or authentic copies of them where use of the Proprietary Marks is shown adequately, within five (5) days following request in writing, in order for Franchisor to prove use of the Proprietary Marks to any third party or Authority at any time.

       3.    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor or its Affiliates.

       4.    Franchisee shall comply with Franchisor's instructions in filing and maintaining the requisite trade name or fictitious name registrations, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection of the Proprietary Marks or to maintain their continued validity and enforceability.

       5.    Franchisee shall not use the Proprietary Marks or any abbreviation or other name associated with Franchisor or the System as part of any e-mail address, domain name, or other identification of Franchisee in any electronic medium. Franchisee agrees not to transmit or cause any other party to transmit advertisements or solicitations by e-mail or other electronic media without first

obtaining Franchisor's written consent as to the content of such e-mail advertisements or solicitations as well as Franchisee's plan for transmitting such advertisements. In addition, Franchisee shall be solely responsible for compliance with any laws pertaining to sending e-mails including but not limited to the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (the "CAN-SPAM Act of 2003").

6. Franchisor undertakes the obligation of registering this Agreement, and Franchisee as authorized user of the proprietary Marks, with the Mexican Industrial Property Institute. Upon the termination of this Agreement, Franchisor shall file such documents and take such actions, in Franchisee's name and behalf, to cancel any and all then effective government approvals, registrations or filings of this Agreement, including without limitation those regarding the Mexican Industrial Property Institute. As a condition of this Agreement taking effect and in order to enable Franchisor to obtain the registrations and/or cancellations contemplated in this paragraph, Franchisee shall grant to Franchisor an irrevocable power of attorney in favor of Franchisor and whomever Franchisor may indicate and in the form attached to this Agreement as Attachment F. This irrevocable power of attorney shall survive the expiration or termination of this Agreement.

D. **Infringement.** Franchisee shall notify Franchisor immediately of any apparent infringement of or challenge to Franchisee's use of any Proprietary Mark and of any claim by any person of any rights in any Proprietary Mark. Franchisee shall not communicate with any person other than Franchisor or any designated Affiliate of Franchisor, their counsel and Franchisee's counsel for any such apparent infringement, challenge or claim. Franchisor shall have complete and sole discretion to take such action as it deems appropriate for the foregoing, and the right to control exclusively, or to delegate control to any of its Affiliates, of any settlement, litigation, or Patent and Trademark Office or other proceedings arising out of any such alleged infringement, challenge or claim, or otherwise relating to any Proprietary Mark. Franchisee agrees to execute any and all instruments and documents, render such assistance, and do such acts or things as may, in the opinion of Franchisor, reasonably be necessary or advisable to protect and maintain the interests of Franchisor or its Affiliates in any litigation or other proceeding or to otherwise protect and maintain the interests of Franchisor or any other interested party in the Proprietary Marks, all at no cost to Franchisee unless such action is necessitated by the wrongful acts of Franchisee or any person or persons under its control.

E. **Retained Rights.** The right to use the Proprietary Marks granted hereunder to Franchisee is nonexclusive, and Franchisor may use, and grant licenses to others to use the Proprietary Marks, and may establish, develop, and license other systems which use the Proprietary Marks and the System, without offering or providing Franchisee any rights in, to, or under such other systems. Franchisor or its Affiliates may also engage, directly or indirectly, through their employees, representatives, licensees, assigns, agents and others, in the production, distribution, license and sale of products and services; and may use in connection therewith the Proprietary Marks and any and all trademarks, trade names, service marks, logos, insignia, slogans, emblems, symbols, designs and other identifying characteristics as may be developed or used from time to time by Franchisor.

220674.v5A (Final)

## 11. MANUAL

A.   The Manual.  Franchisor has provided Franchisee access to a current copy of Franchisor's Manual (which may be in multiple volumes and may be provided electronically).  The Manual contains, among other matters, minimum standards and requirements for constructing, equipping, furnishing, staffing and supplying the Hotel and management, training and operational standards; procedures and techniques. The provisions of the Manual shall be consistently applied by Franchisor to all Wyndham Hotels in the same division as the Hotel; provided that, if in the reasonable judgment of Franchisor local conditions or special circumstances (including the market area or the physical peculiarities of a hotel in the System) warrant a deviation from such provisions, then Franchisor may allow such deviation.

B.   Compliance with Manual.  To protect the reputation and goodwill of Franchisor and to maintain high standards of operation under the Proprietary Marks, Franchisee shall conduct its business under and subject to the Manual, other written directives which Franchisor may issue from time to time (whether or not such directives are included in the Manual), and any other manuals and materials created or approved for use in the operation of the Hotel.  The Manual shall supplement this Agreement.

C.   Confidentiality of Manual.  Franchisee shall at all times treat the Manual and the information contained therein as confidential; and shall maintain such information as confidential.  Franchisee shall not at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise reproduce the Manual, in whole or in part, or otherwise make the same available to any unauthorized person.

D.   Ownership of Manual.  The Manual shall at all times remain the sole property of Franchisor and shall be returned to Franchisor immediately upon the termination or expiration of this Agreement.

E.   Revisions to Manual.  Franchisor may from time to time revise the contents of the Manual.  Franchisor shall provide to Franchisee a copy of all revisions and additions to the Manual, and Franchisee expressly agrees to comply with each new or changed standard.

F.   Master Copy of Manual.  Franchisee shall at all times ensure that Franchisee's copy of the Manual is kept current and up-to-date, and in the event of any dispute as to the contents of said Manual, the terms of the master copy of the Manual maintained by Franchisor at Franchisor's home office shall be controlling. Lack of in writing communication by Franchisee to Franchisor requesting any Manual new or changed standard, shall be expressly understood as Franchisee's fulfillment of its obligation to keep it current and updated.

G.   Paper Manual Fee.  Franchisor will charge a fee of Five Hundred Dollars ($500) for any request for a paper copy of the Manual by Franchisee.

220674.v5A (Final)



H. <u>Electronic Publication</u>. Franchisor may, at its option, publish the Manual only in electronic format only, available on-line or on magnetic, optical or other media that must be accessed via computer.

## 12. CONFIDENTIAL INFORMATION

A. <u>Use of Confidential Information</u>. Franchisee shall not, during the term of this Agreement or thereafter, without Franchisor's prior written consent, copy, duplicate, record, or otherwise reproduce, in whole or in part, the Manual, any Software and accompanying documentation developed for or used in the System, or any other confidential information, including, but not limited to, Internet/Intranet passwords, customer lists and customer information, knowledge or know-how concerning the System or the operation of the Hotel which may be communicated or provided to Franchisee ("Confidential Information"), or of which Franchisee may be apprised, by virtue of Franchisee's operation under this Agreement, or otherwise make the same available to any unauthorized person. Franchisee shall divulge such Confidential Information only to such of Franchisee's employees, agents, accountants and attorneys as must have access to it in order to operate the Hotel. The contents of the Manual, all Software and accompanying documentation developed for or used in the System, and all other information, knowledge, know-how or other data which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement. Franchisee agrees and acknowledges that the Confidential Information contains our commercially valuable trade secrets and that unauthorized use or disclosure of all or any part of them would automatically cause great and irreparable injury to us and/or shall unjustly and unfairly benefit Franchisee and the recipient(s) and beneficiary(ies) of such unauthorized disclosure or use. Confidential Information also includes what is defined as trade/industrial secret in the United Mexican States Industrial Property Law (*Ley de la Propiedad Industrial*).

B. <u>Customer Information</u>. In partial consideration for the license to use the Proprietary Marks and the System and for the training Franchisee receives under this Agreement, Franchisee acknowledges that all rights or interests in customer lists and information relating to Hotel guests (including information obtained or used for any guest recognition program), as constituted from time to time, with the result that such customer lists and guest information shall be the joint property of Franchisee and Franchisor. Accordingly, Franchisor and Franchisee shall each have the right and license to use the customer lists and guest information during the term of this Agreement for the purposes contemplated herein but for no other purpose. Both parties agree to use the Customer lists and information strictly in accordance with all applicable privacy, marketing and other laws.

The covenants in this Section 12 shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee.



## 13. ACCOUNTING AND RECORDS

A. <u>Maintenance of Books and Records</u>. Throughout the term of this Agreement, Franchisee shall maintain and preserve, for at least five (5) years after the dates of their preparation, full, complete and accurate books, records and accounts under and subject to generally-accepted accounting principles and in the form and manner prescribed in the Manual. Franchisee's obligation to preserve such books, records and accounts shall survive the termination hereof.

B. <u>Monthly Reports</u>. Franchisee shall, at Franchisee's expense, prepare and submit to Franchisor by the fifteenth (15th) day of each month following the Opening Date (including the first partial month if the Opening Date is other than the first day of a month), a statement in the form prescribed by Franchisor, accurately reflecting for the immediately preceding month all Gross Package Revenues, the source and amounts of all other revenues generated at the Hotel, room occupancy and rates, reservations data, and such other data or information as Franchisor may require.

C. <u>Financial Statements</u>. Within thirty (30) days following the end of each fiscal quarter during the term of this Agreement, Franchisee shall, at Franchisee's expense, submit to Franchisor a balance sheet and an unaudited quarterly profit and loss statement for the Hotel on the form prescribed by Franchisor. Each statement shall be signed by an authorized officer of Franchisee attesting that it is true and correct. In addition, Franchisee shall, at Franchisee's expense, submit to Franchisor, within ninety (90) days following Franchisee's fiscal year end, a complete annual audited financial statement, prepared under and subject to generally accepted accounting principles by an independent certified public accountant satisfactory to Franchisor (either KPMG or another entity equal in reputation for providing services of similar quality), showing the result of the operations of the Hotel during such fiscal year.

D. <u>Additional Reports</u>. Franchisee shall also submit to Franchisor, for review and audit, such other forms, periodic and other reports, records, information, and data as Franchisor may reasonably designate, in the form and at the times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manual or otherwise in writing.

E. <u>Audits</u>. Franchisor or its designated agent shall have the right at all reasonable times, and upon reasonable notice to Franchisee, to examine and copy, at Franchisor's expense, all books, records, accounts and tax returns of Franchisee related to the operation of the Hotel from and after the Opening Date. Franchisor also shall have the right, at any time, and upon reasonable notice to Franchisee, to have an independent audit made of the books, accounts and records of Franchisee related to the operation of the Hotel pursuant to this Agreement. Franchisee shall provide lodging, if available, without charge to Franchisor's agents during the time that may reasonably be necessary to complete such audits and shall render such other assistance as may reasonably be requested. If an inspection or audit should reveal that payments have been understated in any report to Franchisor, Franchisee shall immediately pay to Franchisor upon demand, the amount understated plus interest from the date such amount was due until paid. The rate of interest shall be one and

220674.v5A (Final)



one-half percent (1½%) per month or the maximum rate permitted by law, whichever is less. If an inspection or audit discloses an understatement in any one year of three percent (3%) or more, Franchisee shall, in addition, reimburse Franchisor for any and all costs and expenses connected with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees). The foregoing remedies shall be in addition to any other remedies Franchisor may have. If an inspection should reveal that Franchisee has made overpayments to Franchisor, the amount of any such overpayment, without interest, shall be credited against future payments due and payable to Franchisor by Franchisee hereunder.

## 14. INSURANCE

A.    <u>Coverage Requirements</u>.  Franchisee, at its expense, shall at all times during the term of this Agreement procure and maintain such insurance as may be required by the terms of any lease or mortgage on the premises where the Hotel is located, and in any event no less than the types and amounts specified in the Manual.

B.    <u>General Requirements</u>.  The following general insurance requirements shall be satisfied by Franchisee:

1.    All insurance shall name each of the following as as an additional insured: Franchisor, any affiliate of Franchisor designated by Franchisor, and their employees and agents.

2.    All workers' compensation and employers' liability insurance shall include a waiver of subrogation in favor of the Franchisor.

3.    All insurance required hereunder shall be specifically endorsed to provide that the coverages will be primary and that any insurance carried by any additional insured shall be excess and non-contributory.

4.    All insurance required hereunder shall contain an endorsement whereby the policies shall not be canceled or materially changed without at least thirty (30) days' prior written notice to Franchisee and Franchisor.

5.    Prior to the Effective Date, Franchisee shall deliver to Franchisor a certificate of insurance or certified copy of each insurance policy evidencing the coverages required herein and setting forth deductibles and amounts thereof, if any. Renewal certificates of insurance or certified copies of such insurance policies if requested by Franchisor shall be delivered to Franchisor not less than ten (10) days prior to their respective inception dates.

6.    Franchisee's obligation to maintain the insurance hereunder shall not relieve Franchisee of liability under the indemnity provisions set forth in Section 21(B) of this Agreement, and each of the policies described in this Section 14 shall contain a contractual coverage endorsement specifically insuring the performance by Franchisee of the indemnity obligations set forth in Section 21(B).

7.    All insurance shall be satisfactory to Franchisor under and subject to standards and specifications set forth or otherwise in writing. Should Franchisee for any reason fail to procure or maintain the insurance required by this Agreement, Franchisor shall have the right and authority (without however any obligation to do so) to immediately procure such insurance and to charge the cost thereof to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon demand.

