File Date: _August 28, 2008_

Case No: _O8cv 1361_

ATTACHMENT # _____

EXHIBIT _5 - 8_____

TAB (DESCRIPTION)

_____

**U.S. Department of State**
## Report of Death of an American Citizen Abroad

Merida, Yucatan, Mexico  10/26/2007
(Post & date of issue)

Name in full  John Wozniak _____ Age ___ 59 __

Date and Place of Birth  January 22, 1948 __ Poland _____

Evidence of U.S. Citizenship  Passport  No. 027158676 issued on August 11, 2000. ____

Address in U.S.A.  7026 Wilson Terrace, Morton Grove, Illinois 60053 _____

Permanent or Temporary Address  Wyndom Resort  Cozumel, Quintana Roo, Mexico. ____

Date of death ____ October _____ 16 _____ 13:58 _____ 2007
         (Month)      (Day)      (Hour)        (Year)

Place of death  Centro Medico de Cozumel _____ Cozumel, Quintana Roo ____ Mexico
     (Number and street) or (Hospital or hotel)      (City)      (Country)

Cause of death  Subdural hematoma, head trauma, accidental fall, severe metabolic uncontrolled, type II diabetes __
     (Including authority for statement - if physician, include full name and official title, if any)

as certified in Mexican death certificate by Dr. Salvador Martin Mandujano. _____

Disposition of the remains  Prepared and sent to Niles, Illinois. _____
_____

Local law governing disinterment of remains provides ___ N/A _____

Disposition of the effects  In custody of NOK/spouse Danuja Wozniak. _____

Person or official responsible for custody of effects and accounting therefore _____
Danuja Wozniak.

Traveling/residing abroad with relatives or friends as follows:
     NAME             ADDRESS
__ Danuja Wozniak _____ 7026 Wilson Terrace, Morton Grove, IL  60053 ____

Informed by telegram or telephone
     NAME              ADDRESS
__ Danuja Wozniak _____ 7026 Wilson Terrace, Morton Grove, IL  60053 ____

Copy of this report sent to:
     NAME              ADDRESS
__ Danuja Wozniak _____ 7026 Wilson Terrace, Morton Grove, IL  60053 ____

Notification or copy sent to Federal Agencies:  SSA x  VA _  CSC _  Other _____
           (State Agency)

The original copy of this document and information concerning the effects are being placed in the permanent files of the Department of State, Washington, D.C. 20520

Remarks:
Passport returned to next of kin.  Mexican death certificate No. 00164, filed Oct. 17, 2007, Cozumel, Q.Roo, Mexico.
           (Continue on reverse if necessary.)

[SEAL]

_Kay Barton_
(Signature on all copies)
    of the United States of America.

Kay Barton
Consul

*Right margin (vertical):*
(Last name) Wozniak
(First name) John
(Middle name)
(Date of death) 16-Oct-2007

DS-2060
Formerly OF-180
12-2003

For Additional Certified Copies, see http://travel.state.gov/passport/consular_records.html.



# CENTRO MÈDICO DE COZUMEL

CALLE PRIMERA SUR #101,COZUMEL QR,MEXICO 77600

# COZUMEL MEDICAL CENTER

TEL/FAX: 987.872.9400 FROM USA(01152)

FECHA/EXAM DATE: 20071016
PACIENTE/PATIENT: JOHN WICENTY WOZNIAK .
EXPEDIENTE/MRN : 00000000000000047435
EPISODIO/EPISODE: INT  91751  1

MÈDICO/PHYSICIAN:  GARCIA- MAGAÑA ,EDUARDO
ESPEC/SPECIALTY:  MED. INTERNA/INTERNAL MEDICINE

### REPORTE MÈDICO/MEDICAL REPORT

INTERNAL MEDICINE
EMERGENCY ROOM REPORT.

WAS ADMITTED A MALE CAUCASIAN PATIENT WHO ARRIVED ON THE AMBULANCE WITH A RESPIRATORY ARREST AND ARRHYTHMIAS.
THE PATIENT HAD HISTORY OF DIABETES MELLITUS AND HYPERTENSION. THE PATIENT HAD AN ACCIDENT ONPAST SUNDAY ON THE WHYNDHAM
HOTEL, HE HAD A HEAD TRAUMA, WAS EVALUATED AND TREATED. DURING ALL NIGHT AND YESTERDAY HE COMPLAINTS OF SEVRE HEADACHE AND
DEVELOPED DIZZINESS AND VOMIT. TODAY THE PATIENT CONTINUES WITH DIZZINESS, CONTINUED WITH HEADACHEAND DEVELOPED A SYNCOPE,
WITH LOSS OF CONSCIOUS AND NEW HEAD TRAUMA, WAS TRANSPORTED BY AMBULANCE TO THIS CLINIC, DURING THE WAY HE WAS FOUND WITH
RESPIRATHORY ARREST AND LOW PULSE, UPON ADMISSION THE PATIENE SHOWED A HR 45 WITH ECTOPIC VENTRICULAR BEATS, NO BREATHING.
WAS STARTED TREATMENT WITH ACLS MANUEVERS. ALSO WAS DETECTED WITH A BLOOD GLUCOSE OF 500mg/dl
WAS INTUBATED, STARTED CPR, MECHANICAL VENTILATION AND GIVEN TREATMENT WITH ATROPINE, EPINEFRINE, BICARBONATE, DOPAMINE,
LIDOCAINE ANDAMODARONE. AFTER 40 MINTUES WITH ACLS THE PATIENT DEVELOPED ASYSTOLIA WITHOUT RESPONSE TO MANUEVERS.
WAS DIAGNOSED HIS DEATH AT 13:58 HR.

MÈDICO/PHYSICIAN:  GARCIA- MAGAÑA ,EDUARDO
ESPEC/SPECIALTY:  MED. INTERNA/INTERNAL MEDICINE
CEDULA  3098708



EGA

**CENTRO MÈDICO DE COZUMEL**
CALLE PRIMERA SUR #101,COZUMEL QR,MEXICO 77600

**COZUMEL MEDICAL CENTER**
TEL/FAX: 987.872.9400 FROM USA(01152)

FECHA/EXAM DATE: 20071016
PACIENTE/PATIENT: JOHN WICENTY WOZNIAK .
EXPEDIENTE/MRN : 00000000000000047435
EPISODIO/EPISODE: INT  91751  1

MÈDICO/PHYSICIAN:  RUBALCAVA- JARILLO ,CITALLI
ESPEC/SPECIALTY:  MEDICINA GENERAL/GENERAL MED.

### REPORTE MÈDICO/MEDICAL REPORT

---

EMERGENCY ROOM REPORT

   59  YEARS OLD MALE WHO ARRIVED TO THIS FACILITY BY AN AMBULANCE. HE IS GUEST OF THE CORAL REEF HOTEL. THE PATIENT  FELL DOWN TODAY  AND TRIPPED WHILE HE WAS HAVING BREAKFAST. HE HIT HIS HEAD AND DEVELOPED A SYNCOPE  AND ARRYTMIAS.
   THE WIFE TOLD  US THAT HE HAD A CLAVICULE  FRACTURE ON SATURDAY, BECAUSE HE ALSO FELL DOWN OVER HIS LEFT SHOULDER,HE ALSO HAD A HEAD TRAUMA  AFTER THAT HE BEGAN TO DEVELOPED HEADACHE. HE WAS TREATED ON THAT MOMENT FOR THE HOSPITAL`S DOCTOR.
   MEDICAL HISTORY
   HIGH BLOOD PRESSURE  SINCE AROUND 11 YEARS OLD
   DIABETIC
   HE HAD RIGHT EYE CANCER , NOW HE WAS USING EYE PROTHESIS
   THE WIFE REPORTED THAT HE ALSO PRESENTED STOMACH TROUBLES SUCH AS GASTRITIS.
   THE PATIENT IS TAKING CURRENT MEDICATION BUT THE WIFE DOES NOT BRING WITH THE MEDICATION LIST


   PHYSICAL EXAMINATION

   SATURACION  75%

   THE PATIENT WAS UNCOUNSCIOUS , ANISOCORIC PUPILS, DIFFICULT BREATHING  , THE PATIENT WAS WITH ECTOPIC VENTRICULAR BEATS , NONE MURMURES, LOW PULSE , AND THEN HE STARTED NOT TO BREATH, HE STARTED WITH ACLS MANUEVERS. AT THIS TIME WE FOUND   500 /MG GLUCOSE , THE PATIENT WAS INTUBATED, STARTED WITH CPR, MECHANICAL VENTILATION  AND GIVEN TREATMENT WITH MIDAZOLAM 13|20HRS 5MG  SUCCINIL COLINA  8 MG  13:20 HRS, ATROPINA 1 MG  13:20 HRS,  EPINEPHRINE 1 AMP  13:25 HRS   LIDOCAINE  13:20 HRS  LIDOCAINE  10 ML  13:29 HRS  EPINEFRINE 1 AMP,MIDAZOLAN 13:32 5MG, BICARBONATO  13:35  HRS  5 AMPULAS,DOPAMINA  13:40   250ML, AMIODARONA  13:45  30 ML, EPINEPHRINE 13:50.  40 MINUTES AFTERWARDS HE DEVELOPED ASYSTOLIA WITHOUT  RESPONSE TO MANUEVERS.
   TIME OF DEATH APROXIMATELY   13:58 HRS.

---

MÈDICO/PHYSICIAN:  RUBALCAVA- JARILLO ,CITALLI
ESPEC/SPECIALTY:  MEDICINA GENERAL/GENERAL MED.
       CEDULA  3545139

EGA

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
               CIVIL ACTION NO: 08 CV 1361
 3
 4   DANUTA WOZNIAK, Individually,  :
       And as Special Administrator :  DEPOSITION OF:
 5   Of the ESTATE of JAN WOZNIAK,  :
     Deceased,                      :
 6                                  :
                : VALERIE CAPERS WORKMAN
 7       Plaintiffs,  :
 8                    :
 9                    :
          Vs.         :
10   Wyndham Hotels AND RESORTS,  :
     LLC, a foreign corporation,   :
11                    :
12       Defendants.  :
     - - - - - - - - - - - - - - -
13
14
          TRANSCRIPT of the deposition of the Witness,
15   called for Oral Examination in the above-captioned
     matter, said deposition being taken pursuant to Superior
16   Court Rules of Practice and Procedure by and before
     JAMES A. KORWAN, Certified Shorthand Reporter, (License
17   No. 1800), and Notary Public of the State of New Jersey,
     at the offices of DAY, PITNEY, 200 Campus Drive, Florham
18   Park, New Jersey  07932, on Wednesday, July 2, 2008,
     commencing at approximately 3:16 p.m..
19
20
21        ESQUIRE DEPOSITION SERVICES
              90 Woodbridge Center Drive
22                   Suite 340
              Woodbridge, New Jersey 07095
23   Phone - (732) 283-1060  -  Fax - (732) 283-1640
                   800-247-8366
24
25   Job No. 66536
```

**Page 2**

```
 1   APPEARANCES:
 2
 3
 4   DAVID NEMEROFF, ESQ.
     55 West Monroe Street
 5   Suite 600
     Chicago, Illinois 60603
 6   Attorney for the Plaintiffs
 7
 8
     WILSON, ELSER, MOSKOWITZ,
 9   EDELMAN & DICKER
     120 North Lasalle Street
10   26th Floor
     Chicago, Illinois  60602
11   BY: CHRISTOPHER DELY, ESQ.
     Attorneys for the Defendant
12
13
14   WYNDHAM WORLDWIDE CORPORATION
     1 Sylvan Way
15   Parsippany, New Jersey  07054
     BY: MARC MERRIWEATHER, ESQ.
16   In-House Counsel for Wyndham
     Worldwide
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                    INDEX
 2
 3   WITNESS        EXAMINATION BY        PAGE
 4   VALERIE CAPERS WORKMAN  Mr. Nemeroff    4, 141
 5              Mr. Dely        134
 6
 7
                    EXHIBITS
 8                              MARKED
     NUMBER   DESCRIPTION               FOR ID
 9
     1     Wyndham Hotel Franchise Agreement   8
10        Between Wyndham Hotel Group
          International and Islander Properties
11
12   2     Two-page Affidavit          9
13   3     Wyndham Hotels and Resorts Brand   14
          Standards Manual
14   4     Conversion Plan Report        110
15
16
17                   REQUESTS
18   NUMBER   DESCRIPTION          PAGE  LINE
19   1     All Affidavits         43   1-3
20   2     List including the name of   45    19-23
          Jurisdiction and lawyers
21        Involved of all litigation
          Involving Wyndham and its
22        Franchisees
23
24
25
```

**Page 4**