## 15.    TRANSFERABILITY OF INTEREST

A.    <u>Transfer by Franchisor</u>. Franchisor shall have the right to transfer this Agreement to any person or legal entity without prior notice to, or consent of, Franchisee. Specifically, and without limitation of the foregoing, Franchisee agrees that Franchisor may sell its assets, its interest in the Proprietary Marks or the System to a third party; may offer its securities privately or publicly; may merge, acquire other entities or be acquired by another entity directly or indirectly; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and with regard to any or all of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands, or damages against Franchisor arising from or related to the transfer, provided that such assignee or transferee expressly agrees to be bound by the provisions of this Agreement. Nothing contained in this Agreement shall require Franchisor to continue any business operating under the System or to offer any services or products, whether or not bearing the Proprietary Marks, to Franchisee if Franchisor assigns its rights in this Agreement under and subject to the provisions of this Section 15A.

B.    <u>Transfer by Franchisee - Franchisor's Consent Required</u>. Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal (*in personam*) to Franchisee, and that Franchisor has granted this franchise in reliance on the business skill, financial capacity, and character of Franchisee and Franchisee's Principals. Accordingly, except as provided in Section 15C (regarding certain permitted transfers) and Section 16 (regarding transfers of interests in publicly-held franchisees) of this Agreement, neither Franchisee nor any of Franchisee's Principals shall sell, transfer, convey, give away, pledge, exchange, lease, mortgage, or otherwise encumber its leasehold interest in the Hotel, its interest in this Agreement (including Franchisee's obligations under this Agreement), in Franchisee, or in any person or entity that owns a controlling interest in Franchisee, without the prior written consent of Franchisor. Except as provided in this Section 15 and Section 16 of this Agreement, any purported assignment or transfer, by operation of law or otherwise (including by auction, foreclosure and any kind of court resolution), not having the prior written consent of Franchisor shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may terminate this Agreement pursuant to Section 17B(5) of this Agreement and seek injunctive relief as well as monetary damages.

220674.v5A (Final)



C.    Permitted Transfers.  Notwithstanding any other provision of this Section 15. or Section 16.:

1.    Franchisee may transfer its interest in this Agreement to another legal entity, if (a) there is no uncured event of default under this Agreement, (b) following such transfer, Franchisee has and continues to have during the term of this Agreement a controlling interest in the transferee, (c) the transferee entity unconditionally assumes in writing all of Franchisee's past, present and future obligations under this Agreement and delivers a copy of such written assumption agreement to Franchisor, and (d) Franchisee provides prior written notice to Franchisor.  No such transfer shall relieve or excuse the liability of Franchisee or any entity who guaranteed or is otherwise liable for Franchisee's performance hereunder for the past and continuing performance of this Agreement, and such liability shall extend to any subsequent amendments, renewals and modifications of this Agreement (and any extensions, adjustments or compromises of claims) which are effective between Franchisor and the then-current franchisee notwithstanding the absence of any notice to or approval by those parties who remain liable, all of whom waive all notices and agree that Franchisor may proceed directly against them without proceeding against any other person or entity who may also be liable therefor.  At Franchisor's request, such persons further agree to execute or reexecute a guaranty substantially similar to the form of Guaranty attached to this Agreement.

2.    Any individual holding an interest in Franchisee may transfer all or a portion of his or her interest in Franchisee to any immediate (up to first tier) family member, to a trust established for the benefit of any such immediate family member, or to an entity in which such individual has and maintains a controlling interest if (a) there is no uncured event of default under this Agreement, (b) the transferor provides prior written notice to Franchisor, and (c) any transferor who transfers a controlling interest executes a guaranty substantially similar to the form of Guaranty attached as Attachment B and continues to maintain the unrestricted power to direct, directly or indirectly, the management and policies of the Franchisee, including those relating to the payment of financial obligations, as reasonably determined by Franchisor.

3.    Franchisee may assign, transfer, pledge, or hypothecate all or any part of the assets of the Hotel excluding this Franchise and this Agreement (and, if Franchisee is a corporation, partnership, limited liability company or other form of entity, all and any part of the ownership interests in Franchisee) to banks or other lending institutions for purposes of any refinancing or as collateral securing a loan made directly to or for the benefit of the Hotel.

D.    Conditions to Franchisor's Consent.  Franchisor shall not unreasonably withhold its consent to a transfer of its leasehold interest in the Hotel, in this Agreement (including Franchisee's obligations under this Agreement), in Franchisee, or in any person or entity that owns a controlling interest in Franchisee; provided however, Franchisor may, in its sole discretion, require any or all of the following as a condition of its consent:



1.      Transferor shall deliver to Franchisor a complete and accurate copy of any purchase and sale agreement or similar document covering the transaction, together with all such other documentation relating to the transaction as Franchisor may reasonably request. Without limitation of the foregoing, if this Agreement is proposed to be the subject of a security interest, the mortgagee shall use commercially reasonable efforts to provide Franchisor with a non-disturbance agreement as to Franchisee's rights as a lessee of the Hotel and the franchised business at the Hotel in form and substance reasonably acceptable to Franchisor;

2.      Transferor shall satisfy all of Franchisee's accrued monetary obligations to Franchisor and its Affiliates, shall execute a general release under seal in a form prescribed by Franchisor of any and all claims against Franchisor and its Affiliates, and their respective officers, directors, agents and employees, and, except with respect to a transfer to either an Affiliate of Franchisee or an entity in which Franchisee has and maintains a controlling interest, shall pay to Franchisor a transfer fee in an amount equal to fifty percent (50%) of Franchisor's then-current initial franchise fee. An amount equal to the application fee, if any, actually paid to Franchisor pursuant to Section 15D(3) below will be credited against the transfer fee payable by transferor;

3.      The proposed transferee shall submit to Franchisor an application, in the form prescribed by Franchisor, for a new franchise agreement to replace this Agreement for its unexpired term. Transferor must pay, or cause to be paid, to Franchisor an amount equal to the then-current application fee payable by applicants for a new franchise at the time that the proposed transferee submits its application. The application fee is non-refundable. Franchisor reserves the right to reject an application for a transfer for reasons that may include, without limitation, the following: (i) if Franchisor deems the transferee's proposed debt service to be too great to permit the transferee to successfully operate the Hotel under the System; or (ii) if the proposed transferee or any of its affiliated entities (other than those holding interests as limited partners only) is the franchisor or owner, or is affiliated with the franchisor or owner, of a hotel trade name which is competitive with Franchisor or its Affiliates, regardless of the number of hotels operating under such trade name;

4.      Transferee shall demonstrate to Franchisor's satisfaction that the transferee and its shareholders, members or partners, as appropriate, meet Franchisor's then-current managerial and business standards and have the aptitude and ability to conduct the franchised business (as may be evidenced by prior related business experience or otherwise); possess good moral character, business reputation and credit rating; and have adequate financial resources and capital to operate the franchised business, and any management company to be engaged by transferee shall meet Franchisor's then-current standards;

5.      Franchisor and the transferee will, upon approval of transferee's application, enter into a new franchise agreement which shall require transferee to upgrade the Hotel to conform to Franchisor's then-current standards, and which new franchise agreement shall contain the standard terms (except for duration) then being issued for new franchised Hotels under the System. The date of the transferee's new franchise agreement shall be the Opening Effective Date, and the transferee will be

required to certify in writing that: (i) Franchisor did not endorse, recommend, or otherwise concur with the terms of the transfer; (ii) Franchisor did not comment upon any financial projections submitted by Franchisee to transferee, and (iii) Franchisor did not participate in the decision of the price to be paid, which decision was made without any intervention, support or participation by Franchisor;

6. Transferee's general manager shall, prior to assuming management of the Hotel, successfully (as defined by Franchisor) complete the management training program then being offered by Franchisor; and

7. Franchisee acknowledges that Franchisor has legitimate reasons to evaluate the qualifications of potential transferees and the proposed terms of their purchase. Franchisee also acknowledges that Franchisor's contact with potential transferees for the purpose of protecting its business interests will not constitute improper or unlawful conduct. Franchisee expressly authorizes Franchisor to investigate any potential transferee's qualifications, to evaluate the proposed purchase terms, and to withhold consent to those transactions which Franchisor, in its sole judgment, determines are not consistent with its business interests, including, without limitation, economically questionable transactions. Franchisee waives any claim that any action Franchisor takes to protect its business interests in relation to a proposed transfer constitutes tortious interference with contractual or business relationships.

E. <u>Certain Changes of Controlling Principals.</u> In the event of the death or permanent disability of Franchisee or any of Franchisee's Controlling Principals, the interest of such person may be transferred under and subject to and subject to the terms of Section 15D provided that (i) any such transfer shall be made within six (6) months of the date of death or permanent disability and (ii) the obligations of Franchisee under this Agreement are satisfied pending the transfer, including adequate provision for management of the Hotel.

F. <u>Right of First Refusal – Intentionally deleted.</u>

## 16. SECURITIES OFFERINGS

A. <u>Consent Requirement.</u> Any transfer of securities in a publicly-held Franchisee or in any publicly-held entity that owns a controlling interest in Franchisee which will result in a transfer of control requires Franchisor's prior written consent, which shall be conditioned upon satisfaction of the requirements of Section 15D and additionally upon satisfaction of the requirements of Section 16B below.

B. <u>Review of Offering Materials.</u> For any public or private offering of securities relating to Franchisee or the Hotel, whether or not involving a transfer of control, Franchisee shall:

1. Submit to Franchisor at least forty-five (45) days before the date on which the prospectus or any other offering material (collectively, the "Prospectus") is first issued, a copy of the Prospectus for review. Franchisee shall reimburse



Franchisor for its expense (including professional fees and costs) in reviewing the proposed offering;

2. Fully and unconditionally indemnify and hold harmless Franchisor and the Wyndham Companies for the offering;

3. State clearly in the Prospectus and supporting materials and releases that Franchisor and the Wyndham Companies are not, in any way, participating in or endorsing the offering;

4. Use the Proprietary Marks in the Prospectus and in any related or supporting materials only as directed by Franchisor; and

5. Refrain from filing, publishing, issuing or releasing the Prospectus or any supporting or related materials without having received the prior written approval of Franchisor.

C. <u>Scope of Review</u>. Franchisor's review of any Prospectus shall be limited solely to the subject of the relationship between Franchisee and Franchisor and use of the Proprietary Marks, and its approval shall not constitute an endorsement or ratification of the offering, either express or implied. Franchisee agrees to make such changes to the Prospectus and related materials as Franchisor may reasonably request under and subject to the guidelines for its review established by this Section.

## 17. DEFAULT AND TERMINATION

A. <u>Termination - No Notice or Cure</u>. Franchisee shall be deemed to be in default under this Agreement and all rights granted hereunder shall automatically terminate without notice from Franchisor, if Franchisee shall become insolvent or make a general assignment for the benefit of creditors, or if a petition in bankruptcy and/or insolvency is filed by Franchisee or such a petition is filed against and consented to by Franchisee, or if Franchisee is adjudicated bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee, or if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction, or if proceedings for a compromise with creditors under any state or federal law is instituted by, against or consented to by Franchisee, or if a final judgment remains unsatisfied or of record for ninety (90) days or longer (unless supersedeas bond is filed), or if execution is levied against the Hotel or other real or personal property at the Hotel, or suit to foreclose any lien or mortgage against the Hotel or other real or personal property appurtenant thereto is initiated against Franchisee or if the real or personal property of the Hotel shall be sold after levied upon by any sheriff, marshal or constable.

B. <u>Termination - Notice Only</u>. Franchisee shall be deemed to be in material default and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default.



effective immediately upon Franchisee's receipt (or first refusal of delivery) of notice, upon the occurrence of any of the following:

1. If Franchisee ceases to do business at the Hotel, or ceases to operate the Hotel under the Proprietary Marks and System, or loses ownership or possession or the right to possession of the Hotel, or otherwise forfeits the right to conduct the franchised business at the Approved Location, except as otherwise provided in Section 19.;

2. If a threat or danger to public health or safety results from the construction, maintenance or operation of the Hotel, and an immediate shutdown of the Hotel is reasonably determined by Franchisor to be essential to avoid substantial liability or loss of goodwill; provided, however, Franchisor shall reinstate this Agreement if, within six (6) months after termination under this Section 17B(2), the threat or danger to public health or safety is eliminated and Franchisor reasonably determines that reopening the Hotel would not cause a substantial loss of goodwill;

3. If Franchisee or any of Franchisee's Principals, or any officer or director of Franchisee is convicted of a felony or any other crime or offense that is reasonably likely, in the reasonable opinion of Franchisor, to adversely affect the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein;

4. If Franchisee intentionally discloses or divulges the contents of the Manual, the Software (including accompanying documentation) or other trade secret or Confidential Information provided Franchisee by Franchisor contrary to Sections 11 and 12 hereof or fails to exercise reasonable care to prevent such disclosure;

5. If Franchisee or any of Franchisee's Principals or Controlling Principals purports to transfer any rights or obligations under this Agreement or any interest in Franchisee or the franchised business to any third party contrary to the terms of Sections 15 or 16 of this Agreement;

6. If in an audit conducted pursuant to the provisions of this Agreement Franchisee is determined to have (i) underreported Gross Package Revenues by five percent (5%) or more for any month during the term hereof, or (ii) underreported Gross Package Revenues by more than two percent (2%) twice in any thirty-six (36) month period;

7. If Franchisee shall default in the payment of any amounts due Franchisor or any of the Wyndham Companies and shall fail to pay the amount due within thirty (30) days after receiving notice of the default;

8. If Franchisee fails to comply with Franchisor's quality assurance program and fails to cure any default under that program within the applicable cure period; or

220674.v5A (Final)

9. If Franchisee shall fail to design, decorate, equip, maintain, operate and provide services at the Hotel in compliance with System standards and the PIP or shall otherwise fail to perform any of its other obligations under this Agreement.