```
 1        VALERIE CAPERS WORKMAN,
 2   Having been first duly sworn, was examined and testified
 3   as follows:
 4             EXAMINATION
 5   BY MR. NEMEROFF:
 6     Q.  Okay.  Can you please state your name, ma'am?
 7     A.  Valerie Capers Workman.
 8        MR. NEMEROFF:  Let the record reflect, this
 9   is the deposition of Valerie Capers Workman taken
10   pursuant to court order and all applicable rules.
11     Q.  Do you like being called Ms. Capers Workman, Ms.
12   Workman?  How would you like to be addressed, ma'am?
13     A.  Ms. Workman is fine.  Thanks.
14     Q.  Ms. Workman, my name is David Nemeroff, attorney
15   here in Chicago.  I represent Danuta Wozniak, both
16   individually and as special administrator of the Estate
17   of Jan Wozniak, her deceased husband, in a lawsuit that
18   we filed here in Illinois against Wyndham Hotels and
19   Resorts LLC.  And I am going to be asking you some
20   questions today.
21        MR. NEMEROFF:  And, just for the record,
22   because this is limited in topic and scope, I am going
23   to reserve the right, should we at a later date, to
24   re-depose this witness on the full issues in the
25   underlying case.  This is being taken for purposes of
```

ORIGINAL

Page 5

1. the motion to dismiss for forum non-convenience.
2. MR. DELY: I would only add that to the
3. extent that Ms. Capers Workman is, in fact, the most
4. knowledgeable individual on information you might seek
5. down the road, if necessary. But for purposes of today,
6. this is only for the forum non-convenience motion.
7. Q. Ms. Workman, what is your home address?
8. A. My home address is 10 Arnold Drive, Parsippany,
9. New Jersey.
10. Q. And who are you currently employed with?
11. A. I am currently employed by Wyndham Hotel Group.
12. Q. And what is your position with Wyndham Hotel
13. Group?
14. A. I am vice president, franchise administration.
15. Q. What is the difference between Wyndham Hotel
16. Group and Wyndham Hotels and Resorts LLC?
17. A. Wyndham Hotel Group is the parent of Wyndham
18. Hotels and Resorts.
19. Q. Okay. So Wyndham Hotel Group owns Wyndham Hotels
20. and Resorts LLC, correct?
21. A. Essentially, that's correct.
22. Q. Is there any kind of functional difference
23. between the two entities?
24. A. Yes.
25. Q. Can you explain to me what the functional

Page 6

1. difference is or what, functionally, Wyndham Hotel Group
2. does versus what functionally Wyndham Hotel and Resorts
3. LLC does?
4. A. Generally speaking, Wyndham Hotels and Resorts is
5. the operator of the brand. And Wyndham Hotel Group is
6. the entity to which Wyndham Hotel Group rolls into among
7. other brands. Did I say that correctly? Let me repeat
8. that. Wyndham Hotel Group is the parent, if you will,
9. of Wyndham Hotels and Resorts and is the parent of other
10. brands, as well.
11. Q. Okay. Does Wyndham Hotel Group act as a
12. franchisor of the Wyndham brand?
13. A. Wyndham Hotels and Resorts is the franchisor.
14. Q. Okay. You're familiar with this lawsuit that was
15. filed at least in terms of you've read the complaint,
16. correct?
17. A. I believe so.
18. Q. Okay. And we sued Wyndham Hotels and Resorts,
19. LLC. That was the franchisor of the result where we
20. alleged that my -- that led to my client's death,
21. correct?
22. A. I would say, it's more correct to say that
23. Wyndham Hotels and Resorts and Wyndham Hotels
24. International are sister companies.
25. Q. I'm sorry. What is the second thing you said?

Page 7

1. Wyndham, what?
2. A. Wyndham International --
3. Q. Okay.
4. A. -- are sister companies.
5. MR. MERRIWEATHER: This is Mark. Let me
6. clarify. She said, correct, Wyndham Hotel Group
7. International. Not Wyndham International.
8. MR. NEMEROFF: Okay.
9. Q. Let me ask you a question. Who is the franchisor
10. to the property owned by Island Properties in Cozumel,
11. Mexico, where we allege that the incident that is
12. alleged in the complaint occurred?
13. A. Wyndham Hotel Group.
14. Q. Is that Wyndham Hotel Group International, Inc.?
15. A. Yes. No. International LLC.
16. Q. LLC, okay. I'm looking at a franchise agreement
17. that is dated June 29th, 2007. Do you have that in
18. front of you?
19. MR. MERRIWEATHER: The witness doesn't have
20. any documents in front of her. I have the documents in
21. front of me. I could put it in front of her.
22. MR. NEMEROFF: Could you please?
23. A. I have to correct. It is correct to say, Wyndham
24. Hotel Group International, comma, Inc.
25. MR. NEMEROFF: Why don't we mark that for

Page 8

1. the purposes of this deposition as Exhibit-1.
2. (Whereupon, Deposition Exhibit No. 1 was
3. marked for identification.)
4. BY MR. NEMEROFF:
5. Q. Okay. Can you take a look at the Wyndham Hotel
6. Franchise Agreement marked Exhibit-1?
7. A. Yes. I'm looking at the Wyndham Hotel Group
8. International, Inc., Franchise Agreement.
9. Q. And that is the agreement between Wyndham that
10. governed the franchisee/franchisor agreement for the
11. Cozumel property that is at issue here; correct?
12. A. Correct.
13. Q. What role does Wyndham Hotel and Resorts LLC have
14. with the Cozumel property that is at issue here?
15. A. Directly, none. This is Wyndham Hotel Group
16. International Inc.'s franchise agreement.
17. MR. NEMEROFF: All right. Now, I have an
18. affidavit that you signed as part of a motion to dismiss
19. based on what's called forum non-convenience. It is a
20. two-page document. Could you please place that in front
21. of the witness?
22. (Mr. Merriweather hands over document to the
23. witness.)
24. MR. MERRIWEATHER: The witness has it in
25. front of her.

**Page 9**

1    THE WITNESS: I have it.

2    MR. NEMEROFF: We're going to mark this

3  Exhibit Number 2.

4    (Whereupon, Deposition Exhibit No. 2 was

5  marked for identification.)

6  BY MR. NEMEROFF:

7    Q. This is an affidavit that you signed, correct?

8    A. Yes, I did.

9    Q. And it lists you as vice president of franchise

10  administration for Wyndham Hotels and Resorts, LLC,

11  correct?

12    A. Correct.

13    Q. Is that accurate?

14    A. Yes.

15    Q. Okay. What is your role with Wyndham Hotel Group

16  International, Inc.?

17    A. I am the vice president of franchise

18  administration.

19    Q. Okay. So you have the same title and role with

20  both entities, correct?

21    A. Generally, correct.

22    Q. When you say, "generally, correct," lawyers get

23  nervous about that. What do you mean, "generally,

24  correct"? What would be the distinction between your

25  roles with each entity?

**Page 10**

1    A. In, in -- generally speaking, Wyndham Hotel Group

2  International, Inc., are franchise agreements with

3  non-U.S. based properties. But that's very general.

4  But other than that, my role is essentially the same.

5    Q. Is Wyndham Hotel Group International, Inc., a

6  Delaware Corporation?

7    A. I am not recalling right now.

8    Q. All right. Your affidavit that you fill out says

9  that all references to the -- and I'm talking about

10  Exhibit Number 2 -- all references at WHR are references

11  to Wyndham Hotels and Resorts, LLC, correct?

12    A. Would you repeat that, please?

13    Q. Sure. If you look at Number 1 of the affidavit,

14  in parentheses it says, "hereinafter referenced as WHR"?

15    A. Yes.

16    Q. See where I'm referring?

17    A. Yes.

18    Q. WHR is referencing Wyndham Hotels and Resorts

19  LLC; is that correct?

20    A. That's correct.

21    Q. There is no reference anywhere in your affidavit

22  to Wyndham Hotel Group International, Inc., correct?

23    A. Specifically, that is correct.

24    Q. Okay. You say that WHR under Number 3 of the

25  affidavit has no ownership interest in Islander

**Page 11**

1  Properties and Hotel in Cozumel, Mexico, correct?

2    A. Which number are you referencing, please?

3    Q. Number 3.

4    A. That is correct.

5    Q. Okay. Does Wyndham Hotel Group International,

6  Inc., have any ownership interest in the Islander

7  Properties Hotel?

8    A. No.

9    Q. Okay. Islander Properties, is that the corporate

10  entity that owns the resort in Cozumel, Mexico, that's

11  at issue here?

12    A. Islander Properties is the franchisee. I am not

13  recalling right now whether they are the owner of the

14  property.

15    Q. Do you know who the owner of the property is of

16  the resort in Cozumel, Mexico?

17    A. As we sit here right now, I cannot say that I do.

18    Q. The Exhibit Number 1, which is the Wyndham

19  Hotel franchise agreement, this agreement that's marked

20  Exhibit-1 controls the relationship between the

21  franchisor, Wyndham Hotel Group, International, Inc.,

22  and Islander Properties, S, period, A, period, d-e, C,

23  period, V, period, correct?

24    A. Yes. It is a document that controls the

25  franchise relationship.

**Page 12**

1    Q. And that document is dated June 29th, 2007,

2  correct?

3    A. Correct.

4    Q. So this agreement was in place on October 16th,

5  2007, correct?

6    A. Correct.

7    Q. Now, in addition to this franchise agreement,

8  there are other manuals that further clarify the

9  obligations of the franchisor, franchisee, and vice

10  versa, correct?

11    A. I do not believe that I would put it that way.

12    Q. Well, there are other manuals that put more

13  minutia, so to speak, of what is required of the

14  franchisee, correct? For example, how somebody has to

15  be greeted, the five-minute rule -- excuse me -- the

16  five-foot rule, the ten-foot rule and other minutia,

17  correct?

18    A. I would not agree with how you're characterizing

19  other information or minutia.

20    Q. Okay. Let me ask you a question. When a phone

21  is answered at this Cozumel resort after this agreement

22  went into place, the franchisee is required to answer

23  the phone in a specific way that is dictated by the

24  Wyndham manual, correct?

25    A. That is incorrect. It's important to note that

3 (Pages 9 to 12)

Page 13

1  because this is a franchise agreement, the licensee
2  under this agreement is independent contractor, so there
3  are no requirements, the way you're using them, as to
4  how someone would answer the telephone as per the
5  franchise agreement. There, there are -- there is
6  another manual which sets out some expectations that the
7  brand has as to how the phone would be answered. But we
8  cannot control how that phone would be answered.
9    Q. You're talking about the Brand Standards Manual,
10  correct?
11    A. Yes.
12    Q. And I have that in front of me. Do you have
13  that, there?
14        MR. MERRIWEATHER: I can put it in front of
15  the witness.
16        MR. NEMEROFF: Yes, please.
17    Q. Do you have that in front of you, ma'am?
18    A. Yes, I do.
19    Q. It says Wyndham Hotel and Resorts. And in the
20  middle it has Brand Standards Manual, correct?
21    A. Correct.
22    Q. And then it has 2007, and then it says updated as
23  of September 25th, 2007, correct?
24    A. Correct.
25        MR. NEMEROFF: Okay. And let's mark that as

Page 14

1  Exhibit Number 3. And I think it's a 94-page document,
2  correct?
3        THE WITNESS: The last page of my copy says
4  94.
5        (Whereupon, Deposition Exhibit No. 3 was
6  marked for identification.)
7  BY MR. NEMEROFF:
8    Q. Very good. I want to make sure we're on the same
9  page, so to speak. Let's go back to Exhibit Number 1,
10  the franchise agreement. Ma'am, I guess there is no
11  pages on it. If you go to the fourth page in, which at
12  the top should say, "Wyndham Hotel Franchise Agreement"?
13    A. Yes.
14    Q. Okay. And, basically, this is an agreement that
15  your company entered into with Islander Properties to
16  run an all inclusive Wyndham Hotel in Cozumel, Mexico,
17  correct?
18    A. That is incorrect, the way you are phrasing it.
19  We would not enter into an agreement to run a hotel. We
20  do not run hotels.
21    Q. Let's go to Line Number 3. And it says -- and if
22  I'm wrong, correct me -- "Franchisee holds a leasehold
23  interest in the hotel identified in the Attachment-A to
24  this agreement," in parentheses, "hotel, and desires to
25  obtain a license to use the Proprietary Marks set forth

Page 15

1  in Attachment-A and the System to operate the Hotel as
2  an All Inclusive Wyndham Hotel as set forth in
3  Attachment-A."
4    I read that correctly?
5    A. Yes, you did.
6    Q. And if you look at -- if we go to Attachment-A --
7  I apologize, because there is no pages on here. But if
8  you take a look back to Attachment-A --
9        MR. MERRIWEATHER: It will be further back
10  than that.
11    A. I'm there.
12    Q. Okay. It says, "Attachment-A". Then it says,
13  "selected terms," correct?
14    A. Correct.
15    Q. And the next line says, "Wyndham Hotel Tier and
16  Proprietary Mark," with a colon. And right next to it
17  it says, "Wyndham Resort," comma, "an All-Inclusive
18  Hotel," correct?
19    A. It does say that.
20    Q. That is what Islander properties is allowed to
21  use to market their hotel; isn't that correct?
22    A. Well, I want to ask your question completely.
23  Section 3 does state, "and the system to operate the
24  hotel." And it is the system that the licensee has been
25  permitted -- been granted permission to operate the

Page 16

1  Wyndham system, not -- it does not reference the
2  operation of their hotel. And the Wyndham Hotel Tier
3  and Property Mark that you're referencing in
4  Attachment-A speaks to the brand that the licensee has
5  been provided the permission to utilize.
6    Q. Correct. So when Islander Properties markets its
7  hotel, this agreement allows it to say it is a "Wyndham
8  Resort," comma, "All Inclusive Hotel," correct?
9    A. That is correct.
10    Q. And, in fact, that's the only way they are
11  allowed to market that property, is as a "Wyndham
12  Resort," comma, "an All-Inclusive Hotel," using that
13  brand?
14    A. I don't believe I would necessarily agree with
15  how you phrased that sentence. I would not agree with
16  the way you said it.
17    Q. Well, when they take out an advertisement that
18  says, "Come to our hotel," it has to say it is a
19  "Wyndham Resort," comma, "an All-Inclusive Hotel," as
20  part of its name, correct?
21    A. I would say, it is more fair to say that they
22  have been granted permission to utilize, Wyndham Resort,
23  an all-exclusive hotel, but the agreement does provide
24  for waivers. So I could not say that this is the only
25  way they can identify themselves.

Page 17

1.  Q. Are you aware of any waiver that was granted as
2   of October 16th, 2007, in terms of identifying
3   themselves in some way, other than, "Wyndham Resort, an
4   All-Inclusive Hotel"?
5   A. I am not aware at this time of any waiver of that
6   nature.
7   Q. If you go back to the franchise agreement, that
8   first page we were looking at where we had been talking
9   about Number 3?
10  A. Yes.
11  Q. Okay. If you look at the bottom of the page
12  where it is entitled, "Grant of Franchise," correct?
13  A. I have it, yes.
14  Q. Well, I guess, first of all, you say -- and I
15  apologize for jumping back and forth -- but in your
16  Affidavit, Exhibit Number 2, under Number 4 you write
17  under oath: "At no time on or prior to October 16th,
18  2007, did WHR operate, manage, control, own or otherwise
19  occupy the Islander Properties Hotel in Cozumel, Mexico,
20  described in Plaintiff's Complaint."
21      That's what was written there, correct?
22  A. Correct.
23  Q. Did you prepare this or did a lawyer prepare
24  this?
25  A. This was prepared with the assistance of our

Page 18

1   Counsel.
2   Q. Okay. Well, did they actually type this up?
3   A. These are absolutely my words.
4   Q. No. That's not what I asked you. Did the law
5   firm type these up?
6   A. A law firm did not -- not sure.
7   Q. If the law firm didn't type it up, you don't know
8   if the law firm typed it up or not?
9   A. I am not sure.
10  Q. Okay. Do you know whether the law firm typed
11  these up and then gave them to you for your approval, or
12  did you give them the information first, and then they
13  typed them up?
14      MR. MERRIWEATHER: I think the difficulty
15  here is Valerie doesn't want to impinge on the
16  attorney/client privilege. That she may have had
17  communications with in-house Counsel.
18      MR. NEMEROFF: There is no privilege here in
19  terms of who manufactured a document. It just has to do
20  with the actual communication between them. And so I'm
21  not asking her what was said between them. I'm asking
22  them to produce this document.
23  A. When you say who produced it -- could you
24  rephrase that question, please?
25  Q. Yes. Did you type this up, yourself, ma'am?

Page 19

1       MR. DELY: Objection. Asked and answered.
2   Q. You can answer.
3   A. I did not sit at a computer and type this myself.
4   Q. Did your secretary type it up?
5   A. No.
6   Q. Did anybody that you can identify by name
7   affiliated with Wyndham type this up?
8       MR. MERRIWEATHER: If you know.
9   A. I'm not sure.
10  Q. Okay. Ma'am, wasn't it, in fact, typed up by the
11  law firm that represents Wyndham here in Chicago and
12  then sent to you for approval?
13      MR. DELY: I just object to the form of that
14  question, with the words, "approval," added to the end.
15  Q. I assume, by signing it, you approved it,
16  correct? You signed this under oath?
17  A. The -- okay. I just want to make sure I'm
18  answering your question, and you're asking a lot. And I
19  want to answer each question as you ask it.
20  Q. Let me rephrase. First of all, you signed this
21  document under oath and under penalty of perjury; is
22  that correct?
23  A. Yes, I did.
24  Q. I assume, by signing this document you approved
25  the contents in terms of it was truthful, at least, in

Page 20

1   your opinion, correct?
2   A. I would not say that. These are my words, and
3   this is my statement.
4   Q. Okay. The question is: Did the law firm
5   representing Wyndham here in Chicago type this up and
6   send it to you?
7       MR. DELY: And I will object as asked and
8   answered. She's answered it already. She said she
9   didn't know.
10      MR. NEMEROFF: You can answer, ma'am.
11  Q. Okay.
12  A. I could not answer. I don't know.
13  Q. Was this the first draft or were there revisions
14  made to this affidavit?
15  A. What I do know is these are my words. This is my
16  statement, and it is my signature.
17  Q. That's not what I asked you, ma'am. If you can
18  limit your answers to my questions, I would really
19  appreciate it.
20      My question is: Is this the first draft of the
21  affidavit or were there -- was a draft sent to you and
22  then corrections were made to the original draft?
23  A. I'm not sure if I can answer, because I don't
24  know if it is an affidavit if I don't sign it. So I'm
25  not sure if I can answer your question correctly.

Page 21

1    Q. Before you signed it, you wanted to make sure it
2  was right, correct? Did you hear my question?
3    A. I did.
4        (Pause.)
5    Q. Are you going to respond to my question?
6    A. I will.
7    Q. Just for the record, I want to make sure you're
8  not conferring with Counsel there? Are you?
9        MR. MERRIWEATHER: No. The witness is not
10  conferring with me. The witness is thinking about your
11  question, and, obviously, deciding on how to respond.
12       MR. NEMEROFF: That's fine. I want to make
13  sure. I'm not there, so I don't have the opportunity to
14  observe.
15   A. I apologize. To be honest, I'm trying to
16  understand the question you're asking me.
17   Q. My question is really simple. First of all, let
18  me rephrase my question. Were you given a draft of the
19  affidavit -- well, first of all, start again. This
20  affidavit that is signed in its present form, is that
21  the original affidavit that was presented to you, or
22  were you given drafts that you asked for corrections to
23  be made before signing?
24   A. I, I do not recall drafts in the way that you're
25  using the term of Affidavits. And, again, I'm not sure

Page 22

1  if it is an affidavit, if I haven't signed it.
2    Q. My point is: Before you signed it, did you get a
3  draft and say, oh, there's corrections that need to be
4  made. Let's not play semantics here, ma'am. I'm trying
5  to be clear. I think you're trying to play a game of
6  semantics, which I'm not going to tolerate. The
7  question is, until you signed it, anything previously to
8  that would be a draft. Did you ever ask anybody to make
9  changes to any drafts of an affidavit that ultimately
10  resulted in Exhibit Number 2?
11   A. Not that I recall.
12   Q. All right. Under Number 4, where it says, "At no
13  time on or prior to October 16th, 2007, did WHR operate,
14  manage, control or otherwise occupy."
15     Does that also hold true for Wyndham -- I'm
16  sorry. Apologize. Wyndham Hotel Group International,
17  Inc.?
18   A. Yes. This same statement would be true for
19  Wyndham Hotel Group International, Inc..
20   Q. Now, let's go back to the franchise agreement
21  where it says, "Grant of Franchise".
22   A. Yes.
23   Q. Okay. If you look at Number A, where it says,
24  "grant," you with me?
25   A. Yes.

Page 23

1    Q. You would agree with me that the obligation is
2  that -- excuse me -- that the "Franchisee undertakes the
3  obligation to operate the hotel as an all-inclusive
4  Wyndham Hotel in a manner compliant with, under and
5  subject to franchisor's standards, specifications,
6  policies and procedures at and only at the location
7  specified in Attachment-A."
8        You would agree that what I read is accurate,
9  correct?
10       MR. MERRIWEATHER: I would like to note,
11  that wasn't the full sentence.
12       MR. NEMEROFF: I understand that.
13   A. I was going to say, I think you missed something
14  in the beginning.
15   Q. So we don't play a game of semantics, we're going
16  to be here for seven hours at this rate. So if you guys
17  want to play this game, I mean, I will sit for seven
18  hours and take this dep.
19       MR. DELY: You're making recitals to games.
20  Nobody is playing games here. She is answering your
21  questions.
22       MR. NEMEROFF: Well --
23       MR. DELY: If you want her to agree what you
24  are reading, read the entire statement.
25   Q. Ma'am, would you agree with me that Paragraph

Page 24

1  1-A -- do you see where I'm referring to, "Grant of
2  Franchise" as under a "grant".
3      Do you see that, ma'am?
4    A. I see Paragraph 1-A, yes.
5    Q. Okay. You would agree with me that this
6  obligates the franchisee, assuming an agreement is
7  reached, to operate the hotel in Cozumel, Mexico, as an
8  all-inclusive Wyndham Hotel in a manner compliant with
9  and subject to franchisor's standards, specifications
10  and policies and procedures only at that Cozumel,
11  Mexico, hotel, correct?
12   A. I would say, the way that you phrased it is
13  incorrect, because it is important to note that this
14  franchise agreement, the grant to the franchisee upon .
15  the terms and conditions contained in this agreement.
16   Q. Correct. Are you aware of anything in this
17  agreement -- ultimately, this agreement was signed,
18  correct?
19   A. Yes. This agreement was signed.
20   Q. Between the respective franchisor and franchisee,
21  correct?
22   A. Yes.
23   Q. Are you aware of anything in this agreement that
24  would take away the obligation of the franchisee to
25  operate the Cozumel, Mexico, hotel as an all inclusive

6 (Pages 21 to 24)

Page 25

1. Wyndham Hotel in a manner compliant with, under and
2. subject to franchisor's standards and specifications and
3. policies and procedures at and only at the Cozumel,
4. Mexico, location where we alleged this incident
5. occurred?
6.    A. Yes.
7.    Q. Okay. Tell me what modifications have been made
8. and where you find that in the agreement.
9.    A. First, I need to know, I didn't say that any
10. modifications had been made. However, there are
11. sections that discuss termination and should this
12. agreement be terminated, the licensee would no longer be
13. obligated as per the licensee agreement.
14.    Q. As of October 16th, 2007, this agreement wasn't
15. terminated, correct?
16.    A. Correct.
17.    Q. Can you now answer the previous question I asked?
18.       MR. NEMEROFF: If the court reporter
19. wouldn't mind reading my previous question, I would
20. appreciate that.
21.       (Whereupon, the Court Reporter read back the
22. record as requested.)
23.    A. I, I would have to repeat my answer. That I did
24. not say that there had been modifications made.
25.    Q. Right. My question was as of October 16th, 2007,

Page 26

1. are you aware of any modifications to the contract that
2. would not require the franchisee to operate the Cozumel
3. resort as an all-inclusive Wyndham Hotel in the manner
4. compliant with under and subject to franchisor's
5. standards, specifications, policies and procedures?
6.    A. I, I did not say that mod -- that
7. modifications --
8.    Q. Just answer my question.
9.       MR. MERRIWEATHER: Please, don't interrupt
10. the witness.
11.    A. I did not say that modifications would be
12. required to remove the obligation under the agreement.
13. I stated that to your question as to whether or not
14. anywhere else in the agreement there would be a
15. provision that would remove the obligation, my answer is
16. still, yes, because the agreement contains termination
17. language.
18.    Q. Okay. My question is, ma'am, that termination --
19. there's been no termination that's ever been exercised;
20. is that correct?
21.    A. Could you rephrase the question, please?
22.    Q. Are you aware of any termination of this
23. agreement by either of the parties pursuant to any terms
24. of this agreement?
25.    A. No.

Page 27

1.    Q. Okay. Good. On October 16th, 2007, you would
2. agree with me that the franchisee was obligated to
3. operate the hotel in Cozumel, Mexico, as an
4. all-inclusive Wyndham Hotel in a manner compliant with,
5. under and subject to the franchisor, Wyndham Hotel Group
6. International Inc.'s standards, specifications, policy
7. and procedures at that hotel only, correct?
8.    A. I would not agree with what you said. It would
9. be correct to state that under the terms and conditions
10. contained in the agreement, and then further on, the
11. franchisee did undertake the obligation to operate the
12. hotel as an all-inclusive Wyndham Hotel in the manner
13. compliant and as per --
14.    Q. On October 16th, 2007, and then the dates before
15. that, after this agreement was entered into, the
16. franchisee was required to follow Wyndham standards,
17. correct?
18.       (Pause.)
19.    A. It is correct to say that on the date that you
20. referenced, the franchisee was required to comply with
21. the terms of the agreement.
22.    Q. Now, ma'am, answer my question, please.
23. Otherwise, we're going to terminate right now. I am
24. going to go to the Judge and force you to answer the
25. questions. I'm not going to play this game.

Page 28

1.       My question was very simple. Please, answer my
2. question. The answer is yes or no.
3.    A. Could you repeat the question, please?
4.       MR. NEMEROFF: Could the court reporter,
5. please, repeat my question? I asked for a yes or no
6. response.
7.       (Whereupon, the Court Reporter read back the
8. record as requested.)
9.    A. The way you phrased the question, it is
10. incorrect.
11.    Q. Okay. So if the agreement says that the
12. franchisee is required to follow the franchisor's
13. standards, you disagree with the plain language of the
14. agreement, correct?
15.    A. Could you please direct me to where it says,
16. "required to follow"?
17.    Q. Well, do you believe that compliant, requires and
18. follows are the same thing, or do you think those are
19. different terms, ma'am, in terms of their meaning?
20.    A. I believe, that the phrase, "compliant," can't be
21. singled out. It has to be read in the section's
22. entirety.
23.    Q. Do you know what the word, "compliant," means,
24. ma'am?
25.    A. I believe so.

Page 29

1    Q. What is your definition of the word, "compliant?"
2    A. If it were in a standard dictionary, it would
3    probably refer to the word, "follow".
4    Q. Ma'am, on October 16th of 2007, and all of the
5    dates after this agreement was signed --
6        MR. DELY: Why don't we just say from June?
7        MR. NEMEROFF: Thank you. Better way.
8        MR. DELY: June 29th, 2007.
9    Q. From June 29th, 2007, when this agreement was
10   signed, through October 16th, 2007, was the franchisee
11   required to be compliant with and subject to the
12   franchisor's standards?
13   A. The franchisee was required to be compliant with,
14   under and subject to the franchisor's standards. That
15   is partially correct.
16   Q. Okay. And what is the date? On June 29th, 2007,
17   and every day throughout October 16th of 2007, was the
18   franchisee required to be compliant with and subject to
19   the franchisor's specifications?
20   A. As I stated earlier -- want to just answer
21   completely -- upon terms and conditions contained in
22   this agreement, and then excluding the sentences, for
23   the sake of brevity, the franchisee was required to
24   operate the hotel in a manner compliant with, under and
25   subject to franchisor's standards, among other things.

Page 30

1    Q. Well, my question was specifically now with the
2    specifications, ma'am. Could you, please, answer my
3    question?
4        MR. DELY: Specifications was a vague term.
5        MR. NEMEROFF: It is the word in the
6    contract, Counsel. I'm not making it up. I'm not
7    making it vague. It is what the contract requires.
8        MR. DELY: I'm stating the basis of my
9    objection.
10   Q. Can you answer my question, ma'am, specifically,
11   as to specifications?
12   A. I'm sorry. Could you repeat the question?
13   Q. Sure. Ma'am, from June 29th, 2007, through
14   October 16th, 2007, would you agree with me that the
15   franchisee was required to be compliant with, under and
16   subject to the franchisor's specifications? Yes or no,
17   ma'am.
18   A. That's partially correct, but I -- to answer that
19   question correctly, I would have to read the entire
20   section to say that your statement -- to answer your
21   question completely.
22   Q. You've been identified as the person with the
23   most knowledge about this agreement -- are you -- at
24   Wyndham, or should we be deposing somebody else with
25   more knowledge?

Page 31

1    A. I am the person with the most knowledge about
2    this agreement.
3    Q. Ma'am, on June 29th, 2007, through October 16th,
4    2007, would you agree with me that the franchisee was
5    required to be compliant with, under and subject to the
6    franchisor's policies?
7    A. Again, I don't think it is possible to answer
8    your question without reading the, the language
9    contained before that. Because under the terms and
10   conditions contained in this agreement is an important
11   part of the question that you're asking me. That this
12   agreement is an independent contractor agreement.
13   Q. Can you answer my question, ma'am, or should I
14   certify the question and ask Judge Levkow (ph) to make a
15   ruling whether you should answer or not and ask the
16   Court to award me attorney's fees and costs --
17       MR. MERRIWEATHER: Counsel, you don't have
18   to badger the witness. She was trying to answer your
19   question.
20       MR. NEMEROFF: She hasn't answered my
21   question. You know what? I'm not going to deal with
22   two lawyers going back and forth with me. There is one
23   Counsel here that is of record for Wyndham, so if there
24   is going to be any objections or any banter, it is going
25   to be by the Counsel of record who is sitting in front

Page 32

1    of me, who, certainly, has a right to make objections.
2    I'm not going to go back and forth with two of you.
3        MR. MERRIWEATHER: I'm not objecting.
4    You're painfully taking this very slowly. I'm trying to
5    help things here.
6        MR. NEMEROFF: I'm asking very simple
7    questions and I'm not getting direct answers. We're
8    going to be here as long as it takes to get direct
9    answers. Otherwise, I am going to get the Judge to get
10   me to get direct answers. There is nothing complex
11   about my questions. Why don't we have one Counsel of
12   Wyndham, because he is of record. I suggest it is
13   Mr. Dely. This is the only person licensed to practice
14   in the Northern District of Illinois.
15       MR. MERRIWEATHER: I'm not objecting. She
16   has to be allowed to answer your question. You
17   interrupted her while she is in the middle of her
18   response. I've not made one objection. You ca go
19   through the entire record.
20       MR. NEMEROFF: Are you done, sir?
21       MR. MERRIWEATHER: I am done.
22       MR. NEMEROFF: Okay.
23   Q. Ma'am, I am going to reask you the question, and
24   I am going to ask you to answer yes or no.
25       From June 29th, 2007, through October 16th, 2007,

8 (Pages 29 to 32)

Page 33

1    was the franchisee who operated the Cozumel, Mexico,
2    all-inclusive Wyndham Hotel required pursuant to Section
3    1-A of the contract to do so in a manner compliant with,
4    under and subject to the franchisor's policies?
5        A.  Upon the terms and conditions contained in the
6    agreement, the non-exclusive right and franchise, the
7    franchisee undertakes the obligation to operate the
8    hotel as an all-inclusive Wyndham Hotel in a manner
9    compliant with, under and subject to franchisor's
10   standards, specifications and et cetera.
11       Q.  Ma'am, maybe you're not hearing me when I asked
12   you.  I had asked you the question specifically about
13   policies.  Would you just answer my questions so we can
14   move on, because, frankly, if you are not going to do
15   it, we are going to keep going at it until I get you to
16   answer my question.  I know you want to answer what you
17   want.  I am -- my question was very simple.  I would
18   appreciate you responding to my question and not going
19   off on your own tangent.
20       MR. NEMEROFF:  Could I ask the court
21   reporter to, please, re-read my question that was
22   specific to policies?
23       (Whereupon, the Court Reporter read back the
24   record as requested.)
25       A.  Subject to the language that appears before the

Page 34

1    phrase, "policies and procedures," and the language that
2    appears after it, yes.
3        Q.  Thank you.  Ma'am, with regard to, basically, the
4    same question, pursuant to Section 1-A of the franchise
5    agreement, was the franchisee required to operate the
6    Cozumel, Mexico, all-inclusive Wyndham Hotel in a manner
7    compliant with, under and subject to the franchisor's
8    procedures from June 29th, 2007, through October 16th,
9    2007?
10       A.  Subject to the language that appears before the
11   word, "procedures," and after it, yes.
12       Q.  Going to the -- actually, there are some pages
13   with page numbers.  I apologize.  On the bottom of this
14   agreement it says Page Number 3.  Could you turn to
15   that?  It is, like, towards the middle, bottom of the
16   page.  It is a little more to the left.
17       A.  I'm on Page 3.
18       Q.  Okay.  If you look at the bottom where it says
19   under Number B, Royalty?
20       A.  Yes.
21       Q.  Okay.  You would agree with me that the
22   franchisee pursuant to this agreement was required to
23   pay the franchisor a monthly royalty fee of three
24   percent of the gross package revenue of the hotel?
25       A.  Yes.

Page 35

1        Q.  Okay.  And pursuant to Section C on that same
2    page, 3-C, there was also a marketing fee, correct?
3        A.  Correct.
4        Q.  And the franchisee was required to pay the
5    franchisor on a monthly basis an amount equal to 1.5
6    percent of the gross package revenues of the hotel as a
7    marketing fee, correct?
8        A.  Correct.
9        Q.  In addition to that, under Section D, 3-D, there
10   was a reservation system fee, correct?
11       A.  Correct.
12       Q.  And in addition to that, under 3-E, there was a
13   national sales fee, correct?
14       A.  Correct.
15       Q.  And then under 3-F there was also a regional
16   marketing fee, correct?
17       A.  Correct.
18       Q.  And those were all fees the franchisee was
19   required to pay to the franchisor pursuant to the terms
20   of the agreement, correct?
21       A.  Correct.
22       Q.  Now, if you go to Page 5 of the agreement on the
23   bottom under Section-I where it says payment in U.S.
24   dollars?
25       A.  I see it.

Page 36

1        Q.  You would agree with me that under the terms of
2    the contract, unless the franchisor instructed the
3    franchisee otherwise in writing, all payments pursuant
4    to this contract are to be made in U.S. dollars?
5        A.  Correct.
6        Q.  And, in fact, the franchisee was required to
7    maintain a bank account in dollars located outside the
8    United Mexican States, correct?
9        A.  Could you repeat that question, please?
10       Q.  Sure.  Under the terms of this agreement, the
11   franchisee was required to maintain a bank account in
12   dollars located outside the territory of the United
13   Mexican States?  The fourth and fifth, fourth and fifth
14   line of Section 1, of Section-I, rather?
15       A.  I -- I disagree with the way you've phrased the
16   requirement.
17       Q.  Okay.  Well, let me read the whole section, then,
18   under Section-I.  Unless franchisor instructs Franchisee
19   otherwise in writing, all payments shall be made in
20   dollars.  Franchisee agrees at Franchisor's request to
21   sign an Electronic Payment Authorization which
22   authorizes franchisor to automatically debit
23   franchisee's bank account in dollars located outside of
24   the territory of the United Mexican States on the dates
25   payments are due, for any recurrent fees and other

Page 37

1. amounts due and owing under the Agreement and any other
2. agreements between Franchisee and Franchisor.
3.    I read that correctly?
4. A. You did.
5. Q. It goes on to say that above authorization does
6. not release Franchisees from its obligation to make all
7. timely payments due to Franchisor under the this
8. agreement. Next sentence: Franchisee shall maintain a
9. bank account with sufficient funds on deposit in dollars
10. outside the territory of the United Mexican States to
11. cover all required and permitted withdrawals.
12. A. You read that correctly.
13. Q. You would agree with me that this agreement
14. requires the franchisee to maintain a bank account in
15. U.S. dollars outside the territories of the United
16. Mexican States to pay it's obligations due to the
17. franchisor?
18. A. Could you repeat that question, please?
19. Q. Sure. You would agree that pursuant to this
20. section of the agreement, Section I-1, the franchisee
21. was required to maintain a bank account in dollars
22. outside the territory of the United Mexican States to
23. cover the required payments due to the franchisor?
24. A. Generally, that's correct.
25. Q. Looking at Page Number 9 of the agreement -- tell

Page 38

1. me when you're with me.
2. A. I'm there.
3. Q. Looking under Section B-1 of that page, you would
4. agree with me that all personnel employed at the hotel
5. in those positions designated by franchisor to receive
6. training shall attend and successfully complete such
7. initial and other training programs as franchisor may
8. from time to time require.
9.    I read that correctly, right, ma'am?
10. A. I'm not sure. Could you read that again, please?
11. Q. Sure. Under Section B-1, the first sentence
12. says, "All personnel employed at the Hotel in those
13. positions designated by Franchisor to receive training
14. shall attend and successfully complete such initial and
15. other training programs as Franchisor may from time to
16. time require."
17.    I read that correctly, right, ma'am?
18. A. You did read that correctly.
19. Q. And I apologize, ma'am, let me go back to Page 7.
20. I'm sorry. I kind of skipped over one part. If you
21. look at Section 5-A --
22. A. I'm there.
23. Q. Okay. First sentence says, "Franchisee will at
24. all times exercise management, control over the Hotel,"
25. correct?

Page 39

1. A. Correct.
2. Q. However, the next sentence says, "Any lease,
3. management agreement or other arrangement for operating
4. the Hotel or any part thereof, including, without
5. limitation, food and beverage service facilities, shall
6. be subject to Franchisor's prior written consent."
7.    I read that correctly, right, ma'am?
8. A. You did.
9. Q. All right. Let's go to Page Number 10. Are you
10. with me, ma'am?
11. A. Oh, yes, I am.
12. Q. On Section 6-A, it says -- it is entitled,
13. "Adherence to System Standards," correct?
14. A. Correct.
15. Q. And the agreement states: "Franchisee
16. understands and acknowledges that each and every
17. standard specification, policy and procedure of the
18. System is essential in order to maintain the quality and
19. guest service of Wyndham Hotels and to enhance public
20. acceptance of and demand for Wyndham Hotels."
21.    I read that correctly?
22. A. You did.
23. Q. And then it says, "Franchisee shall conduct its
24. operations in strict conformity with the standards,
25. specifications, policies and procedures set forth in the

Page 40

1. manual or otherwise in writing, which standards,
2. specifications, policies and procedures shall be applied
3. consistently to all Wyndham Hotels in the same division
4. as the Hotel," correct?
5. A. Okay.
6. Q. I read that correctly, didn't I?
7. A. I missed the last section that you read.
8. Q. Franchisee shall conduct its operations in strict
9. conformity with the standards, specifications, policies
10. and procedures set forth in the manual or otherwise in
11. writing which standards, specifications, policies and
12. procedures shall be applied consistently to all Wyndham