C. <u>Termination - Notice and Cure</u>. Except as provided in Sections 17A and 17B of this Agreement and except for any monetary default, Franchisee shall have thirty (30) days or such longer period as specified herein after its receipt from Franchisor (or first refusal of delivery) of a written notice of default, within which to remedy any default and provide evidence thereof to Franchisor. Franchisee shall have ten (10) days after receipt of a written notice of default within which to cure any monetary default. If a default is not cured within the time set forth above, or such longer period as applicable law may require or as Franchisor may deem necessary to permit Franchisee to cure any non-monetary default (provided Franchisee immediately commences, diligently and in good faith pursues, and cures, such default), Franchisor shall have the right to terminate this Agreement upon notice to Franchisee. Franchisee shall be in default under this Agreement for any failure to comply with any of the requirements imposed by this Agreement, as it may from time to time be supplemented by the Manual, including, without limitation, if Franchisee fails to comply with the Conversion Addendum or New Construction Addendum pursuant to the requirements set forth therein or to carry out the terms of this Agreement in good faith.

## 18. OBLIGATIONS UPON TERMINATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and Franchisee shall comply with all of the obligations applicable to the Approved Location as set forth in this Section 18.

A. <u>Cease Operation as Wyndham Hotel</u>. Franchisee shall immediately cease operation of the Hotel as a Wyndham Hotel and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor. Notwithstanding the foregoing, Franchisee shall not be deemed to be in breach of the provisions of this Section 18.A in the event that independent tour operators maintain seasonal catalogs that identify the Hotel using the Proprietary Marks until the expiration of such seasonal catalogs.

B. <u>Discontinue Use of Proprietary Marks</u>. Franchisor also, to the extent permitted by applicable law, and without prior notice, may enter the Hotel and remove all copies of the Manual, Confidential Information, equipment and all other personal property of Franchisor's, and paint over or remove, all or part of any interior or exterior Proprietary Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Hotel, that Franchisee has not removed or obliterated within five days after termination. Franchisee will promptly pay or reimburse us for our cost of removing such items. Franchisor will exercise reasonable care in removing or painting over signage. Franchisor will have no obligation or liability to restore the Hotel to its condition prior to removing the signage.

220674.v5A (Final)



C. <u>Deidentify</u>. Franchisee shall, at its expense, promptly remove all distinctive signs, emblems, amenities and other items bearing the Proprietary Marks, change directory and other listings to remove all reference to such Proprietary Marks and to any telephone or other number used generally by other Wyndham Hotels for reservation, or other purposes and make such specific additional changes as Franchisor may reasonably request to prevent any possibility that the public may confuse the Hotel with a Wyndham Hotel. Until all modifications and alterations required by this Section 18C are completed, Franchisee shall take all such actions as may reasonably be required by Franchisor to advise all customers and prospective customers that the Hotel is no longer associated with the Wyndham System. Franchisee expressly acknowledges that its failure to make such alterations will cause irreparable injury to Franchisor.

D. <u>Cancel Assumed Name Certificate</u>. Franchisee shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the name "Wyndham" or any variation thereof or any other Proprietary Mark, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

E. <u>Pay Liquidated Damages</u>. If Franchisee terminates this Agreement for any reason other than Franchisor's uncured default, or Franchisor terminates this agreement pursuant to Section 17, Franchisee shall pay to Franchisor, as liquidated damages for the premature termination of this Agreement only and not as a penalty or as damages for breaching this Agreement or in lieu of any other payment, a lump sum equal to the total amounts accruing under Sections 3B and 3C during the thirty-six (36) full calendar months of operation preceding the termination; or if the Hotel has not been in operation as a Wyndham Hotel for thirty-six (36) full calendar months, the greater of: (i) thirty-six (36) times the monthly average of such amounts, or (ii) thirty-six (36) times such amounts as are due for the one full calendar month preceding such termination. Notwithstanding the foregoing sentence, if the number of months remaining between the date of Franchisor's written notice of default (or, in the event of termination pursuant to Section 17A, the occurrence of the termination event) and the date on which the term of this Agreement would otherwise have ended pursuant to Section 2 hereof is less than thirty-six (36) months, then the time period for calculating the amount of liquidated damages shall be the number of months remaining in such term. The parties acknowledge that a precise calculation of the full extent of the damages which Franchisor will incur in the event of termination of this Agreement as a result of Franchisee's default is difficult in the extreme, and agree that the lump sum payment provided under this Section 18E is reasonable in light of the damages for premature termination which Franchisor will incur in such event. Such payment of liquidated damages shall be in addition to amounts provided immediately below in Section 18F. The payment of liquidated damages hereunder shall not affect Franchisor's rights to obtain appropriate equitable relief and remedies, such as injunctive relief to enforce Section 10 hereof and specific performance to enforce Section 18 hereof, nor shall it affect Franchisor's right to pursue any other remedies, including expectancy damages. In the event that this Agreement is terminated prior to the Opening Date, then this Section 18E shall not apply but the initial franchise fee paid by Franchisee hereunder shall be retained by Franchisor.

220674.v5A (Final)

F.  Pay Outstanding Amounts.  Franchisee shall promptly pay all sums owing to Franchisor and its Affiliates, and all suppliers. In the event of termination for any default of Franchisee, such sums shall include any payment to Franchisor required under Section 18.E. and all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor in obtaining (i) injunctive or other relief for the enforcement of any provisions of this Agreement, or (ii) contested termination of this Agreement.

G.  Return of Manual and Other Materials.  Franchisee shall immediately deliver to Franchisor the Manual, instructions, Software and accompanying documentation, and all other materials provided by Franchisor related to the operation of the Hotel, and all copies thereof (all of which are acknowledged to be the Franchisor's property), and shall retain no copy or record of any of the foregoing, excepting only Franchisee's copy of this Agreement and any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

H.  Purchase of Certain Materials.  Franchisor shall have the right but not the duty, to be exercised by notice of intent to do so within thirty (30) days after termination or expiration, to purchase any and all signs, advertising materials, supplies and inventory and any other item bearing Franchisor's Proprietary Marks, at Franchisee's cost.  With respect to any purchase by Franchisor as provided herein, Franchisor shall have the right to set off all amounts due from Franchisee under this Agreement. Franchisee shall deliver to Franchisor any such signs, advertising materials, supplies and inventories, no later than ten (10) days following Franchisee's date of acknowledgement receipt of the Franchisor notice exercising its purchase right.

I.  Survival.  The obligations of Franchisee set forth in Article 18 shall survive the expiration or termination of this Agreement.

## 19.  CONDEMNATION AND CASUALTY

A.  Condemnation.  Franchisee shall, at the earliest possible time, give Franchisor notice of any proposed taking by eminent domain.  If the Hotel is condemned, or such a substantial portion of the Hotel is condemned as to render impractical the continued operation of the Hotel under and subject to System standards, Franchisor may, in its sole discretion permit the transfer of the franchise to another location submitted by Franchisee within one hundred eighty (180) days of the taking.  The new hotel must be converted or constructed and furnished under and subject to the then-current System standards and opened for business under the System within two (2) years of the closing of the condemned Hotel.  Franchisee shall give Franchisor ninety (90) days advance notice of the date of such opening.  In the event that Franchisee does not submit a proposed location for a new Hotel, this Agreement shall terminate upon notice by Franchisor to Franchisee, and Franchisor shall share in the condemnation award to the extent such award includes an allocation for its lost royalty income.  If a non-substantial condemnation shall occur, then Franchisee shall promptly make whatever repairs and restoration may be



necessary to make the Hotel conform substantially to its former condition, character and appearance, according to plans and specifications approved by Franchisor. The resumption of normal operation of the Hotel shall not be unreasonably delayed.

B. <u>Casualty</u>. If the Hotel is damaged or destroyed by fire or other cause, which damage or destruction necessitates the closing of the Hotel for a period in excess of ninety (90) days and Franchisee elects not to repair or rebuild the Hotel, Franchisee shall have the right to terminate this Agreement upon written notice to Franchisor given within one hundred twenty (120) days of the closing of the Hotel; provided that Franchisee shall be obligated to promptly pay to Franchisor any amounts accrued and owing to Franchisee under the Agreement as of the termination date, as well as repay any unamortized portion of the Development Incentive in accordance with the provisions of Section 31.4 below. Franchisee's obligation set forth herein shall survive expiration or termination of this Agreement pursuant to this Section 19B.

## 20. TAXES, PERMITS AND INDEBTEDNESS

A. <u>Payment of Taxes and Indebtedness</u>. Franchisee shall promptly pay when due all taxes levied or assessed by any federal, state or local tax authority of Mexico, and any and all other indebtedness incurred by Franchisee in the conduct of the franchised business. Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax or similar tax imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor. In the event that Franchisor receives any tax credits with respect to any sales tax, gross receipts tax or similar tax imposed on Franchisor for which Franchisee has made payments to Franchisor in accordance with the previous sentence, Franchisor shall forward to Franchisee any such amounts received. Franchisee shall have no obligation hereunder for any tax which is based upon the net income of Franchisor.

B. <u>Contested Amounts</u>. In the event of any *bona fide* dispute as to liability for taxes assessed or other indebtedness, Franchisee may contest the validity of the amount of the tax or indebtedness under and subject to the procedures of the taxing authority or applicable law; however, in no event shall Franchisee permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by creditor, to occur against the premises of the Hotel or any improvement thereon.

C. <u>Compliance with Laws</u>. Franchisee shall comply with all federal, state, and local laws of Mexico, rules and regulations, and shall timely obtain any and all permits, certificates or licenses necessary for the operation of the Hotel and for the full and proper conduct of the franchised business including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, health and sanitation permits and ratings and fire clearances. Franchisee shall obtain and maintain in full force and effect from and after the opening of the Hotel all licenses required for the sale of alcoholic beverages.

D.    <u>Notice of Judicial and Regulatory Matters</u>.    Franchisee shall notify Franchisor in writing within five (5) days (or in a timely manner if the legal term to respond is shorter) after Franchisee's actual or constructive receipt of notice of the commencement of any action, suit or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation or financial condition of the franchised business.    Copies of all inspection reports, warnings, certificates and ratings issued by any governmental entity during the term of this Agreement for the Hotel which indicate a failure to meet or maintain governmental standards or less than full compliance with any applicable law, rule or regulation, shall be forwarded to Franchisor by Franchisee within five (5) days of Franchisee's receipt thereof (or in a timely manner if the legal term to respond is shorter).

E.    <u>Notice of Defaults</u>.    Franchisee shall promptly deliver to Franchisor a copy of any notice of default received from any mortgagee, trustee under any deed of trust, or ground lessor with respect to the Hotel and, upon the request of Franchisor, shall provide such additional information as may be requested in respect of any such alleged default or any subsequent action or proceeding in connection therewith.

F.    <u>Timely Payments</u>.    Franchisee recognizes that Franchisee's failure to make or repeated delay in making prompt payment of all amounts owed for the operation of the Hotel (including, without limitation, all taxes levied or assessed and all accounts and other indebtedness) that Franchisee does not timely contest in good faith under and subject to the terms of any agreements, leases, invoices or statements for purchase or lease of furniture, fixtures, equipment, inventories, supplies, ingredients, travel agent services, or other goods or services will be detrimental to the reputation and credit standing of Franchisee, Franchisor and other System franchisees.    Franchisee shall pay when due all amounts owed by Franchisee for operating the Hotel.

## 21.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A.    <u>Independent Contractor</u>.    Franchisee acknowledges that Franchisor and Franchisee are not and will not be considered as joint venturers, partners or agents of each other.    Franchisee specifically acknowledges that the relationship created by this Agreement is not a fiduciary, special or any other similar relationship, but rather is an arm's-length business relationship.    Franchisor owes Franchisee no duties except as expressly provided in this Agreement.

1.    During the term of this Agreement (including any extensions or renewals), Franchisee shall hold itself out to the public as an independent contractor operating the business pursuant to a franchise from Franchisor and as an authorized user of the Proprietary Marks.    Franchisee shall take such affirmative action as may be necessary to do so, including, without limitation, exhibiting notices of that fact at the Hotel as required under Section 10 hereof.

2.    Nothing in this Agreement authorizes either party to make any contract, agreement, warranty or representation on the other's behalf, or to incur any



debt or other obligation in the other's name. Neither party shall assume liability for, or be deemed liable hereunder, as a result of any such action, or by reason of any act or omission of the other party or any claim or judgment arising therefrom.

3. Franchisor does not exercise any discretion or control over the employment policies or employment decisions of Franchisee. All employees of Franchisee are solely employees of Franchisee, not Franchisor. Franchisee is not Franchisor's agent for any purpose in regard to Franchisee's employees or otherwise.