13. Hotels in the same division as the Hotel, correct?
14. A. The agreement does say that.
15. Q. Okay. And this agreement is the binding document
16. that regulates the relationship, correct?
17.    MR. DELY: Objection. Asked and answered.
18. You can go ahead and answer, again.
19. A. This is the agreement that sets forth the
20. franchisee, franchisor relationship.
21. Q. Now, the next sentence of that paragraph does
22. give some latitude for deviation. The policies
23. procedures, standards, et cetera, correct?
24. A. I, I disagree with the phrase, "some latitude,"
25. because as an independent contractor, the franchisee has

Page 41

1  complete latitude to follow or not follow any part of
2  the manual.
3      Q. Really? Okay. Has Wyndham Hotels ever sued one
4  of its franchisees concerning a dispute over a
5  franchisee not following the terms of its contract?
6      A. The terms of the agreement?
7      Q. Yes.
8      A. The franchise agreement?
9      Q. Yes.
10     A. I believe so.
11     Q. Okay. Has Wyndham Hotels ever sued one of its
12  franchisees for not conforming to its standards,
13  specifications, policies or procedures?
14     A. I don't recall whether that was the basis of a
15  suit.
16     Q. Okay. Have you been involved in terms of as a
17  witness in any other litigation involving Wyndham and
18  its franchise agreements?
19     MR. MERRIWEATHER: Just to clarify, you
20  mean, the Wyndham brand or Wyndham Hotel Group?
21     MR. NEMEROFF: Whoever franchises on behalf
22  of Wyndham.
23     A. Could you rephrase or could you just expand on
24  involved in litigation, please?
25     Q. Well, have you ever been asked to write an

Page 42

1  affidavit in any other case, other than this one?
2      A. I have provided affidavits for cases other than
3  this one.
4      Q. How many, ma'am?
5      A. I could not say.
6      Q. More than ten?
7      A. I'm not sure.
8      Q. More than 100?
9      A. No.
10     Q. Okay. So somewhere between 1 and 100 would be a
11  fair estimate, right?
12     A. That's a bit broad, but it would be accurate.
13     Q. We know it is not one, because you did it in this
14  case. There's been at least one other case. There's
15  not one other time. This is something you do as a
16  normal part of your job, correct?
17     A. I do provide affidavits as part of my
18  responsibilities.
19     Q. And when you give those affidavits, is it always
20  in cases where somebody is suing Wyndham for either
21  personal injury or wrongful death?
22     A. No.
23     Q. Are they sometimes in disputes between the
24  franchisor and the franchisee?
25     A. Yes.

Page 43

1      MR. NEMEROFF: You know what? I'll send
2  over a request. I would like to get all affidavits that
3  have been served that have been signed by this witness?
4      MR. DELY: I don't see the relevance for the
5  motion for --
6      MR. NEMEROFF: I'll send you a written
7  request.
8      THE WITNESS: Before you ask a question,
9  could I take a break, please?
10     MR. NEMEROFF: Sure. Absolutely.
11     (Brief recess.)
12     MR. MERRIWEATHER: We're ready, here.
13  BY MR. NEMEROFF:
14     Q. All right. I think we were talking about
15  lawsuits that you've been involved in. Ma'am, are you
16  currently, as far as writing the affidavits, are you
17  currently involved in -- are there any current cases
18  that are pending in any court in any jurisdiction in
19  which there is a dispute between the franchisor and the
20  franchisee over their following the standards,
21  specifications, policies and procedures as one of the
22  issues of the lawsuit?
23     A. I don't think I can accurately answer that
24  question without Counsel. I'm not sure.
25     Q. Okay. Have you ever testified in a deposition

Page 44

1  concerning those issues as it relates to a lawsuit
2  involving a franchisor, the franchisor, your employer,
3  and the franchisee?
4      MR. MERRIWEATHER: Again, just for clarity,
5  Wyndham Hotels and Resorts or the Wyndham Hotel Group?
6  Because as Valerie testified earlier, Wyndham Hotel has
7  nine or ten different hotel brands. Just trying to move
8  things along here as to how you want her to answer it.
9      MR. NEMEROFF: Either one would be fine with
10  me.
11     A. Could you repeat the question?
12     MR. NEMEROFF: Can the court reporter,
13  please, reread my question?
14     (Whereupon, the Court Reporter read back the
15  record as requested.)
16     A. Which issue? I'm sorry.
17     Q. Well, let me rephrase the question.
18     Ma'am, has Wyndham, the Franchisor, ever revoked
19  its license to a franchisee to use the Wyndham brand
20  because they weren't complying with the terms of a
21  contract, other than payment?
22     A. I would not be comfortable answering that
23  question from memory.
24     Q. You don't -- well, isn't one of your roles this
25  would be involved in the litigation as the person with

11 (Pages 41 to 44)

Page 45

1  the most knowledge of the franchise agreements?
2  A. Correct.
3  Q. I'm not asking you to tell me each and every
4  case. I'm asking you to answer whether or not that has
5  ever occurred.
6  A. I would not want to answer that question from
7  memory. That is a termination question. Not a
8  franchise agreement question.
9  Q. Well, one of your jobs is to make sure that the
10  franchisee conform to the terms of the franchise
11  agreement, correct?
12  A. No. And, again, that would not be possible,
13  because the franchisee is independent contractor. So,
14  no, that would not be my responsibility.
15  Q. It wouldn't be hard for you to provide me with a
16  list of all litigation Wyndham has been involved in with
17  its franchisee, correct?
18  A. I would put that question to our inside counsel.
19      MR. NEMEROFF: I am going to request on the
20  record -- and I'll send a letter to our Counsel here in
21  Chicago -- I would like a list including the name of the
22  jurisdiction and the lawyers involved of all litigation
23  involving Wyndham and its franchisees.
24      MR. DELY: Well, I'll take the request.
25  What would that possibly have to do with a motion for

Page 46

1  forum non-convenience?
2      MR. NEMEROFF: It has everything to do with
3  it.
4  Q. Let me ask you a question, ma'am. With regard to
5  6-A where it says, "Franchisee shall conduct its
6  operations in strict conformity with the standards,
7  specifications and policies and procedures set forth in
8  the manual or otherwise in writing, which standards,
9  specifications and policies and procedures shall be
10  applied consistently to all Wyndham Hotels in the same
11  division as the Hotel," you're saying that that's
12  discretionary?
13  A. I'm saying that as an independent contractor, the
14  franchisee has complete control over how they manage and
15  operate their facility. Absolutely.
16  Q. Ma'am, when is the last time you gave a
17  deposition in a lawsuit involving the franchisors suing
18  a franchisee because they didn't conform to either the
19  standards, specifications, policies or procedures of the
20  franchisor?
21  A. I'm not sure. Again, because not being Counsel
22  for the company, I'm not sure I can answer that question
23  correctly without Counsel. I'm not sure if I would be
24  correctly answering what the basis of the litigation
25  was.

Page 47

1  Q. Are you an officer of the corporation?
2  A. I am.
3  Q. Are you a director?
4  A. No.
5  Q. You are the contact person between counsel and
6  Wyndham any time there is a lawsuit; is that correct?
7  A. I don't think that would be correct to say that,
8  the way you phrased that, no.
9  Q. Ma'am, as a regular part of your job, do you have
10  contact with counsel for Wyndham involving lawsuits
11  between the franchisors and the franchisees?
12  A. Yes.
13  Q. Have you testified by way of deposition in the
14  Year 2008 involving a dispute between a franchisor and
15  -- the franchisor and the franchisee, other than this
16  deposition, which doesn't fit in that category?
17      MR. DELY: Yes. Just clarify. That's
18  not --
19      MR. NEMEROFF: Right. I understand that.
20  That's why I just clarified that.
21  A. Generally, yes.
22  Q. Okay. In this year which properties were in
23  dispute?
24  A. Again, I don't know what you mean by properties
25  being in dispute. Could you rephrase the question?

Page 48

1  Q. Yes. You said you've testified in deposition in
2  the Year 2008 in which there is a pending lawsuit
3  between franchisor and franchisee. And my question is:
4  Which, which licensed Wyndham properties are we talking
5  about?
6  A. I -- the question that you asked me, I believe,
7  referred to my role for Wyndham Hotel Group and not
8  specifically for Wyndham Hotels and Resorts.
9  Q. It is for both, ma'am.
10  A. Oh, okay.
11  Q. Which properties are we talking about?
12  A. I cannot recall, by memory.
13  Q. You have no idea?
14  A. I could not recall by -- from memory.
15  Q. So you're the vice-president of a large company
16  who is an officer of the corporation who has the most
17  knowledge on the issues involving these franchise
18  agreements, and you can't tell me under oath, as we sit
19  here today, even the name of one property that you've
20  testified by way of deposition on this year, correct?
21  A. That is correct.
22  Q. Okay. But you can certainly provide me with a
23  list with them, correct?
24  A. I would assume that you would ask Counsel and
25  Counsel would provide you as according to whatever

Page 49

1  procedures they would follow for that question.
2  Q. My question was: If you were asked by Counsel to
3  provide such a list of all of the times you've
4  testified, you could provide that to Counsel, correct?
5  MR. MERRIWEATHER: Just say, generally, if
6  you can provide it, if you know?
7  A. No.
8  Q. You don't remember the cases you testify in?
9  A. That was not the question.
10  Q. I know. It is a new question, ma'am. You don't
11  remember the cases you've testified in. Is that what
12  you're trying to tell us?
13  MR. DELY: I want to interject a standing
14  objection to this entire line of questioning. It is
15  irrelevant for our purposes here. Form, foundation.
16  She is not legal counsel for the company. And, quite
17  frankly, it is just completely irrelevant to this actual
18  agreement. We're here to discuss the Wyndham Hotel
19  Group International, Inc., and Islander Properties. And
20  with that, subject to that objection, standing objection
21  to all of these questions. She can answer.
22  Q. You can answer, ma'am.
23  A. I do not recall, no.
24  Q. Okay. Do you have a diary or do you use a
25  Blackberry to keep your dates?

Page 50

1  A. I do have a Blackberry.
2  Q. Is that where you keep your appointments on?
3  A. Some, some appointments, yes.
4  Q. Do you keep your appointments in a company
5  computer system?
6  A. Well, Blackberry owns my -- my company owns my
7  Blackberry, so I guess.
8  Q. Do you synch that with your company computer?
9  A. No. There is no -- I don't synch it with a date
10  because --
11  Q. You are going to come into work tomorrow. And I
12  assume you have things that you have to do during the
13  day, correct?
14  A. Yes, I do.
15  Q. And you have appointments?
16  A. Correct. Yes, I do.
17  Q. And you diary those appointments, correct?
18  A. Sometimes I do and sometimes I do not.
19  Q. You, yourself, diary them, sometimes, in your
20  Blackberry, correct?
21  A. Sometimes, yes. Sometimes, no.
22  Q. Does anybody at the company maintain a diary for
23  your schedule, as well?
24  A. Other than me, no.
25  Q. Okay. For each of these legal cases that Wyndham

Page 51

1  is involved in, you keep a file, correct?
2  A. I'm not sure what you mean by that question,
3  please.
4  Q. Exactly what I just said, ma'am. You keep a
5  paper file of each of these legal cases that you're
6  involved in for Wyndham, correct?
7  MR. DELY: Hold on. I'm objecting to form.
8  Does she specifically keep a file or does Wyndham keep a
9  file?
10  Q. Let's start with you, first, ma'am. Do you
11  maintain a file for each of these legal cases that
12  you're involved in on behalf of Wyndham?
13  A. I personally do not maintain legal files for
14  cases that I am involved in.
15  Q. Does Wyndham maintain a file for legal cases that
16  you're involved in? And that could be a physical file
17  in paper or a computer file on a computer?
18  A. I believe, the legal department maintains files.
19  Q. Okay. Thank you. With regard to the term,
20  "motion to dismiss for forum non-convenience," you're
21  familiar with that term, correct?
22  A. Yes, I am.
23  Q. And this is not the first case that you've been
24  involved in in which the Wyndham Hotel -- Wyndham is
25  trying to have a case dismissed based on forum

Page 52

1  non-convenience, correct?
2  A. I'm not recalling right now. So at this moment,
3  I'm not sure. I don't recall.
4  Q. So you're saying this is the very first time?
5  MR. DELY: Objection. That's not what she
6  said.
7  Q. Ma'am, other than this legal case have you been
8  involved in any way, whether it's an affidavit, giving a
9  deposition, testify at trial, on any legal cases in
10  which Wyndham has been sued by somebody claiming
11  personal injury or death?
12  A. Again, I wouldn't want to assume to recall the
13  specifics.
14  Q. I'm not asking you specifics, right now. I'm
15  asking whether you've been involved, at all, in any
16  cases?
17  A. As, as part of my responsibility with the
18  company, I am involved with cases for the company.
19  Q. When you signed this affidavit, which is Exhibit
20  Number 2, let's go to Number 8. That WHR agrees and
21  stipulates to the jurisdiction of a Mexican Court in the
22  event that this cause is dismissed for forum
23  non-convenience, correct?
24  A. That's what it says.
25  Q. Why did you put that terminology in your

13 (Pages 49 to 52)

Page 53

1  affidavit?
2  A. Well, as I discussed earlier, my affidavit was
3  prepared with the assistance of counsel.
4  Q. I see. So that's something that Counsel put in
5  and you signed that the company agrees to do that,
6  correct?
7  A. That is not correct.
8  Q. Okay. Do you read case law as it relates to the
9  issue of forum non-convenience?
10  A. Do I?
11  MR. DELY: Objection to form. Foundation.
12  Q. Did you hear me, ma'am?
13  A. I'm sorry. Can you repeat the question?
14  Q. Do you read case law? Do you know what case law
15  is?
16  A. Yes. I absolutely do.
17  Q. Do you read case law as it relates to the issue
18  of forum non-convenience?
19  A. I do not know, but I'm sure that I have.
20  Q. Did you somehow try to tailor this affidavit to
21  what you believe cases require, case law requires to
22  have a case dismissed for forum non-convenience?
23  A. Did I tailor this statement with respect to that?
24  No.
25  Q. Okay. Well, let me ask you a question. Why did

Page 54

1  you put in under Number 10 that WHR agrees to satisfy a
2  final judgment rendered by a Court of Mexico? Why did
3  you put that in?
4  A. As I stated earlier, this was prepared with the
5  assistance of counsel.
6  Q. I see. Why did you put in under Number 11 that
7  W -- do you know what the statute of limitations is for
8  a case in Mexico?
9  MR. DELY: Objection. Foundation. She's
10  not a Mexican attorney.
11  MR. NEMEROFF: You can answer, ma'am.
12  A. Do I know what the statute of limitations is for
13  Mexico. Is that the question?
14  Q. For a personal injury or wrongful death case in
15  Mexico?
16  MR. DELY: I'll renew my objection.
17  MR. MERRIWEATHER: You can answer, if you
18  know.
19  A. I do not know what it is in Mexico, no.
20  Q. Okay. Looking at Number 11 where it says, "WHR
21  agrees to exclude from statute of limitations time
22  periods, the period of time Plaintiff's claim has been
23  pending in the action, and, in addition, any period of
24  time during an appeal from the dismissal order prior to
25  an order of the 7th Circuit Court of Appeals or the

Page 55

1  United States Supreme Court that has the effect of
2  making the dismissal order final, as well as the 120-day
3  period provided for in Number 9, above."
4  I read that correctly, right, ma'am?
5  A. Yes, you did.
6  Q. Did you put this language in the affidavit or was
7  that language put in there by a lawyer?
8  A. As I stated earlier, my affidavit was prepared
9  with the assistance of Counsel.
10  Q. My question was: Did you put that language in
11  there, ma'am?
12  A. Section 11 is my language and my statement.
13  Q. Okay. So you drafted that language, correct?
14  A. I did not say I drafted the language.
15  Q. My question is: Did you draft that language
16  personally?
17  A. Again, I'm not sure it is possible to answer that
18  question the way you're asking it. This is my
19  statement. It is true, to the best of my knowledge, and
20  I signed it.
21  Q. That is not what I asked you, ma'am. My question
22  is: Did you draft the language in Paragraph 11 of your
23  affidavit personally? That is a yes or a no, ma'am.
24  A. I don't recall how I, with the assistance of
25  Counsel, arrived at this language. But this statement

Page 56

1  is mine.
2  Q. You say the statement is yours. You're saying to
3  me that you remember drafting the language of that
4  statement, or are you saying that you agree with it, now
5  that it's already in the affidavit?
6  A. I am saying that this is my statement, and I
7  agree that I signed this affidavit.
8  Q. All right. But you don't remember whether you
9  drafted this language yourself, correct?
10  MR. DELY: I'll just object. Asked and
11  answered. She said she doesn't remember with the
12  assistance of counsel how it came out in its final form.
13  Q. You can answer my question, ma'am.
14  A. I don't recall exactly how the statement, how I
15  arrived at the final language, but I agree that the
16  language is mine.
17  Q. Okay. Looking at Number 7, you write: "The
18  Islander Properties Hotel at Cozumel, Mexico, described
19  in Plaintiff's Complaint is independently owned by
20  Islander Properties and is operated as a franchisee of
21  WHR," correct?
22  A. Yes. That is the statement.
23  Q. And you signed that under oath that that was true
24  and correct, to the best of your knowledge, correct?
25  A. Yes. To the best of my knowledge.

14 (Pages 53 to 56)



Page 57

1　Q. And I think we determined earlier that, in fact,
2　Islander Properties Hotel in Cozumel, Mexico, as
3　described in Plaintiff's Complaint is actually operated
4　as a franchisee of Wyndham Hotel Group International,
5　Inc., correct?
6　A. I'm sorry. Can you say that again, please?
7　Q. Ma'am, isn't it a fact that the Islander
8　Properties Hotel in Cozumel, Mexico, described in
9　Plaintiff's Complaint is actually operated as a
10　franchisee not of WHR, but, rather, of Wyndham Hotel
11　Group International, Inc.?
12　A. Well, as I said earlier, for my purposes,
13　generally, they're the same.
14　Q. Okay. So you're saying that WHR is the same as
15　Wyndham Hotel Group International, Inc.?
16　A. Sister companies, but, essentially, the same.
17　Q. Are they legally the same? In other words, are
18　they the same corporation or are they two separate
19　corporations?
20　A. I don't know if I could answer whether they're
21　legally the same.
22　Q. All right. So you're saying to me that Islander
23　properties hotel in Cozumel, Mexico, as described in
24　Plaintiff's complaint, is operated as a franchisee of
25　WHR, correct?

Page 58

1　A. Yes. That is correct.
2　Q. Do you have an agreement that was entered into
3　between WHR and Islander Properties?
4　A. The agreement is with Wyndham Hotels
5　International.
6　Q. This is with Wyndham Hotel Group International,
7　Inc., correct?
8　A. Yes.
9　Q. Does Wyndham, either WHR or Wyndham Hotel Group
10　International, Inc., have any employees that work in
11　Mexico? Let me rephrase that, because I can only
12　already anticipate your objection. Does WHR or -- I
13　keep forgetting the name of the thing. Bear with me a
14　second. Does WHR or Wyndham Hotel Group International,
15　Inc., have any employees whose full-time job it is to
16　work in Mexico, other than to inspect a property or to
17　open up a new resort or something like that?
18　　　　MR. DELY: I just object to the form. Maybe
19　break those out one at a time, instead of having one big
20　compound question. I just object.
21　　　　MR. NEMEROFF: Break down Wyndham Hotel
22　versus WHR?
23　　　　MR. DELY: Yes. And maybe even go sofar as
24　to go separate, just so we're clear and we don't have
25　any ambiguity.

Page 59

1　Q. Let me say it a different way, ma'am. Do any
2　employees of WHR ever do any work, at all, in the
3　country of Mexico?
4　A. I, I believe so.
5　Q. And do any employees of -- and I call Wyndham
6　Hotel Group WHG?
7　A. Yes.
8　Q. Okay. Thank you. Do any employees of WHG ever
9　do any work in Mexico?
10　A. I just have to say, I'm hesitating, because I am
11　not recalling right now whether the employees are of WHR
12　or WHG, so I -- International. I don't recall right
13　now.
14　Q. Okay. And that's only because you don't know if
15　it was WHR or WHG people, correct?
16　A. Correct. If there -- if there was a Wyndham
17　Hotel R or G person who may have worked in Mexico, I
18　would not be comfortable stating whether they were WHG,
19　Inc., or WHR.
20　Q. Okay. But for your purposes, you think that
21　they're -- they're the same, correct, for purposes of
22　this franchise agreement?
23　A. For my purposes, generally, the same.
24　Q. Have you ever been to the Wyndham Cozumel Resort,
25　personally?

Page 60

1　A. No.
2　Q. The corporate -- the main corporate offices for
3　both WHG and WHR are in New Jersey; is that correct?
4　A. Correct.
5　Q. What is that? Parsippany?
6　A. Correct.
7　Q. Does either WHG or WHR maintain any regional
8　offices in any other part of the United States?
9　A. I don't believe I would characterize anybody
10　outside of Parsippany as a regional office.
11　Q. Let me take out the regional and go, other than
12　the Parsippany, New Jersey, offices does WHG and WHR
13　maintain any offices in any other state in the United
14　States?
15　A. Could you describe maintain offices, please?
16　Q. Ma'am, have an office.
17　A. The corporate office is in Parsippany.
18　Q. I understand that. That's not my question.
19　　　　Does WHG or WHR have offices any place else in
20　the United States, other than in New Jersey?
21　　　　MR. MERRIWEATHER: Can we say whether it's a
22　sales office or operational office?
23　　　　MR. NEMEROFF: Either kind.
24　　　　MR. MERRIWEATHER: I'm just trying to
25　understand. Maybe it will help her answer.

15 (Pages 57 to 60)

Page 61

1    MR. NEMEROFF: Let's go with yes, and then
2  we can go further than that.
3    MR. DELY: What if yes isn't the answer? If
4  yes isn't the answer --
5    MR. NEMEROFF: The question is pretty clear.
6  Q. Does WHG or WHR have offices in any other state,
7  other than New Jersey, for any purpose?
8  A. There are Wyndham employees who have an office
9  outside of Parsippany.
10  Q. Okay. In what states?
11  A. I could not recall, from memory.
12  Q. Does Wyndham, either WHG or WHR, have an office
13  here in the State of Illinois?
14  A. I believe that there may be salespeople in
15  Illinois, but there would not be operations people
16  outside of Parsippany.
17  Q. Where is the office for the salespeople in
18  Illinois located?
19  A. I, I don't recall, specifically. And I'm not
20  even sure that there is.
21  Q. How would we be able to find that out, ma'am?
22  A. If you would request that from Counsel, then I
23  would ask to provide it. I would undertake to try to
24  provide that.
25  Q. Do you travel, at all, in your job outside of New

Page 62

1  Jersey?
2  A. I do.
3  Q. Have you ever traveled to an office here in
4  Illinois for your job?
5  A. No.
6    MR. MERRIWEATHER: Excuse me. It's just two
7  minutes to 5:00, our time. So Valerie said she had to
8  make a phone call.
9    MR. NEMEROFF: Sure. Do you want to take a
10  break?
11    (Discussion off the record.)
12    (Brief recess.)
13  BY MR. NEMEROFF:
14  Q. Ma'am, does either WHR or WHG maintain any
15  offices in the country of Mexico?
16    (Pause.)
17  A. Not to my knowledge.
18  Q. Does WHG or WHR have any full-time employees who
19  work in the country of Mexico at all times?
20  A. That I don't know.
21  Q. Had you ever traveled to Mexico in your business
22  capacity for Wyndham?
23  A. No.
24  Q. Had you ever been to any other office, any other
25  Wyndham office, WHG or WHR office, in any place in the

Page 63

1  United States, other than New Jersey? You, personally?
2  A. No.
3  Q. Who in your company would have knowledge about
4  where Wyndham, either WHG or WHR, has offices in the
5  United States?
6  A. That would be me.
7  Q. Okay. You're the person with the most knowledge
8  at this deposition. You have no knowledge, as we speak.
9  Is that what you're saying?
10  A. Some of your questions I did not recall.
11  Q. Right. That's what I'm saying. You're the
12  person with the most knowledge in the company; yet, in
13  the deposition you don't recall whether or not WHG or
14  WHR has any offices in any other state, other than New
15  Jersey, correct?
16  A. Could you repeat that question, please?
17  Q. Sure. You have been represented -- you're saying
18  that you are the person with the most knowledge as to
19  where Wyndham has its offices in the United States,
20  other than New Jersey. And, yet, as we sit here in this
21  deposition, you don't recall where Wyndham -- either WHG
22  or WHR, has its offices, correct?
23  A. That's not correct.
24  Q. Okay. Well, then, tell me, where Wyndham, WHG or
25  WHR, have offices other than in New Jersey, please?

Page 64

1  A. I am not recalling right now.
2  Q. Okay. Well, I don't understand how you don't
3  recall any other place. Give me one place.
4  A. As I said earlier, there are salespeople who are
5  located outside of Parsippany, but that does not mean
6  that it is a company office. That's a --
7  Q. We'll get to that in a minute. We haven't even
8  gotten to where individual salespeople work and whether
9  they work out of their homes. We'll get to that in a
10  minute. I'm talking about actual offices that are
11  either owned or rented by WHG or WHR to allow workers to
12  come to work. Are there any such offices in the United
13  States, other than in New Jersey?
14  A. I -- I'm not recalling right now.
15  Q. What would you need to do to get that
16  information, if you are the person with the most
17  knowledge? For example, is there a company directory?
18  A. Actually, not to my knowledge.
19  Q. Okay. Well, what would you need to look at,
20  ma'am, in order to get that information to tell me
21  where -- well, first of all, whether WHG or WHR have any
22  offices outside of New Jersey. And, secondly, if they
23  do, where?
24  A. I would probably need to be comfortable with your
25  definition of offices. Because if you are talking about

Page 65

1.   where leases or whether the company has lease
2.   agreements, I would have to do some research. So, at
3.   first, I have to understand what you meant by offices,
4.   and then I would look into it.
5.      Q. Okay. Well, you understand -- well, doesn't have
6.   to be -- could be leased, could be owned. Understand,
7.   Number 1, that's what I'm talking about by offices,
8.   correct?
9.      A. No. I don't think you've given me enough of a
10.  description of what you mean by an office.
11.     Q. You are sitting in a law firm right now. Do you
12.  consider that to be an office?
13.     A. It is an office, yes.
14.     Q. You work in Parsippany, New Jersey. Do you work
15.  in an office?
16.     A. Yes, I do.
17.     Q. There is your definition of office. I know it is
18.  pretty darn common, what we are talking about. I'm not
19.  talking about people working out of their homes. I will
20.  draw that distinction. But other than people working
21.  out of their homes, I'm talking about a facility,
22.  whether it is one room, 50 rooms, whether it is a whole
23.  building, whether it is part of a building, whether you
24.  lease it, whether you own it, whether somebody gives it
25.  to you for free, where WHG and WHR employees go to work?

Page 66

1.      A. By that definition, I would need to do research.
2.         MR. NEMEROFF: Okay. Okay. I am going to
3.   reserve the right to re-depose this witness on that
4.   question.
5.      Q. And, as we sit here today, you can't even tell me
6.   one place?
7.      A. Again, because you -- as you said, what's leased,
8.   what's owned --
9.      Q. You don't have to draw that distinction, ma'am.
10.  That is all part of the kitten kaboodle of the
11.  definition of office. You don't have to determine
12.  whether it is leased, owned, free or anything. Just a
13.  place where WHG and WHR employees go to work in places
14.  other than New Jersey in the United States, other than
15.  their own home?
16.     A. Yes. To give you a complete answer, I would need
17.  to do research.
18.     Q. I'm not asking for complete right now. I'm
19.  asking for one place.
20.     A. I can't recall, off the top of my head.
21.     Q. Does WHG or WHR have any employees in the State
22.  of Illinois?
23.        MR. DELY: Objection. Asked and answered.
24.        MR. NEMEROFF: I asked her about the
25.  offices. Not employees.

Page 67

1.      A. I believe so, but I'm not certain.
2.      Q. Do you know how many employees WHG or WHR has in
3.   the State of Illinois?
4.      A. If they are there, I do not know the number.
5.      Q. Do you know whether or not salespeople employed
6.   by WHG and WHR, not all, but some, work out of their
7.   homes?
8.      A. Yes.
9.      Q. Do any of the salespeople report to you?
10.     A. No.
11.     Q. Do any of the sales -- are there other
12.  vice-presidents that salespeople report to?
13.     A. Yes.
14.     Q. Who would be the vice president that salespeople
15.  would report to?
16.     A. I'm not trying to be difficult, but I do need you
17.  to be more specific.
18.     Q. Are there any -- give me, if there is more than
19.  one, tell me more than one. Give me the name of the
20.  vice president of sales, please?
21.     A. There is a senior vice president of sales.
22.     Q. Okay. Who is that?
23.     A. That is Gus Stamoutsus.
24.     Q. I'm sorry. Gus?
25.     A. Gus.

Page 68

1.      Q. And his -- spell his last name.
2.      A. S-t-a-m-o-u-t-s-u-s.
3.      Q. Okay. And, go ahead. Is there just a vice
4.   president of sales?
5.      A. Yes.
6.      Q. Who would that be?
7.      A. But, no, because that vice president is not
8.   Wyndham VP of sales.
9.      Q. Who was that? What company is that? You're
10.  speaking about some vice president. Who would that be a
11.  vice president of, what company?
12.     A. It -- the way we're -- we are structured, there
13.  are salespeople of responsibility for more than one
14.  brand.
15.     Q. Okay. Of the Wyndham brand, who would be a vice
16.  president of sales, including the Wyndham brand is
17.  included in that responsibility.
18.     A. That would be -- really be more Jeff Dallas.
19.     Q. I'm sorry. Jeff Dallas? Can you spell the last
20.  name?
21.     A. Dallas, like the city.
22.     Q. Like the town?
23.     A. Like the city, yes.
24.     Q. Is Mr. Dallas responsible for the entire United
25.  States or are there vice-presidents of different

17 (Pages 65 to 68)

Page 69

1    portions of the United States?
2    A. Jeff Dallas and Jeff -- and Gus Stamoutsus'
3    responsibilities are not based on region.
4    Q. So in answer to my question they would be
5    responsible -- they could be responsible for even more
6    than the United States, but they are -- those two are
7    responsible for the entire United States as part of
8    their responsibility, correct?
9    A. They, they would not be responsible routinely for
10   any sales outside of the United States, in general.
11   Q. Does Wyndham break up its sales territories into
12   regions?
13   A. Generally, yes.
14   Q. Can you describe for me the different regions?
15   A. No. Not off the top of my head.
16   Q. You have no idea if there is a west region, a
17   Midwest region, a south region?
18   A. Generally, there is -- it is, it is along those
19   territorial lines.
20   Q. So in order for me to get that information, I
21   need to depose Mr. Dallas or Mr. Stamoutsus, correct?
22   A. No. I could provide that information.
23   Q. I would like you to provide it to me under oath
24   in the deposition. Otherwise, I am going to go to the
25   salespeople.

Page 70

1    A. I would not be able to give you a complete, full
2    answer at this time.
3    Q. Okay. And you would agree that the vice
4    president of sales would have more knowledge about that,
5    correct?
6    A. It depends on which question you're asking.
7    Q. Well, first of all, is there a region within WHG
8    or WHR that encompasses the State of Illinois?
9    A. There is a sales region that encompasses the
10   State of Illinois, yes.
11   Q. And what is that called?
12   A. I do not recall the name of that region.
13   Q. And in terms of the corporate heir -- below -- I
14   assume that Mr. Dallas reports to Mr. Stamoutsus,
15   correct?
16   A. No, not at all.
17   Q. So they're on equal levels?
18   A. Yes.
19   Q. All right. So Mr. Dallas is also a senior vice
20   president, correct?
21   A. Correct.
22   Q. Who reports to -- going down the corporate chain,
23   who reports to Mr. Stamoutsus and Mr. Dallas?
24   A. I would not recall all of the names, off the top
25   of my head, right now.

Page 71

1    Q. Would they be titled regional manager, or what
2    designation does Wyndham use?
3    A. For -- there are regional vice-presidents and
4    then there are sales, salesmen.
5    Q. Okay. But salespeople, salesmen, would be in --
6    the corporate chain would be below regional
7    vice-presidents, correct?
8    A. Yes.
9    Q. If there is a regional vice president, are
10   there -- is there a hierarchy of management in between
11   regional vice president and salespeople? For example,
12   sales manager or district manager or regional manager?
13   A. There is not that breadth, so I wouldn't quite
14   say that was -- I wouldn't say that that would be accurate.
15   Q. Okay. Is there a vice president for sales in the
16   country of Mexico, for the country, that, at least,
17   includes the country of Mexico?
18   A. There is.
19   Q. Who would that be?
20   A. That is Doug Smith.
21   Q. Doug Smith?
22   A. Doug Smith. Although, I'm not sure about the
23   vice. But for the purposes of your question, it would
24   be Doug Smith.
25   Q. Is Mr. Smith's office in your Parsippany, New

Page 72

1    Jersey, office?
2    A. Yes.
3    Q. Is Mr. Stamoutsus' office in your New Jersey
4    office?
5    A. Yes.
6    Q. Mr. Dallas?
7    A. Yes.
8    Q. Okay. For purposes of understanding the Wyndham
9    brand, in other words, what various items franchisees
10   use at hotels that are franchised by Wyndham, all of
11   those employees would be headquartered here in the
12   United States, correct?
13   A. Could you repeat that question, please?
14       MR. NEMEROFF: If you can reread that, I
15   would appreciate it.
16       (Whereupon, the Court Reporter read back the
17   record as requested.)
18   Q. Talking about Wyndham employees.
19   A. I'm sorry. I'm not understanding the connection
20   between brand items and employees. I don't understand
21   the question.
22   Q. Well, for example, if I wanted to understand the
23   type of signage Wyndham offers to its franchisees at its
24   Resorts --
25   A. Okay.

Page 73

1  Q. -- the employee from Wyndham that would have the
2  best understanding of that would be headquartered in the
3  United States, correct?
4  A. The employee from Wyndham who understands the
5  brand standards with respect to signage is in
6  Parsippany, correct, or employees, correct.
7  Q. That goes for all of the various systems that
8  Wyndham has. They're all employees that are
9  headquartered in the United States, correct?
10  A. Would you repeat the question, please?
11  Q. Sure. With regard to any employee of Wyndham
12  that we want to talk with about the policies, the
13  standards, the specifications, the procedures that go
14  along with the franchise agreement that was entered into
15  between Wyndham and Islander Properties, all of those
16  employees would be headquartered in the United States,
17  correct?
18  A. Again, as I am the best person to answer that
19  question, I am headquartered in the United States.
20  Q. I'm not talking about the best person. You are
21  not the only person that has knowledge of the Wyndham
22  brand?
23  A. Oh. Correct. Absolutely.
24  Q. There is lot of people that have knowledge of the
25  Wyndham brand?

Page 74

1  A. There are more than a few that have knowledge of
2  the brand standards.
3  Q. In fact, there is lot of people who -- let me ask
4  you a question. In terms of interaction, say, there is
5  a dispute between a franchisee and a franchisor over
6  standard specifications, policies and procedure, and the
7  franchisee wanted to contact somebody at Wyndham to get
8  a resolution to that issue, would they be discussing
9  that with you or is there somebody else at Wyndham they
10  would be discussing that with?
11  A. If there were disagreement regarding brand
12  standards, most likely they would be talking to a QA
13  person in Parsippany.
14  Q. Okay. And QA, meaning quality assurance,
15  correct?
16  A. Correct.
17  Q. And is there a quality assurance department?
18  A. For, for Wyndham Hotels and Resorts there are
19  individuals responsible for QA.
20  Q. Okay. Who is the highest ranking person that
21  would be responsible for QA?
22  A. I would say, that would be Jeff Smith.
23  Q. Jeff Smith. Okay. And is he related to Doug
24  Smith?
25  A. Not to my knowledge.

Page 75

1  Q. Is Jeff Smith in Parsippany?
2  A. Yes, he is.
3  Q. Do you know who works below Jeff Smith? Not
4  everyone down the line. I'm just talking about the next
5  person below in the corporate chain. You know, let me
6  strike that. Is there a specific, is Jeff Smith the
7  vice president?
8  A. Yes, he is.
9  Q. Is there a specific QA person who handles
10  properties in Mexico, among other ones that they may
11  handle? That is one of the areas they would deal with,
12  QA?
13  A. A QA issue in Mexico, to my knowledge, would
14  probably be addressed by Doug Smith in coordination with
15  Jeff Smith.
16  Q. Okay. Great. Thank you. All right. Let's go
17  back to the agreement, itself, Page 11.
18  A. Yes. I'm there.
19  Q. Okay. Under Section D-4, which is entitled,
20  "Food and Beverage Standards," on Number 4 requires the
21  franchisee to use only menus, signs, promotional
22  displays and other materials that comply with the style,
23  pattern and design prescribed in the manual or,
24  otherwise, approved in writing by the franchisor.
25  That's what that says, correct, ma'am?

Page 76

1  A. It does.
2  Q. Okay. Under Number Letter E, "Guests Services,"
3  it says, "The Franchisee shall honor at the Hotel all
4  credit cards specified in the Manual," correct?
5  A. Yes.
6  Q. When they say, "the Manual," which manual are
7  they referencing?
8  A. The Brand Standards Manual.
9  Q. And that is Exhibit Number 3, correct?
10  A. Yes.
11  Q. All right. And then the franchisee also agreed
12  to participate in and provide all information requested
13  by the franchisor for the purpose of all customer
14  surveys and guest satisfaction audits conducted by the
15  franchisor, correct?
16  A. It does say, correct.
17  Q. And the franchisee shall offer all guest services
18  including complimentary services that franchisor may
19  prescribe for Wyndham Hotels, including, without
20  limitation, programs and services for senior citizens,
21  children and frequent guests; is that correct?
22  A. It does say that, correct.
23  Q. And in addition to that, franchisee shall offer
24  all products and services and shall participate in all
25  programs that the franchisor may determine to be in the

19 (Pages 73 to 76)

Page 77

1　best interest of or may reasonably establish for the
2　System, including, without limitation, guest access high
3　speed internet service, guest recognition programs such
4　as Wyndham ByRequest, in room pay per view movies,
5　subject to franchise rights to direct the type of adult
6　movies which are offered, and the time and manner which
7　such movies are offered, travel agents programs,
8　marketing incentive programs, complaint resolution
9　programs and programs for the provision of complimentary
10　rooms or refunds to guests to the extent such programs
11　are capable of being implemented at the approved
12　location.
13　　　　That's what the agreement says, correct?
14　A. You read correctly.
15　Q. And you don't disagree that that is in the
16　contract, correct?
17　A. I do not disagree that the language is contained
18　in the contract.
19　　　　MR. DELY: Just want to read the whole --
20　　　　MR. NEMEROFF: I have select portions. I
21　think I would like to create a record.
22　Q. Item under Number 4 under "Quality Assurance
23　Program Inspections," it states that --
24　　　　MR. MERRIWEATHER: Excuse me. Where are you
25　looking?

Page 78

1　Q. Quality Assurance?
2　A. You said Number 4, and I don't see Number 4 on
3　Page 12.
4　　　　MR. DELY: Apologize. F.
5　Q. On Page 12, Item 4, where it says, "Quality
6　Assurance Program Inspections," do you see where I'm
7　referring to, ma'am?
8　A. I do.
9　Q. Okay. It states, "Franchisor shall administer a
10　quality assurance program for the System which may
11　include conducting periodic inspections from the hotel
12　and guest satisfaction audits and surveys to assure
13　compliance with System standards." That's correct,
14　right?
15　A. You read correctly.
16　Q. It also says, "Franchisee hereby grants the
17　franchisor and its representatives the right to enter
18　upon the premises of the hotel at all reasonable times,
19　with or without prior notice, for the purpose of
20　conducting inspections," correct?
21　A. It does say that, correct.
22　Q. So at any time Wyndham can inspect the Cozumel
23　property that is the subject of this lawsuit, correct?
24　A. Not necessarily. Because if you remember, as an