B. Indemnity. Throughout the term of this Agreement, Franchisee shall indemnify, defend and save harmless Franchisor, its Affiliates, their respective officers, directors, agents, representatives, employees, successors and assigns (collectively, the "Wyndham Indemnified Parties"), from and against all payments of money (including, without limitation, all losses, costs, liabilities, damages (including moral damages), lost profits, claims, fines, settlement amounts, legal fees, costs and expenses) of every kind and description arising out of or resulting from Franchisee's breach of any representation or warranty in this Agreement or the construction, conversion, operation or use of the Hotel or Hotel premises or of any other business conducted on or for the Hotel by the Franchisee, or because of any act or omission of the Franchisee or anyone associated with, employed by, or affiliated with Franchisee (even where the strict liability or negligence, whether sole, joint or concurrent, active or passive, of the Wyndham Indemnified Parties is actual or alleged). Franchisee shall timely give written notice to Franchisor of any action, suit, proceeding, claim, demand, inquiry, or investigation related to the foregoing. Franchisor shall in any event have the right, through counsel of its choice at Franchisee's expense, to control the defense or response to any such action if it could affect the Wyndham Indemnified Parties financially, and such undertaking by Franchisor shall not, in any manner or form, diminish Franchisee's obligations to Franchisor hereunder. Franchisee shall also reimburse Franchisor for all expenses (including legal fees and court costs) reasonably incurred by Franchisor to protect itself and any of the Wyndham Indemnified Parties from, or to remedy, Franchisee's defaults under this Agreement, provided, that under no circumstances shall Franchisor be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim under this indemnity and against Franchisee, and the failure of Franchisor to pursue such recovery or mitigate such loss will no way reduce the amounts recoverable by Franchisor from Franchisee. This indemnification shall survive the expiration, termination, or transfer of this Agreement or any interest herein.

## 22. APPROVALS AND WAIVERS

A. Written Consent Required. Approvals and consents by either party will not be effective unless evidenced by a writing signed by such party. Either party's consent, wherever required, may be withheld if any default by the other party exists under this Agreement.

B. Standards for Consents. Unless expressly stated otherwise in this Agreement, whenever the consent or approval of Franchisor is required, and whenever Franchisee is required to operate or act under and subject to standards, specifications

or requirements of Franchisor, such consents and approvals shall be given or withheld, and such standards, specifications and requirements shall be promulgated and administered by Franchisor reasonably and in a manner consistent with the requirements Franchisor imposes on the management of all Wyndham Hotels in the same division as the Hotel.

C. Effects of Consents. Except as otherwise provided in any written agreement executed by Franchisor and Franchisee, Franchisor makes no warranties or guarantees upon which Franchisee may rely. Franchisor assumes no liability or obligation to Franchisee by providing any waiver, approval, consent or suggestion to Franchisee for this Agreement or by reason of any delay or denial of any request therefor.

D. No Waiver. No failure of a party to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by the other party with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of such party's right thereafter to demand exact compliance with any of the terms herein. Waiver by a party of any particular default by the other party shall not affect or impair such party's rights with respect to any subsequent default of the same, similar, or different nature; nor shall any delay, forbearance, or omission of a party to exercise any power or right arising out of any breach or default by the other party of any of the terms, provisions, or covenants hereof, affect or impair such party's right to exercise the same.

## 23. REPRESENTATIONS OF FRANCHISEE

Franchisee represents, warrants, and covenants with Franchisor as follows:

A. Information Submitted by Franchisee. Franchisor has entered into this Agreement in reliance upon the statements and information submitted to Franchisor by Franchisee for this Agreement. Franchisee represents and warrants that all such statements and information submitted by Franchisee for this Agreement are true, correct and complete in all material respects. Franchisee agrees to promptly advise Franchisor of any material changes in the information or statements submitted.

B. Compliance With Laws. Franchisee is, and shall continue to be, in compliance with all laws, rules, regulations and court orders applicable to the Hotel or the operation of the Hotel including, but not limited to, all health and safety laws, the Americans with Disabilities Act, innkeepers laws, anti money laundering laws and all licensing requirements. In addition, Franchisee certifies that neither Franchisee nor its owners, employees or anyone associated with Franchisee is listed in the Annex to Executive Order 13224. (The Annex is available at http://www.treasury.gov/offices/enforcement/ofac/sanctions/terrorism.html.) Franchisee agrees not to hire or have any dealings with a person listed in the Annex. Franchisee certifies that it has no knowledge or information that, if generally known, would result in Franchisee, its owners, employees, or anyone associated with Franchisee being listed in the Annex to Executive Order 13224. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's

efforts to comply with the Anti-Terrorism Laws (as defined below). For such compliance, Franchisee certifies, represents, and warrants that none of its property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and its owners are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining what actions must be taken by Franchisee to comply with all such Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that Franchisee's indemnification responsibilities as provided in Section 21B of this Agreement pertain to Franchisee's obligations under this Section 23B. Any misrepresentation by Franchisee under this Section or any violation of the Anti-Terrorism Laws by Franchisee, its owners, or employees shall constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or one of Franchisor's affiliates. As used herein, "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists and any other requirements of any Governmental Authority (including, without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

C. <u>This Transaction</u>. Franchisee and the persons signing this Agreement for Franchisee have full power and authority and have been duly authorized, to enter into and perform or cause performance of Franchisee's obligations under this Agreement. Franchisee has obtained all necessary approvals of its owners, Board of Directors or Manager(s) and lenders and of any other person or entity. No executory franchise, license, or affiliation agreement for the Hotel exists other than this Agreement. Franchisee's execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which Franchisee or any of Franchisee's Principals is a party or is subject or to which the Hotel is subject. Neither Franchisee nor the Hotel is the subject of any current or pending merger, spin-off, sale, lease, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar transaction, action or proceeding on the date Franchisee executes this Agreement and was not within the three years preceding such date, except as disclosed in the franchise application. Franchisee will submit to Franchisor the documents about the Hotel, Franchisee, its owners and its finances that Franchisor requests in the franchise application (or after review of Franchisee's initial submissions) before or within 30 days after Franchisee signs this Agreement.

D. <u>Quiet Enjoyment and Financing</u>. Franchisee leases or will lease prior to commencing improvement, or lease, the Approved Location and the Hotel. Franchisee will be entitled to possession of the Approved Location and the Hotel during the entire Term without restrictions that would interfere with Franchisee's performance under this Agreement, subject to the reasonable requirements of any financing secured by the Hotel. Franchisee has, when it signs this Agreement, and will maintain during the

220674.v5A (Final)



Term, adequate financial liquidity and financial resources to perform its obligations under this Agreement.

      E.    <u>No Implied Covenants</u>.  Except, as expressly stated in this Agreement, Franchisee acknowledges that there are no express or implied covenants or warranties, oral or written, between Franchisee and Franchisor.

## 24. NOTICES

Any and all notices required or permitted under this Agreement shall be in writing and shall be delivered personally or mailed by a nationally recognized overnight commercial delivery service (such as Airborne Express or Federal Express) or by certified mail, return receipt requested, to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

    Notices to Franchisor:        **Wyndham Hotel Group International, Inc.**
                                  1 Sylvan Way
                                  Parsippany, New Jersey 07054
                                  Attention: VP-Franchise Administration
                                  Facsimile: (973) 753-7537
                                  Telephone: (973) 753-7240

    Notices to Franchisee:        **Islander Properties S.A de C.V.**
                                    Carretera Costera Sur 12.9 Km
                                  Cozumel Q. Roo
                                  77600 Mexico
                                  Attention: <u>Mr. Carlos Del Pino</u>
                                  Facsimile: <u>011-52-987-872-29300 ext 8003</u>
                                  Telephone: <u>011-52-987-872-29300 ext 8001</u>

Any notice shall be deemed to have been given at the date and time of (i) receipt or first refusal of delivery if sent via certified mail, or (ii) one (1) day after posting if sent via overnight commercial delivery service.

## 25. ENTIRE AGREEMENT

      A.    This Agreement contains the entire agreement between the parties hereto as it relates to the franchising of the Hotel at the Approved Location. There are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, between the parties relating to the franchising of the Hotel at the Approved Location other than those set forth herein. No agreement of any kind relating to the matters covered by this Agreement shall be binding upon either party unless and until the same has been made in writing and executed by all interested parties.

220674.v5A (Final)

B.    This Agreement may not be amended, modified or rescinded, or any performance requirement waived, except by a written document signed by Franchisor and Franchisee. This provision does not apply to changes in the Manual or notice of the Opening Date, which Franchisor may modify or designate unilaterally. The parties expressly agree that this Agreement may not be amended or modified, or any performance standard changed, by course of dealing, by special indulgences or benefits Franchisor bestows on Franchisee, or by inference from a party's conduct.

## 26.  CONSTRUCTION AND SEVERABILITY

A.    Severability.  Except as expressly provided to the contrary herein, each section, part, term and provision of this Agreement shall be considered severable. If, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other sections, parts, terms and provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms or provisions shall be deemed not to be a part of this Agreement.

B.    No Third Party Beneficiary.  Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies under or by reason of this Agreement upon any person or legal entity other than Franchisee, Franchisor, and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, permitted) by this Agreement.

C.    Maximum Duty Imposed.  Franchisee and Franchisor expressly agree to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made part of this Agreement, that may result from striking from any of the provisions hereof portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor or Franchisee, as applicable, is a party; or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

D.    Captions.  All captions in the Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

E.    Construction.  All references herein to the masculine, neuter or singular shall be construed to include the masculine, feminine, neuter or plural, where applicable.  All acknowledgments, promises, covenants, agreements and obligations herein made or undertaken by Franchisee shall be deemed jointly and severally undertaken by all the parties hereto signing the Guaranty on behalf of Franchisee.

F.    Counterpart Execution.    This Agreement may be executed in counterparts and each copy so executed shall be deemed an original.

220674.v5A (Final)



## 27. DISPUTE RESOLUTION AND GOVERNING LAW

A. This Agreement will be governed by and construed under the laws of the State of New York, U.S.A., except for its conflicts of law principles.

B. Franchisor, as an alternative or supplement to mediation pursuant to Section 27.C, may obtain in any court of competent jurisdiction any injunctive relief, including temporary restraining orders and preliminary injunctions, against conduct or threatened conduct for which no adequate remedy at law may be available or which may cause us irreparable harm. Franchisor may have such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and Franchisee's sole remedy in the event of the entry of such injunction, shall be its dissolution, if warranted, upon hearing duly had (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). Franchisee and each of its Owners acknowledge that any violation of Sections 18 would result in irreparable injury to us for which no adequate remedy at law may be available. Accordingly, Franchisee and each of its Owners consents to the issuance of an injunction prohibiting any conduct in violation of any of those sections and agrees that the existence of any claim Franchisee or any of its Owners may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement of any of those Sections.

C. SUBJECT TO SECTION 27.B AND UPON WRITTEN NOTICE TO ALL PARTIES, FRANCHISOR AND FRANCHISEE AGREE TO SUBMIT ANY CLAIM, CONTROVERSY OR DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT (INCLUDING ALL ATTACHMENTS AND ADDENDA) OR THE RELATIONSHIP CREATED BY THIS AGREEMENT TO NON-BINDING MEDIATION PRIOR TO BRINGING SUCH CLAIM, CONTROVERSY OR DISPUTE IN A COURT OR BEFORE ANY OTHER TRIBUNAL. THE MEDIATION SHALL BE CONDUCTED IN THE JURISDICTION OF MIAMI, FLORIDA, U.S.A. BY EITHER AN INDIVIDUAL MEDIATOR OR A MEDIATOR APPOINTED BY A MEDIATION SERVICES ORGANIZATION OR BODY, EXPERIENCED IN THE MEDIATION OF HOTEL INDUSTRY DISPUTES, AGREED UPON BY THE PARTIES AND, FAILING SUCH AGREEMENT WITHIN A REASONABLE PERIOD OF TIME (NOT TO EXCEED FIFTEEN (15) DAYS AFTER EITHER PARTY HAS NOTIFIED THE OTHER OF ITS DESIRE TO SEEK MEDIATION, AT FRANCHISOR'S PRINCIPAL PLACE OF BUSINESS. THE COSTS AND EXPENSES OF MEDIATION, INCLUDING COMPENSATION AND EXPENSES OF THE MEDIATOR (EXCEPT FOR THE ATTORNEY'S FEES INCURRED BY EITHER PARTY), SHALL BE BORNE BY THE PARTIES EQUALLY. IF THE PARTIES ARE UNABLE TO RESOLVE THE CLAIM, CONTROVERSY OR DISPUTE WITHIN NINETY (90) DAYS AFTER THE MEDIATOR HAS BEEN CHOSEN, THEN, UNLESS SUCH TIME PERIOD IS EXTENDED BY WRITTEN AGREEMENT OF THE PARTIES, EITHER PARTY MAY BRING A LEGAL PROCEEDING UNDER SECTION 27.B ABOVE TO RESOLVE SUCH CLAIM, CONTROVERSY OR DISPUTE. NOTWITHSTANDING THE FOREGOING, FRANCHISOR MAY BRING AN ACTION (1) FOR MONIES OWED, (2) FOR INJUNCTIVE OR OTHER EXTRAORDINARY RELIEF, OR (3) INVOLVING THE POSSESSION OF OR TO SECURE OTHER RELIEF RELATING TO THE HOTEL PREMISES, IN A COURT HAVING

220674.v5A (Final)

JURISDICTION AND UNDER AND SUBJECT TO SECTION 27B ABOVE, WITHOUT FIRST SUBMITTING SUCH ACTION TO MEDIATION.