25　independent contractor, the franchisee can refuse a

Page 79

1　Wyndham employee from entering onto the premises.
2　Q. Where does that say that in this contract?
3　A. Where -- because an independent contractor -- in
4　Section 21, the franchisee acknowledges that franchisor
5　and franchisee will not be considered as joint ventures,
6　partners or agents of each other. Franchisee
7　specifically acknowledges that the relationship created
8　by the agreement is not fiduciary, special or any other
9　similar relationship. But, rather, is an arms length
10　business relationship.
11　Q. Ma'am, my question is very simple. Tell me,
12　specifically, in this contract where it says that the
13　franchisee can refuse to allow the franchisor to enter
14　the premises, specifically, those words?
15　A. As I was answering, it also says: Franchisor
16　owes franchisee no duties except as expressly provided
17　in this agreement.
18　Q. You didn't answer my question, ma'am. Tell me in
19　the agreement where the words that the -- it
20　specifically in these words says, "franchisee may refuse
21　the right to enter upon the premises of the hotel to the
22　franchisor." Show me the specific words where it says
23　that, ma'am.
24　A. I don't know why it would be there, if, as
25　independent contractor, the franchisee owns, operates

Page 80

1　and controls their own facility. That language wouldn't
2　need to be there to be correct.
3　Q. Ma'am, I'm not asking you to interpret anything.
4　I'm asking you to find the specific words that say that.
5　There are none in that contract; you would agree with
6　me, correct?
7　A. I agree, those specific words are not in the
8　contract.
9　Q. In fact, not only does the contract say that the
10　franchisor has a right to inspect, the franchisee must
11　also pay for each inspection pursuant to the terms of
12　the contract; is that correct?
13　A. The contract does require payment for the
14　inspection.
15　Q. And the contract also requires the franchisee to
16　provide lodging without charge to the franchisor's
17　representative during the time necessary to complete the
18　inspection, correct?
19　A. It -- the language has provide lodging, if
20　available.
21　Q. Okay. Where does it say, "if available"? It
22　says -- I don't see where it says, "if available,"
23　ma'am?
24　A. In Section F, in the middle of the paragraph,
25　"franchisee shall pay a fee for each inspection, if any

20 (Pages 77 to 80)

Page 81

1  assessed, provide lodging, if available."
2  Q. The next sentence of that paragraph says that the
3  franchisee must cooperate fully -- I take that back.
4  I'm throwing those first two words in. This contract,
5  Section F, requires the franchisee to cooperate fully
6  with franchisor's representatives during the inspection.
7  Isn't that correct?
8  A. It does state, "cooperate fully with franchisor's
9  representatives during inspections".
10  Q. Okay.
11  A. During the inspections.
12  Q. And it also says, "and take all steps reasonably
13  necessary to correct any deficiencies detected within
14  the time specified by franchisor," correct?
15  A. It does read that way, yes.
16  Q. Do you know if there is video teleconferencing
17  equipment on the premises of the Cozumel resort?
18  A. I do not know.
19  Q. Going to Page 13 of the agreement, Item Number 4
20  on Page 13 states, "The size, form, color scheme,
21  content and location of all signs, advertisements and
22  graphic materials displayed in any public area or guest
23  room at the hotel shall be as prescribed in the manual
24  or otherwise approved in writing by franchisor,"
25  correct?

Page 82

1  A. It does read that, correct.
2  Q. There is also a Wyndham graphic manual, correct,
3  Page 16, Section 9?
4  A. Did you say Page 16, Section 9? I'm sorry.
5  MR. MERRIWEATHER: He is looking at 9-A.
6  Third line down it references a Wyndham graphic manual.
7  A. The section does reference the Wyndham Graphic
8  Manual.
9  Q. Have you ever seen the Wyndham Graphic Manual?
10  A. Do not believe so.
11  Q. Do you know who at Wyndham would have the most
12  knowledge about the contents of the Wyndham Graphic
13  Manual?
14  A. That would be QA, but I'm not certain which
15  individual in QA.
16  Q. Okay. Does Wyndham hold national regional
17  conventions for its franchisees?
18  A. There is a regular meeting.
19  Q. Is that an annual meeting?
20  A. I believe so.
21  Q. What is the purpose of that annual meeting?
22  A. I don't believe I would be the best person to
23  answer that question.
24  Q. Did you ever attend one of those meetings?
25  A. No, I have not.

Page 83

1  Q. Who would be the best person to answer that
2  question?
3  A. Jeff Smith.
4  Q. Are you familiar with how -- well, first of all,
5  do you know whether or not Wyndham works with travel
6  agents to market its franchise properties?
7  A. I wouldn't say, "works with," but there is --
8  there is a program by which the Wyndham brand is
9  marketed to travel agents.
10  Q. Okay. Are you involved in that program?
11  A. No.
12  Q. What is that program called?
13  A. I don't believe there is a specific name.
14  Q. Okay.
15  A. Well, let me rephrase that. There are names of
16  different types of programs, different type of marketing
17  programs, but you need to be more specific for me to
18  answer.
19  Q. Is that what some of the salespeople do? They,
20  as part of their responsibility, go to travel agents and
21  market Wyndham franchised properties to the travel
22  agents?
23  MR. DELY: I'll object to foundation, that
24  she doesn't have salespeople reporting to her.
25  Q. You are an officer of the corporation. I assume,

Page 84

1  you have some understanding.
2  A. There is a team that is responsible for working
3  with travel agents and other entities to promote the
4  Wyndham brands to travelers.
5  Q. And who is the head of that team?
6  A. Generally, that's Greg Land.
7  Q. Greg. What is the last name?
8  A. Land, L-a-n-d.
9  Q. And is he in Parsippany?
10  A. Yes, he is.
11  Q. Is he considered -- what is he vice president of?
12  A. He is senior vice president. I am not recalling
13  his title correctly right now.
14  Q. Okay. And does he have -- do you know who his
15  direct subordinates are? I'm not talking about multiple
16  layers below. I'm talking about directly below.
17  A. Yes. Well, there is a woman who works, generally
18  speaking, on the next level below him. I'm not
19  recalling her name right now.
20  Q. Is she a vice president?
21  A. I believe she is a vice president, yes.
22  Q. Okay. Are you familiar with the travel agents
23  called Apple Vacations?
24  A. Not recalling that name.
25  Q. Well, you probably wouldn't know the answer, but

21 (Pages 81 to 84)

Page 85

1  I'm going to ask it anyway. Do you know who -- first of
2  all, do you know if somebody from Wyndham promotes the
3  Wyndham brand to anybody from Apple Vacations?
4          MR. DELY: I'll object to foundation.
5      A. I am not recalling Apple Vacations.
6      Q. Okay. Probably better off asking Mr. Land,
7  correct?
8          MR. DELY: I'll object. She doesn't know
9  Apple Vacations.
10     Q. Assuming Apple Vacations is a travel agent that
11 operates here in the United States, Mr. Land would
12 probably be the best person to ask whether Wyndham
13 markets to them or not?
14     A. Again, I couldn't say. I'm not familiar with
15 that name enough to be able to be comfortable answering
16 that question.
17     Q. Have you ever seen the Wyndham Hotel directory?
18     A. Yes.
19     Q. What is that?
20     A. It is a directory that lists Wyndham Hotels,
21 Wyndham franchised hotels and Wyndham managed hotels.
22     Q. And going to Page 17, Section E, whenever you're
23 ready?
24     A. I'm there.
25     Q. As part of the franchise agreement, Franchisee

Page 86

1  agrees to list Wyndham franchised hotel in the Wyndham
2  Hotel directory and to furnish the franchisor such
3  information as franchisor may request for that purpose;
4  is that correct?
5      A. That's what it says.
6      Q. Franchisee agrees to honor the information that
7  franchisee causes to be published in the directory to
8  comply with such other requirements with respect to the
9  directory as may be specified from time to time in the
10 manual, correct?
11     A. You read that correctly.
12     Q. Next paragraph on Page 17 is F, as in Frank,
13 "Additional marketing programs." Are you with me?
14     A. Yes.
15     Q. The Franchisor may establish and coordinate
16 advertising, marketing and sales programs, customer
17 satisfaction programs and other activities, among System
18 hotels and other lodging products of Franchisor and its
19 Affiliates on a System-wide or local or regional basis
20 and provide for participation therein by Franchisee.
21 That's in the agreement, correct?
22     A. Yes, it is.
23     Q. And Franchisee shall participate in such programs
24 and activities on the same basis as other affiliated
25 System hotels, including hotels owned or managed by

Page 87

1  franchisor or its affiliates in the same division or
2  region as the hotel, and such programs and activities
3  will be paid for outside the central marketing fund.
4  Correct?
5      A. Just one small correction. It says, "as other
6  participating system hotels". Not affiliated system
7  hotels. But other than that, you read correctly.
8      Q. Okay. Okay. Let's go to Page 20.
9          MR. MERRIWEATHER: David, just one question.
10 Does it make sense to break it up into another session?
11 I don't know how much longer you have. If it is going
12 to be four more hours, if that's what you're asking --
13         MR. NEMEROFF: We seem to be moving along at
14 a much quicker pace now, so I don't think it is going to
15 be that -- it is going to be probably at least a half
16 hour to hour longer. I can't guaranty it. I don't
17 expect it.
18         MR. MERRIWEATHER: An hour later is already
19 longer. It is getting late here on the east coast. I
20 didn't schedule this. I didn't see this was going to go
21 so late past the business hours here. So if you are
22 going to be that long, then I would suggest we reconvene
23 for another telephone deposition. We'll, obviously,
24 agree to produce Valerie again.
25         MR. NEMEROFF: Ask Counsel. I prefer to

Page 88

1  finish today. We have certain -- the Court is sort of
2  pushing us to get this thing done. I'll leave it up to
3  the Counsel here.
4          MR. DELY: It might be better to push on.
5  Obviously, if there are reasons that you cannot, other
6  obligations for Valerie whatnot, certainly, we can
7  reconvene. It is important purposes for the Court and
8  just getting it done. If we've got a half an hour to an
9  hour, it might be prudent to just get it done. But,
10 obviously, I don't want to step on anyone's toes, as far
11 as obligations or commitments that they have. I didn't
12 anticipate going this long and certainly feel that it
13 could be moved along, so ...
14         MR. NEMEROFF: I only have one, two, three
15 -- four more pages in the agreement. And some pages
16 marked in the manual. It is up to you guys.
17         (Discussion off the record.)
18 BY MR. NEMEROFF:
19     Q. Ma'am, on Page 20 of the agreement --
20     A. Yes.
21     Q. -- Subsection-C?
22     A. Yes.
23     Q. Where it says, "Use of Proprietary Marks"?
24     A. Yes.
25     Q. Under Subsection 1 of C, it states: "Unless

Page 89

1.  otherwise authorized or required by Franchisor,
2.  Franchisee shall operate and advertise the hotel only
3.  under the name set forth in the Attachment-A without
4.  prefix or suffix," correct?
5.      A. Correct.
6.      Q. And going to Attachment-A, that name is Wyndham
7.  Resort, An All-Inclusive Hotel, correct?
8.          MR. MERRIWEATHER: It is essentially Page
9.  50.
10.         THE WITNESS: Oh.
11.     A. Correct.
12.     Q. So you would agree with me that in terms of
13. marketing its hotel to the public, Islander Properties
14. is required to market it as Wyndham Resort, An
15. All-Inclusive Hotel?
16.     A. No. I would not agree with the way you phrased
17. that.
18.     Q. Well, otherwise, it will be in breach of the
19. franchise agreement, correct?
20.     A. Well, again, the agreement needs to be read in
21. its entirety, and there are waivers possible, so I --
22.     Q. Right. But you're not aware of any waivers that
23. allowed Islander Properties to market or advertise its
24. property under any name other than Wyndham Resort, An
25. All-Inclusive Hotel, correct?

Page 90

1.      A. I am not aware of any waiver requests.
2.      Q. Okay. Under Page 22, Section 11 --
3.      A. Yes.
4.      Q. And that's entitled under Subsection-A, "The
5.  Manual"?
6.      A. Correct. Yes, I see that.
7.      Q. Is the Brand Standards Manual that we marked as
8.  Exhibit Number 3 the entire thing that comprises the
9.  manual, or is it just part of the manual?
10.     A. I, I'm not aware of any other Brand Standards
11. Manual, other than the one here.
12.     Q. I'm saying, is the Brand Standards Manual the
13. entire -- what's entitled, "The Manual," or is it just
14. part of the manual? Do you understand what I'm saying?
15.     A. I believe so. One minute, please.
16.         (Pause.)
17.         MR. MERRIWEATHER: Counsel, to move this
18. along, can I suggest that the witness look at the
19. definitions to the agreement? I mean --
20.         MR. DELY: That's fine.
21.         MR. NEMEROFF: That's fine. I don't know
22. what is happening there.
23.         MR. MERRIWEATHER: Here. If you look at
24. Attachment-D, it contains the definitions.
25.         THE WITNESS: Yes. If I could read that

Page 91

1.  manual, the Wyndham Business Deluxe Resort Hotel
2.  Operating Manual. Let me just read it, the Wyndham
3.  Business --
4.          MR. NEMEROFF: Are you reading from --
5.          THE WITNESS: Attachment-D, Page 2.
6.          MR. NEMEROFF: I'm sorry. Okay. Go ahead.
7.      A. The manual is the Wyndham Business Deluxe/Resort
8.  Hotel Operating Manual. The Wyndham Graphics Manual and
9.  all other written statements, directives and any other
10. manuals and materials issued by Franchisor and any
11. modifications to such materials containing the
12. standards, specifications, policies and procedures for
13. the establishment and operation of System hotels.
14.     Q. Okay. Well, let's -- so, then, this Brand
15. Standards Manual does not comprise the entire manual,
16. correct?
17.     A. No.
18.     Q. Is the Wyndham Business Deluxe/Resort Hotel
19. Operating Manual the same as the Brand Standards Manual?
20.     A. To my understanding, yes.
21.     Q. Okay. And we already talked about the Wyndham
22. Graphic Manual, correct?
23.     A. Yes.
24.     Q. All right. Let's go back to Page 22, if we can.
25. Thank you.

Page 92

1.      You would agree that the manual for your
2.  definition contained, among other matters, minimum
3.  standards and requirements for constructing, equipping,
4.  furnishing, staffing and supplying the Hotel and
5.  management training and operational standards,
6.  techniques.
7.      I read correctly?
8.      A. Correct. You read correctly.
9.      Q. Under Subsection-B, "Compliance with the Manual,"
10. you would agree that to protect the reputation and good
11. will of Franchisor and to maintain high standards of
12. operation under the Proprietary Marks, Franchisee shall
13. conduct its business under and subject to the Manual,
14. other written directives which Franchisor may issue from
15. time to time, whether or not such directives are
16. included in the Manual, and any other manuals and
17. materials created or approved for use in the operation
18. of the hotel. The manual shall supplement this
19. Agreement.
20.     That is an accurate reading of Subsection-B?
21.     A. You did read correctly. I think it is important
22. to note that it is our expectation that the licensee
23. would comply with the manual as it is described, but we
24. cannot force them to do so.
25.     Q. Really. Do you know what the word, "shall,"

23 (Pages 89 to 92)

VALERIE CAPERS WORKMAN, JULY 2, 2007

Page 93

1   means, ma'am?
2       A. I, generally, believes it means will. But the
3   agreement has to be read in its entirety. And this is
4   an independent contractor agreement.
5       Q. I understand that. Has Wyndham ever filed a
6   lawsuit because one of its franchisees did not follow
7   the Brand Standards Manual?
8       A. At this time I don't recall specifics of any
9   other matters.
10      Q. Who is the General Counsel for Wyndham in
11  Parsippany, New Jersey?
12      A. Sarah Wynn.
13      Q. Sarah, what?
14      A. Wynn.
15      Q. Wynn?
16      A. W-y-n-n.
17      Q. Okay. She is in Parsippany, correct?
18      A. Yes, she is.
19      Q. Is Ms. Wynn involved in litigation involving
20  Wyndham and its enforcement of its brand along with
21  possibly outside counsel?
22      A. She would be if there -- if that was a subject of
23  a matter to which we were involved, she would be
24  involved.
25      Q. All right. How long has Ms. Wynn been the

Page 94

1   General Counsel for --
2       MR. MERRIWEATHER: If you know.
3       A. About two years.
4       Q. And you would agree that there would not be a
5   lawsuit in which Wyndham was aware of in which they were
6   being sued that Ms. Wynn would not ultimately know
7   about, correct?
8       A. I would not want to speak for what Sarah would be
9   aware of.
10      Q. In every case that you've been involved in
11  involving litigation with Wyndham, at least, since Ms.
12  Wynn has been General Counsel, she's been involved to
13  some degree, correct?
14      A. I, on a day-to-day basis, do not know, because I
15  rarely, if ever, have spoken with Ms. Wynn regarding
16  cases.
17      Q. How many other lawyers are in the legal
18  department at Wyndham?
19      MR. DELY: Object to this line of
20  questioning as to relevance.
21      A. Generally, about four or so, I believe.
22      Q. Okay. Which lawyers have you worked with
23  directly in the in-house Wyndham legal department, on
24  legal cases involving Wyndham?
25      A. Because I don't specifically recall which cases

Page 95

1   I've been involved in regarding which brands, I couldn't
2   answer that correctly right now.
3       Q. Name any lawyer, any time.
4       MR. MERRIWEATHER: If you expand it to
5   Wyndham Hotel Group, I think she can answer the
6   question.
7       MR. NEMEROFF: Excuse me?
8       MR. MERRIWEATHER: If you expand your
9   question to Wyndham Hotel Group, I think she can answer
10  the question pretty easily.
11      Q. I assume, there is General Counsel for all of the
12  Wyndham entities, correct, in Parsippany?
13      A. Yes. Sarah Wynn is the General Counsel for all
14  Wyndham entities.
15      Q. With regard to any Wyndham entity that you have
16  been personally involved in with litigation; in other
17  words, you've been asked to give an affidavit or
18  deposition or testify in that case, name any General
19  Counsel or Assistant General Counsel that you have done
20  any work for or with, I should say?
21      A. There is only one General Counsel for Wyndham
22  Hotel Group.
23      Q. Okay.
24      A. And I do not recall working with Sarah on any
25  litigation. I don't recall.

Page 96

1       Q. That wasn't my question. My question was, any of
2   the Wyndham groups. Give me the name of any General
3   Counsel that you've had any involvement with. If you
4   can't give me an exhaustive list, I understand that.
5   But I want to know the name of any General Counsel
6   you've done work with.
7       A. There is only one General Counsel for Wyndham
8   Hotel Group.
9       Q. Or lawyers that work in the legal department,
10  ma'am.
11      A. For Wyndham Hotel Group?
12      Q. No. Any entity, ma'am. Listen to my question.
13      MR. MERRIWEATHER: She was just about to
14  answer it. She was saying for Wyndham Hotel Group the
15  attorneys are. She was about to answer that before you
16  interrupted her.
17      A. For Wyndham Hotel Group the attorneys that I
18  would have worked with would be Mark Merriweather.
19      Q. Merriweather?
20      A. Yes.
21      Q. M-e-e-r?
22      MR. MERRIWEATHER: No. It's two Rs.
23      Q. Okay. Is that Mr. Merriweather that is here
24  today?
25      MR. MERRIWEATHER: Yes. That's me.

24 (Pages 93 to 96)

Page 97

1      MR. NEMEROFF: That's what I thought. I
2 didn't get your last name.
3  Q. Go ahead, ma'am.
4  A. Also, with -- oh, my goodness.
5      MR. MERRIWEATHER: He's asking on
6 litigation, who have you worked with?
7  A. My colleague who is on maternity leave. I can't
8 recall her name right now. It just flew out of my head.
9 Oh, goodness. I'll go back to that. Generally, Mark
10 Merriweather and a -- a woman in the legal team whose
11 name just went right out of my head. I apologize.
12  Q. Say Wyndham Hotel Group, what entities are you
13 referring to?
14  A. Would have been Wyndham Hotels and Resorts.
15 Could have been Ramada. Could have been Days. Could
16 have been Knights Inn or any of our other brands.
17  Q. Are you including Wyndham Hotel Group
18 International? Is that what you're referring -- that's
19 what you're referring to, and Wyndham Hotel Group?
20  A. In my way of thinking, yes.
21  Q. Just want to make sure we're on the same page.
22 Ma'am, you're not a lawyer, correct?
23  A. I am.
24  Q. Oh. You're a lawyer?
25  A. Yes. I am a licensed attorney, but I am not

Page 98

1 Counsel for Wyndham Hotel Group or any of its entities.
2  Q. Where are you licensed to practice law?
3  A. In the State of New York.
4  Q. When did you get your license?
5  A. 1991.
6  Q. Okay. Where did you go to law school?
7  A. St. John's University, School of Law.
8  Q. Have you ever practiced law?
9  A. For a grand total of six months post law school.
10  Q. Okay. What type of law did you practice in that
11 six-month period?
12  A. I was bond counsel.
13  Q. What?
14  A. Bond, B-o-n-d, counsel.
15  Q. What does that mean?
16  A. Attorney who represents entities that would be
17 issuing bonds. We were a firm that had those types of
18 clients.
19  Q. And other than that, you've never practiced law,
20 correct?
21  A. I mean, I am currently admitted, so I wouldn't
22 want to say I've never practiced law. But I only
23 practiced law for a firm for six months. And I do not
24 practice law as an employee of Wyndham.
25  Q. Tell me when, other than the six months doing

Page 99

1 bond law, that you practiced law.
2  A. Technically, any time I may have given any legal
3 advice would have been practicing law. But I have not
4 done so in a formal capacity, not as a solo
5 practitioner, and didn't have my own single, et cetera.
6  Q. When you are saying giving legal advice as
7 relates to your job with Wyndham?
8  A. No, never.
9  Q. You are not licensed to practice in the State of
10 New Jersey?
11  A. I am not. That's correct.
12  Q. That would be unethical to give advice, other
13 than in the State of New York, I think; am I right?
14      MR. MERRIWEATHER: I think we're going far
15 afield here.
16      MR. DELY: Objection to all of that.
17  Q. Ma'am, are you aware of -- you read the complaint
18 in this case, correct?
19  A. I believe so.
20  Q. Okay. Are you aware of the names of any
21 witnesses to this accident that ultimately resulted in
22 my client's death?
23  A. Not that I am recalling right now.
24  Q. Have you or anybody from Wyndham and any of its
25 entities taken any statements, oral or in writing, of

Page 100

1 any witnesses to my client's accident that occurred on
2 October 16th, 2007?
3  A. No.
4  Q. Are you aware of any employees of Islander
5 Properties that were witnesses to my client's accident?
6  A. Not that I recall.
7  Q. When you say not that you recall, I mean, I
8 assume, you don't have -- have you ever known of any
9 employees or not, ma'am -- not what you recall at this
10 point -- but have you ever been aware of any witnesses
11 to this accident?
12  A. Not that I recall.
13  Q. When you say not that you recall, what do you
14 mean by that?
15  A. I'm not recalling if I had heard a name of
16 someone who might have seen something at the hotel.
17  Q. Have you looked at the file in this case that is
18 maintained by the legal department?
19  A. If there is a file, I have not looked at a file.
20  Q. Have you looked at any witness statements that
21 Wyndham or anybody affiliated with Wyndham or hired by
22 Wyndham have ever taken regarding this accident?
23  A. There are none, to my knowledge.
24  Q. Okay. So in terms of this case, because you're
25 not aware of any witnesses, there would be no need to

25 (Pages 97 to 100)

Page 101

1 take any depositions of any Islander employees in Mexico
2 about this accident, correct? At least, as we sit here
3 today.
4      MR. DELY: Objection. Foundation, form.
5 Q. You can answer.
6 A. I don't see how I could answer that question.
7 Q. My question is, as we sit here today, based on
8 your current knowledge, you can't say under oath that we
9 would be required to take a deposition of any
10 eye-witnesses to this accident who are employees of
11 Islander Properties, correct?
12      MR. DELY: I'll just renew my objection.
13 The term required --
14      MR. NEMEROFF: Let me rephrase my question,
15 ma'am.
16 Q. You can't identify, as we sit here today, the
17 name of any witness who is a Mexican resident to this
18 accident --
19 A. Correct.
20 Q. -- can you?
21 A. Correct.
22 Q. Have you spoken to the owners of Islander
23 properties regarding this incident?
24 A. No.
25 Q. Do you know if anybody affiliated with Wyndham,

Page 102

1 with any regard, employees, officers, directors or
2 private investigators hired by Wyndham, do you know of
3 anybody that has spoken to any of the owners of Islander
4 Properties regarding this incident?
5      MR. DELY: I just want to object to the
6 form. And she had previously testified that she wasn't
7 aware of any.
8 Q. You can answer, ma'am.
9 A. I'm sorry. Can you repeat the question?
10 Q. Can you reread the question, please?
11      (Whereupon, the Court Reporter read back the
12 record as requested.)
13 A. I, I believe there were two separate questions.
14 I don't know of any investigation. I don't believe
15 there was any investigation by any Wyndham person or
16 anyone employed by Wyndham as to this incident.
17 Q. Are you aware whether or not Wyndham or the
18 lawyers hired by Wyndham have hired a private
19 investigator to seek out witnesses for this accident
20 that occurred in Cozumel, Mexico, on October 16th, 2007?
21      MR. DELY: Objection, foundation.
22 A. I do not know.
23 Q. Have you ever spoken to the owners, any of the
24 owners of Islander Properties, at all, about any issue?
25 Not this incident. About anything.

Page 103

1 A. Not that I recall.
2 Q. Do you know who the --
3 A. I know, Islander Properties.
4 Q. It's been identified that Islander, S, period, A,
5 period De, C, period, V, period, is the owner of the
6 resort where this accident occurred. My question is, my
7 understanding is that is some type of a Mexican
8 corporation. Question to you is: Do you know who are
9 the shareholders of that corporation, by name?
10 A. I do not.
11 Q. And you've never spoken to any of those
12 shareholders, correct?
13 A. Not that I would have known.
14 Q. Were you involved in the negotiation of the
15 franchise agreement between Wyndham and Islander
16 properties?
17 A. No.
18 Q. Wyndham is a corporation organized under the laws
19 of the State of Delaware, correct?
20 A. Wyndham Hotels and Resorts, that is correct.
21 Q. And, also, Wyndham Hotel Group International, .
22 Inc., correct?
23 A. I believe so.
24 Q. And despite being a corporation organized under
25 the laws of the State of Delaware, it maintains its

Page 104

1 principle place of business in the State of New Jersey,
2 correct?
3 A. For, for both entities the principle place of
4 business is New Jersey.
5 Q. Wyndham Hotel International Group, Inc., does
6 business here in Cook County, Illinois, correct?
7 A. I'm not sure.
8 Q. Who would be able to provide me with that
9 information about whether or not Wyndham Hotel Group
10 International, Inc., does business in Cook County,
11 Illinois?
12 A. I would.
13 Q. There's got to be somebody else at the company.
14 If you don't know, somebody else has got to know. Who
15 would that person be?
16 A. I would.
17 Q. Well, how come you don't know right now, ma'am?
18 You're a high level executive at this company. How come
19 you don't know?
20 A. I am not recalling whether or not we have an
21 employee in Illinois, in the Cook County at this time.
22 Q. Okay. You do have franchises here in Cook County
23 now, correct?
24      MR. DELY: I want to clarify, which entity
25 are you talking about?

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

Page 105

1. Q. Wyndham Hotel Group International, Inc., has
2. franchises here in Cook County, Illinois; is that
3. correct?
4. A. I do not believe so.
5. Q. What about Wyndham Hotels and Resorts, LLC?
6. A. I am not certain at this time.
7. Q. Okay. Okay. Wyndham, the name Wyndham, has
8. various entities registered here to do business in the
9. State of Illinois currently; isn't that correct?
10. A. Could you repeat that, please?
11. Q. Yes. There are a number of different Wyndham
12. corporate entities that are out there, correct?
13. A. There are more than one corporate entities with
14. the Wyndham name.
15. Q. Right. If you go on to the Illinois Secretary of
16. State website, Wyndham Hotels and Resorts, LLC, is
17. registered to do business here in the State of Illinois;
18. is that correct?
19. MR. DELY: Objection. She may not have
20. acknowledged the State of Illinois website.
21. Q. Wyndham Hotel Resort LLC is registered to do
22. business here in the State of Illinois with the Illinois
23. Secretary of State; is that correct?
24. A. I wouldn't be comfortable answering that question
25. right now.

Page 106

1. Q. What do you mean, "right now"? Do you want us to
2. come back in a week to answer some of my questions?
3. MR. MERRIWEATHER: Counsel, we don't need
4. the sarcasm.
5. MR. NEMEROFF: I am going to reserve the
6. right to re-depose her, if she is going to give
7. different information at a later time, if she claims to
8. be the person with most knowledge. She knew she was
9. going to be deposed about these various issues, and I
10. expect that she is going to be able to answer these
11. questions. If not, I am going to ask the Court to bring
12. her back at a time to answer these issues.
13. MR. MERRIWEATHER: The notice we were told
14. about was not every single thing in connection that
15. Wyndham has with the State of Illinois.
16. MR. DELY: Excuse me. I was --
17. MR. MERRIWEATHER: I was not given notice
18. that you were going to depose her on what Wyndham
19. facilities we were going to have in Cook County or on
20. the Illinois Secretary of State website.
21. MR. NEMEROFF: These issues deal with the
22. issue of forum non-convenience.
23. MR. DELY: The interrogatories will clarify
24. for the record. The interrogatories sent by the
25. Plaintiff were all targeted towards the franchise

Page 107

1. agreement, as were every other interrogatory had to do
2. with the franchise.
3. MR. NEMEROFF: The whole reason why this
4. deposition is taking place and where Wyndham does its
5. business is directly relevant to the case law, to the
6. issue of whether or not this is going to stay in
7. Illinois or whether or not this is going to Mexico.
8. MR. DELY: I think what you're talking about
9. is every possible thing with the Illinois Secretary of
10. State. The questions are not --
11. MR. NEMEROFF: She is a person -- she's
12. saying that she is the person with the most knowledge on
13. this issue. Yet, she is not answering my question as
14. relates to this issue.
15. MR. DELY: You're just not happy with the
16. answer.
17. MR. NEMEROFF: I don't know at this time,
18. that is not an appropriate response when you are
19. identified as the person with the most knowledge.
20. Reasonable inquiry is at issue. It's absolutely
21. reasonable.
22. MR. DELY: And as long as the
23. interrogatory --
24. MR. NEMEROFF: This has nothing to do with
25. the interrogatories. This has to do with your

Page 108

1. identification. I want to know -- I want -- then I am
2. going -- I want to know who is going to be able to
3. answer my question to the corporate entities, wherein
4. they do business.
5. MR. DELY: She told you she is.
6. MR. NEMEROFF: She is not answering those
7. questions. That is exactly the problem. You identified
8. her as the person with the most knowledge.
9. MR. DELY: Your tone of sarcasm --
10. MR. NEMEROFF: My tone?
11. You know, with all due respect, we are going
12. to go into court and ask the Court to bring back this
13. witness who is identified as the person with the most
14. knowledge as to the various corporate entities of
15. Wyndham and where they do business.
16. Q. Ma'am, you are the person with the most knowledge
17. in the whole corporation as to whether Wyndham Hotel
18. Group International and Wyndham Hotel and Resorts LLC do
19. their business, correct?
20. A. Yes.
21. Q. And, yet, despite you identifying yourself as the
22. person with the most knowledge, you're unable to answer
23. questions as to where, what states and whether or not --
24. Number 1, whether or not Wyndham Hotel Group
25. International, Inc., and Wyndham Hotel and Resort LLC do

27 (Pages 105 to 108)

Page 109

1  business in the State Illinois; is that correct?
2     A. I don't recall you asking that question in that
3  way.
4     Q. Well, then I just asked that question. Can you
5  give me that answer?
6     A. Repeat the question, please.
7     Q. Yes. First of all, does Wyndham Hotel and Resort
8  LLC do business in the State of Illinois?
9     A. To my understanding of the phrase, yes.
10    Q. Does Wyndham Hotel Group International, Inc., do
11  business in the State of Illinois?
12       (Pause.)
13    A. As we sit here, I do not recall.
14       MR. DELY: The last question was asking in
15  regards to International, Inc.?
16       MR. NEMEROFF: That's correct.
17       MR. DELY: I believe she answered that she
18  did not believe so.
19       MR. NEMEROFF: She just answered, she
20  doesn't recall.
21    Q. Wyndham Hotel and Resorts, LLC, is a wholly owned
22  subsidiary of Wyndham Hotel Group International,
23  correct?
24    A. Correct. Nope.
25       MR. MERRIWEATHER: Well, as I sit here, I

Page 110

1  know that is not correct.
2       THE WITNESS: I'm sorry. I'm confused.
3       MR. NEMEROFF: With all due respect, Mark,
4  I'm not asking you questions under oath. I'm asking the
5  witness.
6       MR. MERRIWEATHER: I know the witness is
7  confused between the two entities, so you're getting a
8  lot of wrong answers. But I don't think that is going
9  to help you in your case.
10       MR. NEMEROFF: It is not your place to
11  correct her and testify on her behalf, with all due
12  respect.
13    Q. Ma'am, let's go to the Conversion Plan Report,
14  which I am going to mark as Exhibit Number 4.
15       (Whereupon, Deposition Exhibit No. 4 was
16  marked for identification.)
17    A. I have it.
18    Q. This is a report that was prepared concerning the
19  conversion of what was previously called the Hotel Reef
20  Club at Cozumel Island, Mexico, to a Wyndham Resort,
21  correct?
22    A. Correct.
23    Q. And do you know who the -- it says it was
24  prepared by Fernando Gonzalez Bernard. Do you know who
25  Mr. Bernard is?

Page 111

1     A. I do not recall that name.
2     Q. Do you know if he is an employee of a Wyndham
3  entity?
4     A. I am not sure.
5     Q. On the top, it says, "Wyndham Worldwide,"
6  correct?
7     A. Yes.
8     Q. What does "Wyndham Worldwide" --
9     A. Wyndham Worldwide is the ultimate parent.
10    Q. And then it says, "Wyndham Hotel and Resorts
11  Design and Construction," correct?
12    A. Yes.
13    Q. Looks like pictures were taken of the resort back
14  in April of '07, correct? At least, some areas of the
15  resort?
16    A. The date at the bottom of the page says April
17  '07.
18    Q. Actually, the bottom of every page says April,
19  April 25th, 2007?
20       MR. MERRIWEATHER: The witness is looking at
21  Page 4.
22    Q. Well, looks like on the bottom left of every page
23  it says 25, slash, 4, slash, '07, correct?
24    A. Without looking at every page, I believe so.
25    Q. And in order for what was previously known as the

Page 112

1  Hotel Reef Club to be converted to the Wyndham Resorts,
2  there were various things that had to be done to convert
3  it, correct?
4     A. Generally, that is correct.
5     Q. Islander Properties did not have the discretion
6  to follow or not follow these recommendations? If
7  Wyndham requested it, it had to be done, correct?
8     A. That is not correct.
9     Q. So you're telling me that Islander Properties
10  could have chosen to ignore every single component in
11  this conversion report, correct? Excuse me. This
12  conversion plan report.
13    A. Yes.
14    Q. Okay. And where in any of the agreements, other
15  than your interpretation of what you believe in the
16  independent contractor agreement, does it say that;
17  specifically, that they can choose to ignore items
18  brought up in the Conversion Plan Report?
19    A. I don't believe that sentence, per say, appears
20  anywhere. But as the independent contractor, they could
21  accept some, all or none of the items in the conversion
22  report.
23    Q. I see. Let me ask you a question. Does that say
24  that in the independent contractor section, that they
25  can accept -- under Section 21, Page 36 does it say

CARRIE CAPERS WORKMAN, JULY 2, 200

Page 113

1 anywhere specifically in the independent contractor
2 section that they can accept, reject any of the policies
3 that Wyndham has in any of its manuals?
4     A. Well, as an independent contractor, they own,
5 operate and control their facilities so they could make
6 any decisions that they so choose.
7     Q. No. My question wasn't your interpretation of
8 the independent contractor, ma'am. My question was in
9 Section 21 of the agreement, is there anywhere where it
10 specifically says that the franchisee does not have to
11 follow the terms of any of the manual?
12     A. It says franchisor owes franchisee no duties
13 except as expressly provided in the agreement. It also
14 says that the franchisee acknowledges, et cetera, and it
15 basically says that they will not be considered to be a
16 joint venture, partners, agents of each other.
17 Specifically acknowledge that the relationship created
18 by this agreement is not fiduciary, special or any
19 similar relationship.
20     Q. Right, ma'am. My question -- well, actually,
21 you're reading the last line of Subsection-A. Franchisor
22 owes no duties except as expressly provided in the
23 agreement, correct?
24     A. That's part of that section, yes.
25     Q. Right. So what is in the agreement controls the

Page 114

1 relationship between the franchisee and the franchisor,
2 correct?
3     A. In the entire agreement, correct.
4     Q. And incorporated into that agreement is the
5 Manual; is that correct?
6     A. The -- yes. The manual is incorporated into the
7 agreement.
8     Q. To your knowledge, has Wyndham, the franchisor,
9 pursued one of its franchisees for failure to comply
10 with the brand? As one of the components, anyway, for
11 failure to comply with the Brand Standards Manual?
12     MR. DELY: I'll object to the fact --
13     MR. NEMEROFF: I didn't ask --
14     MR. DELY: She can answer the question.
15     A. Repeat the question, please.
16     Q. Yes. My question was -- I forgot what my
17 question was. Oh. Has Wyndham, the franchisor, ever
18 sued one of its franchisees for failure to comply with
19 the Brand Standards Manual?
20     A. As I sit here today, I could not answer that
21 question.
22     Q. Why not?
23     A. I believe, as I stated earlier, I do not recall
24 or know of every issue that legal may have addressed
25 with regard to or whether they did address any issue

Page 115

1 regarding the brand standards.
2     Q. So the person with the most knowledge with regard
3 to Wyndham concerning litigation would be the General
4 Counsel, correct? I'm sorry, ma'am.
5     MR. MERRIWEATHER: She's trying to think of
6 your answer.
7     A. The person in my company who would know what
8 matters were subject to litigation would be the legal
9 department. The persons in the legal department.
10     Q. Let's look at the Brand Standards Manual.
11 Exhibit-3, please. Tell me when you're ready.
12     A. I am ready.
13     Q. Go to Page 4. Are you with me?
14     A. Yes.
15     Q. Second paragraph. It says: "All standards are
16 reviewed by Brand Management and will be modified and
17 updated based on continuing customer research." Next
18 sentence: "Non-compliant properties are subject to
19 default under their license agreement or management
20 contract. These standards will be applied throughout
21 the Wyndham Hotels and Resorts. Your property will be
22 subject to Quality Assurance inspections to ensure
23 compliance with these standards."
24     I've read that paragraph correctly. Is that
25 correct, ma'am?

Page 116

1     A. You read that -- I believe, you read it
2 correctly.
3     Q. Let me read it again so you can make sure I read
4 it correctly. Let's start at the beginning of Paragraph
5 2, Page 4, Exhibit-3, of the Brand Standards Manual.
6     It says: "All standards are reviewed by Brand
7 Management and will be modified and updated based on
8 continuing customer research," period. "Non-compliant
9 properties are subject to default under their license
10 agreement or management contract," period. "These
11 standards will be applied throughout Wyndham Hotel and
12 Resorts," period. "Your company will be subject to
13 quality assurance inspections to ensure compliance with
14 these standards," period.
15     I read that correctly, didn't I, ma'am?
16     A. It is correct that the only action that we could
17 take --
18     Q. Ma'am, all I asked is whether I read that
19 correctly; yes or no?
20     A. I would like to answer your question.
21     Q. Answer my question. Did I read that paragraph