## 28. REMEDIES, CURRENCY

Remedies Cumulative. No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

## 29. WAIVER OF JURY TRIAL, CLASS ACTIONS AND DAMAGES

A. IN ANY LITIGATION BETWEEN THE PARTIES FOUNDED UPON OR ARISING FROM THIS AGREEMENT, THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL, AND THE PARTIES HEREBY STIPULATE THAT ANY SUCH TRIAL SHALL OCCUR WITHOUT A JURY.

B. FRANCHISEE AGREES THAT, FOR THE SYSTEM TO FUNCTION PROPERLY, FRANCHISOR AND ITS AFFILIATES SHOULD NOT BE BURDENED WITH THE COSTS OF ARBITRATING OR LITIGATING SYSTEM WIDE CLAIMS. ACCORDINGLY, FRANCHISEE AGREES THAT ANY DISAGREEMENT BETWEEN THE PARTIES SHALL BE CONSIDERED UNIQUE AS TO ITS FACTS AND SHALL NOT BE BROUGHT AS A CLASS ACTION, AND FRANCHISEE WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO BRING, JOIN OR PARTICIPATE IN, A CLASS ACTION OR MULTI-PLAINTIFF, CONSOLIDATED OR COLLECTIVE ACTION AGAINST FRANCHISOR OR ANY OF ITS AFFILIATES.

C. FRANCHISEE AND FRANCHISEE'S PRINCIPALS HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO OR CLAIM OR ANY PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER SIMILAR DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) AGAINST FRANCHISOR, ITS AFFILIATES, AND THE OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, MEMBERS, AGENTS, REPRESENTATIVES, INDEPENDENT CONTRACTORS, SERVANTS AND EMPLOYEES OF EACH OF THEM, IN THEIR CORPORATE AND INDIVIDUAL CAPACITIES, ARISING OUT OF ANY CAUSE WHATSOEVER (WHETHER SUCH CAUSE BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) AND AGREE THAT IN THE EVENT OF A DISPUTE, FRANCHISEE AND FRANCHISEE'S PRINCIPALS SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY THEM. IF ANY OTHER TERM OF THIS AGREEMENT IS FOUND OR DETERMINED TO BE UNCONSCIONABLE OR UNENFORCEABLE FOR ANY REASON, THE FOREGOING PROVISIONS OF WAIVER BY AGREEMENT OF PUNITIVE, EXEMPLARY, INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER SIMILAR DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) SHALL CONTINUE IN FULL FORCE AND EFFECT.

## 30. FRANCHISEE ACKNOWLEDGMENTS

A.    FRANCHISEE ACKNOWLEDGES THAT IT DID NOT RELY ON ANY PROMISES, REPRESENTATIONS OR AGREEMENTS ABOUT THE FRANCHISOR OR THE FRANCHISE NOT EXPRESSLY CONTAINED IN THIS AGREEMENT IN MAKING ITS DECISION TO SIGN THIS AGREEMENT. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE NOT MADE ANY PROMISES, REPRESENTATIONS OR AGREEMENTS, ORAL OR WRITTEN, EXCEPT AS EXPRESSLY CONTAINED IN THIS AGREEMENT.

B.    FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS FRANCHISED HEREUNDER, AND RECOGNIZES THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES BUSINESS RISKS AND THAT ITS SUCCESS WILL BE LARGELY DEPENDENT UPON THE ABILITY OF FRANCHISEE AS AN INDEPENDENT BUSINESSMAN. FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE ACKNOWLEDGES THAT FRANCHISEE HAS NOT RECEIVED, ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT.

C.    FRANCHISEE ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD THIS AGREEMENT AND THE ATTACHMENTS HERETO (IF ANY) AND THAT FRANCHISEE HAS HAD AMPLE TIME AND OPPORTUNITY TO CONSULT WITH ADVISORS OF FRANCHISEE'S OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT.

D.    ALL OF THE OBLIGATIONS OF FRANCHISOR HEREUNDER ARE TO FRANCHISEE ONLY; NO OTHER PERSON OR ENTITY IS ENTITLED TO RELY ON, ENFORCE, OR OBTAIN RELIEF FOR BREACH OF SUCH OBLIGATIONS EITHER DIRECTLY OR BY SUBROGATION.

E.    FRANCHISEE ACKNOWLEDGES THAT IT RECEIVED A COMPLETE COPY OF THIS AGREEMENT AND ALL RELATED ATTACHMENTS AND AGREEMENTS AT LEAST THIRTY (30) CALENDAR DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT WAS EXECUTED. FRANCHISEE FURTHER ACKNOWLEDGES THAT IT HAS RECEIVED THE DISCLOSURE DOCUMENT (INFORMATION FOR POTENTIAL FRANCHISEE) PURSUANT TO ARTICLE 142 OF THE MEXICO INDUSTRIAL PROPERTY LAW AND ARTICLE 65 OF ITS REGULATIONS ATTACHED HERETO AS ATTACHMENT H HERETO.

## 31. SPECIAL STIPULATIONS.

The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. Franchisee acknowledges that these stipulations and any changes made to the body of the Agreement at Franchisee's request or in

220674.v5A (Final)

response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to Franchisee and supported by adequate consideration from both parties. These are personal to Franchisee and are not transferable or assignable except to a Permitted Transferee.

31.1.    Marketing Fee. Notwithstanding Section 3.C to the contrary, Franchisee will pay on a monthly basis a Marketing Fee to Franchisor as a contribution to the Central Marketing Fund (as per Section 9B.2, as follows: (a) during the first (1st) Operating Year of the Term, an amount equal to two-tenths of one percent (.2%) of Gross Package Revenues of the Hotel, and (b) during each Operating Year of the Term thereafter, an amount equal to seven-tenths of one percent (.7%) of Gross Package Revenues of the Hotel.

31.2.    National Sales Fee. Franchisee shall pay to Franchisor or its designee from and after the Opening Date a continuing monthly national sales fee in an amount equal to one-half percent ($\frac{1}{2}$%) of the Gross Package Revenues of the Hotel.    The national sales fee is for national group sales services, regional convention sales services and transient business sales services provided by Wyndham's National Sales Office.

31.3.    Regional Marketing Fee. WAIVED.

31.4    Development Incentive Plan.    Franchisee will be eligible to receive a Development Incentive in the amount of US$1,000,000.00 if Franchisee completes renovation of the Hotel in accordance with the PIP attached hereto as Attachment G. Franchisee must pass our credit approval review, and commence renovation and open the Hotel in compliance with System standards as set forth in the Manual (as the same may be modified upon approval of Franchisor) within the time frames established under Schedule A to the Conversion Addendum. The Development Incentive will be disbursed in [three (3)] separate installments (each a "Disbursement") in accordance with a schedule to be based upon completion of certain milestones set forth in the PIP and within the time frames established under Schedule A to the Conversion Addendum, and each such Disbursement may be evidenced separately in a form to be mutually agreed upon by Franchisor and Franchisee. Each Disbursement will be amortized over a period of fourteen (14) years so that one-fourteenth (1/14th) of the original principal amount will be forgiven without payment upon each anniversary of the date of disbursal of such Disbursement.    Each Disbursement of the Development Incentive is a loan that is not subject to repayment unless the license provided to Franchisee hereunder terminates for any reason before the end of the fourteenth (14th) year of operation of the Hotel or a transfer by Franchisee occurs. If that happens, Franchisee will repay the balance of the aggregate Development Incentive consisting of Disbursements given to Franchisee as of such date.    The Development Incentive will bear no interest except in the case of default.    The corporate entities that own the equity interests of the Franchisee shall be required to guaranty the obligations of Franchisee hereunder. In addition, as a further guaranty of Franchisee's obligation hereunder, Franchisee shall be required to deliver to Franchisor a Letter of Credit from BNP/Parabis Miami, Florida (or such other US banking institution acceptable to Franchisor) in the amount of US$1,000,000

220674.v5A (Final)

representing the original principal of the aggregate Development Incentive, naming Franchisor as the sole payee and payable on demand, which Letter of Credit shall be decreased in the same manner and over the same period as the amortization of the Development Incentive by having a replacement Letter of Credit issued each year in the appropriate reduced amount no later than thirty (30) days prior to the expiration of the then current Letter of Credit. In the event that a replacement Letter of Credit is **not** issued thirty (30) days prior to the expiration of the then-current Letter of Credit, such an event will be deemed a default of Franchisee under this Section 31.4 and Franchisor shall be entitled to present the then-current Letter of Credit to its issuer for immediate payment. If Franchisee transfers the Hotel, Franchisee must repay the balance of the all Development Incentive unless the transferee and its principals meet Franchisor's then-current credit worthiness qualifications and assume the obligation to repay the aggregate Development Incentive consisting of Disbursements given to Franchisee as of such date, and provide Franchisor with such other security as it may require in its sole discretion. Franchisor reserves the right to conduct a credit investigation of the applicant and its owners at all times and withdraw the offer of the Development Incentive before it issues or disburses any Disbursement under the Incentive. In the event that (a) the license provided to Franchisee hereunder terminates for any reason before the end of the fourteenth (14th) year of operation of the Hotel and Franchisee can not repay the balance of the aggregate Development Incentive consisting of Disbursements given to Franchisee as of such termination date, or (b) a transfer by Franchisee occurs before the end of the fourteenth (14th) year of operation of the Hotel and the transferee and its principals do not meet Franchisor's then-current credit worthiness qualifications and assume the obligation to repay the aggregate Development Incentive given to Franchisee as of such date or, in the alternative, provide Franchisor with such other security as it may require in its sole discretion, then Franchisor may, in its sole discretion, present the then current Letter of Credit to its issuer for immediate payment.

31.5    <u>Protected Territory</u>.    Notwithstanding Section 1B, the Wyndham Companies will not own, operate, lease, manage, or license any party but Franchisee to operate a Wyndham Hotel in the "Protected Territory" (as such term is defined below) while this Agreement is in effect. The Wyndham Companies may own, operate, lease, manage, franchise or license anyone to operate any Wyndham Hotel located anywhere outside the Protected Territory without any restriction or obligation to Franchisee. Franchisor may grant Protected Territories for other Wyndham Hotels that overlap the Protected Territory. While this Agreement is in effect, neither Franchisee nor its officers, directors, general partners or owners of 25% or more of its equity interests, may own, operate, lease, manage or franchise any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility, except the ninety (90) timeshare units that currently comprise the Permitted Timeshare Facility. Franchisee will use any information obtained through the central reservation system to refer guests, directly or indirectly, only to Wyndham Hotels and Wyndham Garden Hotels. Franchisee acknowledges that the Protected Territory fairly represents the Hotel's trading area. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. The covenants in this Section are

mutually dependent; if Franchisee breaches this Section, the Protected Territory will be the Site only. The Protected Territory means the entire Island of Cozumel, Mexico.

31.6    Adherence to System Standards. Notwithstanding the provisions set forth in Section 6 hereof, the parties acknowledge and agree that as Franchisor shall be operating the Hotel as an All-Inclusive Hotel, Franchisee shall seek approval from Franchisor, as necessary, to be granted waivers from adhering to some of the requirements set forth in Sections 6A, D & E requiring strict adherence to the System standards, which approval shall not be unreasonably withheld, however Franchisee shall at all times maintain substantial conformity to the System standards despite any waivers approved by Franchisor.

31.7    Franchisee Rights to Terminate. As a supplement to the provisions of Section 17 above, upon the occurrence of either (a) Franchisor's violation of the Protected Territory set forth in Section 31.5 above, (b) Franchisor's assignment of this Agreement to an entity that does not expressly agree to be bound by its term, or (c) the assignment of Franchisor's obligations under this Agreement to a successor entity that subsequently discontinues its use of the Proprietary Marks, Franchisee shall have the right to terminate this Agreement upon written notice to Franchisor or its successor, as applicable, however neither Franchisor nor its successor, as applicable, shall be required to pay Franchisee any liquidated damages or termination fees as a result thereof.

31.8    Grant. Notwithstanding the limited license granted pursuant to Section 1.A above with respect to the Hotel, the parties hereby acknowledge and agree that while the rights granted to the Hotel are limited with respect to the Permitted Timeshare Facility, guests of the Permitted Timeshare Facility will be freely granted access to the common areas of the Hotel.

31.9    Hotel Management. Notwithstanding Section 5.A.1 above to the contrary, Franchisor hereby acknowledges that Franchisee intends to serve as the management company of the Hotel as of the Opening Date and thereafter. Furthermore, Franchisee shall be permitted to assign its rights and obligations to serve as the management company of the Hotel pursuant to this Agreement, provided, however, that either (a) Franchisee has and continues to have a controlling interest in the assignee during the remaining term of this Agreement, or (b) the assignee is an Affiliate of Franchisee. Notwithstanding the foregoing, Franchisor hereby acknowledges that Franchisee intends to serve as the management company of the Hotel as of the Opening Date and thereafter. Furthermore, Franchisee shall be permitted to assign its rights and obligations to serve as the management company of the Hotel pursuant to this Agreement, provided, however, that either (a) Franchisee has and continues to have a controlling interest in the assignee during the remaining term of this Agreement, or (b) the assignee is an Affiliate of Franchisee.