22 correctly; yes or no? That's my question.
23     A. It is correct that --
24     Q. That's all I want to know. I will now ask you
25 other questions.

Page 117

1   MR. MERRIWEATHER: I want to say, we told
2   Chris that Valerie is not the person most knowledge
3   about the system standards manual, so just know that
4   when you're asking your questions.
5   MR. NEMEROFF: That's okay.
6   MR. MERRIWEATHER: We made that
7   representation.
8   MR. NEMEROFF: I'm glad to take this in
9   front of any Judge on this issue, so that's all right.
10  MR. DELY: She's testifying to her general
11  knowledge and --
12  MR. NEMEROFF: All I asked her was to read
13  something. That's all I asked.
14  MR. MERRIWEATHER: I'm just -- you've been
15  sarcastic before. She's not most knowledgeable on this
16  manual. That's all.
17  Q. So you're not most knowledge about whether or not
18  this manual needs to be complied with pursuant to the
19  terms of the contract; isn't that correct, ma'am?
20  A. No. I disagree with that statement.
21  Q. Okay. I think the words of the manual speak for
22  itself. The Wyndham, this Exhibit-3, is the Brand
23  Standards Manual that was in effect on October 16th,
24  2007. Is that correct, ma'am?
25  A. I believe so.

Page 118

1   Q. Were you involved in the drafting of this
2   document, Exhibit-3?
3   A. No.
4   Q. Were you involved in drafting of Exhibit Number
5   1, the franchise agreement?
6   A. No.
7   Q. Does your franchise agreement specify where
8   jurisdiction would be in case of a dispute?
9   A. On Page, Page --
10  Q. 42?
11  A. Yes.
12  Q. Well, here is my question, ma'am. Let me
13  rephrase that. You would agree with me that this
14  agreement between Islander Properties and Wyndham, the
15  contract calls for it to be governed and construed under
16  the laws of the State of New York, United States, except
17  for its conflicts and law principles, correct?
18  A. That is how the agreement reads.
19  Q. So if there is dispute under this contract,
20  Wyndham wants the dispute to be resolved in the United
21  States of America; is that correct?
22  A. That would be a legal interpretation that I would
23  defer to the legal department.
24  Q. Well, ma'am, it is in plain English there, ma'am;
25  is that correct?

Page 119

1   A. The sentence you read, you read correctly. The
2   interpretation, I would not want to make.
3   Q. Okay. Is there anywhere in the contract that
4   Wyndham entered into with its franchisee in Mexico, the
5   Cozumel property, that says that it will make itself
6   available to the jurisdiction of Mexican Courts?
7   A. I would have to read the agreement again to be
8   sure, but I do not believe that language is contained
9   therein.
10  Q. To your knowledge, in any dispute with a
11  franchisee in the country of Mexico, has Wyndham ever
12  allowed a Mexican Court to resolve its disputes?
13  MR. DELY: I'll object to foundation.
14  Q. To your knowledge, your personal knowledge,
15  ma'am?
16  A. My personal knowledge, I am not aware.
17  Q. Does Wyndham consider New York Courts to be less
18  congested than, say, Mexican Courts where this agreement
19  was with, the Mexican corporation?
20  A. I'm sorry. I could not answer that question.
21  Q. For purposes of conflicts between the franchisor
22  and franchisee pursuant to Exhibit Number 1, does
23  Wyndham consider New York Courts to be less congested
24  than Mexican Courts?
25  A. I apologize. I did hear you. I don't believe I

Page 120

1   can answer that question.
2   Q. Okay. You don't know the answer, do you, ma'am?
3   A. I don't know if that question could be answered.
4   I apologize. It is vague.
5   Q. Lawyers get paid a lot of money trying to resolve
6   that one little issue. So you have no evidence to
7   suggest that New York Courts are any less expedient in
8   resolving legal disputes concerning your agreement?
9   MR. DELY: Objection. This witness doesn't
10  have any idea regarding Mexican law. Actually, it is an
11  incomplete hypothetical, and she can answer it, but ...
12  MR. NEMEROFF: Just for the record, every
13  hypothetical is incomplete.
14  Q. You can answer my question.
15  A. I don't have any basis to answer that question
16  with any certainty.
17  Q. I'm sorry. What, ma'am?
18  A. I don't have any basis to answer that question
19  with any certainty.
20  Q. And you have no knowledge as to whether Mexican
21  Courts are more or less congested than, say, Federal
22  Court here in the Northern District of Illinois,
23  correct?
24  A. Personally, no, I do not.
25  MR. NEMEROFF: I should be done in a couple

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

Page 121

1  minutes.
2      Q. Let me ask you a question. When entering into
3  franchise agreements with -- ma'am, I am assuming that
4  the Cozumel resort is not the only Wyndham franchise
5  resort in Mexico, correct?
6      A. That is correct.
7      Q. Do you know how many Wyndham franchise resorts
8  there are in the country of Mexico?
9      A. Not from recollection, no.
10     Q. More than five?
11     A. I would not want to answer that from
12 recollection.
13     Q. Is there one in Puerto Vallarta?
14     A. I'm not comfortable of my recollection of city
15 names to answer that question, specifically, right now.
16     Q. How about the Puerto Vallarta area, ma'am?
17     A. I would not want to recall city locations by
18 recollection.
19     Q. So, as you sit here today, you have no -- you
20 really don't know where Wyndham has franchised -- I
21 mean, the person with the most knowledge about franchise
22 agreements and you don't know where Wyndham has
23 franchise agreements in the country of Mexico? Is that
24 what you're saying?
25     A. I could not recall right now specific city

Page 122

1  location in the -- city in Mexico.
2      Q. Why don't you try?
3      MR. MERRIWEATHER: Come on, Dave. We have
4  7,000 locations.
5      Q. That's my point. Why don't you start with some?
6  I can go on the internet and find out that information
7  in five seconds.
8      A. I would not want to recall from memory.
9      Q. You are the person with the most knowledge of
10 that issue. Give me the name of some Wyndham Resorts in
11 Mexico, ma'am. I realize I'm not going to hold you to
12 Puerto Vallarta versus Nuevo Vallarta. In the general
13 area of Acapulco, Cancun, Puerto Vallarta, Cancun. Name
14 the hot spots in Mexico, and I'm pretty confident you
15 will find a Wyndham franchise resort in one of them or
16 the general vicinity of one of them. Would that be fair
17 to say?
18     A. I think you have to understand as of today or
19 this moment there are sites that could have de-flagged,
20 so I would not be comfortable answering that question
21 from memory.
22     Q. When are you going to be comfortable answering
23 that question, ma'am, if you are not comfortable when
24 you are at deposition under oath?
25     A. I'm not sure if I understand the question.

Page 123

1      Q. If you are not comfortable at a deposition, which
2  you are required under oath to answer my questions, when
3  exactly would you be comfortable answering that
4  question?
5      A. After having the opportunity to research to the
6  second that I'm asked the question.
7      Q. So if we come back in a week and you were asked
8  to get that information, you could get that information
9  for me; is that correct?
10     A. With specific points in time, yes, I could.
11     Q. Are you aware of any franchise agreement with any
12 of Wyndham's franchise Mexican Resorts in which it
13 allows the laws of Mexico to govern those agreements?
14     A. No, I am not.
15     Q. Does the Wyndham Cozumel resort that is the
16 subject matter of this case have video cameras on its
17 premises?
18     A. I do not know.
19     Q. Not for its guests. I'm talking about fixed
20 video cameras to record things.
21     A. I do not know.
22     Q. Do you know whether or not my client, who is now
23 deceased, and his wife, were at the Wyndham Cozumel
24 Resort in October of 2007 on business or on personal
25 vacation?

Page 124

1      A. No, I do not.
2      Q. Does Wyndham employ Spanish interpreters to help
3  in its communication with either its prospective or its
4  customers in Mexico?
5      A. Well, Wyndham does not have customers in Mexico,
6  because we don't own or operate hotels.
7      Q. Its customers are its -- let's define that.
8  Customers are its franchisees, ma'am. Does Wyndham hire
9  or does Wyndham employ interpreters to communicate with
10 its franchisee customers?
11     A. Not to my knowledge.
12     Q. How does Wyndham communicate with its franchisees
13 then in Mexico? In English?
14     A. Written communications are sometimes in English
15 and sometimes in Spanish.
16     Q. Specifically, with regard to the Cozumel resort
17 that is the subject matter of our lawsuit, do you know
18 whether or not the ownership of that resort can either
19 speak or read English?
20     A. I do not know.
21     Q. As we sit here today, you do not know who my
22 client booked their trip through, correct?
23     A. As I sit here today, I do not.
24     Q. Can a prospective vacationer book a vacation in
25 Mexico directly through Wyndham?

31 (Pages 121 to 124)

Page 125

1    A. Could you rephrase the question, please?

2    Q. Yes. My question is: Can a prospective

3  vacationer sometimes who wants to go to a Wyndham

4  franchise resort in Mexico book their vacation directly

5  through Wyndham or one of Wyndham's entities?

6    A. Yes.

7    Q. And how would somebody do that?

8    A. It could take place via the web, via phone,

9  generally speaking, or directly with the franchisee's

10  website or directly with the franchisee's phone.

11    Q. You would agree that one of the purposes of a

12  franchisor/franchisee agreement for a resort is to take

13  advantage of the Wyndham brand?

14        MR. DELY: I would -- can you repeat that

15  question?

16    Q. Ma'am, you would agree that one of the reasons

17  why franchisors and franchisees enter into these

18  agreements with Wyndham is to take advantage of the

19  Wyndham brand?

20        MR. DELY: I'll object to the foundation for

21  the franchisee.

22        MR. NEMEROFF: You can answer, ma'am.

23    A. I would -- one of them -- I'm sorry. Can you

24  repeat the question. One of the reasons --

25    Q. Let me break this down into two questions. Would

Page 126

1  you agree that the Wyndham brand is very important to

2  Wyndham and its corporate entities?

3    A. Yes.

4    Q. And it is the Wyndham brand that is one of the

5  things that Wyndham markets to its prospective

6  franchisees, correct?

7    A. Yes.

8    Q. And Wyndham goes to great lengths to develop a

9  brand that the public will have confidence in, correct?

10    A. I, I disagree with the use of the word,

11  "confidence".

12    Q. So you don't think that one of the things that

13  the Wyndham does is to develop its brand so that the

14  public will have confidence in the hotels that

15  vacationers and others choose?

16    A. Correct. I disagree with the word, "confidence".

17    Q. Okay. Did you read your own manual?

18    A. As I stated earlier, I am not the person with the

19  most knowledge of the contents of the manual.

20    Q. Okay. You should read it. Would you agree with

21  me, Wyndham does research on its brand, correct?

22    A. Could you rephrase the question, please?

23    Q. Yes. Wyndham does research about its brand?

24    A. I'm not sure if I understand the question.

25    Q. Well, does Wyndham conduct focus groups about its

Page 127

1  brand?

2    A. I do not know whether focus groups is a vehicle

3  used.

4    Q. Do you know what market research is, ma'am?

5    A. Yes, I do.

6    Q. Does Wyndham do market research concerning its

7  brand?

8    A. Yes.

9    Q. And the purpose of market research is to allow

10  Wyndham to best position itself to -- at least, one of

11  the purposes is to best position itself so that

12  perspective travelers stay at Wyndham branded hotels and

13  Resorts, correct? One of the purposes?

14    A. I disagree. That is not correct.

15    Q. So Wyndham doesn't care whether vacationers and

16  travelers stay at its branded hotels, correct?

17    A. I disagree. That is not correct.

18    Q. You agree that Wyndham does care whether

19  vacationers and conventionees and other people that

20  travel stay at its hotels, correct?

21    A. Well, Wyndham does not have hotels. Wyndham --

22    Q. Wyndham branded hotels, ma'am.

23    A. Wyndham is -- we are concerned as to whether

24  franchisees' guests stay at the hotels. That is an

25  interest of ours.

Page 128

1    Q. And not only is it an interest of yours, Wyndham

2  pursuant to its agreement gets a percentage of the

3  revenue for those guests staying at its franchised

4  properties, correct?

5    A. That is generally correct.

6    Q. Ma'am, the whole point of having this

7  franchisor/franchisee -- I take that back. It is not

8  the whole point. One of the main points of having this

9  franchisor/franchisee agreement is so that the public

10  who is looking for a hotel or resort believes that

11  they're staying at a Wyndham property?

12    A. I disagree.

13    Q. Okay. So you think that if my client thought

14  that this -- well, strike that. You don't know what my

15  client thought, so you don't think one of the main goals

16  of Wyndham in entering into franchise agreements is to

17  develop a product, i.e., the Wyndham name, that people

18  are at attracted to?

19    A. That is not the purpose of a franchise agreement.

20    Q. Who is the vice president of marketing for

21  Wyndham?

22        (Pause.)

23    A. I am not recalling a name of a VP of marketing.

24    Q. Is there a marketing department?

25    A. There are, there are individuals who have

32 (Pages 125 to 128)

Page 129

1  marketing responsibilities, yes.
2  Q. You can't name somebody that has marketing
3  responsibility?
4  A. That, that would roll up into Jeff Smith.
5  Q. And into what? I'm sorry.
6  A. Jeff Smith.
7  Q. Let's go to Page 43 of the agreement.
8       MR. MERRIWEATHER: All right, David. We're
9  approaching 7:00 o'clock here.
10      MR. NEMEROFF: I am wrapping up, but I'm
11  going to finish up. I am not going to walk away. I
12  would like to finish up.
13  Q. Could we go to Page 43, please?
14  A. I am there.
15  Q. You are there? Section 29.
16  A. Yes.
17  Q. Subsection-B, correct?
18  A. I see it.
19  Q. It says, "Franchisee agrees that, for the system
20  to function properly, Franchisor and its affiliates
21  should not be burdened with the cost of arbitrating or
22  litigating system wide claims." Correct?
23  A. It does say that.
24      MR. NEMEROFF: Just give me one more minute.
25  I'm almost done.

Page 130

1  Q. Page 47, ma'am. Tell me when you're ready.
2  A. I'm there.
3  Q. Section 31.6, "Adherence to System Standards."
4  It says: "Notwithstanding the provisions set forth in
5  Section 6 hereof, the parties acknowledge and agree that
6  as Franchisor shall be operating the Hotel as an
7  All-Inclusive Hotel, Franchisee shall seek approval from
8  Franchisor as necessary to be granted waivers from
9  adhering to some of the requirements set forth in
10  Section 6A, D and E requiring strict adherence to the
11  Systems standards, which approval shall not be
12  unreasonably withheld. However, Franchisee shall at all
13  times maintain substantial conformity to the System
14  standards, despite any waivers approved by the
15  franchisor."
16      I've read that correctly, ma'am; is that correct?
17  A. Yes.
18  Q. Do you know who Carlos Del Pino is?
19  A. In the license agreement it says, managing
20  director title.
21  Q. Have you ever met Mr. Del Pino?
22  A. No.
23  Q. Who would have contact -- in other words, who
24  within Wyndham would have contact with Mr. Del Pino or
25  whoever from Islander Property's is responsible for

Page 131

1  their property?
2  A. That question would be difficult to answer the
3  way you phrased it.
4  Q. Well, would that be typically QA?
5  A. I couldn't answer with specifics to Mr. Del Pino.
6  Q. Well, my question was, or anyone else at Islander
7  Properties that they so designate.
8  A. I apologize. But you need to rephrase the
9  question so that I can answer it.
10      MR. MERRIWEATHER: Can you narrow it down to
11  what topic?
12      MR. NEMEROFF: I don't know what the various
13  topics are that come up in this relationship.
14  A. I would say, to answer the general question, the
15  -- in most instances the QA department or individuals
16  charged with QA would most likely have interaction with
17  the individual that the owner has designated as the GM
18  or relevant or closer to GM responsibilities.
19  Q. Okay. Let me just look at my list here and I
20  should just about be done. Sorry.
21      (Pause.)
22  Q. Ma'am, do you know why Wyndham in its franchise
23  agreements requires jurisdiction in the United States,
24  but when it's sued for personal injury or wrongful death
25  wants the case litigated -- let me say it again.

Page 132

1       Ma'am, do you know why when Wyndham has a legal
2  issue with one of its franchisees its contract
3  stipulates that it will be litigated in the United
4  States, and, yet, when Wyndham gets sued for personal
5  injury or wrongful death case, it wants a Mexican Court
6  to make decisions about the case?
7       MR. DELY: I am just going to object to
8  form. It was a completely cause of action. Form and
9  foundation. You can answer subject to those objections.
10  A. Well, I can't answer that question, because I
11  don't know whether the statement that you made is
12  correct or true.
13  Q. Okay. Well, in this agreement for this property
14  Wyndham wants any disputes with its franchisees
15  litigated in the United States. Yet, for personal
16  injury and wrongful death that is filed in this case at
17  that same resort it wants its disputes resolved in a
18  Mexican Court; not a United States Court. Do you know
19  why that is?
20      MR. DELY: The same objections. Form and
21  foundation.
22  A. I would have to say, again, I'm not comfortable
23  with the way you're phrasing the question is true, so I
24  can't answer that.
25      MR. MERRIWEATHER: Can you point --

33 (Pages 129 to 132)

Page 133

1    Q. The contract stipulates that the disputes
2  involving the franchisor and franchisee for this Cozumel
3  resort is in the United States, correct? We already
4  discussed that at 42?
5    A. Yes. Generally, that's -- let me go back to 42,
6  just to be sure.
7        MR. MERRIWEATHER: Just to move this along,
8  where on the page does this say that, so she can see it?
9        MR. NEMEROFF: Did you have it, 42? State
10  of New York, U.S.A.?
11       MR. MERRIWEATHER: Says nothing as to be
12  litigated in the United States.
13       MR. NEMEROFF: Well, in terms of
14  mediation -- let me see. In terms of mediation, it
15  shall be conducted in the jurisdiction of Miami,
16  Florida, U.S.A..
17       MR. MERRIWEATHER: Says litigation should be
18  where jurisdiction could be found. It could be Mexico.
19  Doesn't have to be U.S.. That's what the conflict is.
20  She doesn't agree with the basis of your statement.
21       MR. NEMEROFF: I think any lawyer looking at
22  this would determine that it has to be litigated in New
23  York, but that is another issue.
24    Q. In fact, this agreement limits the franchisees'
25  rights to even have a jury trial, correct?

Page 134

1    A. Could you show me where you are, please?
2    Q. Page 29. Excuse me. Page 43, Section 29.
3    A. States the parties hereby waive their respective
4  rights to a jury trial.
5    Q. Right.
6        MR. NEMEROFF: All right. I think I'm done.
7  Thank you.
8        MR. DELY: I've got a couple quick things to
9  just follow-up on quickly.
10  BY MR. DELY:
11    Q. If you could just take a look, if you would, at
12  Section 21.
13    A. Yes.
14    Q. And if you look at --
15       MR. NEMEROFF: What page?
16       MR. MERRIWEATHER: 36.
17    Q. I would like you to go to Page 37, under Section
18  3?
19    A. Yes.
20    Q. Okay. And it says, "Franchisor does not exercise
21  any discretion or control over the employment policies
22  or employment decisions of franchisee. All employees of
23  franchisee are solely employees of franchisee, not
24  franchisor. Franchisee is not franchisor's agent for
25  any purpose in regard to Franchisee's employees or

Page 135

1  otherwise."
2        My question is based on that. First of all, did
3  I read that correctly?
4    A. Yes.
5    Q. My question is based on that. Are employees at
6  the Cozumel properties always are -- are employed by
7  Islander Properties, correct?
8        MR. NEMEROFF: Objection. Foundation.
9    A. Because of the section that you read, I couldn't
10  even answer that question. They're not employees of
11  Wyndham.
12    Q. Well, that was going to be my next question. To
13  your knowledge, they're not employees of Wyndham,
14  correct? ·
15    A. Correct.
16    Q. And as far as employees of Wyndham goes with
17  knowledge of this incident, is anybody in New Jersey, to
18  your actual knowledge, had been a witness to this
19  incident?
20    A. Not to my actual knowledge.
21    Q. And had anybody attended the inquest or gotten
22  copy of the autopsy report?
23    A. No, not to my actual knowledge.
24    Q. And do you know if anybody had any role in doing
25  did any type of investigation?

Page 136

1    A. No, not to my knowledge.
2    Q. Now, materials then from an investigation would
3  not be located in New Jersey, correct?
4    A. No. We did not conduct any investigation.
5    Q. And so you have no materials on any investigation
6  there, because you didn't do one?
7    A. Not to my knowledge.
8    Q. Now, you have no knowledge whether Islander
9  Properties did an investigation, do you?
10    A. No.
11    Q. But if they did, you don't have those materials,
12  correct?
13    A. No, we do not.
14    Q. And those materials would be presumably in
15  Mexico, correct?
16    A. I do not know where they would be.
17    Q. And, as far as any contractors who the people at
18  Islander Properties had come in to do work on the hotel
19  as far as cleaning and maintenance, Wyndham would have
20  no knowledge of who those companies were, correct?
21    A. No. Not not from -- no.
22    Q. And you wouldn't have any knowledge of any
23  companies that were brought in by Islander Properties
24  and whether or not they performed their duties
25  correctly, correct?

34 (Pages 133 to 136)

Page 137

1    A. We definitely would not know that.
2    Q. And you wouldn't know whether or not how often or
3    how many times Islander Properties had to change
4    different contractors who were involved in maintaining
5    the property, correct?
6    A. We would have no knowledge of that, whatsoever.
7    Q. Okay. And Wyndham would also have no knowledge
8    of whether or not anybody at the Islander Properties
9    did, in fact, make changes to who they had doing their
10   maintenance, correct?
11   A. They would not, no.
12   Q. And as far as the Brand Standard Manual, Counsel
13   read for you a small portion. If you could grab that
14   for me, on Page 4?
15   A. I'm there.
16   Q. And it says -- this excerpt that Counsel read to
17   you, "Non-compliant properties are subject to default
18   under their license agreement or management contract".
19   Now, that says, "subject to default," correct?
20   A. Yes, it does.
21   Q. It doesn't say, "will be"?
22   A. Correct.
23   Q. It doesn't say, "automatically are," correct?
24   A. Correct.
25   Q. And, as far as a relationship with its

Page 138

1    franchisees, you mentioned earlier from time to time
2    that waivers could be involved?
3    A. At any time any franchisee can request a waiver.
4    Q. And whether or not one occurred would be a
5    decision that's made between the franchisee and the
6    franchisor, correct?
7    A. Correct.
8    Q. The waiver wasn't unilaterally decided if a
9    meeting was had between the two on any type of a waiver?
10   A. Could you repeat that question, please?
11   Q. A meeting was had on whether or not any type of a
12   waiver would be allowed?
13           MR. NEMEROFF: Objection, foundation. No
14   idea --
15   Q. If you know, in a meeting, if you know the
16   mechanism for how a waiver would be allowed, could you
17   please describe it?
18   A. Well, the, the mechanism to request a waiver is
19   simply to request a waiver.
20   Q. And then however the parties work that request
21   out, can you speak to that, at all?
22   A. It would vary from instance to instance.
23   Q. This property is located in Mexico, and it deals
24   with the property that was constructed in 1996, correct?
25   Or at least it was constructed -- let me phrase that.

Page 139

1    This property was constructed before it became a
2    Wyndham, correct?
3    A. It was in existence before it was franchised with
4    Wyndham.
5    Q. And the Wyndham had no input as far as any
6    contractors who were involved in building this hotel,
7    correct?
8    A. Correct.
9    Q. And it would stand to reason that any information
10   regarding the construction of this particular property
11   would be Islander Properties. They would be the entity
12   who would know, correct?
13           MR. NEMEROFF: Objection, foundation.
14   A. I could not say who would know.
15   Q. Would it be safe, then, to assume that someone in
16   Mexico might know because the property is in Mexico?
17   A. It would be safe to assume that someone in Mexico
18   might know. I know we would not know.
19   Q. As far as the section that Counsel had you read
20   -- I'm sorry to be flipping around here, but I'm trying
21   to wrap up as quickly as possible for all of us.
22          On Page 42, regarding Section A, the question
23   about New York, the laws of the State of New York,
24   except for its conflict of laws principle, the clause is
25   -- I am going to read it, and you'll agree, states this:

Page 140

1    "This Agreement will be governed by and construed under
2    the laws of the State of New York, U.S.A. except for its
3    conflict of laws principle." Is that correct?
4    A. That's what it states, correct.
5    Q. It doesn't say all litigation involving this
6    contract will be in the State of New York?
7    A. Does not state that.
8    Q. As far as your affidavit, if you could, please,
9    take a look at that? Instead of having you read every
10   sentence into the record, I just would like to know if
11   you've had a chance to review this affidavit?
12   A. Yes.
13   Q. And are the contents of the affidavit true and
14   correct at the time you executed it, your knowledge,
15   then?
16   A. Yes. To the best of my knowledge.
17   Q. The states regarding the fact that there was no
18   ownership interest on behalf of Wyndham entities. That
19   is true and correct?
20   A. Correct.
21   Q. And as far as maintenance of the subject
22   property, that was not something that Wyndham had
23   control over, correct?
24   A. No control. No involvement.
25   Q. And as far as any employees of the Islander, we

Page 141

1  even covered the fact that you may not know who hired
2  them, but you know Wyndham didn't, correct?
3      A. Correct.
4          MR. DELY: Thank you. Those are all the
5  questions I have.
6          MR. NEMEROFF: I just have a few follow-up
7  questions.
8  BY MR. NEMEROFF:
9      Q. There is no doubt that Wyndham employees have
10 been to the Cozumel resort, correct?
11     A. Could you rephrase the question, please?
12     Q. Yes. Ma'am, Wyndham employees for business
13 purposes have been to the Wyndham Cozumel All-Inclusive
14 Resort, correct?
15     A. I believe so.
16     Q. And there is an ongoing communication between
17 Wyndham and the owners of the resort; isn't that
18 correct?
19     A. I don't know if I would agree with that
20 statement.
21     Q. Well, ma'am, Wyndham sends new standards and
22 changes in standards to the franchisee, correct?
23     A. Standards information is sent to the franchisee.
24 Right.
25     Q. And, for example, if a customer calls up Wyndham

Page 142

1  and complains about the Franchisee's property, Wyndham
2  contacts that franchisee about that problem; is that
3  correct?
4      A. If we receive a call, we would contact the
5  franchisee, generally.
6      Q. Okay. And, in fact, inspections are done at the
7  property by Wyndham, correct?
8      A. If the property is inspected, it would be done by
9  Wyndham.
10     Q. Right. And on Page 24 of the agreement -- tell
11 me when you get there.
12     A. I'm there.
13     Q. Under Section E, Wyndham has a right to audit the
14 books, records, accounts, tax returns of the franchisee
15 related to the operation of the hotel from and after the
16 opening date; isn't that correct?
17     A. Generally, correct. With -- subject to the
18 reasonableness that was stated in the sentence.
19     Q. Okay. So if Wyndham wanted to get records of who
20 was doing maintenance of different areas of the hotel,
21 they have a right to do so; isn't that correct?
22         MR. DELY: I object to form and --
23         MR. NEMEROFF: All records, books, accounts,
24 blah, blah, blah.
25     A. Could you -- I'm sorry. I know it is late, but

Page 143

1  could you repeat that question, please?
2      Q. If the franchisee hired an outside company to do
3  maintenance work on the property, buff the floors or do
4  whatever, as part of its audit rights Wyndham has a
5  right to get copies of all bills that were paid by
6  franchisee, correct? That would be a record?
7      A. I'm not sure I agree with that statement.
8      Q. You don't really know, do you, ma'am?
9      A. I'm not sure I agree with your statement.
10     Q. My question is, you really don't know, because
11 that's not part of your job responsibility, is it,
12 ma'am?
13     A. I'm not sure if I agree with your statement.
14     Q. Ma'am, my question is, is that part of your job
15 responsibly to conduct audits of the franchisees?
16     A. You mean, my personal, day-to-day responsibility.
17     Q. My question was, is it your responsibility in
18 your job to conduct audits of the franchisee, financial
19 audits?
20     A. Well, there is no Wyndham whose responsibility it
21 is to conduct audits. We have the right to, but there
22 is no one responsible for conducting audits, because we
23 have no say in the day-to-day operations of the
24 franchisee.
25     Q. Ma'am, let me speak a little slower. Please,

Page 144

1  listen to my question.
2      Is it part of your responsibility to conduct
3  financial audits of the franchisee, your responsibility,
4  you personally?
5      A. No. It is not my responsibility.
6      Q. In fact, Wyndham receives a monthly report of the
7  franchisee's expenses; isn't that correct?
8      A. That is not correct.
9      Q. Okay. I'm sorry. Every month it receives a
10 report of the gross package revenues, the source and
11 amounts of other revenues generated at the hotel, room
12 occupancy and rates, reservations data and some other
13 data and information as franchisor may require, correct?
14     A. It is the franchisee's responsibility to send
15 those monthly. That does not necessarily mean that we
16 receive them monthly.
17     Q. I see. Ma'am, isn't that how Wyndham keeps track
18 of how much it is owed under the contract as a
19 percentage of the gross package revenues?
20     A. If the franchisee submits the monthly report,
21 yes. That would be how we determine what the monthly
22 fee would be.
23     Q. And what if they don't submit the information of
24 the gross package revenues? Then how does Wyndham
25 determine what its percentage of its fee is?

36 (Pages 141 to 144)

Page 145

1    A. The answer to that question would generally
2  depend on how, how they had previously or whether they
3  had previously complied with the monthly report.
4    Q. So that Wyndham would look at prior reports to
5  determine current gross package revenues? Is that what
6  you're saying?
7    A. No.
8    Q. All right. Ma'am, those franchisees are required
9  to send the revenues, because that is the only way that
10 Wyndham can determine what it's entitled to under the
11 terms of the contract financially; isn't that correct?
12   A. The licensees are required to send the monthly
13 reports because that is the way the monthly fee is
14 calculated.
15   Q. In fact, franchisees are also required to send a
16 balance sheet in an unaudited quarterly profit and loss
17 statement; isn't that correct?
18      MR. MERRIWEATHER: He's looking at C.
19   A. Generally correct.
20   Q. There is an ongoing communication between the
21 franchisor and the franchisee; is that correct, ma'am?
22   A. Yes. Generally, yes.
23      (Discussion off the record.)
24      MR. MERRIWEATHER: Nothing you have asked
25 was in the scope of what was on redirect.

Page 146

1    Q. Ma'am, with regard to -- ma'am, do you have
2  complete knowledge as to what Wyndham did with regard to
3  communication about this lawsuit with its franchisee?
4    A. Could you repeat that question, please?
5    Q. Yes, ma'am. As we sit here today, do you have
6  knowledge as to what Wyndham did with regard to
7  communication about the facts or events that are the
8  subject matter of the lawsuit that we're here for today?
9    A. I do not understand the question.
10   Q. My question is: You don't know whatever person
11 involved with Wyndham has done in terms of investigating
12 the facts of the lawsuit involving my client and Wyndham
13 at the Cozumel resort, do you?
14   A. To my knowledge, no one from Wyndham has
15 investigated this incident.
16   Q. You don't know whether the general -- have you
17 spoken to the General Counsel about whether Wyndham has
18 investigated this accident?
19      MR. DELY: I object because asked and
20 answered. She said, to her knowledge, no one has done
21 it.
22      MR. NEMEROFF: Good.
23   Q. My question is: Have you spoken to the General
24 Counsel or anyone, any of the lawyers in the General
25 Counsel's office at Wyndham about whether an

Page 147

1  investigation has been done?
2      MR. DELY: And she's asked and answered it.
3  A lawyer is part of everybody.
4      MR. MERRIWEATHER: I would just caution her
5  not to reveal any subject of --
6      MR. NEMEROFF: I'm asking. I'm not asking
7  what they have told her.
8    A. I'm not comfortable answering that question.
9    Q. Well, I am going to ask you to answer it or I'm
10 going to certify the question and ask Judge Levkow to
11 force you to answer it.
12      MR. DELY: It's been asked and answered.
13 General Counsel is part of everybody.
14      MR. NEMEROFF: Don't make a speaking
15 objection.
16   Q. I would ask you to answer the question, ma'am.
17   A. I'm not comfortable with answering the question
18 regarding conversations with Counsel at Wyndham.
19   Q. I didn't ask you what the contents of those
20 conversations were. I asked you whether or not you've
21 had any conversations concerning whether Wyndham has
22 conducted investigation?
23   A. I apologize. But I don't see the difference.
24      MR. MERRIWEATHER: Well, you can answer,
25 Valerie, if you've had the conversation. Just don't

Page 148

1  reveal, if you did have the conversation, about what you
2  actually discussed.
3    A. I have not had that conversation with General
4  Counsel at Wyndham.
5    Q. And when you say, "General Counsel," not only
6  General Counsel but all of the lawyers at Wyndham,
7  correct?
8    A. No. I meant the General Counsel.
9    Q. I know exactly what you meant, ma'am.
10      MR. DELY: That was the question you asked.
11      MR. NEMEROFF: No, I did not. I actually
12 said General Counsel or any of the lawyers that are at
13 Wyndham.
14      MR. DELY: Well, clarify.
15   Q. Have you had any conversations with any of the
16 lawyers for Wyndham, Wyndham's legal department, from
17 the General Counsel on down, concerning whether Wyndham
18 had conducted any investigation of the event that
19 include my lawsuit on behalf of my clients against
20 Wyndham?
21      MR. DELY: You can answer. Just don't
22 reveal any substance of any conversations with Wyndham
23 attorneys.
24   A. The topic did come up.
25   Q. Who did you speak to in the legal department?

37 (Pages 145 to 148)

Page 149

1    A. I do not recall right now.
2        MR. MERRIWEATHER: I am going to have to
3    say, I am going to end this in a minute. It is 7:30 in
4    a minute here.
5        MR. NEMEROFF: We'll come back.
6        MR. MERRIWEATHER: This is ridiculous.
7        MR. NEMEROFF: The Federal rules allow me
8    the ask my questions. There is no time limits. We've
9    only been at this for a relatively short period of time.
10       MR. MERRIWEATHER: Then we'll come back. It
11   is 7:30 here. We'll bring her back another day. I'm
12   not saying I'm ending it right now.
13       MR. DELY: All due respect, everybody has
14   been very accommodating. We've put in a long day.
15   We're getting close to the end here. Let's push
16   through. But this line of questioning is -- we've been
17   over it before. You've asked it before.
18       MR. NEMEROFF: You know what. The nice part
19   about being a lawyer representing a client, I'll make
20   the decisions as to what I think is relevant. And I
21   will do that. You can tell her if you don't think that
22   she should answer. Then you tell her not to answer. I
23   will abide by what you say. I'll certify the question
24   and then we will go to Judge Levkow and make a
25   determination whether you are right or wrong.

Page 150

1        MR. DELY: Let's get to the end of this. We
2    have had enough of this.
3        MR. NEMEROFF: That's what my point is. I
4    am going to ask questions I think are relevant. If you
5    think it is not relevant or she shouldn't answer it, by
6    all means, tell her not to. I'll certify it and I'll
7    ask the Judge.
8        MR. DELY: I know you enjoy making these
9    statements. Let's continue with the next question and
10   get this over with.
11   Q. One of your job responsibilities is not to
12   investigate accident claims against Wyndham, correct?
13   A. Can you rephrase that question, please?
14   Q. I'll speak slower, ma'am. One of your job
15   responsibilities, your job responsibilities does not
16   include investigating accident claims for personal
17   injury or wrongful death filed against Wyndham; isn't
18   that correct?
19   A. Correct. But before a question, I need to have a
20   break, please.
21   Q. Well, no, no. Not in the middle of a question,
22   with all due respect.
23       MR. MERRIWEATHER: She just finished
24   answering the question.
25   Q. I didn't hear the answer. I didn't hear the

Page 151

1    answer?
2    A. I can't even remember the question now.
3    Q. Could you repeat the question? I'll be glad to
4    let you take a break.
5    A. I did answer, sir. I just don't ...
6        MR. DELY: Can you ask the court reporter to
7    reread the answer then?
8        THE WITNESS: May I take a break now,
9    please?
10       MR. MERRIWEATHER: The witness is very
11   tired. I don't think any judge is going to expect
12   someone to stay until ridiculous hours when they're
13   tired.
14       MR. NEMEROFF: I'm not insisting that we
15   proceed beyond right now. Counsel for Wyndham here
16   would like us to proceed.
17       MR. DELY: Then we are done, if that is
18   going to be it. Then we're done for the day, and we'll
19   reconvene at a later time.
20       MR. NEMEROFF: That's fine with me.
21       MR. DELY: You asked the questions beyond
22   the scope.
23       MR. NEMEROFF: I'm not limited to the scope
24   of -- this is not trial. I'm not limited in scope of
25   the redirect in a discovery deposition.

Page 152

1        MR. DELY: You are assuming.
2        MR. NEMEROFF: That's fine. You know what?
3    You guys want to terminate it. That's fine. But we
4    will ask and come back at another time. It is -- just
5    for the record it is 6:28 here, Chicago time. This
6    deposition was scheduled to start at --
7        MR. DELY: 2:00 p.m., Central time.
8        MR. NEMEROFF: I think we started a little
9    bit past there. But not all that far past there. We've
10   been at it for the better part of a four hours.
11       MR. DELY: How close are we?
12       MR. NEMEROFF: I don't know. You guys want
13   to terminate it?
14       THE WITNESS: I need to step out to go to
15   the rest room.
16       MR. NEMEROFF: That's fine. You guys want
17   to terminate it, that's fine. We're done. We will come
18   back another time and finish it.
19       MR. DELY: Okay.
20       MR. NEMEROFF: One thing I need to know is,
21   I don't know have the court reporter's name.
22       Are you ordering?
23       MR. DELY: Well, you know what? Can I get
24   your contact information? I am probably going to order
25   an E-Tran only, with a mini.

38 (Pages 149 to 152)



Page 153

1.         MR. NEMEROFF: As soon as he orders, then
2. I'll take a copy. I just want a mini only.
3.         MR. DELY: Actually, you know what, give me
4. the E.
5.         MR. NEMEROFF: I will take a copy of a mini
6. and an E-Tran, too. My e-mail, plaintiff lawyer, is
7. j-u-r-y-m-a-n, with the Number 1, at AOL dot com.
8.         MR. DELY: Mine is Christopher dot d-e-l-y
9. at Wilson Elser dot com.
10.         (Whereupon, the Deposition was adjourned at
11. approximately 7:37 p.m..)
12.
13.
14.
15.
16.
17.
18.
19.
20.
21.
22.
23.
24.
25.

Page 154

1.         C E R T I F I C A T E
2.
3.
4.
5.     I, JAMES A. KORWAN, a Certified Shorthand
6. Reporter and Notary Public of the State of New Jersey,
7. do hereby certify that prior to the commencement of the
8. examination, the witness was duly sworn by me to testify
9. the truth, the whole truth, and nothing but the truth.
10.     I FURTHER CERTIFY that the foregoing is a true
11. and accurate transcript of the testimony as taken
12. stenographically by and before me at the time, place and
13. on the date hereinbefore set forth, to the best of my
14. ability.
15.     I FURTHER CERTIFY that I am neither a relative