31.10   <u>Liquidated Damages.</u> Notwithstanding the provisions of Section 18E to the contrary, if Franchisee terminates this Agreement for any reason other than Franchisor's uncured default, or Franchisor terminates this agreement pursuant to Section 17, Franchisee shall pay to Franchisor, as liquidated damages for the premature termination of this Agreement only and not as a penalty or as damages for breaching this Agreement or in lieu of any other payment, a lump sum equal to the total amounts accruing under Sections 3B and 3C during the eighteen (18) full calendar months of operation preceding the termination; or if the Hotel has not been in operation as a Wyndham Hotel for eighteen (18) full calendar months, the greater of: (i) eighteen (18) times the monthly average of such amounts, or (ii) eighteen (18) times such amounts as are due for the one full calendar month preceding such termination.   Notwithstanding the foregoing sentence, if the number of months remaining between the date of Franchisor's written notice of default (or, in the event of termination pursuant to Section 17A, the occurrence of the termination event) and the date on which the term of this Agreement would otherwise have ended pursuant to Section 2 hereof is less than eighteen (18) months, then the time period for calculating the amount of liquidated damages shall be the number of months remaining in such term.

31.11   <u>Obligations Upon Termination – Franchisee's Obligation to Deidentify.</u> Notwithstanding the provisions of Section 18C to the contrary, Franchisor acknowledges that the Hotel shall be marketed by various tour operators who will produce seasonal catalogs in which the Hotel will be identified with the Proprietary Marks, and that such catalogs will remain in circulation until their expiration. Franchisee's inability to prevent such usage of the Proprietary Marks shall not be deemed a default of its obligations to deidentify under Section 18 of this Agreement.

## SIGNATURES REQUIRED ON THE FOLLOWING PAGE

220674.v5A (Final)

IN WITNESS WHEREOF, the parties hereto have duly executed, sealed and delivered this Agreement in duplicate on the day and year first above written.

**FRANCHISOR:**

WITNESS:

**WYNDHAM HOTEL GROUP INTERNATIONAL, INC.**

By:_____

    Name:_____

    Title:_____

**FRANCHISEE:**

WITNESS:

**ISLANDER PROPERTIES S.A. de C.V.**

By:_____

    Name: Carlos Del Pino

    Title: Managing Director

220674.v5A (Final)

## ATTACHMENT A

## SELECTED TERMS

Wyndham Hotel Tier and Proprietary Mark: Wyndham Resort, an All-Inclusive Hotel
Opening Date: <u>December 1, 2007</u>

Expiration Date: <u>Fourteen (14) Years from the Opening Date, provided however that Franchisee's lease expires on August 2, 2021.</u>

Approved Location of the Hotel: Carretera Costera Sur 12.9 Km
                   Cozumel Q Roo 77600 Mexico

Number of guest rooms: 312 guest rooms & 90 RRVC timeshare units of the Permitted Timeshare Facility, but only to the extent that any such units are, from time to time, rented to guests as a "hotel" room in the event of guest demand in excess of Hotel maximum capacity and available inventory

Food & Beverage Outlets:

Meeting Space (Rooms & Sq. Ft.)

Initial franchise fee: <u>US$109,200, 50% received as Application Fee and 50% due upon execution</u>

Application fee: <u>US$54,600</u>
(to be credited against initial franchise fee)

Franchisee's Principals (names, addresses, and percentages of ownership in Franchisee or in any person or entity that owns a controlling interest in Franchisee):

| Name | Address | Percentage Of Ownership |
|---|---|---|
| Georgina Soni Misrachi/ North Wales | Calle Rio Niagara 63 Col. Cuauhtemoc Mexico, D.F. 6500 Mexico | 31% |
| Maria Virginia De Moya/ Premier Development Corp | Av. Pedro Henriquez Urena #150 5to Piso La Julia, Santo Domingo Republica Dominicana | 32% |
| Raul Gonzalez/ Corporacion Latino-Americana De Hoteles | 10a Avenue Norte Interior Local Corporativo Peninsula No. 101 D4 Esq. con Calle 2 y 4 Norte Cozumel Quintana Roo, 77600 Mexico | 31% |

Attachment A – Page Solo

220674.v5A (Final)

Gavin Scott/
Casa Isla SA de CV

Caratera Costera      6%
Sur 12.9K
Cozumel Q Roo 77600 Mexico

'Designates Franchisee's controlling shareholders, controlling members or general partners signing the Guaranty as Controlling Principals.

Initials:

_____
_____
_____

220674.v5A (Final)

## ATTACHMENT B

### GUARANTY

As an inducement to **Wyndham Hotel Group International, Inc.** ("Franchisor") to execute the Franchise Agreement dated as of June 29, 2007, applicable to the **Wyndham Resort** located at Carretera Costera Sur 12.9 Km, Cozumel Q Roo, 77600 Mexico, the undersigned, jointly and severally, hereby unconditionally warrant to Franchisor and its successors and assigns that all of Franchisee's representations in the Franchise Agreement are true, agree to be bound by all the terms and conditions of the above Franchise Agreement including any amendments thereto whenever made (hereinafter the "Agreement"), and absolutely, unconditionally and irrevocably guaranty to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement will be punctually paid and performed.

Upon default by Franchisee, the undersigned will immediately make each payment and perform each obligation required of Franchisee under the Agreement. Without affecting the obligations of the undersigned under this Guaranty, Franchisor may, without notice to the undersigned, extend, modify, waive, renew or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment or performance by Franchisee.

Franchisor may pursue its rights against any of the undersigned without first exhausting its remedies against Franchisee and without joining any other guarantor. No delay on the part of the Franchisor in the exercise of any right or remedy, and no single or partial exercise by Franchisor of any right or remedy shall preclude the further exercise of such right or remedy. Upon the death of an individual guarantor, the estate of such guarantor will be bound by this Guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of the other guarantors will continue in full force and effect.

In WITNESS WHEREOF, each of the undersigned has signed this Guaranty as of date of the above Agreement.

**GUARANTORS:**

**NORTH WALES**

By: _____
Name: Georgina Soni Misrachi
Title: _____

_____
Witness

**PREMIER DEVELOPMENT CORP**

By: _____
Name: Maria Virginia De Moya
Title: _____

_____
Witness

Attachment B – Page Solo

CORPORACION LATINO-
AMERICANA DE HOTELES

By: _____
Name: Raul Gonzalez
Title: _president_

Witness _____

CASA ISLA SA DE CV

By: _____
Name: Gavin Scott
Title: _President_

Witness _____

Attachment B – Page Solo

220674.v5A (Final)

## ATTACHMENT C

### MANAGEMENT COMPANY RIDER
To Franchise Agreement Dated as of June 29, 2007
Between WYNDHAM HOTEL GROUP INTERNATIONAL, INC. ("Franchisor") and
ISLANDER PROPERTIES S.A. de C.V. ("Franchisee")

_____("Management Company") has entered into a Management Agreement with Franchisee, under the terms of which Management Company will operate the Wyndham Hotel located at Carratera Costera Sur 12.9 Km, Cozumel Q Roo, 77600 Mexico (the "Hotel") under and subject to the terms and conditions of the Franchise Agreement identified above.

In consideration of being permitted to operate the Hotel, Management Company hereby acknowledges and ratifies the terms and conditions of the Franchise Agreement and agrees to fully observe and be bound by all terms, conditions and restrictions regarding the management and operation of the Hotel set forth in the Franchise Agreement as if and as though Management Company had executed the Franchise Agreement as "Franchisee" for as long as Management Company operates the Hotel; provided, however, that the foregoing does not constitute an agreement of the Management Company to pay or assume any financial or other obligation of Franchisee to Franchisor or to any third party. Management Company further agrees to be bound by the confidentiality covenants set forth in Section 12 of the Franchise Agreement (including all remedies available to Franchisor under the Franchise Agreement for breach thereof) during and subsequent to its tenure as manager and operator of the Hotel.

Management Company agrees that Franchisor may enforce directly against Management Company those terms and conditions of the Franchise Agreement to which Management Company has hereby agreed to be bound. The prevailing party in any cause of action brought hereunder, pursuant hereto or in connection herewith (including, without limitation, any action for declaratory or equitable relief) shall be entitled to recover from the non-prevailing party reasonable attorney's fees, expenses and costs of suit incurred by the prevailing party in such action.

MANAGEMENT COMPANY:

a _____ corporation

ATTEST:

By: _____
Witness                                      Name: _____
                                             Title: _____

Attachment C – Page Solo

220674.v5A (Final)



## ATTACHMENT D

## DEFINITIONS

An "Affiliate" means, with respect to any person or entity, any other person or entity controlling, controlled by, or under common control with said person or entity.

An "All-Inclusive" Wyndham Hotel means a Hotel that offers and markets, as its primary arrangement for guests, an all-inclusive package that includes, without limitation, for a fixed price, guest accommodations, breakfast, lunch, dinner, snacks, cocktails and wines, non-motorized water sports and activities, entertainment and all taxes, surcharges and gratuities.

"Control" or "controlling interest" mean the direct or indirect power to direct the management and policies of a person or entity, including those relating to the payment of financial obligations, whether through the ownership of voting securities or interests, by contract, or otherwise, each as reasonably determined by Franchisor.

"Effective Date", means the date set forth in the Preamble, and if not inserted, the date on which all parties have executed and delivered this Agreement.

"Force Majeure" means acts of God, strikes, lockouts or other industrial disturbances, war, terrorism, riot, epidemic, fire or other catastrophe or other forces beyond Franchisee's control.

The "Franchisee" includes the entity identified in the preamble to this Agreement.

"Franchisee's Principals" include any individual, partnership, corporation, or other legal entity which directly or indirectly owns any interest in this franchise, in Franchisee, or in any person or entity that owns a controlling interest in Franchisee. "Franchisee's Controlling Principals" include Franchisee's general partners, controlling shareholders, or controlling members, as applicable.

"Gross Package Revenues" means any and all gross revenues of the Hotel attributable to, or payable for, the rental of guest rooms at the resorts (including any portion of the Permitted Timeshare Facility rented to guests as a "hotel" room in the event of guest demand in excess of Hotel maximum capacity and available inventory), food and beverage, non-motorized activities and entertainment that are included in a guest's package and not paid for by the guest as a charge in addition to the cost of the package; including in all such instances, without limitation, all credit transactions, whether or not collected; but excluding in all such instances any sales or room taxes collected by Franchisee for transmittal to the appropriate taxing authority, any gratuities received and paid to eligible employees pursuant to applicable law, and any other revenues received from guests for extra services beyond those included in the all-inclusive package rates charged to all guests, including "walk in" guests (including, without limitation, telephone charges, extra food and beverage sales, transfers, excursions, boutique purchases and services, timeshare or vacation ownership sales, timeshare or vacation ownership incomes from member exchanges and lead generation programs intended to market timeshare or vacation ownership units).

220674.v5A (Final)



"Hotel" means the freehold or long-term ground or building leasehold title to the Approved Location, together with all improvements constructed on the Approved Location, including, without limitation, the buildings, structures, recreational amenities and facilities, parking areas and structures, appurtenances, easements, licenses, and all furniture, fixtures, equipment (including computer and telephone systems), supplies, and inventories.

The "Manager" is the party identified in the Management Company Rider attached as Attachment C to the Franchise Agreement.

The "Manual" is the Wyndham Business Deluxe/Resort Hotel Operating Manual, the Wyndham Graphics Manual, and all other written statements, directives and any other manuals and materials issued by Franchisor, and any modifications to such materials containing the standards, specifications, policies, and procedures for the establishment and operation of System hotels. The Manual may be in paper or electronic form.

The "Opening Date" is the date on which Franchisor authorizes Franchisee to open the Hotel as a "Wyndham Hotel." The Opening Date shall be entered on Attachment A to this Agreement unilaterally by Franchisor and a copy provided to Franchisee.

The "Proprietary Marks" are all trade names, trademarks, service marks, logos, emblems, symbols and indicia of origin that are now designated on Attachment A or as may hereafter be designated in writing by Franchisor as part of the System for use for System hotels. The Proprietary Marks may be modified by Franchisor from time to time.

The "System" is the collection of procedures, policies, standards, specifications, controls and other distinguishing elements which Franchisor or its Affiliates have developed for the establishment and operation of Wyndham business deluxe and resort hotels. The distinguishing characteristics of the System include, without limitation, standards and specifications for the establishment and operation of a Wyndham Hotel; proprietary reservation and property management systems; advertising, marketing and promotional programs; a Wyndham Hotel Directory; management and personnel training programs; operational standards, policies, procedures and techniques as prescribed in the Manual and a quality assurance program known as the "Wyndham Way," all of which may be changed, improved or further developed from time to time. The Wyndham Companies have all rights in and to the System and Franchisee has only the right to use the System under the terms and conditions of this Agreement.

The "Wyndham Companies" include the Franchisor and any Affiliate of the Franchisor.

A "Wyndham Hotel" is a full-service business upscale, deluxe or resort hotel operated under the Wyndham trade name that is set forth in Attachment A.