16. nor employee nor attorney nor counsel of any of the
17. parties to this action, and that I am neither a relative
18. nor employee of such attorney or counsel, and that I am
19. not financially interested in this action.
20. Dated: July 9, 2008
21.
22.
23.
24.     JAMES A. KORWAN, CSR NO. 1800
25.

39 (Pages 153 to 154)

**A**

abide 149:23
ability 154:14
able 61:21 70:1 85:15
   104:8 106:10 108:2
about 9:23 10:9 13:9
   17:9 21:10 30:23
   31:1 32:11 33:12
   43:14 48:5,11 63:3
   64:10,25 65:7,18,19
   65:21 66:24 68:10
   70:4 71:22 72:18
   73:12,20 75:4
   82:12 84:15,16
   91:21 94:3,7,21
   96:13,15 101:2
   102:24,25 104:9,25
   105:5 106:9,14
   107:8 117:3,17
   121:16,21 123:19
   126:23,25 131:20
   132:6 139:23 142:1
   142:2 146:3,7,17,25
   148:1 149:19
above 37:5 55:3
above-captioned 1:15
absolutely 18:3 43:10
   46:15 53:16 73:23
   107:20
Acapulco 122:13
accept 112:21,25
   113:2
acceptance 39:20
access 77:2
accident 99:21 100:1
   100:5,11,22 101:2
   101:10,18 102:19
   103:6 146:18
   150:12,16
accommodating
   149:14
according 48:25
account 36:7,11,23
   37:9,14,21
accounts 142:14,23
accurate 9:13 23:8
   42:12 71:14 92:20
   154:11
accurately 43:23
acknowledge 113:17
   130:5
acknowledged
   105:20
acknowledges 39:16
   79:4,7 113:14
act 6:11
action 1:2 54:23
   116:16 132:8
   154:17,19

activities 86:17,24
   87:2
actual 18:20 49:17
   64:10 135:18,20,23
actually 18:2 34:12
   57:3,9 64:18
   111:18 113:20
   120:10 148:2,11
   153:3
add 5:2
added 19:14
addition 12:7 35:9,12
   54:23 76:23
Additional 86:13
address 5:7,8 114:25
addressed 4:12 75:14
   114:24
adherence 39:13
   130:3,10
adhering 130:9
adjourned 153:10
administer 78:9
administration 5:14
   9:10,18
administrator 1:4
   4:16
admitted 98:21
adult 77:5
advantage 125:13,18
advertise 89:2,23
advertisement 16:17
advertisements 81:21
advertising 86:16
advice 99:3,6,12
affidavit 3:11 8:18
   9:7 10:8,13,21,25
   17:16 20:14,21,24
   21:19,20,21 22:1,9
   42:1 52:8,19 53:1,2
   53:20 55:6,8,23
   56:5,7 95:17 140:8
   140:11,13
affidavits 3:19 21:25
   42:2,17,19 43:2,16
affiliated 19:7 86:24
   87:6 100:21 101:25
affiliates 86:19 87:1
   129:20
afield 99:15
after 12:21 27:15
   29:5 34:2,11 123:5
   142:15
again 21:19,25 31:7
   38:10 40:18 44:4
   45:12 46:21 47:24
   52:12 55:17 57:6
   66:7 73:18 85:14
   87:24 89:20 116:3
   119:7 131:25

132:22
against 4:18 148:19
   150:12,17
agent 85:10 134:24
agents 77:7 79:6 83:6
   83:9,20,22 84:3,22
   113:16
agree 12:18 16:14,15
   23:1,8,23,25 24:5
   27:2,8 30:14 31:4
   34:21 36:1 37:13
   37:19 38:4 56:4,7
   56:15 70:3 80:5,7
   87:24 89:12,16
   92:1,10 94:4
   118:13 125:11,16
   126:1,20 127:18
   130:5 133:20
   139:25 141:19
   143:7,9,13
agreed 76:11
agreement 3:9 7:16
   8:6,8,9,10,16 11:19
   11:19 12:4,7,21
   13:1,2,5 14:10,12
   14:14,19,24 16:7,23
   17:7 22:20 24:6,14
   24:15,17,17,19,23
   25:8,12,13,14 26:12
   26:14,16,23,24
   27:10,15,21 28:11
   28:14 29:5,9,22
   30:23 31:2,10,12,12
   33:6 34:5,14,22
   35:20,22 36:10
   37:1,8,13,20,25
   39:3,15 40:14,15,19
   41:6,8 45:8,11
   49:18 58:2,4 59:22
   73:14 75:17 77:13
   79:8,17,19 81:19
   85:25 86:21 88:15
   88:19 89:19,20
   90:19 92:19 93:3,4
   103:15 107:1
   112:16 113:9,13,18
   113:23,25 114:3,4,7
   115:19 116:10
   118:5,7,14,18 119:7
   119:18 120:8
   123:11 125:12
   128:2,9,19 129:7
   130:19 132:13
   133:24 137:18
   140:1 142:10
agreements 10:2 37:2
   41:18 45:1 48:18
   65:2 112:14 121:3
   121:22,23 123:13

125:18 128:16
   131:23
agrees 36:20 52:20
   53:5 54:1,21 86:1,6
   129:19
ahead 40:18 68:3
   91:6 97:3
allege 7:11
alleged 6:20 7:12
   25:4
allow 64:11 79:13
   127:9 149:7
allowed 15:20 16:11
   32:16 89:23 119:12
   138:12,16
allows 16:7 123:13
all-exclusive 16:23
all-inclusive 15:17
   16:12,19 17:4 23:3
   24:8 26:3 27:4,12
   33:2,8 34:6 89:7,15
   89:25 130:7 141:13
almost 129:25
along 44:8 69:18
   73:14 87:13 88:13
   90:18 93:20 133:7
already 20:8 56:5
   58:12 87:18 91:21
   133:3
Although 71:22
always 42:19 135:6
ambiguity 58:25
America 118:21
among 6:6 29:25
   75:10 86:17 92:2
amount 35:5
amounts 37:1 144:11
annual 82:19,21
another 13:6 87:10
   87:23 133:23
   149:11 152:4,18
answer 12:22 13:4
   19:2,19 20:10,12,23
   20:25 25:17,23
   26:8,15 27:22,24
   28:1,2 29:20 30:2
   30:10,18,20 31:7,13
   31:15,18 32:16,24
   33:13,16,16 40:18
   43:23 44:8 45:4,6
   46:22 49:21,22
   54:11,17 55:17
   56:13 57:20 60:25
   61:3,4 66:16 69:4
   70:2 73:18 79:18
   82:23 83:1,18
   84:25 95:2,5,9
   96:14,15 101:5,6
   102:8 106:2,10,12

107:16 108:3,22
   109:5 114:14,20
   115:6 116:20,21
   119:20 120:1,2,11
   120:14,15,18
   121:11,15 123:2
   125:22 131:2,5,9,14
   132:9,10,24 135:10
   145:1 147:9,11,16
   147:24 148:21
   149:22,22 150:5,25
   151:1,5,7
answered 12:21 13:7
   13:8 19:1 20:8,8
   31:20 40:17 56:11
   66:23 109:17,19
   120:3 146:20 147:2
   147:12
answering 19:18
   23:20 44:22 46:24
   79:15 85:15 105:24
   107:13 108:6
   122:20,22 123:3
   147:8,17 150:24
answers 20:18 32:7,9
   32:10 110:8
anticipate 58:12
   88:12
anybody 19:6 22:8
   50:22 60:9 85:3
   99:24 100:21
   101:25 102:3
   135:17,21,24 137:8
anyone 102:16 131:6
   146:24
anyone's 88:10
anything 22:7 24:16
   24:23 66:12 80:3
   102:25
anyway 85:1 114:10
anywhere 10:21
   26:14 112:20 113:1
   113:9 119:3
AOL 153:7
apologize 15:7 17:15
   21:15 22:16 34:13
   38:19 78:4 97:11
   119:25 120:4 131:8
   147:23
appeal 54:24
Appeals 54:25
appears 33:25 34:2
   34:10 112:19
Apple 84:23 85:3,5,9
   85:10
applicable 4:10
applied 40:2,12 46:10
   115:20 116:11
appointments 50:2,3

50:4,15,17
**appreciate** 20:19
25:20 33:18 72:15
**approaching** 129:9
**appropriate** 107:18
**approval** 18:11 19:12
19:14 130:7,11
**approved** 19:15,24
75:24 77:11 81:24
92:17 130:14
**approximately** 1:18
153:11
**April** 111:14,16,18
111:19
**arbitrating** 129:21
**area** 81:22 121:16
122:13
**areas** 75:11 111:14
142:20
**arms** 79:9
**Arnold** 5:8
**around** 139:20
**arrangement** 39:3
**arrived** 55:25 56:15
**asked** 18:4 19:1 20:7
20:17 21:22 25:17
28:5 33:11,12
40:17 41:25 48:6
49:2 55:21 56:10
66:23,24 95:17
109:4 116:18
117:12,13 123:6,7
145:24 146:19
147:2,12,20 148:10
149:17 151:21
**asking** 4:19 18:21,21
19:18 21:16 31:11
32:6 45:3,4 52:14
52:15 55:18 66:18
66:19 70:6 80:3,4
85:6 87:12 97:5
109:2,14 110:4,4
117:4,14 7:6,6
**assessed** 81:1
**assistance** 17:25 53:3
54:5 55:9,24 56:12
**Assistant** 95:19
**assume** 19:15,24
48:24 50:12 52:12
70:14 83:25 95:11
100:8 139:15,17
**assuming** 24:6 85:10
121:3 152:1
**assurance** 74:14,17
77:22 78:1,6,10
115:22 116:13
**assure** 78:12
**Attachment-A** 14:23
15:1,3,6,8,12 16:4

23:7 89:3,6
**Attachment-D** 90:24
91:5
**attend** 38:6,14 82:24
**attended** 135:21
**attorney** 2:6 4:14
54:10 97:25 98:16
154:16,18
**attorneys** 2:11 96:15
96:17 148:23
**attorney's** 31:16
**attorney/client** 18:16
**attracted** 128:18
**audit** 142:13 143:4
**audits** 76:14 78:12
143:15,18,19,21,22
144:3
**authorization** 36:21
37:5
**authorized** 89:1
**authorizes** 36:22
**automatically** 36:22
137:23
**autopsy** 135:22
**available** 80:20,21,22
81:1 119:6
**award** 31:16
**aware** 17:1,5 24:16
24:23 26:1,22
89:22 90:1,10 94:5
94:9 99:17,20
100:4,10,25 102:7
102:17 119:16
123:11
**away** 24:24 129:11

---
**B**

**B** 3:7 34:19
**back** 14:9 15:8,9 17:7
17:15 22:20 25:21
28:7 31:22 32:2
33:23 38:19 44:14
72:16 75:17 81:3
91:24 97:9 102:11
106:2,12 108:12
111:13 123:7 128:7
133:5 149:5,10,11
152:4,18
**badger** 31:18
**balance** 145:16
**bank** 36:7,11,23 37:9
37:14,21
**banter** 31:24
**based** 8:19 10:3
51:25 69:3 101:7
115:17 116:7 135:2
135:5
**basically** 14:14 34:3
113:15

**basis** 30:8 35:5 41:14
46:24 86:19,24
94:14 120:15,18
133:20
**Bear** 58:13
**became** 139:1
**before** 1:16 21:1,23
22:2 27:14 31:9
33:25 34:10 43:8
96:15 117:15 139:1
139:3 149:17,17
150:19 154:12
**beginning** 23:14
116:4
**behalf** 41:21 51:12
110:11 140:18
148:19
**being** 1:15 4:11,25
46:21 47:25 77:11
94:6 103:24 149:19
**believe** 6:17 12:11
16:14 28:17,20,25
41:10 48:6 51:18
53:21 59:4 60:9
61:14 67:1 82:10
82:20,22 83:13
84:21 90:15 94:21
99:19 102:13,14
103:23 105:4
109:17,18 111:24
112:15,19 114:23
116:1 117:25 119:8
119:25 141:15
**believes** 93:2 128:10
**below** 70:13 71:6
75:3,5 84:16,16,18
**Bernard** 110:24,25
**best** 55:19 56:24,25
73:2,18,20 77:1
82:22 83:1 85:12
127:10,11 140:16
154:13
**better** 29:7 85:6 88:4
152:10
**between** 3:10 5:15,23
8:9 9:24 11:20
18:20,21 24:20
37:2 42:10,23
43:19 47:5,11,14
48:3 58:3 71:10
72:20 73:15 74:5
103:15 110:7 114:1
118:14 119:21
138:5,9 141:16
145:20
**beverage** 39:5 75:20
**beyond** 151:15,21
**big** 58:19
**bills** 143:5

**binding** 40:15
**bit** 42:12 152:9
**Blackberry** 49:25
50:1,6,7,20
**blah** 142:24,24,24
**bond** 98:12,14 99:1
**bonds** 98:17
**book** 124:24 125:4
**booked** 124:22
**books** 142:14,23
**both** 4:15 9:20 48:9
60:3 104:3
**bottom** 17:11 34:13
34:15,18 35:23
111:16,18,22
**brand** 3:12 6:5,12
13:7,9,20 16:4,13
41:20 44:19 68:14
68:15,16 72:9,20
73:5,22,25 74:2,11
76:8 83:8 85:3 90:7
90:10,12 91:14,19
93:7,20 114:10,11
114:19 115:1,10,16
116:5,6 117:22
125:13,19 126:1,4,9
126:13,21,23 127:1
127:7 137:12
**branded** 127:12,16
127:22
**brands** 6:7,10 44:7
84:4 95:1 97:16
**breach** 89:18
**breadth** 71:13
**break** 43:9 58:19,21
62:10 69:11 87:10
125:25 150:20
151:4,8
**brevity** 29:23
**Brief** 43:11 62:12
**bring** 106:11 108:12
149:11
**broad** 42:12
**brought** 112:18
136:23
**buff** 143:3
**building** 65:23,23
139:6
**burdened** 129:21
**business** 62:21 79:10
87:21 91:1,3,7,18
92:13 104:1,4,6,10
105:8,17,22 107:5
108:4,15,19 109:1,8
109:11 123:24
141:12
**ByRequest** 77:4
**B-o-n-d** 98:14
**B-1** 38:3,11

---
**C**

**C** 2:1 11:22 35:1
88:25 103:5 145:18
154:1,1
**ca** 32:18
**calculated** 145:14
**call** 59:5 62:8 142:4
**called** 1:15 4:11 8:19
70:11 83:12 84:23
110:19
**calls** 118:15 141:25
**came** 56:12
**cameras** 123:16,20
**Campus** 1:17
**Cancun** 122:13,13
**capable** 77:11
**capacity** 62:22 99:4
**Capers** 1:6 3:4 4:1,7
4:9,11 5:3
**cards** 76:4
**care** 127:15,18
**Carlos** 130:18
**case** 4:25 42:1,14,14
45:4 51:23,25 52:7
53:8,14,14,17,21,22
54:8,14 94:10
95:18 99:18 100:17
100:24 107:5 110:9
118:8 123:16
131:25 132:5,6,16
**cases** 42:2,20 43:17
49:8,11 50:25 51:5
51:11,14,15 52:9,16
52:18 53:21 94:16
94:24,25
**category** 47:16
**cause** 52:22 132:8
**causes** 86:7
**caution** 147:4
**Center** 1:21
**central** 87:3 152:7
**certain** 67:1 82:14
88:1 105:6
**certainly** 32:1 48:22
88:6,12
**certainty** 120:16,19
**Certified** 1:16 154:5
**certify** 31:14 147:10
149:23 150:6 154:7
154:10,15
**cetera** 33:10 40:23
99:5 113:14
**chain** 70:22 71:6 75:5
**chance** 140:11
**change** 137:3
**changes** 22:9 137:9
141:22
**characterize** 60:9
**characterizing** 12:18

charge 80:16
charged 131:16
Chicago 2:5,10 4:15
   19:11 20:5 45:21
   152:5
children 76:21
choose 112:17 113:6
   126:15
chosen 112:10
Chris 117:2
Christopher 2:11
   153:8
Circuit 54:25
citizens 76:20
city 68:21,23 121:14
   121:17,25 122:1
CIVIL 1:2
claim 54:22
claiming 52:10
claims 106:7 129:22
   150:12,16
clarified 47:20
clarify 7:6 12:8 41:19
   47:17 104:24
   106:23 148:14
clarity 44:4
clause 139:24
cleaning 136:19
clear 22:5 58:24 61:5
client 123:22 124:22
   128:13,15 146:12
   149:19
clients 98:18 148:19
client's 6:20 99:22
   100:1,5
close 149:15 152:11
closer 131:18
Club 110:20 112:1
coast 87:19
colleague 97:7
colon 15:16
color 81:20
com 153:7,9
come 16:18 50:11
   64:12 104:17,18
   106:2 122:3 123:7
   131:13 136:18
   148:24 149:5,10
   152:4,17
comfortable 44:22
   59:18 64:24 85:15
   105:24 121:14
   122:20,22,23 123:1
   123:3 132:22 147:8
   147:17
comma 7:24 15:17
   16:8,12,19
commencement
   154:7

commencing 1:18
commitments 88:11
common 65:18
communicate 124:9
   124:12
communication
   18:20 124:3 141:16
   145:20 146:3,7
communications
   18:17 124:14
companies 6:24 7:4
   57:16 136:20,23
company 14:15 46:22
   48:15 49:16 50:4,6
   50:8,22 52:18,18
   53:5 63:3,12 64:6
   64:17 65:1 68:9,11
   104:13,18 115:7
   116:12 143:2
complains 142:1
complaint 6:15 7:12
   17:20 56:19 57:3,9
   57:24 77:8 99:17
complete 38:6,14
   41:1 46:14 66:16
   66:18 70:1 80:17
   146:2
completely 15:22
   29:21 30:21 49:17
   132:8
complex 32:10
compliance 78:13
   92:9 115:23 116:13
compliant 23:4 24:8
   25:1 26:4 27:4,13
   28:17,20,23 29:1,11
   29:13,18,24 30:15
   31:5 33:3,9 34:7
complied 117:18
   145:3
complimentary 76:18
   77:9
comply 27:20 75:22
   86:8 92:23 114:9
   114:11,18
complying 44:20
component 112:10
components 114:10
compound 58:20
comprise 91:15
comprises 90:8
computer 19:3 50:5,8
   51:17,17
concerned 127:23
concerning 41:4 44:1
   110:18 115:3 120:8
   127:6 147:21
   148:17
conditions 24:15 27:9

29:21 31:10 33:5
conduct 39:23 40:8
   46:5 92:13 126:25
   136:4 143:15,18,21
   144:2
conducted 76:14
   133:15 147:22
   148:18
conducting 78:11,20
   143:22
conferring 21:8,10
confidence 126:9,11
   126:14,16
confident 122:14
conflict 133:19
   139:24 140:3
conflicts 118:17
   119:21
conform 45:10 46:18
conforming 41:12
conformity 39:24
   40:9 46:6 130:13
confused 110:2,7
congested 119:18,23
   120:21
connection 72:19
   106:14
consent 39:6
consider 65:12
   119:17,23
considered 79:5
   84:11 113:15
consistently 40:3,12
   46:10
constructed 138:24
   138:25 139:1
constructing 92:3
construction 111:11
   139:10
construed 118:15
   140:1
contact 47:5,10 74:7
   130:23,24 142:4
   152:24
contacts 142:2
contained 24:15
   27:10 29:21 31:9
   31:10 33:5 77:17
   92:2 119:8
containing 91:11
contains 26:16 90:24
content 81:21
contents 19:25 82:12
   126:19 140:13
   147:19
continue 150:9
continuing 115:17
   116:8
contract 26:1 30:6,7

33:3 36:2,4 41:5
   44:21 77:16,18
   79:2,12 80:5,8,9,12
   80:13,15 81:4
   115:20 116:10
   117:19 118:15,19
   119:3 132:2 133:1
   137:18 140:6
   144:18 145:11
contractor 13:2
   31:12 40:25 45:13
   46:13 78:25 79:3
   79:25 93:4 112:16
   112:20,24 113:1,4,8
contractors 136:17
   137:4 139:6
control 13:8 17:18
   22:14 38:24 46:14
   113:5 134:21
   140:23,24
controls 11:20,24
   80:1 113:25
conventionees 127:19
conventions 82:17
conversation 147:25
   148:1,3
conversations 147:18
   147:20,21 148:15
   148:22
conversion 3:14
   110:13,19 112:11
   112:12,18,21
convert 112:2
converted 112:1
Cook 104:6,10,21,22
   105:2 106:19
cooperate 81:3,5,8
coordinate 86:15
coordination 75:14
copies 143:5
copy 14:3 135:22
   153:2,5
corporate 11:9 60:2,2
   60:17 70:13,22
   71:6 75:5 105:12
   105:13 108:3,14
   126:2
corporation 1:10
   2:14 10:6 47:1
   48:16 57:18 83:25
   103:8,9,18,24
   108:17 119:19
corporations 57:19
correct 5:20,21 6:16
   6:21,22 7:6,23,23
   8:11,12 9:7,11,12
   9:20,21,22,24 10:11
   10:19,20,22,23 11:1
   11:4,23 12:2,3,5,6

12:10,14,17,24
   13:10,20,21,23,24
   14:2,17,22 15:13,14
   15:18,21 16:6,8,9
   16:20 17:12,21,22
   19:16,22 20:1 21:2
   23:9 24:11,16,18,21
   25:15,16 26:20
   27:7,9,17,19 28:14
   29:15 30:18 35:2,3
   35:7,8,10,11,13,14
   35:16,17,20,21 36:5
   36:8 37:24 38:25
   39:1,13,14 40:4,13
   40:16,23 42:16
   45:2,11,17 47:6,7
   48:20,21,23 49:4
   50:13,16,17,20 51:1
   51:6,21 52:1,23
   53:6,7 55:13 56:9
   56:21,24,24 57:5,25
   58:1,7 59:15,16,21
   60:3,4,6 63:15,22
   63:23 65:8 69:8,21
   70:5,15,20,21 71:7
   72:12 73:3,6,6,9,17
   73:23 74:15,16
   75:25 76:4,9,15,16
   76:21,22 77:13,16
   78:13,20,21,23 80:2
   80:6,12,18 81:7,13
   81:14,25 82:1,2
   85:7 86:4,10,21
   87:4 89:4,5,7,11,19
   89:25 90:6 91:16
   91:22 92:8 93:17
   94:7,13 95:12
   97:22 98:20 99:11
   99:18 101:2,11,19
   101:21 103:12,19
   103:20,22 104:2,6
   104:23 105:3,9,12
   105:18,23 108:19
   109:1,16,23,24
   110:1,11,21,22
   111:6,11,14,23
   112:3,4,7,8,11
   113:23 114:2,3,5
   115:4,25 116:16,23
   117:19,24 118:17
   118:21,25 120:23
   121:5,6 123:9
   124:22 126:6,9,16
   126:21 127:13,14
   127:16,17,20 128:4
   128:5 129:17,22
   130:16 132:12
   133:3,25 135:7,14
   135:15 136:3,12,15



MARIE CAPERS WORKMAN, JULY 2, 2007

136:20,25 137:5,10
137:19,22,23,24
138:6,7,24 139:2,7
139:8,12 140:3,4,14
140:19,20,23 141:2
141:3,10,14,18,22
142:3,7,16,17,21
143:6 144:7,8,13
145:11,17,19,21
148:7 150:12,18,19
**correction** 87:5
**corrections** 20:22
21:22 22:3
**correctly** 6:7 15:4
20:25 30:19 37:3
37:12 38:9,17,18
39:7,21 40:6 46:23
46:24 55:4 77:14
78:15 84:13 86:11
87:7 92:7,8,21 95:2
115:24 116:2,4,15
116:19,22 119:1
130:16 135:3
136:25
**cost** 129:21
**costs** 31:16
**counsel** 2:16 18:1,17
21:8 30:6 31:17,23
31:25 32:11 43:24
45:18,20 46:21,23
47:5,10 48:24,25
49:2,4,16 53:3,4
54:5 55:9,25 56:12
61:22 87:25 88:3
90:17 93:10,21
94:1,12 95:11,13,19
95:19,21 96:3,5,7
98:1,12,14 106:3
115:4 137:12,16
139:19 146:17,24
147:13,18 148:4,5,6
148:8,12,17 151:15
154:16,18
**Counsel's** 146:25
**country** 59:3 62:15
62:19 71:16,16,17
119:11 121:8,23
**County** 104:6,10,21
104:22 105:2
106:19
**couple** 120:25 134:8
**court** 1:1,16 4:10
25:18,21 28:4,7
31:16 33:20,23
43:18 44:12,14
52:21 54:2,25 55:1
72:16 88:1,7
102:11 106:11
108:12,12 119:12

120:22 132:5,18,18
151:6 152:21
**Courts** 119:6,17,18
119:23,24 120:7,21
**cover** 37:11,23
**covered** 141:1
**Cozumel** 7:10 8:11
8:14 11:1,10,16
12:21 14:16 17:19
24:7,10,25 25:3
26:2 27:3 33:1 34:6
56:18 57:2,8,23
59:24 78:22 81:17
102:20 110:20
119:5 121:4 123:15
123:23 124:16
133:2 135:6 141:10
141:13 146:13
**create** 77:21
**created** 79:7 92:17
113:17
**credit** 76:4
**CSR** 154:24
**current** 43:17 101:8
145:5
**currently** 5:10,11
43:16,17 98:21
105:9
**customer** 76:13 86:16
115:17 116:8
141:25
**customers** 124:4,5,7
124:8,10
**CV** 1:2

---
## D

**D** 3:1 35:9 130:10
**Dallas** 68:18,19,21,24
69:2,21 70:14,19,23
72:6
**Danuta** 1:4 4:15
**darn** 65:18
**data** 144:12,13
**date** 4:23 27:19 29:16
50:9 111:16 142:16
154:13
**dated** 7:17 12:1
154:20
**dates** 27:14 29:5
36:24 49:25
**Dave** 122:3
**David** 2:4 4:14 87:9
129:8
**day** 1:17 29:17 50:13
149:11,14 151:18
**Days** 97:15
**day-to-day** 94:14
143:16,23
**De** 103:5

**deal** 31:21 75:11
106:21
**deals** 138:23
**death** 6:20 42:21
52:11 54:14 99:22
131:24 132:5,16
150:17
**debit** 36:22
**deceased** 1:5 4:17
123:23
**decided** 138:8
**deciding** 21:11
**decision** 138:5
**decisions** 113:6 132:6
134:22 149:20
**default** 115:19 116:9
137:17,19
**Defendant** 2:11
**Defendants** 1:12
**defer** 118:23
**deficiencies** 81:13
**define** 124:7
**definitely** 137:1
**definition** 29:1 64:25
65:17 66:1,11 92:2
**definitions** 90:19,24
**degree** 94:13
**Del** 130:18,21,24
131:5
**Delaware** 10:6
103:19,25
**Deluxe** 91:1
**Deluxe/Resort** 91:7
91:18
**Dely** 2:11 3:5 5:2
19:1,13 20:7 23:19
23:23 29:6,8 30:4,8
32:13 40:17 43:4
45:24 47:17 49:13
51:7 52:5 53:11
54:9,16 56:10
58:18,23 61:3
66:23 77:19 78:4
83:23 85:4,8 88:4
90:20 94:19 99:16
101:4,12 102:5,21
104:24 105:19
106:16,23 107:8,15
107:22 108:5,9
109:14,17 114:12
114:14 117:10
119:13 120:9
125:14,20 132:7,20
134:8,10 141:4
142:22 146:19
147:2,12 148:10,14
148:21 149:13
150:1,8 151:6,17,21
152:1,7,11,19,23

153:3,8
**demand** 39:20
**dep** 23:18
**department** 51:18
74:17 94:18,23
96:9 100:18 115:9
115:9 118:23
128:24 131:15
148:16,25
**depend** 145:2
**depends** 70:6
**depose** 69:21 106:18
**deposed** 106:9
**deposing** 30:24
**deposit** 37:9
**deposition** 1:4,14,15
1:21 4:9 8:1,2 9:4
14:5 43:25 46:17
47:13,16 48:1,20
52:9 63:8,13,21
69:24 87:23 95:18
101:9 107:4 110:15
122:24 123:1
151:25 152:6
153:10
**depositions** 101:1
**describe** 60:15 69:14
138:17
**described** 17:20
56:18 57:3,8,23
92:23
**description** 3:8,18
65:10
**design** 75:23 111:11
**designate** 131:7
**designated** 38:5,13
131:17
**designation** 71:2
**desires** 14:24
**despite** 103:24
108:21 130:14
**detected** 81:13
**determination**
149:25
**determine** 66:11
76:25 133:22
144:21,25 145:5,10
**determined** 57:1
**develop** 126:8,13
128:17
**deviation** 40:22
**de-flagged** 122:19
**diary** 49:24 50:17,19
50:22
**DICKER** 2:9
**dictated** 12:23
**dictionary** 29:2
**difference** 5:15,22
6:1 147:23

**different** 28:19 44:7
59:1 68:25 69:14
83:16,16 105:11
106:7 137:4 142:20
**difficult** 67:16 131:2
**difficulty** 18:14
**direct** 28:15 32:7,8
32:10 77:5 84:15
**directives** 91:9 92:14
92:15
**directly** 8:15 84:16
94:23 107:5 124:25
125:4,9,10
**director** 47:3 130:20
**directors** 102:1
**directory** 64:17 85:17
85:20 86:2,7,9
**disagree** 28:13 36:15
40:24 77:15,17
117:20 126:10,16
127:14,17 128:12
**disagreement** 74:11
**discovery** 151:25
**discretion** 112:5
134:21
**discretionary** 46:12
**discuss** 25:11 49:18
**discussed** 53:2 133:4
148:2
**discussing** 74:8,10
**Discussion** 62:11
88:17 145:23
**dismiss** 5:1 8:18
51:20
**dismissal** 54:24 55:2
**dismissed** 51:25
52:22 53:22
**displayed** 81:22
**displays** 75:22
**dispute** 41:4 43:19
47:14,23,25 74:5
118:8,19,20 119:10
**disputes** 42:23
119:12 120:8
132:14,17 133:1
**distinction** 9:24
65:20 66:9
**district** 1:1,1 32:14
71:12 120:22
**division** 1:2 40:3,13
46:11 87:1
**document** 8:20,22
11:24 12:1 14:1
18:19,22 19:21,24
40:15 118:2
**documents** 7:20,20
**doing** 98:25 135:24
137:9 142:20
**dollars** 35:24 36:4,7

36:12,20,23 37:9,15
37:21
done 32:20,21 88:2,8
88:9 95:19 96:6
99:4 112:2,7
120:25 129:25
131:20 134:6 142:6
142:8 146:11,20
147:1 151:17,18
152:17
dot 153:7,8,9
doubt 141:9
Doug 71:20,21,22,24
74:23 75:14
down 5:5 58:21 70:22
75:4 82:6 125:25
131:10 148:17
draft 20:13,20,21,22
21:18 22:3,8 55:15
55:22
drafted 55:13,14 56:9
drafting 56:3 118:1,4
drafts 21:22,24 22:9
draw 65:20 66:9
Drive 1:17,21 5:8
due 36:25 37:1,7,16
37:23 108:11 110:3
110:11 149:13
150:22
duly 4:2 154:8
during 50:12 54:24
80:17 81:6,9,11
duties 79:16 113:12
113:22 136:24
d-e 11:22
d-e-l-y 153:8
D-4 75:19

_____
E
_____

E 2:1,1 3:1,7,17,17
76:2 85:22 130:10
142:13 153:4 154:1
154:1
each 9:25 19:19
39:16 45:3 50:25
51:5,11 79:6 80:11
80:25 113:16
earlier 29:20 44:6
53:2 54:4 55:8 57:1
57:12 64:4 114:23
126:18 138:1
easily 95:10
east 87:19
EASTERN 1:2
EDELMAN 2:9
effect 55:1 117:23
either 26:23 42:20
44:9 46:18 58:9
60:7,23 61:12

62:14 63:4,21
64:11 124:3,18
Electronic 36:21
Elser 2:8 153:9
employ 124:2,9
employed 5:10,11
38:4,12 67:5
102:16 135:6
employee 73:1,4,11
79:1 98:24 104:21
111:2 154:16,18
employees 58:10,15
59:2,5,8,11 61:8
62:18 65:25 66:13
66:21,25 67:2
72:11,18,20 73:6,8
73:16 100:4,9
101:1,10 102:1
134:22,23,25 135:5
135:10,13,16
140:25 141:9,12
employer 44:2
employment 134:21
134:22
encompasses 70:8,9
end 19:14 149:3,15
150:1
ending 149:12
enforcement 93:20
English 118:24
124:13,14,19
enhance 39:19
enjoy 150:8
enough 65:9 85:15
150:2
ensure 115:22 116:13
enter 14:19 78:17
79:13,21 125:17
entered 14:15 27:15
58:2 73:14 119:4
entering 79:1 121:2
128:16
entire 23:24 30:19
32:19 49:14 68:24
69:7 90:8,13 91:15
114:3
entirety 28:22 89:21
93:3
entities 5:23 9:20
84:3 95:12,14
97:12 98:1,16
99:25 104:3 105:8
105:12,13 108:3,14
110:7 125:5 126:2
140:18
entitled 17:12 39:12
75:19 90:4,13
145:10
entity 6:6 9:25 11:10

95:15 96:12 104:24
111:3 139:11
equal 35:5 70:17
equipment 81:17
equipping 92:3
ESQ 2:4,11,15
ESQUIRE 1:21
essential 39:18
essentially 5:21 10:4
57:16 89:8
establish 77:1 86:15
establishment 91:13
Estate 1:5 4:16
estimate 42:11
et 33:10 40:23 99:5
113:14
even 48:19 58:23
61:20 64:7 66:5
69:5 133:25 135:10
141:1 151:2
event 52:22 148:18
events 146:7
ever 22:8 26:19 41:3
41:11,25 43:25
44:18 45:5 59:2,8
59:24 62:3,21,24
82:9,24 85:17 93:5
94:15 98:8 100:8
100:10,22 102:23
114:17 119:11
130:21
every 29:17 39:16
45:3 94:10 106:14
107:1,9 111:18,22
111:24 112:10
114:24 120:12
140:9 144:9
everybody 147:3,13
149:13
everyone 75:4
everything 46:2
evidence 120:6
exactly 51:4 56:14
108:7 123:3 148:9
examination 1:15 3:3
4:4 154:8
examined 4:2
example 12:14 64:17
71:11 72:22 141:25
except 79:16 113:13
113:22 118:16
139:24 140:2
excerpt 137:16
exclude 54:21
excluding 29:22
excuse 12:15 23:2
62:6 77:24 95:7
106:16 112:11
134:2

executed 140:14
executive 104:18
exercise 38:24 134:20
exercised 26:19
exhaustive 96:4
Exhibit 8:2 9:3,4
10:10 11:18 14:1,5
14:9 17:16 22:10
52:19 76:9 90:8
110:14,15 118:4
119:22
Exhibit-1 8:1,6 11:20
Exhibit-3 115:11
116:5 117:22 118:2
existence 139:3
expand 41:23 95:4,8
expect 87:17 106:10
151:11
expectation 92:22
expectations 13:6
expedient 120:7
expenses 144:7
explain 5:25
expressly 79:16
113:13,22
extent 5:3 77:10
eye-witnesses 101:10
e-mail 153:6
E-Tran 152:25 153:6

_____
F
_____

F 78:4 80:24 81:5
86:12 154:1
facilities 39:5 106:19
113:5
facility 46:15 65:21
80:1
fact 5:3 16:10 19:10
36:6 57:1,7 74:3
80:9 114:12 133:24
137:9 140:17 141:1
142:6 144:6 145:15
facts 146:7,12
failure 114:9,11,18
fair 16:21 42:11
122:16
familiar 6:14 51:21
83:4 84:22 85:14
far 43:16 88:10 99:14
135:16 136:17,19
137:12,25 139:5,19
140:8,21,25 152:9
Fax 1:23
Federal 120:21 149:7
fee 34:23 35:2,7,10
35:13,16 80:25
144:22,25 145:13
feel 88:12
fees 31:16 35:18

36:25
Fernando 110:24
few 74:1 141:6
fiduciary 79:8 113:18
fifth 36:13,13
file 51:1,5,8,9,11,15
51:16,17 100:17,19
100:19
filed 4:18 6:15 93:5
132:16 150:17
files 51:13,18
fill 10:8
final 54:2 55:2 56:12
56:15
financial 143:18
144:3
financially 145:11
154:19
find 25:8 61:21 80:4
122:6,15
fine 4:13 21:12 44:9
90:20,21 151:20
152:2,3,16,17
finish 88:1 129:11,12
152:18
finished 150:23
firm 18:5,6,7,8,10
19:11 20:4 65:11
98:17,23
first 4:2 17:8,14
18:12 19:20 20:13
20:20 21:17,19
25:9 38:11,23
51:10,23 52:4
64:21 65:3 70:7
81:4 83:4 85:1
109:7 135:2
fit 47:16
five 121:10 122:7
five-foot 12:16
five-minute 12:15
fixed 123:19
flew 97:8
flipping 139:20
Floor 2:10
floors 143:3
Florham 1:17
Florida 133:16
focus 126:25 127:2
follow 27:16 28:12,16
29:3 41:1,1 49:1
93:6 112:6,6
113:11
following 41:5 43:20
follows 4:3 28:18
follow-up 134:9
141:6
food 39:5 75:20
force 27:24 92:24

147:11
foregoing 154:10
foreign 1:10
forgetting 58:13
forgot 114:16
form 19:13 21:20
  49:15 51:7 53:11
  56:12 58:18 81:20
  101:4 102:6 132:8
  132:8,20 142:22
formal 99:4
forth 14:25 15:2
  17:15 31:22 32:2
  39:25 40:10,19
  46:7 89:3 130:4,9
  154:13
forum 5:1,6 8:19 46:1
  51:20,25 52:22
  53:9,18,22 106:22
found 133:18
foundation 49:15
  53:11 54:9 83:23
  85:4 101:4 102:21
  119:13 125:20
  132:9,21 135:8
  138:13 139:13
four 87:12 88:15
  94:21 152:10
fourth 14:11 36:13
  36:13
franchise 3:9 5:14
  7:16 8:6,8,16 9:9
  9:17 10:2 11:19,25
  12:7 13:1,5 14:10
  14:12 17:7,12
  22:20,21 24:2,18
  33:6 34:4 41:8,18
  45:1,8,10 48:17
  59:22 73:14 77:5
  83:6 85:25 89:19
  103:15 106:25
  107:2 118:5,7
  121:3,4,7,21,23
  122:15 123:11,12
  125:4 128:16,19
  131:22
franchised 72:10
  83:21 85:21 86:1
  121:20 128:3 139:3
franchisee 11:12 12:9
  12:14,22 14:22
  23:2 24:6,14,20,24
  26:2 27:2,11,16,20
  28:12 29:10,13,18
  29:23 30:15 31:4
  33:1,7 34:5,22 35:4
  35:18 36:3,6,11,18
  36:20 37:2,8,14,20
  38:23 39:15,23

40:8,20,25 41:5
  42:24 43:20 44:3
  44:19 45:10,13,17
  46:5,14,18 47:15
  48:3 56:20 57:4,10
  57:24 74:5,7 75:21
  76:3,11,17,23 78:16
  78:25 79:4,5,6,13
  79:16,20,25 80:10
  80:15,25 81:3,5
  85:25 86:6,7,20,23
  89:2 92:12 113:10
  113:12,14 114:1
  119:4,11,22 124:10
  125:21 129:19
  130:7,12 133:2
  134:22,23,23,24
  138:3,5 141:22,23
  142:2,5,14 143:2,6
  143:18,24 144:3,20
  145:21 146:3
franchisees 3:22 37:6
  41:4,12 45:23
  47:11 72:9,23
  82:17 93:6 114:9
  114:18 124:8,12
  125:17 126:6
  127:24 132:2,14
  133:24 138:1
  143:15 145:8,15
franchisee's 36:23
  125:9,10 134:25
  142:1 144:7,14
franchisee/franchis...
  8:10
franchises 41:21
  104:22 105:2
franchisor 6:12,13,19
  7:9 11:21 12:9
  24:20 27:5 34:23
  35:5,19 36:2,18,22
  37:2,7,17,23 38:5,7
  38:13,15 40:20
  42:24 43:19 44:2,2
  44:18 46:20 47:14
  47:15 48:3 74:5
  75:24 76:13,15,18
  76:25 78:9,17 79:4
  79:13,15,22 80:10
  81:14,24 86:2,3,15
  86:18 87:1 89:1
  91:10 92:11,14
  113:12,21 114:1,8
  114:17 119:21
  129:20 130:6,8,15
  133:2 134:20,24
  138:6 144:13
  145:21
franchisors 46:17

47:11 125:17
franchisor's 23:5
  24:9 25:2 26:4
  28:12 29:12,14,19
  29:25 30:16 31:6
  33:4,9 34:7 36:20
  39:6 80:16 81:6,8
  134:24
franchisor/franchis...
  125:12 128:7,9
Frank 86:12
frankly 33:14 49:17
free 65:25 66:12
frequent 76:21
from 29:6,9 30:13
  32:25 34:8 37:6
  38:8,15 44:23 45:6
  48:14 54:21,24
  61:11,22 73:1,4
  78:11 79:1 85:2,3
  86:9 91:4 92:14
  99:24 121:9,11
  122:8,21 130:7,8,25
  136:2,21 138:1,22
  142:15 146:14
  148:16
front 7:18,20,21,21
  8:20,25 13:12,14,17
  31:25 117:9
full 4:24 23:11 70:1
fully 81:3,5,8
full-time 58:15 62:18
function 129:20
functional 5:22,25
functionally 6:1,2
fund 87:3
funds 37:9
furnish 86:2
furnishing 92:4
further 12:8 15:9
  27:10 61:2 154:10
  154:15

G

G 59:17
game 22:5 23:15,17
  27:25
games 23:19,20
gave 18:11 46:16
general 10:3 69:10
  93:10 94:1,12
  95:11,13,18,19,21
  96:2,5,7 115:3
  117:10 122:12,16
  131:14 146:16,17
  146:23,24 147:13
  148:3,5,6,8,12,17
generally 6:4 9:21,22
  9:23 10:1 37:24

47:21 49:5 57:13
  59:23 69:13,18
  84:6,17 93:2 94:21
  97:9 112:4 125:9
  128:5 133:5 142:5
  142:17 145:1,19,22
generated 144:11
gets 128:2 132:4
getting 32:7 87:19
  88:8 110:7 149:15
give 18:12 40:22
  42:19 64:3 66:16
  67:18,19 70:1
  95:17 96:2,4 99:12
  106:6 109:5 122:10
  129:24 153:3
given 21:18,22 65:9
  99:2 106:17
gives 65:24
giving 52:8 99:6
glad 117:8 151:3
GM 131:17,18
go 14:9,11,21 15:6
  17:7 22:20 27:24
  32:2,18 35:22
  38:19 39:9 40:18
  52:20 58:23,24
  60:11 61:2 65:25
  66:13 68:3 69:24
  73:13 75:16 83:20
  87:8,20 91:6,24
  97:3,9 98:6 105:15
  108:12 110:13
  115:13 122:6 125:3
  129:7,13 133:5
  134:17 149:24
  152:14
goals 128:15
goes 37:5 73:7 126:8
  135:16
going 4:19,22 9:2
  21:5 22:6 23:13,15
  27:23,24,25 31:21
  31:22,24,24 32:2,8
  32:9,23,24 33:14,15
  33:15,18 34:12
  45:19 50:11 66:2
  69:24 70:22 81:19
  85:1,22 87:11,14,15
  87:20,22 88:12
  89:6 99:14 106:5,6
  106:9,10,11,18,19
  107:6,7 108:2,2,11
  110:8,14 122:11,22
  129:11,11 132:7
  135:12 139:25
  147:9,10 149:2,3
  150:4 151:11,18
  152:24

Gonzalez 110:24
good 14:8 27:1 92:10
  146:22
goodness 97:4,9
gotten 64:8 135:21
govern 123:13
governed 8:10 118:15
  140:1
grab 137:13
grand 98:9
grant 17:12 22:21,24
  24:1,2,14
granted 15:25 16:22
  17:1 130:8
grants 78:16
graphic 81:22 82:2,6
  82:7,9,12 91:22
Graphics 91:8
great 75:16 126:8
greeted 12:15
Greg 84:6,7
gross 34:24 35:6
  144:10,19,24 145:5
Group 3:10 5:11,13
  5:16,17,19 6:1,5,6,8
  6:11 7:6,13,14,24
  8:7,15 9:15 10:1,5
  10:22 11:5,21
  22:16,19 27:5
  41:20 44:5 48:7
  49:19 57:4,11,15
  58:6,9,14 59:6 95:5
  95:9,22 96:8,11,14
  96:17 97:12,17,19
  98:1 103:21 104:5
  104:9 105:1 108:18
  108:24 109:10,22
groups 96:2 126:25
  127:2
guaranty 87:16
guess 14:10 17:14
  50:7
guest 39:19 76:14,17
  77:2,3 78:12 81:22
guests 76:2,21 77:10
  123:19 127:24
  128:3
Gus 67:23,24,25 69:2
guys 23:16 88:16
  152:3,12,16

H

H 3:7
half 87:15 88:8
handle 75:11
handles 75:9
hands 8:22
happening 90:22
happy 107:15

**hard** 45:15
**having** 4:2 58:19
   123:5 128:6,8
   140:9
**head** 66:20 69:15
   70:25 84:5 97:8,11
**headquartered** 72:11
   73:2,9,16,19
**hear** 21:2 53:12
   119:25 150:25,25
**heard** 100:15
**hearing** 33:11
**heir** 70:13
**help** 32:5 60:25 110:9
   124:2
**her** 4:17 7:20,21 8:25
   18:21 23:23 32:17
   32:17 44:8 60:25
   66:24 83:24 84:19
   96:16 97:8 106:6
   106:12,18 108:8
   110:11,11 117:10
   117:12 146:20
   147:4,7 149:11,21
   149:22 150:6
**hereinafter** 10:14
**hereinbefore** 154:13
**hereof** 130:5
**hesitating** 59:10
**hierarchy** 71:10
**high** 77:2 92:11
   104:18
**highest** 74:20
**him** 84:18
**hire** 124:8
**hired** 100:21 102:2
   102:18,18 141:1
   143:2
**hold** 22:15 51:7 82:16
   122:11
**holds** 14:22
**home** 5:7,8 66:15
**homes** 64:9 65:19,21
   67:7
**honest** 21:15
**honor** 76:3 86:6
**hot** 122:14
**hotel** 3:9,10 5:11,12
   5:15,17,19 6:1,2,5,6
   6:8,11 7:6,13,14,24
   8:5,7,13,15 9:15
   10:1,5,22 11:1,5,7
   11:19,21 13:19
   14:12,16,19,23,24
   15:1,2,15,18,21,24
   16:2,2,7,8,12,18,19
   16:23 17:4,19
   22:16,19 23:3,4
   24:7,8,11,25 25:1

26:3 27:3,4,5,7,12
   27:12 29:24 33:2,8
   33:8 34:6,24 35:6
   38:4,12,24 39:4
   40:4,13 41:20 44:5
   44:6,7 46:11 48:7
   49:18 51:24 56:18
   57:2,4,8,10,15,23
   58:6,9,14,21 59:6
   59:17 76:3 78:11
   78:18 79:21 81:23
   85:17 86:1,2 87:2
   89:2,7,13,15,25
   91:1,8,18 92:4,18
   95:5,9,22 96:8,11
   96:14,17 97:12,17
   97:19 98:1 100:16
   103:21 104:5,9
   105:1,21 108:17,18
   108:24,25 109:7,10
   109:21,22 110:19
   111:10 112:1
   116:11 128:10
   130:6,7 136:18
   139:6 142:15,20
   144:11
**hotels** 1:10 3:12 4:18
   5:16,18,19 6:4,9,13
   6:18,23,23 9:10
   10:11,18 14:20
   39:19,20 40:3,13
   41:3,11 44:5 46:10
   48:8 58:4 72:10
   74:18 76:19 85:20
   85:21,21 86:18,25
   86:25 87:6,7 91:13
   97:14 103:20 105:5
   105:16 115:21
   124:6 126:14
   127:12,16,20,21,22
   127:24
**hour** 87:16,16,18
   88:8,9
**hours** 23:16,18 87:12
   87:21 151:12
   152:10
**husband** 4:17
**hypothetical** 120:11
   120:13

---

**I**

**ID** 3:8
**idea** 48:13 69:16
   120:10 138:14
**identification** 8:3 9:5
   14:6 108:1 110:16
**identified** 14:23
   30:22 103:4 107:19
   108:7,13

**identify** 16:25 19:6
   101:16
**identifying** 17:2
   108:21
**ignore** 112:10,17
**Illinois** 1:1 2:5,10
   4:18 32:14 61:13
   61:15,18 62:4
   66:22 67:3 70:8,10
   104:6,11,21 105:2,9
   105:15,17,20,22,22
   106:15,20 107:7,9
   109:1,8,11 120:22
**impinge** 18:15
**implemented** 77:11
**important** 12:25
   24:13 31:10 88:7
   92:21 126:1
**Inc** 7:14,24 8:8,16
   9:16 10:2,5,22 11:6
   11:21 22:17,19
   27:6 49:19 57:5,11
   57:15 58:7,10,15
   59:19 103:22 104:5
   104:10 105:1
   108:25 109:10,15
**incentive** 77:8
**incident** 7:11 25:4
   101:23 102:4,16,25
   135:17,19 146:15
**include** 78:11 148:19
   150:16
**included** 68:17 92:16
**includes** 71:17
**including** 3:20 39:4
   45:21 68:16 76:18
   76:19 77:2 86:25
   97:17
**inclusive** 14:16 15:2
   16:8 24:25
**incomplete** 120:11,13
**incorporated** 114:4,6
**incorrect** 12:25 14:18
   24:13 28:10
**independent** 13:2
   31:12 40:25 45:13
   46:13 78:25 79:3
   79:25 93:4 112:16
   112:20,24 113:1,4,8
**independently** 56:19
**individual** 5:4 64:8
   82:15 131:17
**individually** 1:4 4:16
**individuals** 74:19
   128:25 131:15
**information** 5:4
   12:19 18:12 64:16
   64:20 69:20,22
   76:12 86:3,6 104:9

106:7 122:6 123:8
   123:8 139:9 141:23
   144:13,23 152:24
**initial** 38:7,14
**injury** 42:21 52:11
   54:14 131:24 132:5
   132:16 150:17
**Inn** 97:16
**input** 139:5
**inquest** 135:21
**inquiry** 107:20
**inside** 45:18
**insisting** 151:14
**inspect** 58:16 78:22
   80:10
**inspected** 142:8
**inspection** 80:11,14
   80:18,25 81:6
**inspections** 77:23
   78:6,11,20 81:9,11
   115:22 116:13
   142:6
**instance** 138:22,22
**instances** 131:15
**instead** 58:19 140:9
**instructed** 36:2
**instructs** 36:18
**interaction** 74:4
   131:16
**interest** 10:25 11:6
   14:23 77:1 127:25
   128:1 140:18
**interested** 154:19
**interject** 49:13
**International** 3:10
   6:24 7:2,7,7,14,15
   7:24 8:8,16 9:16
   10:2,5,22 11:5,21
   22:16,19 27:6
   49:19 57:4,11,15
   58:5,6,10,14 59:12
   97:18 103:21 104:5
   104:10 105:1
   108:18,25 109:10
   109:15,22
**internet** 77:3 122:6
**interpret** 80:3
**interpretation** 112:15
   113:7 118:22 119:2
**interpreters** 124:2,9
**interrogatories**
   106:23,24 107:25
**interrogatory** 107:1
   107:23
**interrupt** 26:9
**interrupted** 32:17
   96:16
**investigate** 150:12
**investigated** 146:15

146:18
**investigating** 146:11
   150:16
**investigation** 102:14
   102:15 135:25
   136:2,4,5,9 147:1
   147:22 148:18
**investigator** 102:19
**investigators** 102:2
**involved** 3:21 41:16
   41:24 43:15,17
   44:25 45:16,22
   51:1,6,12,14,16,24
   52:8,15,18 83:10
   93:19,23,24 94:10
   94:12 95:1,16
   103:14 118:1,4
   137:4 138:2 139:6
   146:11
**involvement** 96:3
   140:24
**involving** 3:21 41:17
   44:2 45:23 46:17
   47:10,14 48:17
   93:19 94:11,24
   133:2 140:5 146:12
**in-house** 2:16 18:17
   94:23
**irrelevant** 49:15,17
**Island** 7:10 110:20
**Islander** 3:10 10:25
   11:6,9,12,22 14:15
   15:20 16:6 17:19
   49:19 56:18,20
   57:2,7,22 58:3
   73:15 89:13,23
   100:4 101:1,11,22
   102:3,24 103:3,4,15
   112:5,9 118:14
   130:25 131:6 135:7
   136:8,18,23 137:3,8
   139:11 140:25
**issue** 8:11,14 11:11
   44:16 53:9,17 74:8
   75:13 92:14 102:24
   106:22 107:6,13,14
   107:20 114:24,25
   117:9 120:6 122:10
   132:2 133:23
**issued** 91:10
**issues** 4:24 43:22 44:1
   48:17 106:9,12,21
**issuing** 98:17
**Item** 77:22 78:5
   81:19
**items** 72:9,20 112:17
   112:21
**I-1** 37:20
**i.e** 128:17

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950



## J

**JAMES** 1:16 154:5
154:24
**Jan** 1:5 4:17
**Jeff** 68:18,19 69:2,2
74:22,23 75:1,3,6
75:15 83:3 129:4,6
**Jersey** 1:17,18,22
2:15 5:9 60:3,12,20
61:7 62:1 63:1,15
63:20,25 64:13,22
65:14 66:14 72:1,3
93:11 99:10 104:1
104:4 135:17 136:3
154:6
**job** 1:25 42:16 47:9
58:15 61:25 62:4
99:7 143:11,14,18
150:11,14,15
**jobs** 45:9
**John's** 98:7
**joint** 79:5 113:16
**judge** 27:24 31:14
32:9 117:9 147:10
149:24 150:7
151:11
**judgment** 54:2
**July** 1:18 154:20
**jumping** 17:15
**June** 7:17 12:1 29:6,8
29:9,16 30:13 31:3
32:25 34:8
**jurisdiction** 3:20
43:18 45:22 52:21
118:2 119:6 131:23
133:15,18
**jury** 133:25 134:4
**just** 4:21 18:19 19:13
19:17 21:7 26:8
29:6,20 33:13
41:19,23 44:4,7
47:17,20 49:5,17
51:4 56:10 58:18
58:20,24 59:10
60:24 62:6 66:12
68:3 75:4 77:19
87:5,9 88:8,9 90:9
90:13 91:2 96:13
97:8,11,21 101:12
102:5 107:15 109:4
109:19 117:3,14
120:12 129:24
131:19,20 132:7
133:6,7 134:9,11
140:10 141:6 147:4
147:25 148:21
150:23 151:5 152:4
153:2
**j-u-r-y-m-a-n** 153:7

## K

**kaboodle** 66:10
**keep** 33:15 49:25
50:2,4 51:1,4,8,8
58:13
**keeps** 144:17
**kind** 5:22 38:20 60:23
**kitten** 66:10
**knew** 106:8
**Knights** 97:16
**know** 11:15 18:7,10
19:8 20:9,12,15,24
25:9 28:23 31:21
33:16 42:13 43:1
47:24 49:6,10
53:14,19 54:7,12,18
54:19 57:20 59:14
62:20 65:17 67:2,4
67:5 75:3,5 79:24
81:16,18 82:11
83:5 84:14,25 85:1
85:2,8 87:11 90:21
92:25 94:2,6,14
96:5 101:25 102:2
102:14,22 103:2,3,8
104:14,14,17,19
107:17 108:1,2,11
110:1,6,23,24 111:2
114:24 115:7
116:24 117:3 120:2
120:3 121:7,20,22
123:18,21,22
124:17,20,21 127:2
127:4 128:14
130:18 131:12,22
132:1,11,18 135:21
136:16 137:1,2
138:15,15 139:12
139:14,16,18,18,18
140:10 141:1,2,19
142:25 143:8,10
146:10,16 148:9
149:18 150:8 152:2
152:12,20,21,23
153:3
**knowledge** 30:23,25
31:1 45:1 48:17
55:19 56:24,25
62:17 63:3,7,8,12
63:18 64:17,18
70:4 73:21,24 74:1
74:25 75:13 82:12
100:23 101:8 106:8
107:12,19 108:8,14
108:16,22 114:8
115:2 117:2,11,17
119:10,14,14,16
120:20 121:21
122:9 124:11

126:19 135:13,17
135:18,20,23 136:1
136:7,8,20,22 137:6
137:7 140:14,16
146:2,6,14,20
**knowledgeable** 5:4
117:15
**known** 100:8 103:13
111:25
**KORWAN** 1:16
154:5,24

## L

**Land** 84:6,8 85:6,11
**language** 26:17 28:13
31:8 33:25 34:1,10
55:6,7,10,12,13,14
55:15,22,25 56:3,9
56:15,16 77:17
80:1,19 119:8
**large** 48:15
**Lasalle** 2:9
**last** 14:3 40:7 46:16
68:1,19 84:7 97:2
109:14 113:21
**late** 87:19,21 142:25
**later** 4:23 87:18
106:7 151:19
**latitude** 40:22,24
41:1
**law** 18:4,6,7,8,10
19:11 20:4 53:8,14
53:14,17,21 65:11
98:2,6,7,8,9,10,19
98:22,23,24 99:1,1
99:3 107:5 118:17
120:10
**laws** 103:18,25
118:16 123:13
139:23,24 140:2,3
**lawsuit** 4:17 6:14
43:22 44:1 46:17
47:6 48:2 78:23
93:6 94:5 124:17
146:3,8,12 148:19
**lawsuits** 43:15 47:10
**lawyer** 17:23 55:7
95:3 97:22,24
133:21 147:3
149:19 153:6
**lawyers** 3:20 9:22
31:22 45:22 94:17
94:22 96:9 102:18
120:5 146:24 148:6
148:12,16
**layers** 84:16
**lease** 39:2 65:1,24
**leased** 65:6 66:7,12
**leasehold** 14:22

**leases** 65:1
**least** 6:15 19:25
42:14 71:16 87:15
94:11 101:2 111:14
127:10 138:25
**leave** 88:2 97:7
**led** 6:20
**left** 34:16 111:22
**legal** 49:16 50:25
51:5,11,13,15,18
52:7,9 94:17,23,24
96:9 97:10 99:2,6
100:18 114:24
115:8,9 118:22,23
120:8 132:1 148:16
148:25
**legally** 57:17,21
**length** 79:9
**lengths** 126:8
**less** 119:17,23 120:7
120:21
**let** 4:8 6:7 7:5,9 12:20
19:20 21:17 36:17
38:19 44:17 46:4
53:25 58:11 59:1
60:11 74:3 75:5
83:15 91:2 101:14
112:23 116:3
118:12 121:2
125:25 131:19,25
133:5,14 138:25
143:25 151:4
**letter** 45:20 76:2
**let's** 13:25 14:9,21
22:4,20 39:9 51:10
52:20 61:1 75:16
87:8 91:14,24
110:13 115:10
116:4 124:7 129:7
149:15 150:1,9
**level** 84:18 104:18
**levels** 70:17
**Levkow** 31:14 147:10
149:24
**license** 1:16 14:25
44:19 98:4 115:19
116:9 130:19
137:18
**licensed** 32:13 48:4
97:25 98:2 99:9
**licensee** 13:1 15:24
16:4 25:12,13
92:22
**licensees** 145:12
**like** 4:11,12 23:10
34:15 43:2 45:21
58:17 68:21,22,23
69:23 77:21 111:13
111:22 116:20

129:12 134:17
140:10 151:16
**likely** 74:12 131:16
**limit** 20:18
**limitation** 39:5 76:20
77:2
**limitations** 54:7,12
54:21
**limited** 4:22 151:23
151:24
**limits** 133:24 149:8
**line** 3:18 14:21 15:15
36:14 49:14 75:4
82:6 94:19 113:21
149:16
**lines** 69:19
**list** 3:20 45:16,21
48:23 49:3 86:1
96:4 131:19
**listen** 96:12 144:1
**lists** 9:9 85:20
**litigated** 131:25
132:3,15 133:12,22
**litigating** 129:22
**litigation** 3:21 41:17
41:24 44:25 45:16
45:22 46:24 93:19
94:11 95:16,25
97:6 115:3,8
133:17 140:5
**little** 34:16 120:6
143:25 152:8
**LLC** 1:10 4:19 5:16
5:20 6:3,19 7:15,16
8:13 9:10 10:11,19
105:5,16,21 108:18
108:25 109:8,21
**local** 86:19
**located** 36:7,12,23
61:18 64:5 136:3
138:23
**location** 23:6 25:4
77:12 81:21 122:1
**locations** 121:17
122:4
**lodging** 80:16,19 81:1
86:18
**long** 32:8 87:22 88:12
93:25 107:22
149:14
**longer** 25:12 87:11
87:16,19
**look** 8:5 10:13 15:6,8
17:11 22:23 34:18
38:21 64:19 65:4
90:18,23 115:10
131:19 134:11,14
140:9 145:4
**looked** 100:17,19,20

Page 8

looking 7:16 8:7 17:8
37:25 38:3 54:20
56:17 77:25 82:5
111:20,24 128:10
133:21 145:18
looks 111:13,22
loss 145:16
lot 19:18 73:24 74:3
110:8 120:5
L-a-n-d 84:8

---

**M**

made 20:14,22 21:23
22:4 25:7,10,24
32:18 36:4,19
117:6 132:11 138:5
main 60:2 128:8,15
maintain 36:7,11
37:8,14,21 39:18
50:22 51:11,13,15
60:7,13,15 62:14
92:11 130:13
maintained 100:18
maintaining 137:4
maintains 51:18
103:25
maintenance 136:19
137:10 140:21
142:20 143:3
make 14:8 19:17 21:1
21:7,12 22:8 31:14
32:1 37:6 45:9 62:8
87:10 97:21 113:5
116:3 119:2,5
132:6 137:9 147:14
149:19,24
making 23:19 30:6,7
55:2 150:8
manage 17:18 22:14
46:14
managed 85:21 86:25
management 38:24
39:3 71:10 92:5
115:16,19 116:7,10
137:18
manager 71:1,12,12
71:12
managing 130:19
manner 23:4 24:8
25:1 26:3 27:9,12
29:24 33:3,8 34:6
77:6
manual 3:13 12:24
13:6,9,20 40:1,10
41:2 46:8 75:23
76:4,6,6,8 81:23
82:2,6,8,9,13 86:10
88:16 90:5,7,9,9,11
90:12,13,14 91:1,2

91:7,8,8,15,18,19