220674.v5A (Final)



## WYNDHAM HOTEL GROUP INTERNATIONAL INC.
## ATTACHMENT E
## WORK FOR HIRE AGREEMENT

I, the undersigned accordingly with the task entrusted to me by the [FRANCHISEE] ("[Company]") to create for Wyndham Hotel Group International Inc., their successors, assignees and licensees ("WHGI"), as [employee/third party vendor/_____] of [Company], the designs, drawings, technical and proprietary information, material and/or specifications that are described in Exhibit 1 to this Agreement (each, individually "Material," and collectively, "Materials"), hereby acknowledge that WHGI is the legitimate owner of all and any copyrights directly or indirectly arising from or related to the Materials, and further acknowledge the right of WHGI to use, exploit, not exploit, disclose, publish, exhibit, distribute, sell or in any manner dispose of the ownership of such Materials and the material supports, samples containing, jointly or individually, totally or partially, the Materials as well as the right of WHGI to authorize third parties to exploit the Materials, including without limitation, the right of WHGI to privately or publicly communicate the Materials, to use the Materials in whole or in part, including its use retail stores, all forms of products and merchandising including consumer products, all forms of computer products and uses, Internet and all associated on-line services, all interactive formats, solid state devices, etc., all commercial and non-commercial uses, and all promotional, marketing or advertising, and the total or partial use of the Materials themselves. I also hereby waive any right deriving from any law with regard to the Materials to the extent permitted by law.

I hereby, acknowledge my consent in order for WHGI to make changes, deletions and abbreviations in the Materials for the purpose of the exploitation of the Materials, as well as to use any result of my assigned work with the purpose of promoting, marketing and for consumption or for any other purpose.

Likewise, I hereby acknowledge that my assigned work in the creation and preparation of the Materials has been remunerated or paid in its entirety by [Company] or will be remunerated or paid based upon the applicable laws and agreements different from this agreement or the copyrights' legislation, and therefore waive any right to claim any future compensation either directly or indirectly related to the copyrights arising from the Materials, notwithstanding the number of produced material supports or samples, the editions or the use given to the Materials themselves.

Furthermore, I hereby acknowledge the right of WHGI to make, at any time, all kinds of modification, deformation and mutilation to the Materials, in the understanding that all and each of such modification, deformation and mutilation to the Materials by WHGI, shall be made at WHGI sole cost and for its sole benefit. On the other hand, I hereby waive any right to which I may be entitled to defend any kind of violation of the copyrights corresponding to the Materials, as well as any copyright directly or indirectly related to the Materials, including the rights arising from same. If contrary to what has been hereby agreed upon, at any time I

220674.v5A (Final)



## ATTACHMENT F
## IRREVOCABLE POWER OF ATTORNEY

IRREVOCABLE POWER OF ATTORNEY FORM
VOLUME
DEED

In the city of Mexico Federal District, on _____, 2007, before me, Mr. _____, Notary Public No. ___ of _____, appeared Mr.     , as legal representative of Islander Properties, S.A. de C.V. ("Grantor"), and declared that requests from the undersigned Notary Public the granting and formalization of an irrevocable power of attorney pursuant to the following Recitals and Clauses.


RECITALS


I.     As of June 29, 2007, Grantor, among others, executed a License Agreement (hereinafter referred to as the "Agreement") with WYNDHAM HOTEL GROUP INTERNATIONAL INC., a Delaware corporation (hereinafter referred to as "WYNDHAM"), whereby among other things, WYNDHAM, acting as Licensor, granted to Grantor, upon the terms and conditions contained in the Agreement, the non-exclusive license or franchise to operate a Chain Facility, as a "Wyndham Resort, An All-Inclusive Hotel", using the System and the Proprietary Marks (as all of such terms are defined in the Agreement).

II.    That pursuant to Section 10.C.6 of the Agreement, Licensor undertook the obligation to register the Agreement, and Grantor as authorized user of the Proprietary Marks, with the Mexican Industrial Property Institute, and, upon the termination of to Agreement, to file such documents and take such actions, to cancel any and all then effective government approvals, registrations or filings of the Agreement, including without limitation those regarding the Mexican Industrial Property Institute:

III.   That also in accordance with Section 10.C.6 of the Agreement, Grantors and WYNDHAM agreed that as a condition for the Agreement to enter into effect, Grantor will among others, grant an irrevocable power of attorney in favor of the attorneys in fact mentioned in Recital IV below.

IV.    That in order for the Agreement to enter into effect as established in Recital III above and also as a means necessary for WYNDHAM to comply with its obligation described in Recital II above, Grantor wishes to grant an irrevocable power of attorney for said purposes, to be exercised jointly and severally in favor of WYNDHAM and Messrs. Carlos Müggenburg R.V., Esteban Constantino Gorches Guerrero, Jean-Yves Peñalosa Sol la Lande, Alfonso Jesús Sepúlveda García y Ana Esther Urquizo Gómez.

220674.v5A (Final)

V. *[TO BE FILLED OUT WITH BACKGROUND INFORMATION NECESSARY FOR THE GRANTORS TO BE FULLY IDENTIFIABLE LICENSEES' FRANCHISEE'S PERSONAL DATA SUCH AS FULL LEGAL NAME (TO BE THE SAME INCLUDED IN HIS/HER VOTING CARD), DATE AND PLACE OF BIRTH, CIVIL STATUS, MARRIAGE PATRIMONIAL REGIME –AS APPLICABLE- PERSONAL OCCUPATION, TAX PAYER REGISTRATION, RELIGION ETC.*

## CLAUSES

FIRST.　Grantor, as a condition for the Agreement to enter into effect as described in Recital III above and in order to allow WYNDHAM to comply with its obligations described in Recital II herein, hereby grants if favor of WYNDHAM HOTELS AND RESORTS, LLC, Inc. and Messrs. Carlos Müggenburg R.V., Esteban Constantino Gorches Guerrero, Jean-Yves Peñalosa Sol La Lande, Alfonso Jesús Sepúlveda García y Ana Esther Urquizo Gómez an Irrevocable Power of Attorney, as broad as required by law, to be exercised jointly or severally, so that as Grantors attorneys-in-fact they may carry out each and every action necessary or convenient to register and/or cancel the registration of Grantors as authorized users of the Proprietary Marks described in Exhibit "A" hereto and to register and/or cancel the registration of the Agreement, with the Mexican Industrial Property Institute of the Mexican Federal Government, as well as to prepare, sign and file the documents, and take the actions, necessary and/or convenient, to cancel any and all government approvals, registrations or filings, derived from or related to the Agreement .

SECOND.　The power of attorney granted to the attorneys-in-fact includes, but is not limited to, the authority to execute all kind of documents, whether public or private, necessary or convenient for exercising the power of attorney granted herein, as well as to carry on any and all actions necessary or convenient to accomplish the registration and cancellation of any rights Grantors may have acquired or acquire pursuant to the Agreement or any other agreement delivered in connection with the Agreement. Within the specialty of their power of attorney, the above mentioned attorneys in fact will have the authority of an attorney in fact for acts of ownership, in the terms of the third paragraph of Article 2, 554 of the Federal Civil Code and the correlative provisions of the Civil Code for the Federal District and the Civil Codes for each of the States of the Mexican Republic. The attorneys in fact have the authority to substitute or delegate the power of attorney granted herein at any moment, in whole or in part, and the powers of attorney granted that the attorneys in fact substitute or delegate shall continue in full force and effect notwithstanding the termination or expiration of the Agreement.

THIRD.　This irrevocable power of attorney shall survive the expiration or termination of the Agreement and of its modifications.

**[INSERT STANDARD NOTARIAL TRANSCRIPTS]**

220674.v5A (Final)

# ATTACHMENT G

## PROJECT IMPROVEMENT PLAN (PIP)

[To Be Attached]



**ATTACHMENT H**

**WYNDHAM HOTEL GROUP INTERNATIONAL, INC.**
**INFORMATION FOR POTENTIAL FRANCHISEE/LICENSEE PURSUANT TO**
**ARTICLE 142 OF THE MEXICO INDUSTRIAL PROPERTY LAW**
**AND ARTICLE 65 OF ITS REGULATIONS**

**FRANCHISE AGREEMENT**

**TO BE ENTERED BY AND BETWEEN**

**WYNDHAM HOTEL GROUP INTERNATIONAL, INC.**
**(FRANCHISOR/LICENSOR)**

**AND**

**ISLANDER PROPERTIES S.A. DE C.V.**
**(FRANCHISEE/LICENSEE)**
**FOR PROVIDING TRANSIENT GUEST LODGING SERVICES UNDER THE**
**"WYNDHAM" MARK IN COZUMEL, MEXICO**
**(THE FRANCHISE AGREEMENT)**

## I. FRANCHISOR'S NAME, CORPORATE NAME, ADDRESS AND NATIONALITY

The name of the Franchisor is WYNDHAM HOTEL GROUP INTERNATIONAL, INC. a U. S. Delaware corporation, with its principal business address at 1 Sylvan Way, Parsippany, NJ 07054 U.S.A.

## II. DESCRIPTION OF FRANCHISE

A franchise of WYNDHAM HOTEL GROUP INTERNATIONAL, INC., offers the Franchisee a non-exclusive right to operate businesses under the WYNDHAM mark and other Proprietary Marks listed in Schedule ["D"] of the Franchise Agreement for providing transient guest lodging services to the public under the "WYNDHAM" mark, as well as certain services, including the Reservation System, advertising, marketing and training services.

## III. NUMBER OF YEARS WYNDHAM HOTEL GROUP INTERNATIONAL, INC. HAS OPERATED THE SUBJECT FRANCHISE BUSINESS

WYNDHAM HOTEL GROUP INTERNATIONAL, INC. or its predecessor have conducted business of the kind to be operated by Franchisee since _____.

## IV. INTELLECTUAL PROPERTY RIGHTS (INDUSTRIAL AND COPYRIGHTS) COMPRISING THE FRANCHISE.

220674.v5A (Final)

The intellectual property rights comprise the Franchise Agreement include the Marks; the comprehensive system (the "System") for providing guest lodging facility services under the Proprietary Marks as Licensor specifically which includes only the following: (a) the Proprietary Marks; (b) other intellectual property, including Confidential Information, the Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System. Franchisee is not enabled to use any other trademark, service mark, trade name, or logo together with or linked to the Proprietary Marks. The use of the Proprietary Marks shall not create in Franchisee's favor any interest in same. Franchisee shall use the Proprietary Marks only in accordance with the Franchise Agreement.

Franchisee shall not, directly or indirectly, commit an act of infringement or contest or aid in contesting the validity or right of WYNDHAM HOTEL GROUP INTERNATIONAL, INC. to the Proprietary Marks, or take any action to challenge or jeopardize the Proprietary Marks.

Franchisee's use of the Proprietary Marks will inure to the exclusive benefit of WYNDHAM HOTEL GROUP INTERNATIONAL, INC.

WYNDHAM HOTEL GROUP INTERNATIONAL, INC. owns all copyrights covering various materials used in its business, including advertising and promotional literature, video and audio tapes and other materials.

## V. AMOUNTS OF PAYMENTS TO BE MADE BY FRANCHISEE TO WYNDHAM WORLDWIDE HOTEL GROUP INTERNATIONAL, INC.

A.   Initial Franchise Fee; Expansion Fee.
B.   Royalty.
C.   Marketing Fee.
D.   Reservation System Fees.
E.   National Sales Fee.
F.   Regional Marketing Fee.
G.   Due Dates.
H.   Non-Resident Withholding Taxes.
I.   Payments in U.S. Dollars.
J.   Payment Restrictions.

## VI. TYPE OF TECHNICAL ASSISTANCE AND SERVICES TO BE PROVIDED BY WYNDHAM HOTEL GROUP INTERNATIONAL, INC. TO FRANCHISEE

Services to be provided by WYNDHAM HOTEL GROUP INTERNATIONAL, INC. to Franchisee are described in the Franchise Agreement hereto attached, including without limitation, Section 4 of the Franchise Agreement.

## VII. GEOGRAPHIC TERRITORY WITHIN WHICH THE FRANCHISE WILL BE OPERATED

_____ (the Facility) and WYNDHAM HOTEL GROUP INTERNATIONAL, INC. may own, operate or license a Chain Facility which includes Wyndham Hotels located within the Protected Territory (as such term is defined in the Franchise Agreement), provided this restriction shall not apply to owning, operating or licensing any: (i) hotels located in the Protected Territory that are part of another chain, franchise system or portfolio of at least four (4) hotels acquired by WYNDHAM HOTEL GROUP INTERNATIONAL, INC. or any of its Affiliates.

## VIII. INDICATION WHETHER FRANCHISEE IS ENTITLED TO GRANT SUBFRANCHISES TO THIRD PARTIES AND, IF SO, THE REQUIREMENTS AND TERMS FOR DOING SO.

Franchisee is not entitled to grant subfranchises to third parties.

## IX. FRANCHISEE OBLIGATIONS WITH RESPECT TO CONFIDENTIAL INFORMATION PROVIDED BY WYNDHAM HOTEL GROUP INTERNATIONAL, INC.

Franchisee will take all appropriate actions to preserve the confidentiality of all Confidential Information. Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement. Franchisee will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software). Franchisee will use Confidential Information only for the Facility and to perform under this Agreement. Upon termination of the Franchise Agreement, franchisee shall return to WYNDHAM HOTEL GROUP INTERNATIONAL, INC. all originals and copies of the Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended. Franchisee's confidentiality obligations shall commence upon the execution of the Franchise Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as WYNDHAM HOTEL GROUP INTERNATIONAL, INC. continue to use the information in confidence, even if edited or revised, plus three (3) years.