91:19,22 92:1,9,13
92:16,18,23 93:7
113:11 114:5,6,11
114:19 115:10
116:5 117:3,16,18
117:21,23 126:17
126:19 137:12
manuals 12:8,12
91:10 92:16 113:3
manufactured 18:19
many 42:4 67:2 94:17
121:7 137:3
MARC 2:15
mark 7:5,25 9:2
13:25 15:16 16:3
96:18 97:9 110:3
110:14
marked 3:8 8:3,6 9:5
11:19 14:6 88:16
90:7 110:16
market 15:21 16:11
83:6,21 89:14,23
127:4,6,9
marketed 83:9
marketing 35:2,7,16
77:8 83:16 86:13
86:16 87:3 89:13
128:20,23,24 129:1
129:2
markets 16:6 85:13
126:5
Marks 14:25 88:23
92:12
materials 75:22
81:22 91:10,11
92:17 136:2,5,11,14
maternity 97:7
matter 1:15 93:23
123:16 124:17
146:8
matters 92:2 93:9
115:8
may 18:16 38:7,15
59:17 61:14 75:10
76:18,25 77:1
78:10 79:20 86:3,9
86:15 92:14 99:2
105:19 114:24
141:1 144:13 151:8
maybe 33:11 58:18
58:23 60:25
ma'am 4:6,12 13:17
14:10 18:25 19:10
20:10,17 22:4
23:25 24:3 26:18
27:22 28:19,24
29:4 30:2,10,13,17
31:3,13 32:23

33:11 34:3 38:9,17
38:19 39:7,10 42:4
43:15 44:18 46:4
46:16 47:9 48:9
49:10,22 51:4,10
52:7 53:12 54:11
55:4,11,21,23 56:13
57:7 59:1 60:16
61:21 62:14 64:20
66:9 75:25 78:7
79:11,18,23 80:3,23
88:19 93:1 96:10
96:12 97:3,22
99:17 100:9 101:15
102:8 104:17
108:16 110:13
113:8,20 115:4,25
116:15,18 117:19
117:24 118:12,24
118:24 119:15
120:2,17 121:3,16
122:11,23 124:8
125:16,22 127:4,22
128:6 130:1,16
131:22 132:1
141:12,21 143:8,12
143:14,25 144:17
145:8,21 146:1,1,5
147:16 148:9
150:14
mean 9:23 23:17
41:20 47:24 51:2
64:5 65:10 90:19
98:15,21 100:7,14
106:1 121:21
143:16 144:15
meaning 28:19 74:14
means 28:23 93:1,2
150:6
meant 65:3 148:8,9
mechanism 138:16
138:18
mediation 133:14,14
meeting 82:18,19,21
138:9,11,15
meetings 82:24
memory 44:23 45:7
48:12,14 61:11
122:8,21
mentioned 138:1
menus 75:21
Merriweather 2:15
7:5,19 8:22,24
13:14 15:9 18:14
19:8 21:9 23:10
26:9 31:17 32:3,15
32:21 41:19 43:12
44:4 49:5 54:17
60:21,24 62:6

77:24 82:5,8,9,18
89:8 90:17,23 94:2
95:4,8 96:13,18,19
96:22,23,25 97:5,10
99:14 106:3,13,17
109:25 110:6
111:20 115:5 117:1
117:6,14 122:3
129:8 131:10
132:25 133:7,11,17
134:16 145:18,24
147:4,24 149:2,6,10
150:23 151:10
met 130:21
Mexican 36:8,13,24
37:10,16,22 52:21
54:10 101:17 103:7
119:6,12,18,19,24
120:10,20 123:12
132:5,18
Mexico 7:11 11:1,10
11:16 14:16 17:19
24:7,11,25 25:4
27:3 33:1 34:6 54:2
54:8,13,15,19 56:18
57:2,8,23 58:11,16
59:3,9,17 62:15,19
62:21 71:16,17
75:10,13 101:1
102:20 107:7
110:20 119:4,11
121:5,8,23 122:1,11
122:14 123:13
124:4,5,13,25 125:4
133:18 136:15
138:23 139:16,16
139:17
Miami 133:15
middle 13:20 32:17
34:15 80:24 150:21
Midwest 69:17
might 5:4 88:4,9
100:16 139:16,18
mind 25:19
mine 56:1,16 153:8
mini 152:25 153:2,5
minimum 92:2
minute 64:7,10 90:15
129:24 149:3,4
minutes 62:7 121:1
minutia 12:13,16,19
missed 23:13 40:7
mod 26:6
modifications 25:7,10
25:24 26:1,7,11
91:11
modified 115:16
116:7
moment 52:2 122:19

money 120:5
Monroe 2:4
month 144:9
monthly 34:23 35:5
144:6,15,16,20,21
145:3,12,13
months 98:9,23,25
more 6:22 12:12
16:21 30:25 34:16
42:6,8 67:17,18,19
68:13,18 69:5 70:4
74:1 83:17 87:12
88:15 105:13
120:21 121:10
129:24
MOSKOWITZ 2:8
most 5:3 30:23 31:1
45:1 48:16 63:7,12
63:18 64:16 74:12
82:11 106:8 107:12
107:19 108:8,13,16
108:22 115:2 117:2
117:15,17 121:21
122:9 126:19
131:15,16
motion 5:1,6 8:18
43:5 45:25 51:20
move 33:14 44:7
90:17 133:7
moved 88:13
movies 77:4,6,7
moving 87:13
much 87:11,14
144:18
multiple 84:15
must 80:10 81:3
myself 19:3
M-e-e-r 96:21

---

**N**

N 2:1 3:1
name 3:20 4:6,14
16:20 19:6 45:21
48:19 58:13 67:19
68:1,20 70:12
83:13 84:7,19,24
85:15 89:3,6,24
95:3,18 96:2,5 97:2
97:8,11 100:15
101:17 103:9 105:7
105:14 111:1
122:10,13 128:17
128:23 129:2
152:21
names 70:24 83:15
99:20 121:15
narrow 131:10
national 35:13 82:16
nature 17:6

**necessarily** 16:14
78:24 144:15
**necessary** 5:5 80:17
81:13 130:8
**need** 22:3 25:9 64:15
64:19,24 66:1,16
67:16 69:21 80:2
83:17 100:25 106:3
131:8 150:19
152:14,20
**needs** 89:20 117:18
**negotiation** 103:14
**neither** 154:15,17
**Nemeroff** 2:4 3:4 4:5
4:8,14,21 7:8,22,25
8:4,17 9:2,6 13:16
13:25 14:7 18:18
20:10 21:12 23:12
23:22 25:18 28:4
29:7 30:5 31:20
32:6,20,22 33:20
41:21 43:1,6,10,13
44:9,12 45:19 46:2
47:19 54:11 58:21
60:23 61:1,5 62:9
62:13 66:2,24
72:14 77:20 87:13
87:25 88:14,18
90:21 91:4,6 95:7
97:1 101:14 106:5
106:21 107:3,11,17
107:24 108:6,10
109:16,19 110:3,10
114:13 117:5,8,12
120:12,25 125:22
129:10,24 131:12
133:9,13,21 134:6
134:15 135:8
138:13 139:13
141:6,8 142:23
146:22 147:6,14
148:11 149:5,7,18
150:3 151:14,20,23
152:2,8,12,16,20
153:1,5
**nervous** 9:23
**never** 98:19,22 99:8
103:11
**new** 1:17,18,22 2:15
5:9 49:10 58:17
60:3,12,20 61:7,25
63:1,14,20,25 64:13
64:22 65:14 66:14
71:25 72:3 93:11
98:3 99:10,13
104:1,4 118:16
119:17,23 120:7
133:10,22 135:17
136:3 139:23,23

**140:**2,6 141:21
154:6
**next** 15:15,16 37:8
39:2 40:21 75:4
81:2 84:18 86:12
115:17 135:12
150:9
**nice** 149:18
**nine** 44:7
**Nobody** 23:20
**none** 8:15 80:5
100:23 112:21
**Non-compliant**
115:18 116:8
137:17
**non-convenience** 5:1
5:6 8:19 46:1 51:20
52:1,23 53:9,18,22
106:22
**non-exclusive** 33:6
**non-U.S** 10:3
**Nope** 109:24
**normal** 42:16
**North** 2:9
**Northern** 1:1 32:14
120:22
**Notary** 1:17 154:6
**note** 12:25 23:10
24:13 92:22
**nothing** 32:10 107:24
133:11 145:24
154:9
**notice** 78:19 106:13
106:17
**Notwithstanding**
130:4
**Nuevo** 122:12
**number** 3:8,18 9:3
10:10,13,24 11:2,3
11:18 14:1,9,21
17:9,16,16 22:10,12
22:23 34:14,19
37:25 39:9 52:20
52:20 54:1,6,20
55:3 56:17 65:7
67:4 75:20 76:2,9
77:22 78:2,2 81:19
90:8 105:11 108:24
110:14 118:4
119:22 153:7
**numbers** 34:13

**────── O ──────**

**oath** 17:17 19:16,21
48:18 56:23 69:23
101:8 110:4 122:24
123:2
**object** 19:13 20:7
56:10 58:18,20

**83:**23 85:4,8 94:19
102:5 114:12
119:13 125:20
132:7 142:22
146:19
**objecting** 32:3,15
51:7
**objection** 19:1 30:9
32:18 40:17 49:14
49:20,20 52:5
53:11 54:9,16
58:12 66:23 99:16
101:4,12 102:21
105:19 120:9 135:8
138:13 139:13
147:15
**objections** 31:24 32:1
132:9,20
**obligated** 25:13 27:2
**obligates** 24:6
**obligation** 23:1,3
24:24 26:12,15
27:11 33:7 37:6
**obligations** 12:9
37:16 88:6,11
**observe** 21:14
**obtain** 14:25
**obviously** 21:11
87:23 88:5,10
**occupancy** 144:12
**occupy** 17:19 22:14
**occurred** 7:12 25:5
45:5 100:1 102:20
103:6 138:4
**October** 12:4 17:2,17
22:13 25:14,25
27:1,14 29:4,10,17
30:14 31:3 32:25
34:8 100:2 102:20
117:23 123:24
**off** 33:19 62:11 66:20
69:15 70:24 85:6
88:17 145:23
**offer** 76:17,23
**offered** 77:6,7
**offers** 72:23
**office** 60:10,16,17,22
60:22 61:8,12,17
62:3,24,25,25 64:6
65:10,12,13,15,17
66:11 71:25 72:1,3
72:4 146:25
**officer** 47:1 48:16
83:25
**officers** 102:1
**offices** 1:17 60:2,8,12
60:13,15,19 61:6
62:15 63:4,14,19,22
63:25 64:10,12,22

**64:**25 65:3,7 66:25
**often** 137:2
**oh** 22:3 39:11 48:10
73:23 89:10 97:4,9
97:24 114:17
**okay** 4:6 5:19 6:11,14
6:18 7:3,8,16 8:5
9:15,19 10:24 11:5
11:9,18 12:20
13:25 14:14 15:12
17:11 18:2,10
19:10,17 20:4,11
22:23 24:5 25:7
26:18 27:1 28:11
29:16 32:22 34:18
34:21 35:1 36:17
38:23 40:5,15 41:3
41:11,16 42:10
43:25 47:22 48:10
48:22 49:24 50:25
51:19 53:8,25
54:20 55:13 56:17
57:14 59:8,14,20
61:10 63:7,24 64:2
64:19 65:5 66:2,2
67:22 68:3,15 70:3
71:5,15 72:8,25
74:14,20,23 75:16
75:19 76:2 78:9
80:21 81:10 82:16
83:10,14 84:14,22
85:6 87:8,8 90:2
91:6,14,21 93:17
94:22 95:23 96:23
98:6,10 99:20
100:24 104:22
105:7,7 112:14
117:5,21 119:3
120:2 126:17,20
128:13 131:19
132:13 134:20
137:7 142:6,19
144:9 152:19
**one** 31:22 32:11,18
38:20 41:3,11 42:1
42:3,13,14,15 43:21
44:9,24 45:9 48:19
58:19,19 64:3
65:22 66:6,19
67:19,19 68:13
75:11 82:24 87:5,9
88:14 90:11,15
93:6 95:21 96:7
105:13 114:9,10,18
120:6 121:13
122:15,16 125:5,11
125:16,23,24 126:4
126:12 127:10,13
128:8,15 129:24

**132:**2 136:6 138:4
143:22 146:14,20
150:11,14 152:20
**ones** 75:10
**ongoing** 141:16
145:20
**only** 5:2,6 16:10,24
23:6 24:10 25:3
27:7 32:13 58:11
59:14 73:21 75:21
80:9 88:14 89:2
95:21 96:7 98:22
116:16 121:4 128:1
145:9 148:5 149:9
152:25 153:2
**onto** 79:1
**open** 58:17
**opening** 142:16
**operate** 15:1,23,25
17:18 22:13 23:3
24:7,25 26:2 27:3
27:11 29:24 33:7
34:5 46:15 89:2
113:5 124:6
**operated** 33:1 56:20
57:3,9,24
**operates** 79:25 85:11
**operating** 39:3 91:2,8
91:19 130:6
**operation** 16:2 91:13
92:12,17 142:15
**operational** 60:22
92:5
**operations** 39:24
40:8 46:6 61:15
143:23
**operator** 6:5
**opinion** 20:1
**opportunity** 21:13
123:5
**oral** 1:15 99:25
**order** 4:10 39:18
54:24,25 55:2
64:20 69:20 111:25
152:24
**ordering** 152:22
**orders** 153:1
**organized** 103:18,24
**original** 20:22 21:21
**other** 6:7,9 10:4 12:8
12:12,16,19 17:3
29:25 36:25 37:1
38:7,15 39:3 41:17
42:1,1,2,14,15
44:21 47:15 50:24
52:7 57:17 58:16
60:8,11,13,20 61:6
61:7 62:24,24 63:1
63:14,14,20,25 64:3

64:13 65:20 66:14
66:14 67:11 72:9
75:10,22 79:6,8
84:3 86:8,17,18,24
87:5,7 88:5 89:24
90:10,11 91:9,9
92:2,14,16 93:9
94:17 95:16 97:16
98:19,25 99:12
107:1 112:14
113:16 116:25
127:19 130:23
144:11,12
others 126:15
otherwise 17:18
22:14 27:23 32:9
36:3,19 40:1,10
46:8 69:24 75:24
81:24 89:1,18
135:1
out 10:8 13:6 16:17
28:21 56:12 58:19
60:11 61:21 64:9
65:19,21 67:6 97:8
97:11 102:19
105:12 122:6
138:21 152:14
outside 36:7,12,23
37:10,15,22 60:10
61:9,16,25 64:5,22
69:10 87:3 93:21
143:2
over 8:22 38:20,24
41:4 43:2,20 46:14
74:5 134:21 140:23
149:17 150:10
owed 144:18
owes 79:16 113:12,22
owing 37:1
own 17:18 33:19
65:24 66:15 80:1
99:5 113:4 124:6
126:17
owned 7:10 56:19
64:11 65:6 66:8,12
86:25 109:21
owner 11:13,15 103:5
131:17
owners 101:22 102:3
102:23,24 141:17
ownership 10:25 11:6
124:18 140:18
owns 5:19 11:10 50:6
50:6 79:25
o'clock 129:9

**P**

P 2:1,1
pace 87:14

package 34:24 55:6
144:10,19,24 145:5
page 3:3,18 14:3,9,11
17:8,11 34:13,14,16
34:17 35:2,22
37:25 38:3,19 39:9
75:17 78:3,5 81:19
81:20 82:3,4 85:22
86:12 87:8 88:19
89:8 90:2 91:5,24
97:21 111:16,18,21
111:22,24 112:25
115:13 116:5 118:9
118:9 129:7,13
130:1 133:8 134:2
134:2,15,17 137:14
139:22 142:10
pages 14:11 15:7
34:12 88:15,15
paid 87:3 120:5 143:5
painfully 32:4
paper 51:5,17
paragraph 8:25
24:4 40:21 55:22
80:24 81:2 86:12
115:15,24 116:4,21
parent 5:17 6:8,9
111:9
parentheses 10:14
14:24
Park 1:18
Parsippany 2:15 5:8
60:5,10,12,17 61:9
61:16 64:5 65:14
71:25 73:6 74:13
75:1 84:9 93:11,17
95:12
part 8:18 16:20 31:11
38:20 39:4 41:1
42:16,17 47:9
52:17 60:8 65:23
66:10 69:7 83:20
85:25 90:9,14
113:24 143:4,11,14
144:2 147:3,13
149:18 152:10
partially 29:15 30:18
participate 76:12,24
86:23
participating 87:6
participation 86:20
particular 139:10
parties 26:23 130:5
134:3 138:20
154:17
partners 79:6 113:16
past 87:21 152:9,9
pattern 75:23
Pause 21:4 27:18

62:16 90:16 109:12
128:22 131:21
pay 34:23 35:4,19
37:16 77:4 80:11
80:25
payment 35:23 36:21
44:21 80:13
payments 36:3,19,25
37:7,23
penalty 19:21
pending 43:18 48:2
54:23
people 59:15 61:15
65:19,20 73:24
74:3 127:19 128:17
136:17
per 13:4 25:13 27:13
77:4 112:19
percent 34:24 35:6
percentage 128:2
144:19,25
performed 136:24
period 11:22,22,23
11:23 54:22,23
55:3 98:11 103:4,5
103:5,5 116:8,10,12
116:14 149:9
periodic 78:11
periods 54:22
perjury 19:21
permission 15:25
16:5,22
permitted 15:25
37:11
person 30:22 31:1
32:13 44:25 47:5
59:17 63:7,12,18
64:16 73:18,20,21
74:13,20 75:5,9
82:22 83:1 85:12
102:15 104:15
106:8 107:11,12,19
108:8,13,16,22
115:2,7 117:2
121:21 122:9
126:18 146:10
personal 42:21 52:11
54:14 119:14,16
123:24 131:24
132:4,15 143:16
150:16
personally 51:13
55:16,23 59:25
63:1 95:16 120:24
144:4
personnel 38:4,12
persons 115:9
perspective 127:12
ph 31:14

phone 1:23 12:20,23
13:7,8 62:8 125:8
125:10
phrase 28:20 34:1
40:24 109:9 138:25
phrased 16:15 24:12
28:9 36:15 47:8
89:16 131:3
phrasing 14:18
132:23
physical 51:16
pictures 111:13
Pino 130:18,21,24
131:5
PITNEY 1:17
place 8:20 12:4,22
60:19 62:25 64:3,3
66:6,13,19 104:1,3
107:4 110:10 125:8
154:12
places 66:13
plain 28:13 118:24
plaintiff 106:25 153:6
Plaintiffs 1:7 2:6
Plaintiff's 17:20
54:22 56:19 57:3,9
57:24
plan 3:14 110:13
112:12,18
play 22:4,5 23:15,17
27:25
playing 23:20
please 4:6 7:22 8:20
10:12 11:2 13:16
18:24 26:9,21
27:22 28:1,3,5,15
30:2 33:21 36:9
37:18 38:10 41:24
43:9 44:13 51:3
57:6 60:15 63:16
63:25 67:20 72:13
73:10 90:15 102:10
105:10 109:6
114:15 115:11
125:1 126:22
129:13 134:1
138:10,17 140:8
141:11 143:1,25
146:4 150:13,20
151:9
point 22:2 100:10
122:5 128:6,8
132:25 150:3
points 123:10 128:8
policies 23:6 24:10
25:3 26:5 31:6 33:4
33:13,22 34:1
39:25 40:2,9,11,22
41:13 43:21 46:7,9

46:19 73:12 74:6
91:12 113:2 134:21
policy 27:6 39:17
portion 137:13
portions 69:1 77:20
position 5:12 127:10
127:11
positions 38:5,13
possible 31:7 45:12
55:17 89:21 107:9
139:21
possibly 45:25 93:21
post 98:9
practice 1:16 32:13
98:2,10,24 99:9
practiced 98:8,19,22
98:23 99:1
practicing 99:3
practitioner 99:5
prefer 87:25
prefix 89:4
premises 78:18 79:1
79:14,21 81:17
123:17
prepare 17:23,23
prepared 17:25 53:3
54:4 55:8 110:18
110:24
prescribe 76:19
prescribed 75:23
81:23
present 21:20
presented 21:21
president 5:14 9:9,17
67:14,20,21 68:4,7
68:10,11,16 70:4,20
71:9,11,15 75:7
84:11,12,20,21
128:20
presumably 136:14
pretty 61:5 65:18
95:10 122:14
previous 25:17,19
previously 22:7 102:6
110:19 111:25
145:2,3
principle 104:1,3
139:24 140:3
principles 118:17
prior 17:17 22:13
39:6 54:24 78:19
145:4 154:7
private 102:2,18
privilege 18:16,18
probably 29:3 64:24
75:14 84:25 85:6
85:12 87:15 152:24
problem 108:7 142:2
procedure 1:16 39:17

74:6
procedures 23:6
24:10 25:3 26:5
27:7 34:1,8,11
39:25 40:2,10,12,23
41:13 43:21 46:7,9
46:19 49:1 73:13
91:12
proceed 151:15,16
produce 18:22 87:24
produced 18:23
product 128:17
products 76:24 86:18
profit 145:16
program 77:23 78:6
78:10 83:8,10,12
programs 38:7,15
76:20,25 77:3,7,8,9
77:9,10 83:16,17
86:13,16,17,23 87:2
promote 84:3
promotes 85:2
promotional 75:21
properly 129:20
properties 3:10 7:10
10:3 11:1,7,9,12,22
14:15 15:20 16:6
17:19 47:22,24
48:4,11 49:19
56:18,20 57:2,8,23
58:3 73:15 75:10
83:6,21 89:13 89:17
100:5 101:11,23
102:4,24 103:3,16
112:5,9 115:18
116:9 118:14 128:4
131:7 135:6,7
136:9,18,23 137:3,8
137:17 139:11
property 7:10 8:11
8:14 11:14,15 16:3
16:11 48:19 58:16
78:23 89:24 115:21
119:5 128:11 131:1
132:13 137:5
138:23,24 139:1,10
139:16 140:22
142:1,7,8 143:3
Property's 130:25
Proprietary 14:25
15:16 88:23 92:12
prospective 124:3,24
125:2 126:5
protect 92:10
provide 16:23 42:17
45:15 48:22,25
49:3,4,6 61:23,24
69:22,23 76:12
80:16,19 81:1

86:20 104:8
provided 16:5 42:2
55:3 79:16 113:13
113:22
provision 26:15 77:9
provisions 130:4
prudent 80:9
public 1:17 39:19
81:22 89:13 126:9
126:14 128:9 154:6
published 86:7
Puerto 121:13,16
122:12,13
purpose 61:7 76:13
78:19 82:21 86:3
127:9 128:19
134:25
purposes 4:25 5:5 8:1
49:15 57:12 59:20
59:21,23 71:23
72:8 88:7 119:21
125:11 127:11,13
141:13
pursuant 1:15 4:10
26:23 33:2 34:4,22
35:1,19 36:3 37:19
80:11 117:18
119:22 128:2
pursued 114:9
push 88:4 149:15
pushing 88:2
put 7:21 12:11,12
13:14 45:18 52:25
53:4 54:1,3,6 55:6
55:7,10 149:14
p.m 1:18 152:7
153:11

Q
QA 74:12,14,19,21
75:9,12,13 82:14,15
131:4,15,16
quality 39:18 74:14
74:17 77:22 78:1,5
78:10 115:22
116:13
quarterly 145:16
question 7:9 12:20
15:22 18:24 19:14
19:18,19 20:4,20,25
21:2,5,11,16,17,18
22:7 25:17,19,25
26:8,13,18,21 27:22
28:1,2,3,5,9 30:1,3
30:10,12,19,21 31:8
31:11,13,14,19,21
32:16,23 33:12,16
33:17,18,21 34:4
36:9 37:18 43:8,24

44:11,13,17,23 45:6
45:7,8,18 46:4,22
47:25 48:3,6 49:1,2
49:9,10 51:2 53:13
53:25 54:13 55:10
55:15,18,21 56:13
58:20 60:18 61:5
63:16 66:4 69:4
70:6 71:23 72:13
72:21 73:10,19
74:4 79:11,18
82:23 83:2 85:16
87:9 95:6,9,10 96:1
96:1,12 101:6,7,14
102:9,10 103:6,8
105:24 107:13
108:3 109:2,4,6,14
112:23 113:7,8,20
114:14,15,16,17,21
116:20,21,22
118:12 119:20
120:1,3,14,15,18
121:2,15 122:20,23
122:25 123:4,6
125:1,2,15,24
126:22,24 131:2,6,9
131:14 132:10,23
135:2,5,10,12
138:10 139:22
141:11 143:1,10,14
143:17 144:1 145:1
146:4,9,10,23 147:8
147:10,16,17
148:10 149:23
150:9,13,19,21,24
151:2,3
questioning 49:14
94:20 149:16
questions 4:20 20:18
23:21 27:25 32:7
32:11 33:13 49:21
63:10 102:13 106:2
106:11 107:10
108:7,23 110:4
116:25 117:4 123:2
125:25 141:5,7
149:8 150:4 151:21
quick 134:8
quicker 87:14
quickly 134:9 139:21
quite 49:16 71:13

R
R 2:1 3:17 59:17
154:1
Ramada 97:15
ranking 74:20
rarely 94:15
rate 23:16

rates 144:12
rather 36:14 57:10
79:9
reached 24:7
read 6:15 15:4 23:8
23:24 25:21 28:7
28:21 30:19 33:23
36:17 37:3,12 38:9
38:10,17,18 39:7,21
40:6,7 44:14 53:8
53:14,17 55:4
72:16 77:14,19
78:15 81:15 82:1
86:11 87:7 89:20
90:25 91:2 92:7,8
92:21 93:3 99:17
102:11 115:24
116:1,1,3,3,15,18
116:21 117:12
119:1,1,7 124:19
126:17,20 130:16
135:3,9 137:13,16
139:19,25 140:9
reading 23:24 25:19
31:8 91:4 92:20
113:21
reads 118:18
ready 43:12 85:23
115:11,12 130:1
realize 122:11
really 20:18 21:17
41:3 68:18 92:25
121:20 143:8,10
reask 32:23
reason 107:3 139:9
reasonable 78:18
107:20,21
reasonableness
142:18
reasonably 77:1
81:12
reasons 88:5 125:16
125:24
recall 21:24 22:11
41:14 48:12,14
49:23 52:3,12
55:24 56:14 59:12
61:11,19 63:10,13
63:21 64:3 66:20
70:12,24 93:8
94:25 95:24,25
97:8 100:6,7,9,12
100:13 103:1 109:2
109:13,20 111:1
114:23 121:17,25
122:8 149:1
recalling 10:7 11:13
52:2 59:11 64:1,14
84:12,19,24 85:5

99:23 100:15
104:20 128:23
receive 38:5,13 142:4
144:16
receives 144:6,9
recess 43:11 62:12
recitals 23:19
recognition 77:3
recollection 121:9,12
121:14,18
recommendations
112:6
reconvene 87:22 88:7
151:19
record 4:8,21 21:7
25:22 28:8 31:23
31:25 32:12,19
33:24 44:15 45:20
62:11 72:17 77:21
88:17 102:12
106:24 120:12
123:20 140:10
143:6 145:23 152:5
records 142:14,19,23
recurrent 36:25
redirect 145:25
151:25
Reef 110:19 112:1
refer 29:3
reference 10:21 16:1
82:7
referenced 10:14
27:20
references 10:9,10,10
82:6
referencing 10:18
11:2 16:3 76:7
referred 48:7
referring 10:16 24:1
78:7 97:13,18,19
reflect 4:8
refunds 77:10
refuse 78:25 79:13,20
regard 34:3 46:4
51:19 73:11 95:15
102:1 114:25 115:2
124:16 134:25
146:1,2,6
regarding 74:11
94:15 95:1 100:22
101:23 102:4 115:1
120:10 139:10,22
140:17 147:18
regards 109:15
region 69:3,16,17,17
70:7,9,12 87:2
regional 35:15 60:7
60:10,11 71:1,3,6,9
71:11,12 82:16

86:19
regions 69:12,14
registered 105:8,17
  105:21
regular 47:9 82:18
regulates 40:16
reject 113:2
related 74:23 142:15
relates 44:1 53:8,17
  99:7 107:14
relationship 11:20,25
  40:16,20 79:7,9,10
  113:17,19 114:1
  131:13 137:25
relative 154:15,17
relatively 149:9
release 37:6
relevance 43:4 94:20
relevant 107:5
  131:18 149:20
  150:4,5
remember 49:8,11
  56:3,8,11 78:24
  151:2
remove 26:12,15
rendered 54:2
renew 54:16 101:12
rented 66:11
repeat 6:7 10:12
  25:23 28:3,5 30:12
  36:9 37:18 44:11
  53:13 63:16 72:13
  73:10 102:9 105:10
  109:6 114:15
  125:14,24 138:10
  143:1 146:4 151:3
rephrase 18:24 19:20
  21:18 26:21 41:23
  44:17 47:25 58:11
  83:15 101:14
  118:13 125:1
  126:22 131:8
  141:11 150:13
report 3:14 67:9,12
  67:15 110:13,18
  112:11,12,18,22
  135:22 144:6,10,20
  145:3
reporter 1:16 25:18
  25:21 28:4,7 33:21
  33:23 44:12,14
  72:16 102:11 151:6
  154:6
reporter's 152:21
reporting 83:24
reports 70:14,22,23
  145:4,13
represent 4:15
representation 117:7

representative 80:17
representatives 78:17
  81:6,9
represented 63:17
representing 20:5
  149:19
represents 19:11
  98:16
reputation 92:10
request 36:20 43:2,7
  45:19,24 61:22
  86:3 138:3,18,19,20
requested 25:22 28:8
  33:24 44:15 72:17
  76:12 102:12 112:7
requests 90:1
require 26:2 38:8,16
  53:21 80:13 144:13
required 12:13,22
  26:12 27:16,20
  28:12,16 29:11,13
  29:18,23 30:15
  31:5 33:2 34:5,22
  35:4,19 36:6,11
  37:11,21,23 89:1,14
  101:9,13 123:2
  145:8,12,15
requirement 36:16
requirements 13:3
  86:8 92:3 130:9
requires 28:17 30:7
  37:14 53:21 75:20
  80:15 81:5 131:23
requiring 130:10
reread 44:13 72:14
  102:10 151:7
research 65:2 66:1,17
  115:17 116:8 123:5
  126:21,23 127:4,6,9
reservation 35:10
reservations 144:12
reserve 4:23 66:3
  106:5
resident 101:17
resolution 74:8 77:8
resolve 119:12 120:5
resolved 118:20
  132:17
resolving 120:8
resort 11:10,16 12:21
  15:17 16:8,12,19,22
  17:3 26:3 58:17
  59:24 81:17 89:7
  89:14,24 91:1
  103:6 105:21
  108:25 109:7
  110:20 111:13,15
  121:4,5 122:15
  123:15,24 124:16

124:18 125:4,12
128:10 132:17
133:3 141:10,14,17
146:13
resorts 1:10 3:12
  4:19 5:16,18,20 6:2
  6:4,9,13,18,23 8:13
  9:10 10:11,18
  13:19 44:5 48:8
  72:24 74:18 97:14
  103:20 105:5,16
  108:18 109:21
  111:10 112:1
  115:21 116:12
  121:7 122:10
  123:12 127:13
respect 53:23 73:5
  86:8 108:11 110:3
  110:12 149:13
  150:22
respective 24:20
  134:3
respond 21:5,11
responding 33:18
response 28:6 32:18
  107:18
responsibilities 42:18
  69:3 129:1 131:18
  150:11,15,15
responsibility 45:14
  52:17 68:13,17
  69:8 83:20 129:3
  143:11,16,17,20
  144:2,3,5,14
responsible 68:24
  69:5,5,7,9 74:19,21
  84:2 130:25 143:22
responsibly 143:15
rest 152:15
result 6:19
resulted 22:10 99:21
returns 142:14
reveal 147:5 148:1,22
revenue 34:24 128:3
revenues 35:6 144:10
  144:11,19,24 145:5
  145:9
review 140:11
reviewed 115:16
  116:6
revisions 20:13
revoked 44:18
re-depose 4:24 66:3
  106:6
re-read 33:21
ridiculous 149:6
  151:12
right 4:23 8:17 10:7,8
  11:13,17 15:16

21:2 22:12 25:25
  27:23 32:1 33:6
  38:9,17 39:7,9
  42:11 43:14 47:19
  52:2,14 55:4 56:8
  57:22 59:11,12
  63:11 64:1,14
  65:11 66:3,18
  70:19,25 75:16
  76:11 78:14,17
  79:21 80:10 84:13
  84:19 89:22 91:24
  93:25 95:2 97:8,11
  99:13,23 104:17
  105:15,25 106:1,6
  113:20,25 117:9
  121:15,25 129:8
  134:5,6 141:24
  142:10,13,21 143:5
  143:21 145:8 149:1
  149:12,25 151:15
rights 77:5 133:25
  134:4 143:4
road 5:5
role 8:13 9:15,19 10:4
  48:7 135:24
roles 9:25 44:24
roll 129:4
rolls 6:6
room 65:22 77:4
  81:23 144:11
  152:15
rooms 65:22 77:10
routinely 69:9
royalty 34:19,23
Rs 96:22
rule 12:15,16,16
rules 1:16 4:10 149:7
ruling 31:15
run 14:16,19,20

_____

S

s 2:1 3:7,17,17 8:16
  11:22 27:6 103:4
safe 139:15,17
sake 29:23
sales 35:13 60:22
  67:11,20,21 68:4,8
  68:16 69:10,11
  70:4,9 71:4,12,15
  86:16
salesmen 71:4,5
salespeople 61:14,17
  64:4,8 67:5,9,12,14
  68:13 69:25 71:5
  71:11 83:19,24
same 9:19 10:4 14:8
  22:18 28:18 34:4
  35:1 40:3,13 46:10

57:13,14,16,17,18
  57:21 59:21,23
  86:24 87:1 91:19
  97:21 132:17,20
Sarah 93:12,13 94:8
  95:13,24
sarcasm 106:4 108:9
sarcastic 117:15
satisfaction 76:14
  78:12 86:17
satisfy 54:1
saying 46:11,13 52:4
  56:2,4,6 57:14,22
  63:9,11,17 90:12,14
  96:14 99:6 107:12
  121:24 145:6
  149:12
says 10:8,14 13:19,22
  14:3,21 15:12,12,15
  15:17 16:18 22:12
  22:21,23 28:11,15
  34:14,18 35:23
  38:12,23 39:2,12,23
  46:5 52:24 54:20
  75:25 76:3 77:13
  78:5,16 79:12,15,20
  79:22 80:22,22
  81:2,12 86:5 87:5
  88:23 110:23 111:5
  111:10,16,18,23
  113:10,12,14,15
  115:15 116:6 119:5
  129:19 130:4,19
  133:11,17 134:20
  137:16,19
schedule 50:23 87:20
scheduled 152:6
scheme 81:20
school 98:6,7,9
scope 4:22 145:25
  151:22,23,24
second 6:25 58:14
  115:15 123:6
secondly 64:22
seconds 122:7
secretary 19:4 105:15
  105:23 106:20
  107:9
section 15:23 30:20
  33:2 34:4 35:1,9
  36:14,17 37:20,20
  38:3,11,21 39:12
  40:7 55:12 75:19
  79:4 80:24 81:5
  82:3,4,7 85:22 90:2
  112:24,25 113:2,9
  113:24 129:15
  130:3,5,10 134:2,12
  134:17 135:9

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

139:19,22 142:13
sections 25:11
section's 28:21
Section-I 35:23 36:14
  36:18
see 10:16 24:1,3,4
  35:25 43:4 53:4
  54:6 78:2,6 80:22
  87:20 90:6 101:6
  112:23 129:18
  133:8,14 144:17
  147:23
seek 5:4 102:19 130:7
seem 87:13
seen 82:9 85:17
  100:16
select 77:20
selected 15:13
semantics 22:4,6
  23:15
send 20:6 43:1,6
  45:20 144:14 145:9
  145:12,15
sends 141:21
senior 67:21 70:19
  76:20 84:12
sense 87:10
sent 19:12 20:21
  106:24 141:23
sentence 16:15 23:11
  37:8 38:11,23 39:2
  40:21 81:2 112:19
  115:18 119:1
  140:10 142:18
sentences 29:22
separate 57:18 58:24
  102:13
September 13:23
served 43:3
service 39:5,19 77:3
services 1:21 76:2,17
  76:18,20,24
session 87:10
set 14:25 15:2 39:25
  40:10 46:7 89:3
  130:4,9 154:13
sets 13:6 40:19
seven 23:16,17
shareholders 103:9
  103:12
sheet 145:16
short 149:9
Shorthand 1:16
  154:5
show 79:22 134:1
sign 20:24 36:21
signage 72:23 73:5
signature 20:16
signed 8:18 9:7 19:16

19:20 21:1,20 22:1
  22:2,7 24:17,19
  29:5,10 43:3 52:19
  53:5 55:20 56:7,23
signing 19:15,24
  21:23
signs 75:21 81:21
similar 79:9 113:19
simple 21:17 28:1
  32:6 33:17 79:11
simply 138:19
since 94:11
single 99:5 106:14
  112:10
singled 28:21
sir 32:20 151:5
sister 6:24 7:4 57:16
sit 11:17 19:23 37:17
  48:18 63:20 66:5
  101:2,7,16 109:13
  109:25 114:20
  121:19 124:21,23
  146:5
sites 122:19
sitting 31:25 65:11
six 98:9,23,25
six-month 98:11
size 81:20
skipped 38:20
slash 111:23,23
slower 143:25 150:14
slowly 32:4
small 87:5 137:13
Smith 71:20,21,22,24
  74:22,23,24 75:1,3
  75:6,14,15 83:3
  129:4,6
Smith's 71:25
sofar 58:23
solely 134:23
solo 99:4
some 4:19 13:6 17:3
  34:12 40:22,24
  50:3,3 63:10 65:2
  67:6 68:10 83:19
  84:1 88:15 94:13
  103:7 106:2 111:14
  112:21 122:5,10
  130:9 144:12
somebody 12:14
  30:24 42:20 52:10
  65:24 74:7,9 85:2
  104:13,14 125:7
  129:2
somehow 53:20
someone 13:4 100:16
  139:15,17 151:12
something 23:13
  42:15 53:4 58:17

100:16 117:13
  140:22
sometimes 42:23
  50:18,18,19,21,21
  124:14,15 125:3
somewhere 42:10
soon 153:1
sorry 6:25 22:16
  30:12 38:20 44:16
  53:13 57:6 67:24
  68:19 72:19 82:4
  91:6 102:9 110:2
  115:4 119:20
  120:17 125:23
  129:5 131:20
  139:20 142:25
  144:9
sort 88:1
source 144:10
south 69:17
Spanish 124:2,15
speak 12:13 14:9 63:8
  94:8 117:21 124:19
  138:21 143:25
  148:25 150:14
speaking 6:4 10:1
  68:10 84:18 125:9
  147:14
speaks 16:4
special 1:4 4:16 79:8
  113:18
specific 12:23 33:22
  67:17 75:6,9 79:22
  80:4,7 83:13,17
  121:25 123:10
specifically 10:23
  30:1,10 33:12 48:8
  51:8 61:19 79:7,12
  79:14,20 94:25
  112:17 113:1,10,17
  121:15 124:16
specification 39:17
specifications 23:5
  24:9 25:2 26:5 27:6
  29:19 30:2,4,11,16
  33:10 39:25 40:2,9
  40:11 41:13 43:21
  46:7,9,19 73:13
  74:6 91:12
specifics 52:13,14
  93:8 131:5
specified 23:7 76:4
  81:14 86:9
specify 118:7
speed 77:3
spell 68:1,19
spoken 94:15 101:22
  102:3,23 103:11
  146:17,23

spots 122:14
St 98:7
staffing 92:4
Stamoutsus 67:23
  69:2,21 70:14,23
  72:3
stand 139:9
standard 29:2 39:17
  74:6 137:12
standards 3:13 13:9
  13:20 23:5 24:9
  25:2 26:5 27:6,16
  28:13 29:12,14,25
  33:10 39:13,24
  40:1,9,11,23 41:12
  43:20 46:6,8,19
  73:5,13 74:2,12
  75:20 76:8 78:13
  90:7,10,12 91:12,15
  91:19 92:3,5,11
  93:7 114:11,19
  115:1,10,15,20,23
  116:5,6,11,14 117:3
  117:23 130:3,11,14
  141:21,22,23
standing 49:13,20
start 21:19 51:10
  116:4 122:5 152:6
started 152:8
state 1:17 4:6 15:23
  27:9 60:13 61:6,13
  63:14 66:21 67:3
  70:8,10 81:8 98:3
  99:9,13 103:19,25
  104:1 105:9,16,17
  105:20,22,23
  106:15,20 107:10
  109:1,8,11 118:16
  133:9 139:23 140:2
  140:6,7 154:6
stated 26:13 29:20
  54:4 55:8 114:23
  126:18 142:18
statement 20:3,16
  22:18 23:24 30:20
  53:23 55:12,19,25
  56:2,4,6,14,22
  117:20 132:11
  133:20 141:20
  143:7,9,13 145:17
statements 91:9
  99:25 100:20 150:9
states 1:1 36:8,13,24
  37:10,16,22 39:15
  55:1 60:8,14,20
  61:10 63:1,5,19
  64:13 66:14 68:25
  69:1,6,7,10 72:12
  73:3,9,16,19 77:23

78:9 81:20 85:11
  88:25 108:23
  118:16,21 131:23
  132:4,15,18 133:3
  133:12 134:3
  139:25 140:4,17
stating 30:8 59:18
statute 54:7,12,21
stay 107:6 127:12,16
  127:20,24 151:12
staying 128:3,11
stenographically
  154:12
step 88:10 152:14
steps 81:12
still 26:16
stipulates 52:21
  132:3 133:1
Street 2:4,9
strict 39:24 40:8 46:6
  130:10
strike 75:6 128:14
structured 68:12
style 75:22
subject 23:5 24:9
  25:2 26:4 27:5
  29:11,14,18,25
  30:16 31:5 33:4,9
  33:25 34:7,10 39:6
  49:20 77:5 78:23
  92:13 93:22 115:8
  115:18,22 116:9,12
  123:16 124:17
  132:9 137:17,19
  140:21 142:17
  146:8 147:5
submit 144:23
submits 144:20
subordinates 84:15
Subsection 88:25
Subsection-A 90:4
  113:21
Subsection-B 92:9,20
  129:17
Subsection-C 88:21
subsidiary 109:22
substance 148:22
substantial 130:13
successfully 38:6,14
sued 6:18 41:3,11
  52:10 94:6 114:18
  131:24 132:4
sufficient 37:9
suffix 89:4
suggest 32:12 87:22
  90:18 120:7
suing 42:20 46:17
suit 41:15
Suite 1:22 2:5

**Superior** 1:15
**supplement** 92:18
**supplying** 92:4
**Supreme** 55:1
**sure** 10:13 14:8 18:6
18:9 19:9,17 20:23
20:25 21:1,7,13,25
30:13 36:10 37:19
38:10,11 42:7
43:10,24 45:9
46:21,22,23 51:2
52:3 53:19 55:17
61:20 62:9 63:17
71:22 73:11 97:21
104:7 111:4 116:3
119:8 122:25
126:24 133:6 143:7
143:9,13
**surveys** 76:14 78:12
**sworn** 4:2 154:8
**Sylvan** 2:14
**synch** 50:8,9
**system** 15:1,23,24
16:1 35:10 39:13
39:18 50:5 77:2
78:10,13 86:17,25
87:6,6 91:13 117:3
129:19,22 130:3,13
**systems** 73:7 130:11
**System-wide** 86:19
**S-t-a-m-o-u-t-s-u-s**
68:2

**T**

**T** 3:7,17 154:1,1
**tailor** 53:20,23
**take** 8:5 15:8 16:17
23:18 24:24 43:9
45:24 60:11 62:9
81:3,12 101:1,9
116:17 117:8 125:8
125:12,18 128:7
134:11 140:9 151:4
151:8 153:2,5
**taken** 1:15 4:9,25
99:25 100:22
111:13 154:11
**takes** 32:8
**taking** 32:4 107:4
**talk** 73:12
**talked** 91:21
**talking** 10:9 13:9
17:8 43:14 48:4,11
64:10,25 65:7,18,19
65:21 72:18 73:20
74:12 75:4 84:15
84:16 104:25 107:8
123:19
**tangent** 33:19

**targeted** 106:2...
**tax** 142:14
**team** 84:2,5 97:10
**Technically** 99:2
**techniques** 92:6
**teleconferencing**
81:16
**telephone** 13:4 87:23
**tell** 25:7 37:25 45:3
48:18 49:12 63:24
64:20 66:5 67:19
79:11,18 98:25
115:11 130:1
142:10 149:21,22
150:6
**telling** 112:9
**ten** 42:6 44:7
**ten-foot** 12:16
**term** 21:25 30:4
51:19,21 101:13
**terminate** 27:23
152:3,13,17
**terminated** 25:12,15
**termination** 25:11
26:16,18,19,22 45:7
**terminology** 52:25
**terms** 6:15 15:13 17:2
18:19 19:25 24:15
26:23 27:9,21
28:19,19 29:21
31:9 33:5 35:19
36:1,10 41:5,6,16
44:20 45:10 70:13
74:4 80:11 89:12
100:24 113:11
117:19 133:13,14
145:11 146:11
**territorial** 69:19
**territories** 37:15
69:11
**territory** 36:12,24
37:10,22
**testified** 4:2 43:25
44:6 47:13 48:1,20
49:4,11 102:6
**testify** 49:8 52:9
95:18 110:11 154:8
**testifying** 117:10
**testimony** 154:11
**Thank** 29:7 34:3
51:19 59:8 75:16
91:25 134:7 141:4
**Thanks** 4:13
**their** 15:21 16:2
28:19 43:20 46:15
64:9 65:19,21
66:15 67:6 69:8
80:1 83:20 108:19
113:5 115:19 116:9

124:22 125:4 131:1
134:3 136:24 137:9
137:18
**themselves** 16:25
17:3
**thereof** 39:4
**thing** 6:25 28:18
58:13 88:2 90:8
106:14 107:9
152:20
**things** 29:25 32:5
44:8 50:12 112:2
123:20 126:5,12
134:8
**think** 14:1 18:14 22:5
23:13 28:18 31:7
43:14,23 47:7 57:1
59:20 65:9 77:21
87:14 92:21 95:5,9
99:13,14 107:8
110:8 115:5 117:21
122:18 126:12
128:13,15 133:21
134:6 149:20,21
150:4,5 151:11
152:8
**thinking** 21:10 97:20
**Third** 82:6
**thought** 97:1 128:13
128:15
**three** 34:23 88:14
**through** 29:10 30:13
31:3 32:19,25 34:8
124:22,25 125:5
149:16
**throughout** 29:17
115:20 116:11
**throwing** 81:4
**Tier** 15:15 16:2
**time** 17:5,17 22:13
38:8,8,15,16 42:15
46:16 47:6 52:4
54:21,22,24 58:19
62:7 70:2 77:6
78:22 80:17 81:14
86:9,9 92:15,15
93:8 95:3 99:2
104:21 105:6 106:7
106:12 107:17
123:10 138:1,1,3
140:14 149:8,9
151:19 152:4,5,7,18
154:12
**timely** 37:7
**times** 38:24 49:3
62:19 78:18 130:13
137:3
**tired** 151:11,13
**title** 9:19 84:13

130:20
**titled** 71:1
**today** 4:20 5:5 48:19
66:5 88:1 96:24
101:3,7,16 114:20
121:19 122:18
124:21,23 146:5,8
**toes** 88:10
**told** 106:13 108:5
117:1 147:7
**tolerate** 22:6
**tomorrow** 50:11
**tone** 108:9,10
**top** 14:12 66:20 69:15
70:24 111:5
**topic** 4:22 131:11
148:24
**topics** 131:13
**total** 98:9
**towards** 34:15 106:25
**town** 68:22
**track** 144:17
**training** 38:6,7,13,15
92:5
**transcript** 1:14
154:11
**travel** 61:25 77:7
83:5,9,20,21 84:3
84:22 85:10 127:20
**traveled** 62:3,21
**travelers** 84:4 127:12
127:16
**trial** 52:9 133:25
134:4 151:24
**trip** 124:22
**true** 22:15,18 55:19
56:23 132:12,23
140:13,19 154:10
**truth** 154:9,9,9
**truthful** 19:25
**try** 53:20 61:23 122:2
**trying** 21:15 22:4,5
31:18 32:4 44:7
49:12 51:25 60:24
67:16 115:5 120:5
139:20
**turn** 34:14
**two** 5:23 31:22 32:2
57:18 62:6 69:6
81:4 88:14 94:3
96:22 102:13 110:7
125:25 138:9
**two-page** 3:11 8:20
**type** 18:2,5,7,25 19:3
19:4,7 20:5 72:23
77:5 83:16 98:10
103:7 135:25 138:9
138:11
**typed** 18:8,10,13

19:10
**types** 83:16 98:17
**typically** 131:4

**U**

**U** 3:17
**ultimate** 111:9
**ultimately** 22:9 24:17
94:6 99:21
**unable** 108:22
**unaudited** 145:10
**under** 10:24 13:2
17:16,17 19:16,21
19:21 22:12 23:4
24:2 25:1 26:4,12
27:5,9 29:14,24
30:15 31:5,9 33:4,9
34:7,19 35:9,12,15
35:23 36:1,10,18
37:1,7 38:3,11
48:18 54:1,6 56:23
69:23 75:19 76:2
77:22,22 88:25
89:3,24 90:2,4 92:9
92:12,13 101:8
103:18,24 110:4
112:25 115:19
116:9 118:15,19
122:24 123:2
134:17 137:18
140:1 142:13
144:18 145:10
**underlying** 4:25
**understand** 21:16
23:12 47:19 60:18
60:25 64:2 65:3,5,6
72:20,22 90:14
93:5 96:4 122:18
122:25 126:24
146:9
**understanding** 72:8
72:19 73:2 84:1
91:20 103:7 109:9
**understands** 39:16
73:4
**undertake** 27:11
61:23
**undertakes** 23:2 33:7
**unethical** 99:12
**unilaterally** 138:8
**United** 1:1 36:8,12,24
37:10,15,22 55:1
60:8,13,20 63:1,5
63:19 64:12 66:14
68:24 69:1,6,7,10
72:12 73:3,9,16,19
85:11 118:16,20
131:23 132:3,15,18
133:3,12

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

University 98:7
unless 36:2,18 88:25
unreasonably 130:12
until 22:7 33:15
  151:12
updated 13:22
  115:17 116:7
use 14:25 15:21 44:19
  49:24 71:2 72:10
  75:21 88:23 92:17
  126:10
used 127:3
using 13:3 16:12
  21:25
utilize 16:5,22
U.S 35:23 36:4 37:15
  133:19
U.S.A 133:10,16
  140:2

_____
**V**

V 11:23 103:5
vacation 123:25
  124:24 125:4
vacationer 124:24
  125:3
vacationers 126:15
  127:15,19
Vacations 84:23 85:3
  85:5,9,10
vague 30:4,7 120:4
Valerie 1:6 3:4 4:1,7
  4:9 18:15 44:6 62:7
  87:24 88:6 117:2
  147:25
Vallarta 121:13,16
  122:12,12,13
various 72:9 73:7
  105:8 106:9 108:14
  112:2 131:12
vary 138:22
vehicle 127:2
venture 113:16
ventures 79:5
versa 12:10
versus 6:2 58:22
  122:12
very 10:3 14:8 28:1
  32:4,6 33:17 52:4
  79:11 126:1 149:14
  151:10
via 125:8,8
vice 5:14 9:9,17 12:9
  67:14,20,21 68:5,17
  68:10,11,15 70:3,19
  71:9,11,15,23 75:7
  84:11,12,20,21
  128:20
vice-president 48:15

vice-presidents 67:12
  68:25 71:3,7
vicinity 122:16
video 81:16 123:16
  123:20
view 77:4
VP 68:8 128:23
Vs 1:8

_____
**W**

W 54:7
waive 134:3
waiver 17:1,5 90:1
  138:3,8,9,12,16,18
  138:19
waivers 16:24 89:21
  89:22 130:8,14
  138:2
walk 129:11
want 14:8 15:22
  18:15 19:17,19
  21:7,12 23:17,23
  29:20 33:16,17
  44:8 45:6 49:13
  52:12 62:9 73:12
  77:19 88:10 94:8
  96:5 97:21 98:22
  102:5 104:24 106:1
  108:1,1,2 116:24
  117:1 119:2 121:11
  121:17 122:8 152:3
  152:12,16 153:2
wanted 21:1 72:22
  74:7 142:19
wants 118:20 125:3
  131:25 132:5,14,17
wasn't 19:10 23:11
  25:14 96:1 102:6
  113:7 138:8
way 2:14 12:11,23
  13:3 14:18 16:10
  16:16,25 17:3
  21:24 24:12 28:9
  29:7 36:15 47:8,13
  48:20 52:8 55:18
  59:1 68:12 81:15
  89:16 97:20 109:3
  131:3 132:23 145:9
  145:13
web 125:8
website 105:16,20
  106:20 125:10
Wednesday 1:18
week 106:2 123:7
well 6:10 12:12 15:22
  16:17 17:14 18:2
  21:19 23:22 28:17
  30:1 36:17 41:25
  44:17,24 45:9,24

50:6,23 53:2,25
  55:2 57:12 63:24
  64:2,19,21 65:5,5
  70:7 72:22 83:4,15
  84:17,25 89:18,20
  91:14 104:17 109:4
  109:25 111:22
  113:4,20 118:12,24
  124:5 126:25
  127:21 128:14
  131:4,6 132:10,13
  133:13 135:12
  138:18 141:21
  143:20 147:9,24
  148:14 150:21
  152:23
went 12:22 97:11
were 17:8 20:13,21
  20:22 21:18,22
  29:2 35:18 43:14
  47:22 49:2 59:18
  74:11 93:23 94:5
  98:17 100:5 102:13
  103:14 106:13,18
  106:19,25 107:1
  111:13 112:2 115:8
  118:1,4 123:7,23
  136:20,23 137:4
  139:6 143:5 147:20
  weren't 44:20
west 2:4 69:16
we'll 64:7,9 87:23
  149:5,10,11 151:18
we're 9:2 14:8 23:15
  27:23 32:7 43:12
  49:18 58:24 68:12
  97:21 99:14 129:8
  146:8 149:15
  151:18 152:17
we've 88:8 149:8,14
  149:16 152:9
whatnot 88:6
whatsoever 137:6
WHG 59:6,8,12,15
  59:18 60:3,7,12,19
  61:6,12 62:14,18,25
  63:4,13,21,24 64:11
  64:21 65:25 66:13
  66:21 67:2,6 70:7
while 32:17
whole 36:17 65:22
  77:19 107:3 108:17
  128:6,8 154:9
wholly 109:21
WHR 10:10,14,18,24
  17:18 22:13 52:20
  54:1,20 56:21
  57:10,14,25 58:3,9
  58:12,14,22 59:2,11

59:15,19 60:3,7,12
  60:19 61:6,12
  62:14,18,25 63:4,14
  63:22,25 64:11,21
  65:25 66:13,21
  67:2,6 70:8
wide 129:22
wife 123:23
Wilson 2:8 153:9
withdrawals 37:11
withheld 130:12
witness 1:14 3:3 4:24
  7:19 8:21,23,24 9:1
  13:15 14:3 21:9,10
  26:10 31:18 41:17
  43:3,8 66:3 89:10
  90:18,25 91:5
  100:20 101:17
  108:13 110:2,5,6
  111:20 120:9
  135:18 151:8,10
  152:14 154:8
witnesses 99:21 100:1
  100:5,10,25 102:19
woman 84:17 97:10
Woodbridge 1:21,22
word 28:23 29:1,3
  30:5 34:11 92:25
  126:10,16
words 18:3 19:14
  20:2,15 57:17 72:9
  79:14,19,20,22 80:4
  80:7 81:4 95:17
  117:21 130:23
work 50:11 58:10,16
  59:2,9 62:19 64:8,9
  64:12 65:14,14,25
  66:13 67:6 95:20
  96:6,9 136:18
  138:20 143:3
worked 59:17 94:22
  96:18 97:6
workers 64:11
working 65:19,20
  84:2 95:24
Workman 1:6 3:4 4:1
  4:7,9,11,12,13,14
  5:3,7
works 75:3 83:5,7
  84:17
Worldwide 2:14,16
  111:5,8,9
wouldn't 25:19 45:15
  52:12 71:13,14
  80:1 83:7 84:25
  98:21 105:24
  136:22 137:2
Wozniak 1:4,5 4:15
  4:17

wrap 139:21
wrapping 129:10
write 17:16 41:25
  56:17
writing 36:3,19 40:1
  40:11 43:16 46:8
  75:24 81:24 99:25
written 17:21 39:6
  43:6 91:9 92:14
  124:14
wrong 14:22 110:8
  149:25
wrongful 42:21 54:14
  131:24 132:5,16
  150:17
Wyndham 1:10 2:14
  2:16 3:9,10,12,21
  4:18 5:11,12,15,16
  5:17,17,19,19 6:1,2
  6:4,5,6,8,9,11,12,13
  6:18,23,23 7:1,2,6,7
  7:13,14,23 8:5,7,9
  8:13,15 9:10,15
  10:1,5,11,18,22
  11:5,18,21 12:24
  13:19 14:12,16
  15:2,15,17 16:1,2,7
  16:11,19,22 17:3
  19:7,11 20:5 22:15
  22:16,19 23:4 24:8
  25:1 26:3 27:4,5,12
  27:16 30:24 31:23
  32:12 33:2,8 34:6
  39:19,20 40:3,12
  41:3,11,17,20,20,22
  42:20 44:5,5,6,18
  44:19 45:16,23
  46:10 47:6,10 48:4
  48:7,8 49:18 50:25
  51:6,8,12,15,24,24
  52:10 57:4,10,15
  58:4,6,9,9,14,21
  59:5,16,24 61:8,12
  62:22,25 63:4,19,21
  63:24 68:8,15,16
  69:11 71:2 72:8,10
  72:18,23 73:1,4,8
  73:11,15,21,25 74:7
  74:9,18 76:19 77:4
  78:22 79:1 82:2,6,7
  82:9,11,12,16 83:5
  83:8,21 84:4 85:2,3
  86:1,1 89:6,14,24
  91:1,2,7,8,18,21
  93:5,10,20 94:5,11
  94:18,23,24 95:5,9
  95:12,14,15,21 96:2
  96:7,11,14,17 97:12

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

VALERIE CAPERS WORKMAN, July 2, 2008

97:14,17,19 98:1,24
99:7,24 100:21,21
100:22 101:25
102:2,15,16,17,18
103:15,18,20,21
104:5,9 105:1,5,7,7
105:11,14,16,21
106:15,18 107:4
108:15,17,18,24,25
109:7,10,21,22
110:20 111:2,5,8,9
111:10 112:1,7
113:3 114:8,17
115:3,21 116:11
117:22 118:14,20
119:4,11,17,23
121:4,7,20,22
122:10,15 123:15
123:23 124:2,5,8,9
124:12,25 125:3,5
125:13,18,19 126:1
126:2,4,5,8,13,21
126:23,25 127:6,10
127:12,15,18,21,21
127:22,23 128:1,11
128:16,17,21
130:24 131:22
132:1,4,14 135:11
135:13,16 136:19
137:7 139:2,4,5
140:18,22 141:2,9
141:12,13,17,21,25
142:1,7,9,13,19
143:4,20 144:6,17
144:24 145:4,10
146:2,6,11,12,14,17
146:25 147:18,21
148:4,6,13,16,17,20
148:22 150:12,17
151:15
**Wyndham's** 123:12
125:5 148:16
**Wynn** 93:12,14,15,19
93:25 94:6,12,15
95:13
**W-y-n-n** 93:16

---

**X**

X 3:1,7

---

**Y**

**year** 47:14,22 48:2,20
**years** 94:3
**York** 98:3 99:13
118:16 119:17,23
120:7 133:10,23
139:23,23 140:2,6

---

**0**

---

**07** 111:14,17,25
**07054** 2:15
**07095** 1:22
**07932** 1:18
**08** 1:2

---

**1**

**1** 2:14 3:9,19 8:2
10:13 11:18 14:9
36:14 42:10 65:7
88:25 108:24 118:5
119:22 153:7
**1-A** 24:1,4 33:3 34:4
**1-3** 3:19
**1.5** 35:5
**10** 5:8 39:9 54:1
**100** 42:8,10
**11** 54:6,20 55:12,22
75:17 90:2
**110** 3:14
**12** 78:3,5
**120** 2:9
**120-day** 55:2
**13** 81:19,20
**134** 3:5
**1361** 1:2
**14** 3:12
**141** 3:4
**16** 82:3,4
**16th** 12:4 17:2,17
22:13 25:14,25
27:1,14 29:4,10,17
30:14 31:3 32:25
34:8 100:2 102:20
117:23
**17** 85:22 86:12
**1800** 1:17 154:24
**19-23** 3:20
**1991** 98:5
**1996** 138:24

---

**2**

**2** 1:18 3:11,20 9:3,4
10:10 17:16 22:10
52:20 91:5 116:5
**2:00** 152:7
**20** 87:8 88:19
**200** 1:17
**2007** 7:17 12:1,5
13:22,23 17:2,18
22:13 25:14,25
27:1,14 29:4,8,9,10
29:16,17 30:13,14
31:3,4 32:25,25
34:8,9 100:2
102:20 111:19
117:24 123:24
**2008** 1:18 47:14 48:2
154:20

---

**21** 79:4 112:25 113:9
134:12
**22** 90:2 91:24
**24** 142:10
**25** 111:23
**25th** 13:23 111:19
**26th** 2:10
**283-1060** 1:23
**283-1640** 1:23
**29** 129:15 134:2,2
**29th** 7:17 12:1 29:8,9
29:16 30:13 31:3
32:25 34:8

---

**3**

**3** 3:12 10:24 11:3
14:1,5,21 15:23
17:9 34:14,17 76:9
90:8 134:18
**3-C** 35:2
**3-D** 35:9
**3-E** 35:12
**3-F** 35:15
**3:16** 1:18
**31.6** 130:3
**340** 1:22
**36** 112:25 134:16
**37** 134:17

---

**4**

**4** 3:4,14 17:16 22:12
75:20 77:22 78:2,2
78:5 81:19 110:14
110:15 111:21,23
115:13 116:5
137:14
**42** 118:10 133:4,5,9
139:22
**43** 3:19 129:7,13
134:2
**45** 3:20
**47** 130:1

---

**5**

**5** 35:22
**5-A** 38:21
**5:00** 62:7
**50** 65:22 89:9
**55** 2:4

---

**6**

**6** 130:5
**6A** 130:10
**6-A** 39:12 46:5
**6:28** 152:5
**600** 2:5
**60602** 2:10
**60603** 2:5
**66536** 1:25

---

**7**

**7** 38:19 56:17
**7th** 54:25
**7,000** 122:4
**7:00** 129:9
**7:30** 149:3,11
**7:37** 153:11
**732** 1:23,23

---

**8**

**8** 3:9 52:20
**800-247-8366** 1:23

---

**9**

**9** 3:11 37:25 55:3
82:3,4 154:20
**9-A** 82:5
**90** 1:21
**94** 14:4
**94-page** 14:1

---

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

C E R T I F I C A T E

I, JAMES A. KORWAN, a Certified Shorthand
Reporter and Notary Public of the State of New Jersey,
do hereby certify that prior to the commencement of the
examination, the witness was duly sworn by me to testify
the truth, the whole truth, and nothing but the truth.

I FURTHER CERTIFY that the foregoing is a true
and accurate transcript of the testimony as taken
stenographically by and before me at the time, place and
on the date hereinbefore set forth, to the best of my
ability.

I FURTHER CERTIFY that I am neither a relative
nor employee nor attorney nor counsel of any of the
parties to this action, and that I am neither a relative
nor employee of such attorney or counsel, and that I am
not financially interested in this action.

Dated: July 9, 2008


_____

JAMES A. KORWAN, CSR NO. 1800

# AMERICAN TRAVEL ABROAD, INC.

**INVOICE**

5316 N. MILWAUKEE AVE., STE. I • CHICAGO, ILLINOIS 60630 • (800) 342-5315 (except Illinois)
(773) 467-0700 • FAX: (773) 467-0701 • E-mail: amta@amtachicago.com • Internet: http://www.amta.com