## X. FRANCHISEE RIGHTS AND OBLIGATIONS UNDER THE AREA DEVELOPMENT AND OPERATION AGREEMENT

Franchisee's rights and obligations derived from the Franchise Agreement, including, without limitation Sections 3, 5, 7, 8, 9, 10, 13 and 18.

## XI. EXHIBITS

The Attachments, Appendix, Schedule and Addenda, have been received by the undersigned together with this Disclosure Document.

Attachment A -    Selected Terms

Attachment B -    Guaranty

Attachment C -    Management Company Rider

Attachment D -    Definitions

### ADDENDA

New Construction Addendum

Conversion Addendum

## XII. FRANCHISEE AKNOWLEDGMENT

The undersigned acknowledges that, no later than _____, 2007, the undersigned received this Information for Potential Franchisees/Licensees pursuant to Article 142 of the United Mexican States Industrial Property Law and Article 65 of its Regulations, (the "Disclosure Document"). Since receiving the Disclosure Document, the undersigned, through its attorneys, has proposed and negotiated certain additional provisions of the Franchise Agreement which resulted in certain changes contained in Section 31 (Special Stipulations) as well as in other sections of the Franchise Agreement.

The undersigned hereby represents, warrants and acknowledges that the undersigned, through its counsel, proposed, negotiated, as fully familiar with and understands all of the provisions of the Franchise Agreement including the Special Stipulations and all other negotiated changes.

The undersigned's signature on this Disclosure Document, and on the receipt to the Disclosure Document, in no way binded the undersigned to enter into the Franchise Agreement. Signing this Disclosure Document merely indicates that the undersigned has received, has reviewed and understands it, as well as all its Exhibits.

The undersigned acknowledges and accepts that all terms not otherwise defined in this Disclosure Document have the meaning stated in the Franchise Agreement, its Appendix and Schedules.

220674.v5A (Final)

## CONVERSION ADDENDUM

This Conversion Addendum is made and entered into effective as of the 29th day of June 2007, by and between Wyndham Hotel Group International, Inc. ("Franchisor"), and ISLANDER PROPERTIES S.A. de C.V. ("Franchisee") with respect to the hotel located at Carretera Costera Azul, Quintana Roo, Cozumel Mexico (the "Hotel"). Capitalized terms used, but not defined, in this Addendum shall have the meanings assigned to them in the Wyndham Hotel Franchise Agreement for the Hotel of even date ("Franchise Agreement").

### Recitals

Franchisor and Franchisee wish to enter into this Addendum to provide for the terms and conditions upon which the Hotel will be converted to a Wyndham Hotel ("Hotel").

Now, therefore, in consideration of the mutual promises and covenants set forth herein and in the Franchise Agreement, the parties agree as follows:

1.    Conversion Requirements.

1.1 Franchisor and Franchisee have inspected the Hotel and have determined the work needed to be completed to convert the Hotel to a Wyndham Hotel pursuant to Franchisor's standards, as evidenced by those items in the PIP attached hereto as Schedule A-2 (the "Conversion Requirements").

1.2 Franchisee shall complete the Conversion Requirements on or before the dates specified in Schedule A-1 hereto. However, Franchisor may extend the date specified in Schedule A-1 for completion thereof for a reasonable period (not to exceed 60 days) and for no additional fee in case of delays caused by Force Majeure or other causes that Franchisor considers beyond Franchisee's reasonable control.

2.    Furniture, Fixtures and Supplies. Franchisee shall bear the entire cost of renovating and converting the Hotel, including the cost of signs, equipment, furniture, furnishings and supplies. Franchisee shall order, purchase and/or lease and install all fixtures, equipment, furnishings, furniture, signs, supplies and other items necessary to complete and open the Hotel as specified in the Conversion Requirements.

3.    Opening. Except as set forth in Section 4 hereof, Franchisee shall not operate or advertise the Hotel as a Wyndham Hotel until all of the conditions of this Section 3 are satisfied:

3.1 Those items on Schedule A-1 and A-2 hereto marked "C" for completion on or before [December 1, 2007] (the "Conversion") have been completed under and subject to the Conversion Requirements;

220674.v5A (Final)

"Hotel" means the freehold or long-term ground or building leasehold title to the Approved Location, together with all improvements constructed on the Approved Location, including, without limitation, the buildings, structures, recreational amenities and facilities, parking areas and structures, appurtenances, easements, licenses, and all furniture, fixtures, equipment (including computer and telephone systems), supplies, and inventories.

The "Manager" is the party identified in the Management Company Rider attached as Attachment C to the Franchise Agreement.

The "Manual" is the Wyndham Business Deluxe/Resort Hotel Operating Manual, the Wyndham Graphics Manual, and all other written statements, directives and any other manuals and materials issued by Franchisor, and any modifications to such materials containing the standards, specifications, policies, and procedures for the establishment and operation of System hotels. The Manual may be in paper or electronic form.

The "Opening Date" is the date on which Franchisor authorizes Franchisee to open the Hotel as a "Wyndham Hotel." The Opening Date shall be entered on Attachment A to this Agreement unilaterally by Franchisor and a copy provided to Franchisee.

The "Proprietary Marks" are all trade names, trademarks, service marks, logos, emblems, symbols and indicia of origin that are now designated on Attachment A or as may hereafter be designated in writing by Franchisor as part of the System for use for System hotels. The Proprietary Marks may be modified by Franchisor from time to time.

The "System" is the collection of procedures, policies, standards, specifications, controls and other distinguishing elements which Franchisor or its Affiliates have developed for the establishment and operation of Wyndham business deluxe and resort hotels. The distinguishing characteristics of the System include, without limitation, standards and specifications for the establishment and operation of a Wyndham Hotel; proprietary reservation and property management systems; advertising, marketing and promotional programs; a Wyndham Hotel Directory; management and personnel training programs; operational standards, policies, procedures and techniques as prescribed in the Manual and a quality assurance program known as the "Wyndham Way," all of which may be changed, improved or further developed from time to time. The Wyndham Companies have all rights in and to the System and Franchisee has only the right to use the System under the terms and conditions of this Agreement.

The "Wyndham Companies" include the Franchisor and any Affiliate of the Franchisor.

A "Wyndham Hotel" is a full-service business upscale, deluxe or resort hotel operated under the Wyndham trade name that is set forth in Attachment A.



with the terms of this Conversion Addendum, Franchisee shall comply with all post-termination obligations under the Franchise Agreement. With respect to any failure to complete those items in Schedule A-2 marked "C", in lieu of the lump sum payment for premature termination set forth in Section 18E, Franchisee shall pay the Franchisor a lump sum equal to 2 ½ times the amount of the application fee for the Hotel.

**FRANCHISOR**

WYNDHAM HOTEL GROUP INTERNATIONAL, INC.
a Delaware Corporation

By: _____

    Name: _____ Richard M. Saltzman _____

    Title: _____ Vice President _____

**FRANCHISEE**

**ISLANDER PROPERTIES S.A. DE C.V.**

a _____

By: _____

    Name: Manuel Villanueva

    Title: Legal Representative

220674.v5A (Final)

**Schedule A-1**
**to Conversion Addendum**

| Items in Schedule A-2 to be Completed | Date to be Completed |
|---|---|
| C | On or before _____ |
| D1 | On or before ___ months from the Conversion |
| D2 | On or before ___ months from the Conversion |
| D3 | Deferred until next required renovation |

220674.v5A (Final)

**Schedule A-2**
**to Conversion Addendum**

Property Improvement Plan

(This page intentionally left blank)

220674 v5A(Final)

## CONVERSION ADDENDUM

This Conversion Addendum is made and entered into effective as of the 29th day of June 2007, by and between Wyndham Hotel Group International, Inc. ("Franchisor"), and ISLANDER PROPERTIES S.A. de C.V. ("Franchisee") with respect to the hotel located at Carretera Costera Azul, Quintana Roo, Cozumel Mexico (the "Hotel"). Capitalized terms used, but not defined, in this Addendum shall have the meanings assigned to them in the Wyndham Hotel Franchise Agreement for the Hotel of even date ("Franchise Agreement").

### Recitals

Franchisor and Franchisee wish to enter into this Addendum to provide for the terms and conditions upon which the Hotel will be converted to a Wyndham Hotel ("Hotel").

Now, therefore, in consideration of the mutual promises and covenants set forth herein and in the Franchise Agreement, the parties agree as follows:

1.    Conversion Requirements.

1.1 Franchisor and Franchisee have inspected the Hotel and have determined the work needed to be completed to convert the Hotel to a Wyndham Hotel pursuant to Franchisor's standards, as evidenced by those items in the PIP attached hereto as Schedule A-2 (the "Conversion Requirements").

1.2 Franchisee shall complete the Conversion Requirements on or before the dates specified in Schedule A-1 hereto. However, Franchisor may extend the date specified in Schedule A-1 for completion thereof for a reasonable period (not to exceed 60 days) and for no additional fee in case of delays caused by Force Majeure or other causes that Franchisor considers beyond Franchisee's reasonable control.

2.    Furniture, Fixtures and Supplies. Franchisee shall bear the entire cost of renovating and converting the Hotel, including the cost of signs, equipment, furniture, furnishings and supplies. Franchisee shall order, purchase and/or lease and install all fixtures, equipment, furnishings, furniture, signs, supplies and other items necessary to complete and open the Hotel as specified in the Conversion Requirements.

3.    Opening. Except as set forth in Section 4 hereof, Franchisee shall not operate or advertise the Hotel as a Wyndham Hotel until all of the conditions of this Section 3 are satisfied:

3.1 Those items on Schedule A-1 and A-2 hereto marked "C" for completion on or before [December 1, 2007] (the "Conversion") have been completed under and subject to the Conversion Requirements;

3.2 Franchisee has hired and trained the staff necessary to operate the Hotel;

3.3 Franchisee has paid all amounts due Franchisor and its Affiliates;

3.4 Franchisee has given Franchisor written notice that all terms and conditions of this Addendum, have been satisfied and the Hotel is ready to open for business as a Wyndham Hotel;

3.5 Franchisor has granted written approval to open and operate the Hotel as a Wyndham Hotel. Franchisor shall use its best efforts to inspect the Hotel within fourteen (14) days after receiving the notice specified in Section 3.4 above and to conduct any such other investigations that Franchisor deems necessary to determine whether Franchisee has satisfied all requirements for opening the Hotel as a Wyndham Hotel. Franchisor shall not be liable for delays or loss occasioned by the inability of Franchisor to complete its investigation and to make such determination for reasons beyond Franchisor's control; and

3.6 Except as permitted by Section 4 of this Addendum, Franchisee understands and agrees that it shall not operate the Hotel as part of the Wyndham System nor shall it advertise or otherwise hold out the Hotel as being a Wyndham Hotel until it has completed, and Franchisor has approved in writing, the opening of the Hotel pursuant to this Section 3.

4.    Limited Trademark License.

4.1 If Franchisor certifies that the improvements are being made under and subject to the Conversion Requirements, such certification will constitute the grant of a limited, temporary license under which Franchisee may use the Wyndham trademark to advertise the Hotel's anticipated opening and to offer, sell and make reservations for guest rooms for guests arriving on or after the completion date for the Conversion Requirements set forth on Schedule A-1. Any advertisements may appear only on signs at the Approved Location and in print and broadcast media announcements that, in each instance, meet Franchisor's standards for design and quality.

4.2 Franchisor may, upon consultation with Franchisee, conditionally authorize Franchisee to open and operate the Hotel as a Wyndham Hotel even though Franchisee has not fully complied with the Conversion Requirements, if Franchisee has substantially complied with the Conversion Requirements and agrees to comply with all remaining terms thereof on or before the completion date specified in Schedule A-1. If Franchisee fails to comply with all such remaining terms on or before the completion date specified in Schedule A-1 (or any extension thereof that may be granted by Franchisor), Franchisor may terminate the Franchise Agreement pursuant to Section 17C thereof.

5.    Termination. This Conversion Addendum shall remain in full force and effect until all items listed in Schedule A-2 have been completed. Upon any termination of the Franchise Agreement as a result of Franchisee's failure to comply

220674.v5A (Final)

with the terms of this Conversion Addendum, Franchisee shall comply with all post-termination obligations under the Franchise Agreement. With respect to any failure to complete those items in Schedule A-2 marked "C", in lieu of the lump sum payment for premature termination set forth in Section 18E, Franchisee shall pay the Franchisor a lump sum equal to 2 ½ times the amount of the application fee for the Hotel.

**FRANCHISOR**

WYNDHAM HOTEL GROUP INTERNATIONAL, INC.
a Delaware corporation

By: _____

    Name: _____ Richard M. Saltzman _____

    Title: _____ Vice President _____

**FRANCHISEE**

ISLANDER PROPERTIES S.A. DE C.V.

a _____

By: _____

    Name: Manuel Villanueva

    Title: Legal Representative

220674.v5A (Final)

**Schedule A-1**
**to Conversion Addendum**

| Items in Schedule A-2 to be Completed | Date to be Completed |
|---|---|
| C | On or before _____ |
| D1 | On or before ___ months from the Conversion |
| D2 | On or before ___ months from the Conversion |
| D3 | Deferred until next required renovation |

Schedule A-1 to Conversion Addendum – Page Solo

220674.v5A (Final)

**Schedule A-2
to Conversion Addendum**

Property Improvement Plan

220674.v5A(Final)

(This page intentionally left blank)