```
                                    INVOICE  000012840
                                    DATE  01OCTOBER07
                                    BOOKING REF  YFL6A9
                                    AGENT  JM/JM

7026 WILLSON                        WOZNIAK/JOHN MR
MORTON GROVE                        WOZNIAK/DANUTA MRS
IL 60053

ACCOUNT NUMBER  061000

TOUR                    1OCT CHICAGO IL - O'HARE INTL
                   WEDNESDAY CZM BY APPLE VACATIONS
```

```
                        TOTAL VACATION PRICE            1694.87

                              INVOICE TOTAL             1694.87
```

PAYMENT: CCAX372765955721004/1208

```
PANSTWO WOZNIAK 847-581-0506
FLYING TO CANCUN ON USA3000 -10/10/07 -10/17/07
ROUNDTRIP FERRY TO COZUMEL ON YOUR OWN
ROUND TRIP TRANSFERS FORM CUN AIRPORT TO PORT ON YOUR OWN
ROUNDTRIP TRANSFERS FORM COZUMEL PORT TO HOTEL INCLUDED
WYNDHAM CZM ALL INCLUSIVE
PROSZE BYC NA TERMNINLE #5 DWIE GODZIMY PRZED ODLOTEM
10/10/07 USA 3000 ORD 7:00AM - CUN 10:40AM
10/17/07 USA 3000 CUN 11:40AM - ORD 3:25PM
ZYCZYMY UDANYCH WAKACJII!!!!
PD IN FULL
```

10/1/07
p. d
C. C.
J. M.

*Over 60 Years Experience*

THANK YOU, YOUR SALES COUNSELOR

# **APPLEVACATIONS**.com

ACCOMMODATIONS:
WYNDHAM COZUMEL RESORT & SPA CARIBBEAN RM AI
G ADT 00 CHD 00 INF 00 RM
Transfers Included
ORDCUN20071010CL071LB AV
ABVGX14632400BGX            LLC ED
Date of Issue: 10/02/2007

        775
        At
        Amount
        3
        CHECK

# **APPLEVACATIONS**.com

JOHN WOJNIAK

## Itinerary

Oct10 USA 3000 Airlines                              FLT#
    DEPARTURE Harlingen                          07:00AM
    ARRIVES Cancun                              10:40AM
    CHECK-IN USA 3000 Ticket Counter/Terminal 15. Calling from the U.S. for
    flight information. Call 1-800-359-3000 before you leave for the airport.

Oct10 ROUND TRIP GROUND TRANSFERS
    On arrival into Cozumel you will be escorted to your hotel.
    transportation by our representative. Representative. If you are flying
    into Cancun you may take our optional transfer to travel
    between Cancun and Cozumel. Roundtrip ground transportation will
    provided between the airport and WYNDHAM COZUMEL RESORT & SPA CAR

# APPLE VACATIONS

Coupon
JOHN

AI

Oct10 WYNDHAM CZM RESORT & SPA CARIBBEAN RM AI 7 NIGHTS
CHECK IN: 10/10/2007 CHECK OUT: 10/  /2007

USA 3000 Airlines
DEPARTUR
ARRIVE
CHEC
fligh

Please note that

# APPLE VACATIONS

adtb

must no later

selected AVON  cation Security Plan
call the AVON Hotline 1-800-860-2855

**PASSENGER NOTICE COUPON**

Passenger Alert:

1. We have received notifications from the hotel that they will not accept spring breakers, students, or unaccompanied young adults under any circumstances.

2. Reef Club Cozumel Beach Dive and Spa Resort, Reef Club Cozumel Beach Dive and Spa Resort has changed its name to Wyndham Cozumel Resort & Spa.

**APPLE VACATIONS**

Coupon 7 of 8
Booking# 17517430
JOHN WOZNIAK

*************End of Document*************

Thank you for choosing Apple Vacations
America's Favorite Vacation Company

**APPLE VACATIONS**

Coupon 8 of 8
Booking# 17517430
JOHN WOZNIAK

*************End of Document*************

Thank you for choosing Apple Vacations
America's Favorite Vacation Company